1  Debra I. Grassgreen (CA Bar No. 169978)
   Maxim B. Litvak (CA Bar No. 215852)
2  Steven W. Golden (*pro hac vice* pending)
   PACHULSKI STANG ZIEHL & JONES LLP
3  One Market Plaza, Spear Tower, 40th Floor
   San Francisco, CA  94105-1020
4  Telephone:    415.263.7000
   Facsimile:    415.263.7010
5  E-mail:       dgrassgreen@pszjlaw.com
                 mlitvak@pszjlaw.com
6                sgolden@pszjlaw.com

7  Proposed Attorneys for Debtors and
   Debtors in Possession

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

8            **UNITED STATES BANKRUPTCY COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

10                **SAN JOSE DIVISION**

| | |
|---|---|
| 11  In re: | Case No. 21-51477 |
| 12  WATSONVILLE HOSPITAL CORPORATION, *et al.*, | Chapter 11 |
| 13                              Debtors.[1] | **DECLARATION OF JEREMY ROSENTHAL, CHIEF RESTRUCTURING OFFICER, IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF** |
| | |

16  Date:      December 7, 2021
17  Time:      9:30 a.m.
    Place:     **Telephonic/Video Appearance Only**
18             Courtroom 11
19             280 South First Street
               San Jose, CA 95113
20  Judge:     Hon. M. Elaine Hammond

21        I, Jeremy Rosenthal, pursuant to section 1746 of title 28 of the United States Code, hereby

22  declare that the following is true and correct to the best of my knowledge, information, and belief:

23        I am the Chief Restructuring Officer (the "<u>CRO</u>") of Watsonville Hospital Corporation

24  ("<u>WHC</u>") and its debtor affiliates in the above-captioned chapter 11 cases (together with WHC, the

25  "<u>Debtors</u>").  I am a partner with Force Ten Partners, LLC ("<u>Force 10</u>"), an advisory firm specializing

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Watsonville Hospital Corporation (4113); Watsonville Healthcare Management, LLC (4168); Watsonville Hospital Holdings, Inc. (1118); and Halsen Healthcare, LLC. The Debtors' business address is 75 Nielson Street, Watsonville, CA 95076.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

in corporate restructuring, challenged business situations, litigation support, and special situations. I, and my colleagues at Force 10, have substantial experience with providing chief restructuring officer services for entities that have filed for relief under chapter 11 of the Bankruptcy Code, including analyzing business operations, financial modeling, operational analyses, capital raising, asset sales, serving in the capacity of financial advisor, and developing reorganization strategies.

I have served as CRO of the Debtors since September 7, 2021, and previously served as an independent director of the Debtors from January 11, 2021 to September 7, 2021 (as discussed further below). On the date hereof (the "Petition Date"), the Debtors each commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of California, San Jose Division (the "Court"), and they will continue to operate their businesses and manage their properties as debtors in possession.

I am knowledgeable and familiar with the Debtors day-to-day operations, business, and financial affairs, books and records, and the circumstances leading to the commencement of these cases. I have been directly and personally involved in the Debtors' restructuring process, including negotiations with funding sources and prospective buyers of the Debtors' assets and the preparation of projections, budgets, and liquidity analyses for the Debtors. I intend to take the lead postpetition, as the designated responsible individual, in the Debtors' reorganization and sale process, including the Debtors' financing and sale efforts, and their efforts to maximize value for all constituents.

Except as otherwise indicated herein, the facts set forth in this declaration (this "Declaration") are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of or advisors to the Debtors, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations. If called upon to testify, I would testify competently to the facts set forth in this Declaration on that basis.

To minimize any adverse effects of filing the bankruptcy petitions (the "Petitions") and to preserve value for the benefit of all stakeholders, the Debtors have filed a number of motions requesting various forms of "first day" relief (collectively, the "First Day Pleadings"). I submit this Declaration in support of the Petitions and the First Day Pleadings. The relief requested in the First

Day Pleadings is necessary to preserve and maximize the value of the Debtors' estates and allow them to sustain their current operations in chapter 11.

I am familiar with the contents of each First Day Pleading (including the exhibits and other attachments thereto) and, to the best of my knowledge, after reasonable inquiry, believe the relief sought in each First Day Pleading: (a) will enable the Debtors to sustain uninterrupted operations while in chapter 11; (b) is critical to the Debtors' ability to maximize the value of their estates; and (c) serves the best interests of the Debtors' estates and creditors. Further, it is my belief that the relief sought in the First Day Pleadings is in each case narrowly-tailored and necessary to achieve the goals identified above.

I submit this Declaration in accordance with the Court's First Day Motion Guidelines for chapter 11 cases and Rule 9013-1(d) of the Bankruptcy Local Rules for the Bankruptcy Court for the Northern District of California (the "Bankruptcy Local Rules") to provide the Court and all parties in interest with an overview of the Debtors, their business, and the circumstances surrounding the commencement of these chapter 11 cases and in support of Debtors' petitions and First Day Pleadings. I am authorized to submit this Declaration on behalf of the Debtors.

## THE DEBTORS' BUSINESS

### A.  Formation and History

Located in Watsonville, California, the Watsonville Community Hospital (the "Hospital") first opened in 1895 as a five-room sanitarium founded by Dr. P.K. Watters. Over the next 125 years, the Hospital expanded its services, moved several times, and kept pace with the needs of the growing and diverse population of the Pajaro Valley. Today, Watsonville Community Hospital serves a primary service area of Watsonville, Freedom, Aptos, Moss Landing, Aromas, and Castroville consisting of approximately 140,000 people. The Hospital presently has 106 licensed beds and offers a 24-hour emergency department (the only one within an approximately 30 minute radius), outpatient and inpatient surgical services, obstetrics, neonatal intensive care (NICU), hyperbaric therapies, diagnostic, therapeutic, and rehabilitative services, and community education.

### 1. *The Quorum Acquisition*

On May 31, 2019, Watsonville Hospital Holdings, Inc. ("Hospital Holdings") and Halsen Healthcare, Inc. ("Halsen Healthcare") entered into an equity purchase agreement (the "Equity Purchase Agreement") with Quorum Health Corporation and QHC California Holdings, LLC (collectively, "Quorum") pursuant to which Hospital Holdings acquired all of the equity in Watsonville Hospital Corporation ("WHC") and Watsonville Healthcare Management, LLC ("WHM") from Quorum (the "Quorum Acquisition"). In connection with the Quorum Acquisition, Hospital Holdings and Halsen Healthcare entered into the *Master Agreement* dated May 31, 2019 (the "Master Agreement") with MPT of Watsonville, LLC ("MPT Lessor") and MPT of Watsonville Lender, LLC ("MPT Prepetition Lender" and, together with MPT Lessor, "MPT").

Pursuant to the Master Agreement, among other things, MPT (subsidiaries of Medical Properties Trust) agreed to make a series of acquisition loans (the "MPT Secured Financing," discussed in further detail below) to Hospital Holdings in the aggregate amount of $55,000,000 to be used by Hospital Holdings to (a) satisfy its obligations under the Equity Purchase Agreement, and (b) cause WHC to sell the real property owned by WHC to MPT Lessor for $40,000,000 immediately following the consummation of the Quorum Acquisition, and thereafter lease such real property back from MPT Lessor (the "Real Estate Transaction").[2] The Quorum Acquisition and the Real Estate Transaction were consummated on September 30, 2019. In connection with the Real Estate Transaction, MPT Lessor and WHC entered into that certain *Lease Agreement* dated September 30, 2019 (as amended, the "Lease"), pursuant to which WHC leases the Land and Leased Improvements (each as defined in the Lease) from MPT Lessor.

On October 1, 2019, WHC and Halsen Healthcare entered into the *Management Services Agreement* (the "Halsen MSA"), pursuant to which Halsen Healthcare agreed to perform certain management, administrative, and related services for WHC, as set forth in the Halsen MSA. Pursuant to the *Subordination of Management Agreement*, dated September 30, 2019 (the "Subordination Agreement"), among other things, Halsen Healthcare agreed (i) to subordinate any liens or rights to

---

[2] In addition to the $40 million used for the Real Estate Transaction, the MPT Secured Financing also included the MPT Prepetition Note, as described in further detail below.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

payment under the Halsen MSA to liens and rights to payment owed to MPT; and (ii) that after the occurrence of an uncured event of default under the Lease and/or MPT Secured Note, MPT would have the right to terminate, or cause WHC to terminate, the Halsen MSA.

**2.      *The Proxy Exercise***

On January 11, 2021, having previously sent a series of Default Notices to the Debtors (as defined and discussed in further detail below), MPT gave written notice to the Hospital of its immediate exercise (the "Proxy Exercise") of certain voting and consent rights granted to MPT by the Pledgors (as defined below) pursuant to section 3 of the MPT Pledge Agreement (the "Proxy Rights"). On that date, pursuant to written consents executed under the Proxy Rights, MPT removed the then existing directors and managers (the "Former Managers") of WHC, Halsen Healthcare, and Hospital Holdings, and named Frank R. Williams and me as independent directors and managers of Hospital Holdings, Halsen Healthcare, and WHC.  Thereafter, on February 10, 2021, MPT removed the existing managers of WHM and appointed Mr. Williams and me as independent managers of WHM.

On January 18, 2021, pursuant to section 2 of the Subordination Agreement, MPT directed WHC to terminate the Halsen MSA.  On the same date, WHC entered into that certain *Management Services Agreement* (the "Prospect MSA") with Alta Hospitals System, LLC ("Alta"), an affiliate of Prospect Medical Holdings, Inc.  Pursuant to the Prospect MSA, Alta manages and oversees the day-to-day operations of the Hospital, such as purchasing equipment and supplies, supervising employees, implementing operating procedures and policies, and coordinating billing and collections.  On January 22, 2021, the boards of directors of Hospital Holdings and WHC (and on February 10, 2021, Hospital Holdings as sole member of WHM) formally removed the Former Managers from their roles with such entities.

On September 7, 2021, I resigned as director and manager of the Debtors.  David J. Gordon was appointed as an independent director and manager of the Debtors on September 7, 2021.  The newly-constituted boards then appointed me as the CRO of the Debtors.

**B.      The Debtors' Workforce**

The Hospital relies on its dedicated and talented physicians, nurses, nursing assistants, medical technicians, allied health support, service workers, and administrative and management personnel

(collectively, the "Workforce") to deliver patient care and to serve the Watsonville community. As described in further detail below, the Debtors' Workforce includes directly-employed individuals (the "Employees"), physicians who are hired by the Hospital as independent contractors or through non-Debtor medical groups (the "Physicians"), and other contracted professionals (the "Supplemental Workforce").

As of the Petition Date, the Debtors directly employ approximately 654 individuals,[3] making the Hospital one of the three largest employers in Watsonville.[4] Of the Debtors' employees, approximately 294 are full-time, 230 are part-time, and 130 are *per diem*. Over three-quarters of the Debtors' employees—approximately 557 Employees total—are represented by one of four labor unions (collectively, the "Unions"), as follows:

| Union | # of Represented Employees |
|---|---|
| California Nurses Association ("CNA") | 261 |
| California Technical Employees' Coalition ("CalTEC") | 53 |
| General Teamsters, Local 912 ("Teamsters") | 54 |
| SEIU-United Healthcare Workers West ("SEIU-UHW") | 189 |

The Debtors' contractual arrangements with the Unions regarding the employment of the Represented Employees are reflected in five collective bargaining agreements.[5]

## DEBTORS' CORPORATE AND CAPITAL STRUCTURE

**A.     Corporate Structure**

The Debtors' ultimate corporate parent is non-Debtor Halsen Holdings, LLC ("Halsen Holdings"), which is a holding company created in connection with the Quorum Acquisition. Upon information and belief, the membership interests of Halsen Holdings are held by Daniel Brothman, Chris Wheeler, Sean Fowler, Edmund King, RLB Capital LLC, and KSJS Montecito Investments LLC (collectively the "Halsen Members").

---

[3] Approximately 641 of the Employees are employed by WHC and approximately 13 of the Employees are employed by WHM. Neither Halsen Healthcare nor Hospital Holdings currently have any Employees.

[4] *See City of Watsonville, California Comprehensive Annual Financial Report for the Fiscal Year Ended June 30, 2019* at p. 131, *available at* https://cityofwatsonville.org/DocumentCenter/View/13219/Comprehensive-Annual-Financial-Report-for-FY-18-19

[5] SEIU-UHW Represented Employees are represented under one of two separate CBAs, one for the Service and Maintenance Represented Employees (the "S&M CBA") and one for the Professional Employees (the "Professionals CBA").

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Halsen Holdings owns 100% of the membership interests in Debtor Halsen Healthcare, a California limited liability corporation. Halsen Healthcare, in turn, owns 100% of the equity interests in Debtor Hospital Holdings, a California corporation.

Hospital Holdings owns 100% of the equity in Debtor WHC, a Delaware corporation. WHC operates the Hospital. Halsen Healthcare also owns 100% of the membership interests in Debtor WHM, a Delaware limited liability corporation.

A chart showing the Debtors' organizational structure is attached hereto as **Exhibit A**.

**B.     Prepetition Capital Structure**

      *i.  MPT Secured Note*

WHC is the Borrower under that certain *Amended and Restated Promissory Note (TRS Acquisition Note)* dated as of September 30, 2019 (as amended and restated, the "MPT Prepetition Note") by and among WHC and MPT Prepetition Lender with respect to a loan in the original principal amount of $15,000,000 (the "MPT Secured Financing"). Pursuant to (i) that certain *Security Agreement* dated as of September 30, 2019 (as amended and restated, the "MPT Security Agreement"), by and among WHC, MPT Prepetition Lender, and MPT Lessor, and (ii) that certain *Security Agreement* dated November 10, 2021 (as amended, restated, supplemented, or otherwise modified from time to time, the "MPT (Holdings) Security Agreement," and together with the MPT Security Agreement, the "MPT Security Agreements"), by and among WHC, Hospital Holdings, and MPT, WHC granted to MPT a security interest in and continuing lien (the "WHC Note Lien") on the Collateral (as such term is defined in the MPT Security Agreement)[6] and Hospital Holdings granted to MPT a security interest in and continuing lien on all of Hospital Holdings' assets and the proceeds thereof (the "Hospital Holdings Note Lien," and, together with the WHC Note Lien, the "MPT Prepetition Liens").

---

[6] As defined in the MPT Security Agreement, the Collateral consists of: (a) WHC's interests as lessee under the Lease; (b) WHC's machinery, equipment, furniture, inventory, and other fixtures; (c) WHC's general intangibles, including Accounts, QAF Accounts, Licenses, Operating Agreements, and Participation Agreements; (d) all personal property of WHC on the Leased Property; and (e) proceeds of the foregoing. Pursuant to that certain *Amendment to Security Agreement* dated January 18, 2021, the Collateral also includes any and all tort claims held by WHC against the Former Managers arising out of such Former Managers' service as directors and/or officers of WHC and/or its affiliates.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

The obligations of WHC under the MPT Prepetition Note and the Lease are guaranteed, pursuant to that certain *Guaranty* dated September 30, 2019 (the "Halsen Guaranty"), by non-Debtor Halsen Holdings. Additionally, pursuant to that certain *Pledge Agreement* dated September 30, 2019 (the "MPT Pledge Agreement", and together with the Lease, MPT Security Agreements, MPT Prepetition Note, and any other agreements entered into in connection with any of the foregoing, collectively, the "MPT Prepetition Transaction Documents"), the Pledgors[7] pledged a first priority security interest in the Pledged Interests[8] to MPT. Any event of default under the other MPT Prepetition Transaction Documents also constitutes an Event of Default under the Lease (as defined therein).

Beginning in April 2020, MPT sent WHC a series of notices of alleged defaults under the MPT Prepetition Note and/or Lease (collectively, the "Default Notices"), including for failure to pay prepetition rent and other sums due under the Lease and the MPT Prepetition Note.[9] After the Proxy Exercise (as defined in the First Day Declaration), on January 18, 2021, WHC, Halsen Healthcare, LLC ("Halsen Healthcare"), and Hospital Holdings entered into that certain *Forbearance Agreement* with MPT (as amended and restated, the "Forbearance Agreement").[10] Pursuant to a series of amendments to the MPT Prepetition Note (collectively, the "MPT Note Amendments"),[11] MPT Prepetition Lender advanced additional funds to WHC. As of the Petition Date, the outstanding MPT Prepetition Obligations totaled no less than $40,132,813, inclusive of all principal and accrued and unpaid interest, exclusive of all costs, expenses, and fees owed to the MPT Prepetition Lender.

---

[7] The Pledgors are, collectively, (a) Halsen Members; (b) Halsen Holdings; (c) Halsen Healthcare; and (d) Hospital Holdings.

[8] The Pledged Interests are (a) Halsen Members' membership interests in Halsen Holdings; (b) Halsen Holdings' membership interests in Halsen Healthcare; (c) certain equity interests in Hospital Holdings; and (d) Hospital Holdings' equity or membership interests, as applicable, in each of WHC and Watsonville Healthcare Management, LLC ("WHM").

[9] The Default Notices were dated April 6, 2020; April 13, 2020; April 24, 2020; May 21, 2020; August 12, 2020; August 19, 2020; September 16, 2020; and October 29, 2020.

[10] The Forbearance Agreement was amended on March 4, 2021; April 5, 2021; June 4, 2021; July 30, 2021; October 4, 2021; and December 2, 2021.

[11] The MPT Note Amendments are dated January 18, 2021; January 27, 2021; June 8, 2021; July 30, 2021; October 4, 2021; November 10, 2021; November 30, 2021; and December 2, 2021.

DOCS_DE:236707.15 92381/001
Case: 21-51477   Doc# 17   Filed: 12/05/21   Entered: 12/05/21 18:26:54   Page 8 of 46

### ii. Prepetition CNH Credit Agreement

On June 22, 2021, WHC and CNH Finance Fund I, L.P. ("CNH Prepetition Lender") entered into that certain *Credit and Security Agreement* (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition CNH Credit Agreement", and, together with any additional agreements, documents, instruments, and certificates executed, and any orders delivered in connection therewith or evidencing or securing any of the obligations thereunder, the "CNH Prepetition Loan Documents", and the liens granted to the CNH Prepetition Lender thereby, he "CNH Prepetition Liens"), pursuant to which CNH Prepetition Lender provided a revolving loan to WHC (the "CNH Credit Facility"). Pursuant to the Prepetition CNH Credit Agreement, the obligations thereunder are secured by the Revolving Collateral.[12] As of the Petition Date, the aggregate principal amount owed under the Prepetition CNH Credit Agreement is approximately $5,632,477.

### iii. The Intercreditor Agreement

Pursuant to that certain *Intercreditor Agreement* dated as of June 22, 2021 between MPT and CNH Prepetition Lender (the "Intercreditor Agreement"), the parties thereto agreed to the priority of their respective security interests in the Debtors' assets in which each shares a lien, among other rights, remedies, and protections. Specifically, pursuant to the Intercreditor Agreement, (a) CNH Prepetition Lender has a first-priority security interest in and senior lien on the Revolving Collateral; and (b) MPT has a first-priority security interest in and senior lien on the MPT Senior Collateral (as defined therein)[13] and a second-priority security interest in and junior lien on the Revolving Collateral (to the extent such Revolving Collateral constitutes Collateral under the MPT Security Agreement).

---

[12] The "Revolving Collateral" is the Collateral (as defined in the Prepetition CNH Credit Agreement), consisting of (a) all Accounts (excluding QAF Accounts and Accounts payable to WHC by Coastal Health Partners, P.C. or WHM); (b) WHC's deposit accounts (excluding Excluded Deposit Accounts); (c) all Books and Records related to the Collateral; and (d) proceeds of the foregoing.

[13] As defined in the Intercreditor Agreement, the MPT Senior Collateral consists of: (a) WHC's interests as lessee under the Lease; (b) WHC's machinery, equipment, furniture, inventory, and other fixtures; (c) the Designated QAF Deposit Account; (d) the Facility Permits; (e) the MPT Equity Collateral; (f) the QAF Accounts; and (g) all proceeds of the foregoing.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

#### iv. General Unsecured Claims

The Debtors have outstanding trade payables, primarily arising from ordinary course operations of the Hospital, totaling in excess of $19,000,000 as of the Petition Date.

### EVENTS LEADING TO THE PETITION DATE

The Hospital has faced substantial operating difficulties and negative cash flows since the Quorum Acquisition, if not earlier, which have only been exacerbated by the COVID-19 pandemic. The Hospital is an acute care hospital located in a primarily agricultural area and serves a historically underserved and less affluent population. According to demographic data provided by the City of Watsonville, the population is predominantly from Latin America and approximately 75% of the population has household income below $100,000 per year.[14] This is significantly below the average household income for Santa Cruz County as a whole, where approximately 43% of the population has household income above $100,000 per year.[15]

Over the course of this year, the Hospital has lost approximately $32,500,000 and most such losses have been funded by loan advances from MPT. During this time, the Debtors have considered a variety of restructuring options. On November 23, 2021, the Debtors retained Cowen and Company, LLC ("Cowen"), as investment banker to market the Debtors' assets.

Over the last few weeks, the Debtors have negotiated a potential sale transaction with the Pajaro Valley Healthcare District Project (the "Project"), which culminated on December 3, 2021 with the signing of the Summary of Principal Terms for Potential Restructuring with the Project and MPT (the "Term Sheet"). A true and correct copy of the Term Sheet is attached hereto as **Exhibit B**. Pursuant to the Term Sheet, the Project has agreed to act as the stalking horse purchaser for the Hospital as a going concern and MPT has agreed to provide debtor-in-possession financing to fund the Debtors' hospital operations and other chapter 11 administrative expenses through March 31, 2022, pending consummation of the sale. The Debtors are aware of no other funding sources willing to fund the Debtors' operating losses or the administrative expenses of these chapter 11 proceedings. Absent

---

[14] *See* https://www.cityofwatsonville.org/1441/Demographics, visited as of December 5, 2021.

[15] *Ibid.*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

the immediate funding provided by MPT to support the Hospital's operations through a sale process, the Debtors would have been required to immediately close the Hospital.

## GOALS OF THE CHAPTER 11 CASES

The Debtors' goals in these cases are <u>first and foremost</u>, to maintain the Hospital's operations so that it can continue to provide critical healthcare to the community while also saving approximately 650 jobs; <u>second</u>, to successfully sell the Hospital to a buyer that can support the healthcare needs of the community in a value maximizing transaction; and <u>third</u>, to confirm a plan of reorganization for the Debtors. However, if the Debtors cannot consummate a sale of the Hospital within the time allotted in the DIP Loan Documents and are unable to secure alternate funding for the Hospital's operations and repayment of the DIP Facility; then, the Debtors will be compelled to seek authority to commence an orderly closure of the Hospital and the suspension of its licenses.

Most importantly, the Debtors want to emphasize to the Court and other governmental authorities and the Debtors' patients, employees, creditors, and other stakeholders that the Debtors are focused on: (a) ensuring a seamless entry into bankruptcy for the Hospital and (b) maintaining quality patient care at the Hospital, so that the Debtors can effectuate the goals set forth above. The First Day Pleadings described below will allow the Debtors to achieve these vital objectives.

## FIRST DAY PLEADINGS[16]

### A. Administrative Motions

#### i. *Debtors' Motion Pursuant to Bankruptcy Local Rule 9006-1 Requesting an Order Shortening Time for Hearing on First Day Pleadings* (the "<u>Motion to Shorten Time</u>")

Pursuant to the Motion to Shorten Time, the Debtors seek entry of an order shortening the time for the Court to hold a hearing on the First Day Pleadings to December 7, 2021 at 9:30 a.m. (prevailing Pacific Time), or as soon thereafter as is convenient to the Court (the "<u>First Day Hearing</u>"). The Debtors will face numerous operational and payment issues without expedited consideration of the First Day Pleadings which, even more importantly than the deleterious effect such issues would have on the Debtors' estates, would jeopardize patients' health and safety. The relief sought in the First

---

[16] Unless otherwise noted herein, capitalized terms used in this section have the meanings ascribed in the applicable First Day Pleading.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Day Motions for approval at the First Day Hearing is the minimum necessary to preserve the Hospital's continued operations and ensure continuity of patient care as the Debtors transition into operations under chapter 11. Accordingly, I respectfully ask the Court to grant the relief requested in the Motion to Shorten Time.

### ii. *Debtors' Application for Order Authorizing Joint Administration Pursuant to 11 U.S.C. § 105(a) and Federal Rule of Bankruptcy Procedure 1015(b)* (the "<u>Joint Administration Motion</u>")

Through the Joint Administration Motion, the Debtors seek entry of an order directing the joint administration of these Bankruptcy Cases for procedural purposes. Because the Debtors' financial affairs and business operations are closely related, many of the motions, hearings, and orders in the bankruptcy proceedings will affect all of the Debtors. The entry of an order directing joint administration of these Bankruptcy Cases will reduce fees and costs by avoiding duplicative filings and objections without harming the substantive rights of any party in interest.

Joint administration will also significantly reduce the volume of papers that otherwise would be filed with the Clerk of the Court because it will avoid the preparation, replication, service, and filing, as applicable, of duplicative notices, applications, and orders. Accordingly, I respectfully ask the Court to grant the relief requested in the Joint Administration Motion.

### iii. *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) File A Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (C) Redact Certain Personally Identifiable Information for Individual Creditors, and (D) Protecting Confidential Patient Information; (II) Implementing Certain Procedures for the Notice of Commencement; and (III) Granting Related Relief* (the "<u>Creditor Matrix and Privacy Motion</u>")

Pursuant to the Creditor Matrix and Privacy Motion, the Debtors seek entry of an order: (a) authorizing the Debtors to (i) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor (the "<u>Creditor Matrix</u>"), (ii) file a consolidated list of the Debtors' thirty-five largest unsecured creditors in lieu of filing lists for each Debtor (the "<u>Top 35 List</u>"), and (iii) redact certain personally identifiable information for the Debtors' individual creditors; and (b) implementing certain procedures for the mailing of the Notice of Commencement.

Although I understand that a list of creditors is usually filed on a debtor-by-debtor basis, in a complex chapter 11 bankruptcy case involving more than one debtor, debtors may file a consolidated

creditor matrix "in the interest of justice." Requiring the Debtors to segregate and convert their computerized records into a Debtor-specific creditor matrix format would be an unnecessarily burdensome task, would waste estate resources, and would result in duplicate mailings.

Similarly, I submit that it is appropriate for the Debtors to file a single list of their thirty largest general unsecured creditors on a consolidated basis. Because the Top 20 Lists of the Debtors could overlap, and two Debtors have no known general unsecured creditors, the Debtors submit that filing separate Top 20 Lists for each individual Debtor could consume an excessive amount of the company's limited time and resources. Further, I believe that a single, consolidated list of the Debtors' thirty largest unsecured, non-insider creditors will aid the U.S. Trustee in its efforts to communicate with these creditors.

Additionally, I believe that it is appropriate to authorize the Debtors to redact from the Creditor Matrix the home addresses of individual creditors—including employees—because such information could be used, among other things, to perpetrate identity theft, to locate survivors of domestic violence, or to perpetrate harassment or stalking. I am sensitive to the potential invasion of privacy that could occur if home addresses for creditors were published and am aware of an instance, described in the Creditor Matrix and Privacy Motion in the *Charming Charlie* bankruptcy case, where the public disclosure of individuals' addresses in bankruptcy filings were used for criminal purposes. I believe that it is not in the best interests of the Debtors' estates—nor in the best interest of the community that the Hospital serves—to subject any individuals to *any* potential of becoming victims of crime because the Debtors published such individuals' personal information without their knowing and voluntary consent.

I do understand that, in the context of a chapter 11 bankruptcy case, there are instances in which an individual creditor is entitled to notice of certain matters attendant to such bankruptcy case, which would necessitate the party responsible for giving such notice to have individual creditors' contact information. To that end, the Debtors propose to provide an unredacted version of the Creditor Matrix to the U.S. Trustee, any official committee of unsecured creditors appointed in these Bankruptcy Cases, the Court, and any party-in-interest upon reasonable request. The Debtors also provided an unredacted version of the Creditor Matrix to their proposed claims agent who, if approved

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

to act in such capacity, will serve notices upon all parties identified on such Creditor Matrix. Additionally, the Debtors will distribute to their former employees any notices that are delivered to an employee at the Hospital pursuant to these chapter 11 cases.

Furthermore, it is necessary and appropriate to implement the HIPAA Privacy Procedures to maintain the confidentiality of patient information as is required under HIPAA, while providing required notices in these Bankruptcy Cases. HIPAA and its corresponding regulations impose stringent standards on health care providers and establish significant penalties for any health care provider that uses or discloses patient information.[17] A health care provider is a "covered entity" under HIPAA if it engages in certain electronic payment-related transactions for which HIPAA has established standards. The Debtors engage in such transactions, and are therefore considered "covered entities" under 45 C.F.R. § 160.103. This designation prevents the Debtors from disclosing, except in limited circumstances, "individually identifiable health information" ("PHI").[18] HIPAA defines PHI as any information relating to the individual's "past, present or future physical or mental health or condition, the provision of health care to the individual, or the past, present or future payment for the provision of health care to the individual" that also "identifies the individual or for which there is a reasonable basis to believe that the information can be used to identify the individual."[19] Identification of an individual as a patient or former patient of a hospital is considered PHI, because it discloses information about the provision of health care to the individual.

The Debtors could be subjected to significant monetary penalties for the unauthorized disclosure of PHI.[20] Such penalties can be imposed even if a person "did not know and, by exercising reasonable diligence, would not have known" that a violation occurred.[21] HIPAA permits a covered entity to disclose PHI for its "health care operations," including conducting or arranging for legal services, business planning and management, and general administration.[22] Debtors are undertaking

---

[17] See 42 U.S.C. § 1302d, *et seq.* and 45 C.F.R. § 164.502.

[18] 45 C.F.R. § 164.502

[19] 42 U.S.C. § 1302d(6).

[20] *See* 45 C.F.R. § 160.402.

[21] 45 C.F.R. § 160.404(b)(2)(i).

[22] 45 CFR § 164.501.

these Bankruptcy Cases in the course of their health care operations. However, HIPAA requires that the use and disclosure of PHI for health care operations be limited to the "minimum necessary" to accomplish the intended purpose of the use or disclosure.[23] This requires the covered entity to develop criteria designed to limit the protected health information disclosed to the information reasonably necessary to accomplish the purpose for which disclosure is sought.[24] The HIPAA Privacy Procedures embody the Debtors' criteria designed to comply with HIPAA.

The Debtors believe, and I agree, that the requirements to maintain patient confidentiality under HIPAA conflict with the requirements to disclose information under the Bankruptcy Code, specifically the duty to file a list of all creditors under section 521(a)(1)(A) of the Bankruptcy Code and the duty to file schedules of all assets and liabilities under section 521(a)(1)(B)(i) of the Bankruptcy Code. The Debtors therefore request that such patient information be protected through the proposed HIPAA Privacy Procedures, which appropriately balance the Debtors' obligations under HIPAA and the Bankruptcy Code and are consistent with similar procedures implemented by other chapter 11 debtors subject to HIPAA. Given the nature of any information that may reveal even the identity of patients, confidentiality in this context is of paramount importance, and even any perceived violation of HIPAA on the Debtors' part could negatively affect the Hospital's reputation and prospects for reorganization.

### iv. Debtors' Motion Pursuant to Local Bankruptcy Rule 9013-1(c) for Entry of an Order Authorizing Oversize Briefing for Certain First Day Motions (the "Oversize Briefing Motion")

Pursuant to the Oversize Briefing Motion, the Debtors seek entry of an order authorizing the Debtors to file oversize briefs for certain of the First Day Pleadings. The First Day Pleadings seek emergency relief on various matters meant to sustain the Debtors' operations, prevent disruptions in employee wages, and maintain cash management systems. The Debtors' operations are large and necessarily complex so, while the Debtors have tried to limit the lengths of their briefs as much as possible, certain First Day Pleadings may exceed the 25-page limit set by Bankruptcy Local Rules. Accordingly, I respectfully ask the Court to grant the relief requested in the Oversize Briefing Motion.

---

[23] 45 C.F.R. § 164.502(b).

[24] 45 C.F.R. § 164.514(d)(3)(ii)(a).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**v.** ***Debtors' Motion to Temporarily Suspend the Deadline for Filing Proofs of Claim (the "Bar Date Suspension Motion")***

Pursuant to the Bar Date Suspension Motion, the Debtors seek entry of an order temporarily suspending the deadline for non-government creditors to file proofs of claim (the "Bar Date"). I understand that, under the Bankruptcy Local Rules, the Bar Date is automatically fixed as the date that is 90 days after the initial date set for the section 341(a) meeting of creditors, subject to the Court ordering otherwise.

I submit that there is good and sufficient cause to temporarily suspend the Bar Date, pending the Debtors' submission of a motion that will request the Court enter an order that, among other things, (i) establish a Bar Date that accounts for the specific exigencies and circumstances of these Bankruptcy Cases; (ii) sets forth procedures for the filing of proofs of claim, including specific procedures for filing proofs of claim that may contain "individually identifiable health information," under HIPAA; and (iii) provides for adequate notice to all potential parties-in-interest, including those individuals on the Patient List, in compliance with HIPAA. I believe that granting the Bar Date Suspension Motion will reduce the confusion (and unnecessary administrative expense) that would ensue if parties received multiple notices with conflicting Bar Dates and procedures for filing Proofs of Claim.

**vi.** ***Debtors' Motion for Order Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules Extension Motion")***

Pursuant to the Schedules Extension Motion, the Debtors seek entry of an order extending the deadline by which the debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statement of financial affairs (the "Schedules") by thirty-one (31) days (making the Schedules due within forty-five (45) days of the Petition Date).

I submit that there exists good and sufficient cause for granting an extension of time to file the Schedules. While the Debtors are working diligently to assemble the information needed to complete the Schedules, the considerable amount of information necessary to provide a complete perspective of the Debtors' financial situation requires significant effort and more time. The Debtors and their professionals have been, and continue to be, focused on preserving the Hospital's operations and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   restructuring the Debtors as a going concern to maximize value through the ongoing marketing and

2   sale process, maintain required standards of patient care, and preserve hundreds of jobs. I believe that

3   requiring the Debtors to divert time to the preparation and filing of the Schedules by the statutory

4   fourteen (14) day deadline will be an unnecessary distraction from the Debtors' sale efforts and not

5   calculated to maximize the value of their estates.

6       To prepare the Schedules, the Debtors must compile information from books, records, and

7   documents relating to creditor claims, as well as the Debtors' assets, executory contracts, and

8   unexpired leases. This information is voluminous and collecting the necessary information requires a

9   significant expenditure of time and effort on the part of the Debtors, their employees, and their

10  professional advisors in the near term, when these resources would be best used to address the

11  immediate needs of the Debtors' business operations in the early days of these chapter 11 cases.

12      Although the Debtors have commenced the process that will enable them to prepare and

13  finalize the Schedules, the Debtors will not be able to properly and accurately complete the Schedules

14  within the required time period. The Debtors therefore request that the Court extend the 14-day period

15  provided in the Bankruptcy Code by an additional thirty-one (31) days for cause shown (making the

16  Schedules due forty-five (45) days after the Petition Date). Accordingly, I respectfully ask the Court

17  to approve the Schedules Extension Motion.

18          **vii.**   ***Debtors' Application for Entry of an Order (I) Authorizing and Approving the
19          Appointment of Stretto as Claims and Noticing Agent, and (II) Granting Related
            Relief* (the "<u>Claims Agent Application</u>")**

20      Pursuant to the Claims Agent Application, the Debtors seek entry of an order (a) authorizing

21  the Debtors to employ and retain Stretto as the claims and noticing agent in the Debtors' Bankruptcy

22  Cases effective as of the Petition Date; and (b) granting related relief.

23      Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of

24  Stretto to act as the Claims and Noticing Agent is appropriate under the circumstances and in the best

25  interest of the Debtors' estates. Moreover, it is my understanding that, based on all engagement

26  proposals obtained and reviewed, Stretto's rates are competitive and reasonable given Stretto's quality

27  of services and expertise with a case of this size.

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

The Debtors anticipate that there will be thousands of persons and entities to be noticed in these Bankruptcy Cases. In light of the number of parties in interest and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's office of the administrative burden of, noticing and processing proofs of claim and is in the best interests of both the Debtors' estates and their creditors. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Claims Agent Application.

       **viii.** ***Debtors' Motion for Interim and Final Orders (I) Implementing Certain Complex Case Management Procedures; (II) Limiting Notice of Certain Pleadings; and (III) Granting Related Relief** (the "**<u>Case Management Motion</u>**"*)

The Debtors' Case Management Motion seeks interim and final orders authorizing the Case Management Procedures set forth therein. These Bankruptcy Cases are large and necessarily complex, with a Creditors Matrix including approximately 4,100 parties and a Patient List including an additional 71,900 individuals. I believe that implementing the Case Management Procedures and establishing the Master Service List as set forth in the Case Management Motion will benefit both the Court and the Debtors' estates by, among other things, streamlining and standardizing the filing and service of Pleadings in these Bankruptcy Cases, providing for set Omnibus Hearing dates, and encouraging resolution of discovery disputes without the need for Court intervention. As such, on behalf of the Debtors, I respectfully request the Court grant the Case Management Motion.

**B.**     <u>**Motions Related to Hospital Operations for First Day Relief**</u>

       **i.** ***Motion for Entry of Interim and Final Orders (I) Authorizing Maintenance of Existing Bank Accounts; (II) Authorizing Continuance of Existing Cash Management System; (III) Granting Limited Waiver of Section 345(b) Deposit and Investment Requirements; and (IV) Granting Related Relief** (the "**<u>Cash Management Motion</u>**"*)

Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders: (i) authorizing the maintenance of existing bank accounts, including the authority to pay routine prepetition banking fees owed to financial institutions; (ii) authorizing the continued use of the Debtors' existing cash management system, bank accounts, and checks; (iii) granting a limited waiver

DOCS_DE:236407.5 92681/001

of the deposit requirements imposed under section 345(b) of the Bankruptcy Code; and (iv) granting related relief.

To facilitate the efficient operation of the Hospital, in the ordinary course, the Debtors maintain a cash management system (the "Cash Management System") comprised of nine (9) bank accounts (collectively, the "Bank Accounts"), that are held at four (4) different banks (the "Banks"). The Debtors use the Cash Management System in the ordinary course of business to collect, transfer, and disburse funds generated from operations and to facilitate cash monitoring, forecasting, and reporting, including wire and automated-clearinghouse transfers. The Debtors' personnel maintain daily oversight of the Cash Management System and controls are in place for receiving, accounting for, and disbursing funds.

I believe that the Cash Management System provides numerous benefits including the ability to (a) receive payments from payors (public and private), patients, and other parties; (b) allow a mechanism for deposits; (c) pay Workforce Compensation and Benefits Programs; and (d) pay vendors and other operational expenses. Closing these Bank Accounts and opening new accounts would be a significant burden on the Debtors and their estates. The Debtors' ability to continue their Cash Management System in the ordinary course of business is essential to their operations.

Absent the ability to maintain the Cash Management System, the Debtors would have to significantly alter their business operations to comply with United States Trustee established guidelines. The Cash Management System provides benefits to the Debtors, such as enabling them to: (a) control and monitor corporate funds; (b) ensure cash availability; and (c) reduce costs and administrative expenses by facilitating the movement of funds.

Any disruption in the Debtors' existing cash management procedures will hamper the Debtors' efforts to preserve and enhance the value of their estates and could jeopardize patient safety. Altering the Cash Management System could disrupt payments to the Hospital's Workforce and key vendors. Therefore, I believe that it is essential that the Debtors be permitted to continue to use their Cash Management System in accordance with their existing cash management procedures.

In addition, in the ordinary course of business, the Debtors engage in Intercompany Transactions as more fully set forth in the Cash Management Motion. The Cash Management System

and other processes allow the Debtors to track all obligations owing between related entities. The Debtors seek the authority to continue their Intercompany Transactions in the ordinary course of business, subject to and as further set forth in the Cash Management Motion and proposed order thereon.

Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Cash Management Motion.

**ii. *Debtors' Motion for Interim and Final Orders Authorizing the Debtors to (I) Continue Existing Insurance Coverage and Satisfy Obligations Related Thereto in the Ordinary Course of Business; and (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies* (the "<ins>Insurance Motion</ins>")**

In the ordinary course of business, the Debtors maintain approximately twelve (12) insurance policies that are administered by various third party carriers (the "<ins>Insurance Carriers</ins>"). These policies provide coverage for, among other things, general and professional liability, automotive, commercial property, non-owned helicopter liability, pollution liability, management liability, and cyber privacy and data liability (collectively, the "<ins>Insurance Policies</ins>").[25] A summary of the Insurance Policies, including descriptions of coverage, annual premiums, applicable Insurance Carriers, policy periods, and policy numbers, is attached to the Insurance Motion as Exhibit B (the "<ins>Insurance Schedule</ins>").[26]

While the Debtors previously paid the annual premiums for several of the Insurance Policies, as indicated in the Insurance Schedule, the Debtors also finance a number of the Insurance Policies or otherwise pay their annual premiums in installments. More particularly, the Debtors finance their management liability, cyber liability, and crime policies (collectively, the "<ins>PFA Policies</ins>") pursuant to the terms of a Premium Finance Agreement (the "<ins>PFA</ins>") with FIRST Insurance Funding, a Division of Lake Forest Bank & Trust Company. In addition, the Debtors obtain their commercial property and primary automobile liability policies (the "<ins>Travelers Policies</ins>")[27] from Travelers Property Casualty

---

[25] Certain of the Insurance Policies may cover certain non-Debtor affiliates in addition to the Debtors.

[26] For clarity, the Debtors also maintain certain health, life, workers compensation, and related insurance policies and programs which are not the subject of the Insurance Motion; rather, such policies are detailed in and addressed by the Compensation and Benefits Motion (defined below).

[27] In addition to the Travelers Policies herein, the Debtors also obtain their worker's compensation policies from Travelers, which is addressed by, and detailed in, the Compensation and Benefits Motion.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Company of America, or an affiliate thereof (collectively, "Travelers") and their general and professional liability policies (together, the "BETA Policies", and together with the PFA Policies, the Travelers Policies, and the BETA Policies, the "Financed Policies") from BETA Healthcare Group ("BETA"). The Debtors pay the annual premiums for the Travelers Policies and BETA Policies in monthly installments directly to Travelers and BETA, respectively. As of the Petition Date, and to the best of my knowledge, the Debtors are current under the Financed Policies and the PFA and there are no prepetition amounts due and owing with respect to the Insurance Policies.

I believe that continuation of the Debtors' Insurance Policies, and entry into new insurance policies as may be required during the Debtors' Bankruptcy Cases, is essential to the preservation of the value of the Debtors' business and operations. Moreover, I understand that in many instances, insurance coverage is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including U.S. Trustee's requirement that a debtor maintain adequate coverage during its chapter 11 case. Accordingly, to ensure uninterrupted coverage, the Debtors are requesting authority in the Insurance Motion to maintain their existing Insurance Policies, pay any prepetition Insurance Obligations related thereto, and enter into new Insurance Policies in the ordinary course of business.

In addition, in the ordinary course of business, the Debtors utilize Marsh & McLennan Insurance Agency LLC (the "Insurance Broker") to obtain their Insurance Policies. The Insurance Broker primarily assists the Debtors with the procurement and negotiation of the Insurance Policies, enabling the Debtors to obtain the Insurance Policies on advantageous terms and at competitive rates. The Insurance Broker is compensated for its services through a commission from the Insurance Carriers (the "Brokerage Fees"). To the best of my knowledge, they do not owe any prepetition Brokerage Fees. To the extent the Debtors have to pay the Brokerage Fees in the future, the Debtors seek the Court's authority to do so in the Insurance Motion. I believe that the use of the Insurance Broker allows the Debtors to obtain and manage their program of Insurance Policies in a reasonable and prudent manner and to realize considerable savings in the procurement of the Insurance Policies by having access to market comparables provided by the Insurance Broker.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Insurance Motion.

### iii. *Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, and Other Compensation, and (B) Pay and Honor Benefits and Other Workforce Obligations; (II) Authorizing and Directing the Applicable Bank to Pay All Checks and Electronic Payment Requests Made by the Debtors Relating to the Foregoing; and (III) Granting Related Relief (the "*Compensation and Benefits Motion*")*

Pursuant to the Compensation and Benefits Motion, the Debtors seek entry of interim and final orders: (a) authorizing the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses of the Hospital's Workforce and (ii) continue benefits programs and other Workforce obligations (including withholding obligations, maintenance of workers' compensation, and contributions to retirement plans); (b) authorizing and directing the applicable banks to pay all checks and electronic payment requests related to the foregoing; and (c) granting related relief

The Hospital relies on its dedicated Workforce to deliver patient care and to serve the Watsonville community. Broadly speaking, the Hospital's Workforce consists of three groups of individuals, each as defined and explained below: the Physicians, the Employees, and the Supplemental Workforce.

**Physicians**: California law does not permit the practice of medicine by unlicensed persons.[28] This prohibition is broadly interpreted in California to, among other things, restrict unlicensed persons or entities from directly engaging physicians to practice medicine, which is generally viewed as the impermissible "corporate practice" of medicine.[29] The general policy behind the prohibition is to prevent profit motivations from affecting medical judgment and discretion. Generally, therefore, this means that physicians may not be employed by for-profit hospitals to practice medicine.

As a result, hospitals often obtain professional medical services through a variety of independent contractor relationships, including through contracts with third-party medical groups ("Medical Groups"). One model that has emerged as a way for hospitals to secure the services of

---

[28] Calif. Bus. & Prof. Code §§ 2400; 2052-53

[29] *See e.g.*, *Epic Medical Management, LLC v. Paquette*, 244 Cal.App.4th 504 (2015)); *see also* 92 Ops. Cal. Atty. Gen. 56 (2009), p.4 ("[t]he practice of medicine by a corporate entity, except a professional medical corporation, is prohibited…." (internal cites omitted).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

physicians without employing them directly is the affiliated professional corporation model (often called a "friendly physician" model), which allows hospitals to approximate an employment relationship by "affiliating" with a professional medical corporation that actually can employ physicians. Through its relationship with Coastal Health Partners, P.C. ("CHP"), the Hospital employs this model for certain of its Physicians.

CHP directly employs nine Physicians (the "CHP Physicians"), and the Hospital contracts with CHP to obtain professional services and coverage from CHP and its Physicians. In addition, the Hospital, through Debtor WHM, provides turnkey management services to CHP.[30] CHP's employed Physicians continue to have complete independence in their clinical decision-making, but CHP is able to outsource the administrative back-office functions associated with the Physicians' professional care to the patients, thus allowing the Physicians to spend their time seeing patients instead of focusing on the business and operational side of the medical practice.

The CHP Physicians are so fully integrated with and indispensable to the Hospital's daily operations that even though they are legally treated as independent contractors, they are functionally equivalent to full-time employees in other ways. In providing CHP with practice management services, WHM bills patients and payors on CHP's behalf and in CHP's name, collects the resulting revenue, and handles all salary and expense payments for the CHP Physicians. WHM earns a management fee based on CHP's monthly revenue. All revenue, however, is CHP's property and, although it may be commingled with WHC's revenues, it is carefully tracked and separately accounted for.

In addition to CHP, the Hospital contracts with approximately 12 other Medical Groups, who provide approximately 70 Physicians to the Hospital. The Medical Groups' Physicians include those in the anesthesiology, pathology, pediatrics, obstetrics, radiology, neurology, general surgery, pathology, and intensive care departments. The Hospital also maintains independent contractor relationships with approximately 11 Physicians (the "On Call Physicians") who provide on call

---

[30] The Hospital provides CHP with such services pursuant to that certain *Management Agreement* dated April 23, 2013 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "CHP Management Agreement").

DOCS_DE:236407.5 92681/001

coverage in the Hospital's critical care, orthopedic, neurology, gastroenterology, cardiology, nephrology, and infectious disease departments.

**Employees**: As discussed above, the Debtors directly employ approximately 654 Employees, the majority of whom are represented by a Union. The Debtors' Employees are either full-time, part-time, or *per diem*; both full-time and part-time Employees are regularly scheduled to work every pay period, whereas *per diem* Employees are used on an as-needed basis. The Hospital calls on *per diem* Employees in situations when it could not otherwise meet its core staffing requirements, such as when core Employees are sick or on vacation, or when there is a spike in patient census. Although not limited to nursing Employees, California law requires the Hospital to maintain specific nurse-to-patient ratios,[31] so the Debtors use *per diem* Employees to ensure the Hospital is in compliance with those requirements.

**Supplemental Workforce**: In addition to their Employees, the Debtors utilize the services of third parties (the "Supplemental Workforce") to perform essential functions in the Hospital. Most critically, as of the Petition Date, approximately 18 members of the Debtors' Supplemental Workforce are traveling nurses (the "Traveling Nurses"), of whom 15 are sourced through various medical staffing agencies (the "Staffing Agencies") and three (3) are independent contractors who directly contract with the Debtors.

Substantially all of the Workforce rely on their compensation to pay their daily living expenses. Moreover, the Benefits Programs are a critical component of the Workforce's total compensation package. The continued and uninterrupted support of the Debtors' Workforce is essential to the success of the Hospital and the Debtors' business and operations. Maintaining the goodwill of the Workforce and ensuring the uninterrupted availability of their services will protect the going concern value of the estates and keep an essential cornerstone of the Watsonville community by maintaining the Hospital's "business as usual" atmosphere and preserving the Debtors' relationships with its patients, vendors, Unions, and all other stakeholders. Any interruption in the payment of prepetition Workforce-related obligations, including wages and benefits, will impose a hardship on the Workforce

---

[31] *See* Cal. Health & Safety Code § 1276.4; Cal. Code Regs. tit. 22, § 70217.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

and is certain to jeopardize their continued performance during this critical time in the Hospital's operations.

To minimize the personal hardship that the Workforce will suffer, particularly as frontline healthcare workers in the midst of the COVID-19 pandemic, if prepetition Workforce-related obligations are not paid when due, and to maintain the Workforce's morale and focus on providing life-sustaining patient care, I believe that it is imperative that the Debtors be permitted to pay and/or perform, as applicable, Workforce-related obligations, including prepetition wages, salaries, other compensation, reimbursable expenses, benefits programs, and withholding obligations. Compared to a typical claim in bankruptcy, wages represent a large part of an employee's wealth. Unlike an ordinary trade creditor, the typical Employee does not have other sources of income and thus cannot diversify the risk of their employer's default. Indeed, much of the Workforce lives paycheck-to-paycheck and rely on receiving their full compensation and benefits to continue to pay their daily living expenses.

Due to the timing of the commencement of these Bankruptcy Cases, the Workforce is owed 14 days' worth (a full pay period) of accrued prepetition Wages for which they are to receive payment in the ordinary course through their regularly scheduled payroll this coming Friday, December 10. Even though, absent the chapter 11 filing, such Wages would be paid in the ordinary course and without any effect on the Workforce, they now cannot be paid in full without the approval of this Court. The Debtors' failure to pay the Wages timely and in the ordinary course of business would result in significant hardship to our employees, may violate California labor law, would undermine the employee-employer relations and would likely lead to significant employee turnover and could result in serious and irreparable disruptions of the Hospital's operations and potentially cause harm to the Patients. Any number of Workforce departures or deterioration in morale, especially at this sensitive time and in the midst of the Omicron variant of COVID-19,[32] will substantially and adversely affect the Debtors' ability to operate the Hospital and would thus result in immediate and irreparable harm to the Debtors' estates.

---

[32] *See, e.g.,* NPR, "Why some researchers think the omicron variant could be the most infectious one yet," November 30, 2021, available at https://www.npr.org/sections/goatsandsoda/2021/11/30/1059859253/why-omicron-variant-spreads-so-quickly-infectious-mutations (noting, among other things, that the Omicron variant may be resistant to certain vaccines).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Pursuant to the Compensation and Benefits Motion, the Debtors seek authority to pay, in the ordinary course, all prepetition obligations arising under the Compensation and Benefits Programs to all non-insider Employees, whether or not such amount exceeds $13,650 with respect to each Employee. Based on historical data, the Debtors estimate that approximately six to eight non-insider Employees—all of whom are CNA-represented nurses—may be owed in excess of $13,650 in prepetition Compensation and Benefits Programs obligations, principally due to such nurses filling critical staffing needs during the Last Pay Period to preserve Patient care, such as taking on overtime, picking up additional shifts, and/or forgoing rest in between shifts, all of which are compensable under the CNA collective bargaining agreement. However, because the Last Pay Period ended on December 4 and the Debtors' payroll personnel have not yet determined the precise amount of the Prepetition Employee Wages, the Debtors cannot yet precisely identify which Employee nurses may be owed in excess of $13,650, and by exactly how much. Based on available information, including historical data and the Hospital's human resources system, the Debtors estimate that any prepetition Wage and Benefits Program obligations owing to such Employees would only exceed the section 507 cap by between $400 and $3,300 per Employee.

The Debtors submit that the amounts to be paid pursuant to the Compensation and Benefits Motion, including any amounts owing to any individual member of the Workforce in excess of $13,650, is comparatively small in light of the immediate and irreparable consequences that the Hospital (not to mention the employees, Patients and the Watsonville community) will suffer if employees do not receive wages they are relying on, if morale deteriorates, or if the Workforce leaves in significant numbers.

Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Compensation and Benefits Motion.

**iv.** *Debtors' Motion Pursuant to 11 U.S.C. §§ 366 and 105(a) Requesting Entry of Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures Providing Adequate Assurance and Resolving Objections of Utility Providers, and (III) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Service* (the "**Utilities Motion**")*

In the ordinary course of business, the Debtors incur expenses for electricity, natural gas, water, sewer, waste disposal, telecommunications, and other utility services (collectively, the "Utility Services"). A nonexclusive list (the "Utility Service List") of the utility companies or brokers (collectively, the "Utility Providers") that provide the Utility Services to the Debtors as of the Petition Date is attached to the Utilities Motion as Exhibit B.

As detailed in the Utility Service List, on average over the immediately preceding twelve calendar months, the Debtors incur approximately $195,973.10 per month in the aggregate for the Utility Services. As of the Petition Date, and to the best of my knowledge, none of the Debtors' Utility Provider holds a pre-petition security deposit with respect to the Utility Services.

The Debtors intend to pay all postpetition obligations owed to the Utility Providers in a timely manner and have sufficient funds to do so. The Debtors have a commitment for debtor in possession financing, which, together with existing cash and cash generated from operations, is more than adequate to fund their day to day expenses, including postpetition amounts for Utility Services. In addition, the Debtors propose to deposit into an interest-bearing bank account designated by the Debtors for holding deposits (the "Adequate Assurance Account") a sum equal to the cost of two (2) weeks of Utility Services, calculated based on the historical average of the Debtors' utility expenses over the twelve-month period prior to the Petition Date (the "Adequate Assurance Deposit"). I understand that, subject to the terms more fully set forth in the Utility Motion, the Debtors estimate that the total amount of the Adequate Assurance Deposit will be $97,986.56.

I believe that the Adequate Assurance Deposit, together with the Debtors' ability to pay for future Utility Services in the ordinary course of business (the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Providers.

Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Utilities Motion.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**v. *Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Liens and Superpriority Administrative Expense Claims; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; Scheduling a Final Hearing; and (VII Granting Related Relief* (the "<u>DIP Financing Motion</u>")***

Under the proposed DIP Facility, MPT has agreed to fund ordinary course hospital operations and other chapter 11 administrative expenses through March 2022 in accordance with the Budget, to provide an opportunity to consummate a going concern sale of the Hospital and for the Debtors to confirm a plan of reorganization. As a result of the funding under the DIP Facility, the Debtors project they will have sufficient liquidity to satisfy all ordinary course postpetition obligations to vendors and employees and other chapter 11 administrative expenses pursuant to an agreed budget with MPT.

Following good faith, arms'-length negotiations, the Debtors agreed to the terms of the DIP Facility with the DIP Lender to provide the funding that their estates require to maintain operations and high quality patient care at the Hospital on a postpetition basis and provide a sufficient runway to consummate a going concern sale and ultimately confirmation of a plan of reorganization for the Debtors. I am confident that, as a result of their prepetition efforts, the proposed DIP Facility is the only realistic funding option available under the circumstances. Absent the DIP Facility, I believe that the Debtors would no longer be able to operate as a going concern. I therefore believe that approval of the DIP Facility will maximize value for the Debtors' stakeholders and reflects the exercise of the Debtors' sound business judgment.

Most importantly, the DIP Facility provides the Debtors with the working capital needed to ensure the continuity of crucial, life-saving medicines and supplies, and the continued employment of hundreds of highly committed health care workers, during a time when the COVID-19 pandemic continues to strain our healthcare safety net and impact the number and availability of employees willing to work for the Hospital. The DIP Facility also will provide the opportunity for the Hospital to maintain operations while effectuating a going concern sale strategy and ultimately pursue a plan of reorganization. Alternatively, in a worst-case scenario, the DIP Facility will provide the Debtors

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  with the ability to responsibly transition the Debtors' existing patients to other healthcare providers

2  and wind-down operations and suspend their licenses.

3       Without the DIP Facility in place, the Debtors lack sufficient capital to continue operations as

4  a going concern and would be forced to cease providing their critical health care services to an already

5  underserved community. Accordingly, it is imperative that the DIP Facility be immediately approved,

6  not only to maximize the value of the Debtors' estates as a going concern for the financial benefit of

7  the Debtors' economic stakeholders, but for the health and welfare of the Debtors' patients and

8  community.

9       I believe that the Debtors have exercised the utmost level of care in selecting and entering into

10  the DIP Facility. The Debtors engaged in extensive efforts prepetition to obtain the financing they

11  require to continue to operate the Hospital and provide crucial medical care to their patients while they

12  continue their marketing process and reorganization. Indeed, without financing, the Debtors will not

13  have the liquidity necessary to purchase medicine and supplies or to pay their workforce of hundreds

14  of committed health care professionals. The survival of this Hospital is critical for this community

15  during the COVID-19 pandemic and beyond. In addition, absent the DIP Facility, the Debtors will be

16  unable to continue marketing the Hospital as a going concern, destroying potential value for their

17  stakeholders and adversely impacting our employees, patients and the broader safety net of Santa Cruz

18  County, not to mention the City of Watsonville. Because of their immediate need for financing and

19  given that the DIP Facility was the only realistic financing option available to the Debtors after

20  searching for alternatives, I submit that the decision to enter into the DIP Facility is the product of

21  their sound business judgment.

22       Notwithstanding the fact that the DIP Lender was the only party willing to provide post-

23  petition financing to the Debtors, the Debtors and their professionals were able to meaningfully engage

24  on the terms of the DIP Facility in good faith and at arms' length. However, ultimately, the DIP

25  Lender was unwilling to extend the DIP Facility on more favorable terms than those set forth in the

26  DIP Loan Documents and Interim Order.

27       In this regard, the Debtors were unable to obtain funding without agreeing to provide the DIP

28  Lender with certain terms which I understand that the Court does not ordinarily approve, such as the

"roll-up" of a portion of the MPT Prepetition Obligations. The MPT Prepetition Lender (and soon to be DIP Lender) advanced millions of dollars prepetition to fund the Debtors' hospital operations and other expenses and repeatedly agreed to forebear from exercising certain remedies under the MPT Prepetition Transaction Documents. Just over the last month, the MPT Prepetition Lender funded $9,250,000 in bridge loans to the Debtors, without which the Debtors would have been unable to continue to operate the Hospital, let alone conduct a value-maximizing going-concern sale process. These funds were used to fund the Debtors' significant operating losses, to prepare for these chapter 11 cases, to negotiate with stakeholders like their labor unions and to negotiate a term sheet for a stalking horse bid from the Project. The DIP Lender now seeks to "roll-up" these Emergency MPT Advances as part of the DIP Facility at the Final Hearing. Under the circumstances, I submit that the "roll-up" of the Emergency MPT Advances, as well as the other terms of the DIP Facility, including the Carve-Out Expenses and limited modifications to the automatic stay, are appropriate. The Emergency MPT Advances were funded over the last month for the sole purpose of giving the Debtors additional time to identify a stalking horse bidder for a going-concern sale and avert closure of the Hospital and the concomitant losses to the Watsonville community, the Debtors' workforce, and other stakeholders

All negotiations regarding the DIP Facility were conducted in good faith and on an arms'-length basis by parties represented by separate counsel. I believe that the terms and conditions of the DIP Facility are fair and reasonable under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Facility other than as described in the DIP Loan Documents or Interim Order approving the DIP Financing Motion.

Finally, I believe that the Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorization to immediately access up to $16,000,000 under the DIP Facility during the Interim Period, is not granted promptly. As further detailed above, the Debtors have an immediate need for access to financing to continue the operation of their health care business, ensure adequate continuity of patient care, meet payroll, procure goods and services from vendors and suppliers, and otherwise satisfy their working capital and operational needs, all of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

DOCS_DE:236407.5 92681/001
Case: 21-51477   Doc# 17   Filed: 12/05/21   Entered: 12/05/21 18:26:54   Page 30 of 46

which are required to preserve and maintain the Debtors' value for the benefit of all parties in interest. Accordingly, absent authorization from the Court to immediately access the DIP Facility and Cash Collateral on an interim basis pending a final hearing, I believe that the Debtors and their stakeholders will be immediately and irreparably harmed.

For all of the foregoing reasons, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings filed concurrently herewith.

[*Remainder of page intentionally left blank*]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 5th day of December, 2021 at Berkeley, California.

*Jeremy Rosenthal*
Jeremy Rosenthal

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 5th day of December, 2021 at Berkeley, California.

*Jeremy Rosenthal*
Jeremy Rosenthal

**EXHIBIT A**

**Organizational Chart**



# EXHIBIT B

## Term Sheet with Project

**Watsonville Community Hospital**
**Summary of Principal Terms for Potential Restructuring**
**December 3, 2021**

This Summary of Principal Terms for Potential Restructuring (this "**Summary of Principal Terms**") reflects the terms of a proposed restructuring (the "**Restructuring**") of the existing indebtedness and other obligations of Halsen Healthcare, LLC, Watsonville Hospital Holdings, Inc., Watsonville Healthcare Management, LLC, and Watsonville Hospital Corporation (collectively, the "**Watsonville Entities**" or the "**Debtor in Possession**" or "**DIP**" after the Cases are filed), which operate Watsonville Community Hospital (the "**Hospital**").

THIS SUMMARY OF PRINCIPAL TERMS DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, WILL ONLY BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAWS.

THIS SUMMARY OF PRINCIPAL TERMS HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES PROTECTING THE USE OR DISCLOSURE OF INFORMATION EXCHANGED IN THE CONTEXT OF SETTLEMENT DISCUSSIONS.

This Summary of Principal Terms does not constitute a binding commitment by any Party with respect to any transaction.  The Summary of Principal Terms reflects only the Parties' current understanding of the Restructuring, and a binding contract will not exist between the Parties unless and until the later of (a) each of the Parties signs and delivers one or more definitive agreements, which will contain material terms not set forth herein (together, the "**Implementation Documents**"), and (b) the satisfaction or waiver of all conditions contained in the Implementation Documents.

| Parties: | The following shall be referred to collectively herein as the "**Parties**:" <ul><li>Watsonville Entities—the "**Debtor in Possession**" or "**DIP**";</li><li>Pajaro Valley Healthcare District Project (the "**Project**"); and</li><li>MPT Operating Partnership, L.P., MPT of Watsonville Lender, LLC ("**MPT Lender**") and MPT of Watsonville, LLC ("**MPT Lessor**"); collectively, "**MPT**")</li></ul>Other parties in interest referenced herein:<ul><li>Pajaro Valley Healthcare District, a political subdivision of the State of California to be formed (the "**District**");</li><li>Alta Hospitals System, LLC ("**Alta**"); and</li><li>Santa Clara Valley Medical Center – possible Hospital manager during/after the Acquisition ("**SCVMC**").</li></ul> |
| --- | --- |

1

| | |
|---|---|
| **Implementation:** | The Restructuring shall be implemented by the commencement of chapter 11 cases (the "**Cases**") by the DIP to effectuate a sale under section 363 of the Bankruptcy Code followed by a reorganization of the DIP pursuant to a chapter 11 plan (the "**Plan**"). The Cases would be commenced in San Jose by December 5, 2021 (the "**Petition Date**").

The Project's participation in the Restructuring is based upon (i) the Project's understanding that on November 30, 2021 MPT Lender advanced pre-petition emergency funding to the DIP in the amount of $3,500,000 to fund certain employee health benefits and outstanding professional fees to physicians (the "**Bridge Prepetition Loan**") and (ii) MPT Lender's agreement to make DIP loans to fund, in accordance with the Budget (as defined below), the DIP's operations and other administrative expenses through March 31, 2022 in the amount of up to $21,500,000 in new money. The DIP would seek to roll-up the Bridge Prepetition Loan, and other emergency prepetition advances totaling $5,750,000 in the aggregate (the "**Other Prepetition Loans**") ($9,250,000 in total inclusive of the Bridge Prepetition Loan), into the DIP Loans provided by MPT (the aggregate amount of the DIP loans to be provided by MPT, inclusive of any such roll-up, the "**DIP Loans**") at the final hearing to approve the DIP Loans. MPT, in its capacity as lender, is referred to herein as a "**DIP Lender**". The Project will fund the operations of the Hospital and the DIP's other administrative obligations from and after March 31, 2022 (such funding to be at the sole cost and expense of the Project without recourse to the Debtors or the DIP Lender for the amount of any such funds irrespective of whether the Acquisition (as defined below) is ultimately consummated), pending the closing of the Acquisition as defined below, pursuant to a budget to be agreed upon.

The Project will enter into a term sheet or Asset Purchase Agreement dated on or prior to the Petition Date, by and among the DIP, as seller, and the District, as buyer, to purchase substantially all of the assets of the DIP (as amended, restated, modified and/or supplemented from time to time, the "**Stalking Horse APA**"). The closing contemplated by the Stalking Horse APA is referred to herein as the "**Acquisition.**" At the closing of the Acquisition, the District will take assignment of that certain Lease Agreement, dated as of September 30, 2019 (the "**Lease**"), by and between MPT Lessor and Watsonville Hospital Corporation. The Lease will be assigned on the existing terms without modification, except that (a) the "Lease Rate" (as defined therein) will be amended to 7.5% with Base Rent equal to $250,000 per month through December 31, 2025 (after which the escalation provisions of the Lease apply); (b) the Option Date (as defined therein) will be revised such that the District may exercise the option to purchase the Leased Property (as defined therein) on the terms otherwise set forth in Section 33.1 of the Lease on any date during the Term (as defined therein) on 90 days prior notice (or such |

2

| | |
|---|---|
| | shorter prior notice period MPT Lessor may agree to at the time of any such exercise) (provided, however, any such Option Date that occurs in the final year of the Term shall be on no less than 365 days prior notice); (c) the definition of "Option Price" shall be revised to read: The "Option Price" shall be (A) equal to the greater of (1) the Fair Market Value Purchase Price of the Leased Property, and (2) the Lease Base, or (B) $40,000,000 solely to the extent Lessee notifies Lessor of its intent to exercise such option upon no less than 90 days prior written notice and closes on the purchase of the Leased Property on or before December 31, 2025; and (d) such other amendments as MPT Lessor and the District mutually agree.<br><br>The Acquisition is conditioned on the Project obtaining (i) legislative authorization for the formation of the District to participate as the buyer in the Acquisition and thereafter provide for the operation of the Hospital, (ii) State of California funding and tax-exempt debt to consummate the Acquisition and (iii) license and other operating approvals no later than August 31, 2022.<br><br>The Project agrees, pending the closing of the Acquisition, to exercise its best efforts to obtain grants, funding, and/or advances from any and all available government and/or charitable programs, contracts, and initiatives, including as are sufficient to consummate the Acquisition. |
| **Debtor in Possession Financing:** | Except for the allowed administrative expense claims of the DIP during the pendency of the Cases, which shall be paid as described below, certain of the costs of the Restructuring and ongoing liquidity for the DIP's working capital needs and general corporate purposes during the pendency of the Cases shall be funded by cash on hand and DIP Loans to be provided by the DIP Lender on the terms set forth below and to be further set out in DIP Credit Agreements and other related documents (collectively, the "**DIP Loan Documents**").<br><br>The DIP Loans shall comprise initially the interim DIP Loan for the purposes set forth in a budget to be agreed upon (as the same may be modified from time to time consistent with the terms of the DIP Loan Documents, the "**Budget**"), subject to a negotiated permitted variance.<br><br>The DIP Loan Documents shall, without limitation, include the following terms:<br>• The granting of allowed superpriority administrative expense claim status pursuant to Section 364(c)(1) of the Bankruptcy Code.<br>• The granting to the DIP Lender of automatically perfected, first priority security interests in and liens on all of the DIP's assets (the "**DIP Collateral**"), subject to the CNH liens and any permitted prior liens. As adequate protection, unless otherwise |

Case: 21-51477    Doc# 17    Filed: 12/05/21    Entered: 12/05/21 18:26:54    Page 39 of 46

|  | agreed, CNH will receive the post-petition proceeds of accounts receivable (other than QAF payments) until CNH is paid in full, as addressed below. |
|  | <ul><li>Authorization for the DIP to use "**Cash Collateral**," as defined in Section 363(a) of the Bankruptcy Code, that the DIP is holding or may obtain, on and subject in all respects to the terms and conditions set forth in the DIP Loan Documents and orders entered by the Bankruptcy Court relating to the DIP Loans.</li><li>The DIP Loans shall be sufficient to fund costs of operations of the Hospital from commencement of the Cases through March 31, 2022 in accordance with the Budget.</li><li>The DIP Loans shall bear interest at 10% per annum, payable in kind and added to the principal balance pending maturity.</li><li>The DIP Loans shall mature on the earliest to occur of the following: (i) August 31, 2022; (ii) completion of the Acquisition; (iii) the date that is 30 days after an interim order in respect to the DIP Loans is entered if a final order has not been entered by such date; and (iv) the acceleration of all or any portion of the DIP Loans and the termination of the commitments to make the DIP Loans in accordance with the terms of this Term Sheet or the DIP Loan Documents, as applicable.</li><li>A customary carve-out for all required statutory fees and for unpaid professional fees and expenses of the DIP.</li><li>Such other terms and are ordinary and customary for DIP Loan transactions of this type.</li><li>The DIP shall be authorized to pay the principal amount due plus all interest then owed to CNH from the proceeds of accounts receivable (other than QAF payments), unless otherwise agreed with CNH.</li><li>In consideration of the DIP Loans and MPT's consent to the Acquisition, subject to the customary challenge rights of creditors and parties in interest, the DIP shall stipulate to the validity and priority of the prepetition liens and claims of MPT against the DIP and shall release any and all claims or causes of action that the DIP may have against MPT (and its affiliates, agents, attorneys, and employees) as of the petition date.</li></ul> |

| **Milestones:** | The milestones for progress of the Cases shall include the following:<br><br><ul><li>Petition Date: December 5, 2021</li><li>Obtain an Interim Order authorizing the interim advances on the DIP Loans: December 8, 2021</li><li>File Bid Procedures/Sale Motion which shall include a request for the approval of the Buyer's Expense Reimbursement (as defined in the Stalking Horse APA) payable on the terms set forth in the Stalking Horse APA: December 15, 2021</li></ul> |

4

| | |
|---|---|
| | <ul><li>Obtain a Final Order authorizing the DIP Loans within 30 days after entry of the Interim Order</li><li>Bid Procedures Hearing: early January 2022 (regular notice)</li><li>Bid Deadline: no later than February 9, 2022, after Project legislative approval</li><li>Auction: no later than February 16, 2022</li><li>Sale Hearing: within 1-2 business days of Auction; mid-February 2022 (regular notice)</li><li>Closing as soon as practicable after entry of Sale Order, but no later than August 31, 2022.</li></ul> |
| **Treatment of MPT's Claims:** | Post-petition rent to the MPT Lessor will be paid in the amount of $250,000 per month (absolute net in accordance with the terms of the Lease). The terms of the Lease will otherwise continue without modification until the closing of the Acquisition.<br><br>In consideration of MPT's secured claims and its support of the Acquisition, MPT will be paid $9 million from the Acquisition Price at closing from proceeds of the Stalking Horse APA in exchange for its release of its liens against the DIP's personal property assets being sold to the Project under the APA (including, without limitation, MPT's security interest in the DIP's California Quality Assurance Fund (QAF) proceeds).<br><br>Any remaining amounts due to MPT by the DIP shall be treated as set forth in the Plan. |
| **Treatment of Project's and District's Fees and Expenses:** | Professional fees and expenses of the Project and the District relating to the Cases shall be for the account of the Project and the District. In the event the District is not the buyer in the Acquisition due to a successful overbid by another party, the Project and the District shall be entitled to reimbursement of their actual and reasonable fees and expenses up to $500,000 in the aggregate payable from the closing of an Acquisition by such alternative buyer. |
| **Treatment of Executory Contracts and Unexpired Leases:** | Pursuant to the terms of the Stalking Horse APA, the Project, and once organized, the District, shall be authorized to direct the DIP to provide for assumption of certain designated executory contracts and unexpired lease which shall be assigned to the District on closing of the Acquisition. |
| **Collective Bargaining Agreements:** | The Project and, once organized, the District, shall have the right to direct the DIP to assume any Collective Bargaining Agreements and assign any such agreements to the District (in the event that new memoranda of understanding with the unions are not required); provided, however, that the District may seek modification of any such agreements as a condition to assumption and assignment of the same; provided, |

5

| | |
|---|---|
| | further, neither the assumption and assignment of any Collective Bargaining Agreements or any modifications thereto shall be a condition to the closing of the Acquisition. The Project and, once organized, the District, will assume those certain non-cash employee-related liabilities described on the schedule attached to this term sheet. |
| **Sale to District:** | The Acquisition shall be consummated if the Bankruptcy Court enters a final order authorizing the DIP to close the Acquisition and the District secures funding to consummate the Acquisition and the necessary certifications, licenses, and approvals to operate the Hospital on or before August 31, 2022. |
| | The Project will fund the operations of the Hospital and the DIP's other administrative obligations from and after March 31, 2022, pending the closing of the Acquisition, pursuant to the Budget. |
| | The price for the Acquisition (the "**Acquisition Price**") shall be (i) the amounts then due under the DIP Loans (including the Bridge Prepetition Loan, but excluding the Other Prepetition Loans) to MPT up to $25 million, plus (ii) any additional consideration specified in the Stalking Horse APA, plus (iii) obligations assumed under the Stalking Horse APA, including the assumption of those certain non-cash employee liabilities described on the schedule attached to this term sheet, plus (iv) $9 million to be paid to MPT on account of its secured claim against the DIP's personal property assets and upon MPT's release of its security interests in the DIP's personal property assets being sold pursuant to the Stalking Horse APA from proceeds of the Stalking Horse APA. MPT's remaining rolled-up DIP Loans in the principal amount of $5.75 million (i.e., the Other Prepetition Loans), together with interest and expenses, shall remain as outstanding administrative claims against the DIP. To the extent that the Acquisition does not close by March 31, 2022, the Project shall be responsible for payment to MPT of any simple interest that accrues after March 31, 2022 under the DIP Loans (excluding the Other Prepetition Loans) pending the closing of the Acquisition. |
| | If the District is not the buyer in the Acquisition due to a successful overbid by another party, the Project's and the District's fees and expenses incurred in connection with the Case up to $500,000 in the aggregate shall be reimbursed out of sale proceeds. |
| | All property conveyed to the Project under the Stalking Horse APA shall be conveyed free and clear of all liens, claims and encumbrances. |

6

| | |
|---|---|
| **Hospital Operations, Quality and Performance Requirements:** | The Parties agree that it is a condition of closing the Acquisition that the Hospital maintain a patient standard of care and operate the Hospital during the Cases consistent with its current level of operations. From the Petition Date through the closing of the Acquisition, MPT will lease the hospital to the DIP at $250,000 per month, subject to the other terms of the lease. |
| **Management of the Hospital:** | Subject to the Project being designated as the winning bidder at the sale hearing, the Project shall have the discretion to direct the DIP to reject the current management agreement for the Hospital with Alta on thirty days' notice if a replacement interim manager is found to manage the Hospital through the Acquisition closing. The identity and terms of such alternative manager must be acceptable to the Project, the DIP Lender and the DIP. One possible manager being considered is SCVMC. |
| **No Admission of Liability:** | The Parties acknowledge that this Summary of Principal Terms represents a proposed compromise of disputed claims and that, in connection herewith, none of the Parties admits or acknowledges the existence of any liability or wrongdoing. No provision of this Summary of Principal Terms shall be deemed an admission or concession by any Party as to the merits of another Party's claims or the liability of any nature on the part of any Party. |
| **Plan:** | Any Plan proposed by the DIP must be consistent with and not interfere with the Acquisition. The DIP Loans shall be immediately due and payable in full upon the closing of an alternative Acquisition. |

[Signature Page Follows]

7

**DIP**:

**HALSEN HEALTHCARE, LLC,**
**WATSONVILLE HOSPITAL HOLDINGS, INC.,**
**WATSONVILLE HEALTHCARE**
**MANAGEMENT, LLC, AND**
**WATSONVILLE HOSPITAL CORPORATION**

By: _____
Name: Jeremy Rosenthal
Title: Chief Restructuring Officer

**PROJECT**:

**PAJARO VALLEY HEALTHCARE DISTRICT**
**PROJECT**

By: _____
Name:
Title:

**MPT**:

**MPT OPERATING PARTNERSHIP, L.P.,**
**MPT OF WATSONVILLE LENDER, LLC AND**
**MPT OF WATSONVILLE, LLC**

By: _____
Name: R. Steven Hamner
Title: Executive Vice President & CFO

Signature page to the Watsonville Community Hospital
Summary of Principal Terms for Potential Restructuring Term Sheet

**DIP:**

**HALSEN HEALTHCARE, LLC,**
**WATSONVILLE HOSPITAL HOLDINGS, INC.,**
**WATSONVILLE HEALTHCARE**
**MANAGEMENT, LLC, AND**
**WATSONVILLE HOSPITAL CORPORATION**

By: _____

Name:   Jeremy Rosenthal

Title:   Chief Restructuring Officer

**PROJECT:**

**PAJARO VALLEY HEALTHCARE DISTRICT**
**PROJECT**

By: _____
Mimi Hall (Dec 3, 2021 13:23 PST)

Name:   Mimi Hall

Title:   Chair, Board of Directors

**MPT:**

**MPT OPERATING PARTNERSHIP, L.P.,**
**MPT OF WATSONVILLE LENDER, LLC AND**
**MPT OF WATSONVILLE, LLC**

By: _____

Name:

Title:

8

**Signature page to the Watsonville Community Hospital**
**Summary of Principal Terms for Potential Restructuring Term Sheet**

## Schedule of Assumed Non-Cash Employee Liabilities

PTO Liabilities
Cash Balance Pension Plan Liability
Incurred But Not Reported Health Benefits (IBNR)
Retiree Flex Benefit
Sign-on Bonus
Status Change Incentive Bonus
Employee Referral Bonus

9