**EXHIBIT 1**

**(Proposed Final Order)**

Debra I. Grassgreen (CA Bar No. 169978)
Maxim B. Litvak (CA Bar No. 215852)
Steven W. Golden (admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
One Market Plaza, Spear Tower, 40th Floor
San Francisco, CA 94105-1020
Telephone:    415.263.7000
Facsimile:    415.263.7010
E-mail:       dgrassgreen@pszjlaw.com
              mlitvak@pszjlaw.com
              sgolden@pszjlaw.com

Attorneys for Debtors and
Debtors in Possession

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| In re:<br><br>WATSONVILLE HOSPITAL CORPORATION, *et al.*,<br><br>Debtors.[1] | Case No. 21-51477<br><br>Chapter 11<br>(Jointly Administered)<br><br>**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE; (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL; (III) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (IV) GRANTING ADEQUATE PROTECTION; (V) MODIFYING THE AUTOMATIC STAY; AND (VI) GRANTING RELATED RELIEF**<br><br>Date:      January 19, 2022<br>Time:      10:00 a.m.<br>Place:     **Telephonic/Video Appearance Only**<br>           Courtroom 11<br>           280 South First Street<br>           San Jose, CA 95113<br>Judge:     Hon. M. Elaine Hammond |

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Watsonville Hospital Corporation (4113); Watsonville Healthcare Management, LLC (4168); Watsonville Hospital Holdings, Inc. (1118); and Halsen Healthcare, LLC.  The Debtors' business address is 75 Nielson Street, Watsonville, CA 95076.

Upon the motion (the "<u>Motion</u>"), dated December 5, 2021, of Watsonville Hospital Corp. ("<u>WHC</u>") and its affiliated debtors and debtors in possession (collectively, the "<u>Debtors</u>") in the above-captioned chapter 11 cases (the "<u>Cases</u>"), pursuant to sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "<u>Bankruptcy Code</u>"), and Rules 2002, 4001(c), and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), seeking, among other things:

a. authorization for the Debtors to obtain post-petition loans, advances and other financial accommodations in an amount up to **$30,750,000** on a final basis from MPT of Watsonville Lender, LLC (in such capacity, the "<u>DIP Lender</u>"), in accordance with all of the lending formulae, sublimits, terms, and conditions set forth in the DIP Note (as defined below), and in accordance with this Final Order, secured by security interests and liens upon all of the DIP Collateral (as defined below) pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code;

b. authorization for the Debtors to enter into, be bound by, and perform under a multi-draw term loan credit facility (the "<u>DIP Facility</u>"), under the "Senior Secured Superpriority Debtor in Possession Promissory Note," dated as of December 5, 2021, by and among the Debtors and the DIP Lender which agreement is attached hereto as **<u>Exhibit A</u>** (as it may be modified, supplemented, amended or restated from time to time, the "<u>DIP Note</u>," and together with the other DIP Loan Documents, as defined in the DIP Note, the "<u>DIP Loan Documents</u>");

c. modification of the automatic stay to the extent hereinafter set forth;

d. the grant to the DIP Lender of superpriority administrative claim status pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all of the DIP Obligations (as defined in the DIP Note);

e. authorization for the Debtors to use the DIP Collateral (including Cash Collateral (as defined below) in accordance with the Budget (as defined below) and subject to the terms, restrictions, and other conditions of the DIP Note) that is subject to the existing liens and security interests in favor of MPT of Watsonville Lender, LLC (in such capacity, the "<u>MPT Prepetition Lender</u>") and CNH Finance Fund I, L.P. (the "<u>CNH Prepetition Lender</u>"), respectively, and granting adequate protection to these parties as set forth herein; and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

f. authorization for the Debtors to use the proceeds of the loans under the DIP Facility (the "DIP Loans"), subject to the terms, restrictions, and other conditions of the DIP Note, to (a) upon entry of this Final Order, repay the outstanding MPT Prepetition Note up to $9,250,000, (b) upon entry of the Interim Order (as defined below), accrue fees and expenses related to the DIP Note and the Cases, and (c) upon entry of the Interim Order, fund working capital in the ordinary course of the business of the Debtors and other general corporate purposes, in each case, to the extent set forth in the Budget and permitted under DIP Loan Documents; and

The initial hearing on the Motion having been held by this Court on December 7, 2021 (the "Interim Hearing") and an order having been entered on December 8, 2021 approving the Motion on interim basis [Docket No. 54] (the "Interim Order" and together with the Final Order, the "Financing Orders"); and

The final hearing on the Motion having been held on January 19, 2022 (the "Final Hearing"); and

It appearing that due and appropriate notice of the Motion, the relief requested therein, the Interim Hearing, and the Final Hearing (the "Notice") was served by the Debtors in accordance with Bankruptcy Rule 4001(c) on (i) the DIP Lender, (ii) counsel to the DIP Lender, (iii) the CNH Prepetition Lender, (iv) the Office of the United States Trustee for the Northern District of California (the "U.S. Trustee"), (v) the holders of the thirty-five (35) largest unsecured claims against the Debtors' Estates (on a consolidated basis) (the "35 Largest Unsecured Creditors"), (vi) the United States Attorney's Office for the District of California, (vii) the Internal Revenue Service, (viii) the Securities and Exchange Commission, and (ix) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Noticed Parties"); and

This Court having reviewed the Motion and any responses and objections thereto, the *Declaration of Jeremy Rosenthal in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), the other filings and pleadings made by the Debtors and other parties in interest, the evidence and testimony presented at the Interim Hearing and the Final Hearing, and after due deliberation and consideration and good and sufficient cause appearing therefor,

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW**:

A. <u>Petition</u>. On December 5, 2021 (the "<u>Petition Date</u>"), each Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code. The Debtors continue as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On December 22, 2021, the U.S. Trustee appointed an official committee of unsecured creditors (the "<u>Committee</u>").

B. <u>Jurisdiction and Venue</u>. The Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue in this Court over the Cases and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C. <u>Notice</u>. Under the circumstances, the Notice given by the Debtors of the Motion, the Interim Hearing, the Final Hearing, and the relief granted under the Interim Order and this Final Order constitutes due and sufficient notice thereof and complies with Bankruptcy Rule 4001(c) and Local Rule 4001-2.

D. <u>Findings Regarding the MPT Prepetition Note</u>. Without prejudice to the rights of any other non-Debtor party in interest as provided in Section 9.1 of this Final Order, the Debtors admit, stipulate, acknowledge and agree that:

(i) *MPT Prepetition Note*: As of the Petition Date, certain of the Debtors and the DIP Lender are parties to those certain: (a) Amended and Restated Promissory Note, dated September 30, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>MPT Prepetition Note</u>"), by WHC in favor of the DIP Lender; (b) Security Agreement, dated September 30, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>MPT Security Agreement</u>"), by and among WHC, MPT of Watsonville, LLC, and the DIP Lender; (c) the Security Agreement, dated November 10, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>MPT (Holdings) Security Agreement</u>" and together with the MPT Security Agreement, the "<u>MPT Security Agreements</u>"), by and among Watsonville Hospital Holdings, Inc., MPT of Watsonville, LLC, and the DIP Lender; (d) the Pledge Agreement, dated September 30, 2019, by the Pledgors (as defined therein), MPT of Watsonville, LLC, and the DIP Lender (as amended, restated, supplemented or otherwise modified from time to time, the "<u>MPT</u>

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

3

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Pledge Agreement"); and (e) the Lease (as defined in the DIP Note, and together with the MPT Prepetition Note, the MPT Security Agreements, the MPT Pledge Agreement and any other agreements entered into in connection with any of the foregoing, collectively, the "MPT Prepetition Transaction Documents"). The MPT Prepetition Transaction Documents provide that: (a) WHC and, as applicable, the other Debtors are obligated for principal, accrued and unpaid interest, fees, costs, expenses, indemnities, and other amounts arising under the MPT Prepetition Transaction Documents (the "MPT Prepetition Obligations") and (b) subject to that certain Intercreditor Agreement, dated as of June 22, 2021 (the "Intercreditor Agreement"), by and among the CNH Prepetition Lender, the MPT Prepetition Lender, MPT of Watsonville, LLC and WHC, all of the MPT Prepetition Obligations are secured by first priority liens granted to the MPT Prepetition Lender (the "MPT Prepetition Liens") on certain of the property of the Debtors, as described in the MPT Prepetition Transaction Documents (the "MPT Prepetition Collateral"), which includes certain cash collateral within the meaning of Bankruptcy Code section 363(a) ("Cash Collateral").

(ii) *MPT Prepetition Obligations and the MPT Prepetition Liens*: As of the Petition Date, the outstanding MPT Prepetition Obligations totaled no less than $40,132,813, inclusive of all principal and accrued and unpaid interest, exclusive of all costs, expenses, and fees owed to the MPT Prepetition Lender. The Debtors further acknowledge, agree, and stipulate that (a) the MPT Prepetition Liens (1) are valid, binding, enforceable, and perfected liens in the MPT Prepetition Collateral, (2) were granted to the MPT Prepetition Lender for fair consideration and reasonably equivalent value, (3) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (4) are subject and subordinate only to (A) valid, perfected, and unavoidable liens permitted under the applicable MPT Prepetition Transaction Documents, but only to the extent that (x) such liens are permitted by the applicable MPT Prepetition Transaction Documents to be senior to the applicable MPT Prepetition Liens and (y) such liens are actually senior to the applicable MPT Prepetition Liens under applicable law and (B) as set forth in the Intercreditor Agreement, and (b) (1) all of the MPT Prepetition Obligations constitute legal, valid, and binding obligations of WHC and the other Debtors, as applicable, enforceable in accordance with the terms of the applicable MPT Prepetition Transaction Documents, (2) no setoffs, recoupments,

4

offsets, defenses, or counterclaims to any of the MPT Prepetition Obligations exist, and (3) no portion of the MPT Prepetition Obligations or any payments made to or for the benefit of the MPT Prepetition Lender are subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(iii)    *Proof of Claim*.  The foregoing acknowledgment by the Debtors of the MPT Prepetition Obligations and the rights, priorities, and protections granted to MPT Prepetition Lender pursuant to the MPT Prepetition Transaction Documents were, upon entry of the Interim Order, deemed to be a timely filed proof of claim on behalf of the MPT Prepetition Lender in these Cases and the MPT Prepetition Lender is and shall not be required to file any additional proofs of claim with respect to the MPT Prepetition Obligations.

E.    Findings Regarding the Post-Petition Financing.

(i)    *Postpetition Financing*.  The Debtors have requested from the DIP Lender, and the DIP Lender is willing to extend, certain loans, advances, and other financial accommodations on the terms and conditions set forth in this Final Order and the DIP Loan Documents.

(ii)    *Need for Postpetition Financing*.  The Debtors do not have sufficient available sources of working capital, including cash collateral, to pay administrative expenses and conclude a sale of their assets without the financing requested under the Motion.  As of the Petition Date, the Debtors are actively marketing their assets for sale.  The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed postpetition financing arrangements with the DIP Lender as set forth in the Interim Order, this Final Order and the DIP Loan Documents is vital to the Debtors' ability to maximize the value of the assets of their bankruptcy estates (as defined under section 541 of the Bankruptcy Code, the "Estates") through an orderly sale process.  Accordingly, the Debtors have a need to obtain the postpetition financing in order to, among other things, preserve and maximize the value of the assets of their Estates.

(iii)    *No Credit Available on More Favorable Terms*.  The Debtors are unable to procure financing in the form of unsecured credit allowable under section 503(b)(1) of the

Case: 21-51477    Doc# 207-1    Filed: 01/17/22    Entered: 01/17/22 14:38:00    Page 7 of 77

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Bankruptcy Code, as an administrative expense under section 364(a) or (b) of the Bankruptcy Code, or solely based on the grant of an administrative expense priority pursuant to section 364(c)(1) of the Bankruptcy Code. The Debtors are also unable to obtain secured credit allowable solely under section 364(c)(2) or 364(c)(3) of the Bankruptcy Code. The Debtors have been unable to procure the necessary financing on terms more favorable than the financing offered by the DIP Lender pursuant to the DIP Note.

(iv)     *Budget*.  The Debtors have prepared and delivered to the DIP Lender a cash-flow forecast for the orderly sale of the Watsonville Community Hospital, an updated copy of which is attached hereto as **Exhibit B** (as may be modified from time to time in accordance with the DIP Note, the "Budget").  The Budget has been approved by the DIP Lender pursuant to the terms of the DIP Note.  The Budget has been thoroughly reviewed by the Debtors and their management and sets forth, among other things, projections for the periods covered thereby.  The DIP Lender has relied upon and is continuing to rely upon the Debtors' compliance with the Budget in accordance with the terms of the DIP Note, the other DIP Loan Documents, the Interim Order, and this Final Order in determining to enter into the post-petition financing arrangements provided for herein.

(v)     *Business Judgment and Good Faith Pursuant to Section 364(e)*.  The terms of the DIP Loan Documents and this Final Order reflect the Debtors' exercise of their prudent business judgment, and are supported by reasonably equivalent value and fair consideration.  The terms and conditions of the DIP Loan Documents and this Final Order have been negotiated in good faith and at arms' length by and among the Debtors and the DIP Lender, with all parties being represented by counsel.  Any new money credit extended under the terms of this Final Order shall be deemed to have been extended in good faith by the DIP Lender as that term is used in section 364(e) of the Bankruptcy Code.

(vi)     *Good Cause*.  The relief requested in the Motion is necessary, essential, and appropriate, and is in the best interests of and will benefit the Debtors, their creditors, and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to preserve and maximize the value of the Debtors' Estates for the benefit of all the Debtors' creditors, and avoid immediate and irreparable harm to the Debtors, their creditors, and their assets.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

6

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

(vii)  *Objections.*  Any objections that were made to the relief sought in the Motion or the entry of this Final Order (to the extent such objections have not been withdrawn or resolved) are hereby overruled.

Based upon the foregoing, and after due consideration and good cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, that:**

Section 1.     Authorization and Conditions to Financing.

1.1     Motion Granted.  The Motion is granted in accordance with Bankruptcy Rule 4001(c)(2) on a final basis as set forth herein.  This Final Order shall hereinafter be referred to as the "Final Order."

1.2     Authorization to Borrow and Use Loan Proceeds.  The Debtors are hereby authorized to enter into, be bound by, and perform under the DIP Facility and all DIP Loan Documents and to borrow, pursuant to the DIP Note, an aggregate amount not to exceed **$30,750,000**, provided that disbursements of such amount are in accordance with the Budget, the DIP Loan Documents, and this Final Order.  Upon the entry of this Final Order, the Debtors shall be authorized to use the DIP Collateral, including Cash Collateral, and to draw on the DIP Facility to make any disbursement as specifically provided in the Budget (subject to the permitted variances as set forth in the DIP Loan Documents), but solely in accordance with the terms and conditions set forth in this Final Order and the DIP Loan Documents.

1.3     DIP Loan Documents

1.3.1     Approval.  The DIP Loan Documents and each term, condition, and covenant set forth therein are approved.  All of such terms, conditions, and covenants shall be sufficient and conclusive evidence of the borrowing arrangements by and among the Debtors and the DIP Lender, and of each Debtor's assumption and adoption of all of the terms, conditions, and covenants of the DIP Note and the other DIP Loan Documents for all purposes, including, without limitation, to the extent applicable, the payment when due of all DIP Obligations arising thereunder, including, without limitation, all principal, interest, and such fees and expenses, including, without limitation, all of the DIP Lender's consultant fees and professional fees (including attorney fees and expenses) as more fully set forth in the DIP Loan Documents.

7

1.3.2 <u>Amendment.</u> Subject to the terms and conditions of the DIP Note and the other DIP Loan Documents, the Debtors and the DIP Lender may amend, modify, supplement or waive any provision of the DIP Loan Documents (an "<u>Amendment</u>") without further approval or order of the Court, provided that any material Amendment shall require advance notice and opportunity to object of no less than two (2) business days to the U.S. Trustee and the Committee.

Section 2. <u>Liens; Superpriority Administrative Claim Status.</u>

2.1 <u>Priority and Liens</u>.

2.1.1 <u>Lien Grant</u>. To secure the prompt payment and performance of any and all obligations of the Debtors to the DIP Lender of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, the DIP Lender shall have and is hereby granted, effective as of the Petition Date, valid and perfected first priority security interests and liens, superior to all other liens, claims or security interests that any creditor of the Debtors' Estates may have (but subject to the Carve-Out Expenses (as defined below) and the Permitted Priority Liens (as defined below)) in and upon all of the DIP Collateral (as defined below) (collectively, the "<u>DIP Liens</u>").

2.1.2 <u>DIP Collateral</u>. For purposes of this Final Order, the term "<u>DIP Collateral</u>" shall have the meaning ascribed to such term in the DIP Loan Documents as modified and subject to the exclusions set forth in this Section 2.1.2, which term includes the following: all of the existing and after acquired real and personal, tangible and intangible, property and assets of the Debtors, including, but not limited to, all cash, cash equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, fixtures, real property interests, franchise rights, patents, tradenames, trademarks, copyrights, intellectual property, general intangibles, payment intangibles, rights under Section 506(c) of the Bankruptcy Code, and all other property or "property of the estate" (as defined in Section 541 of the Bankruptcy Code) of any kind or nature, investment property, supporting obligations, letter of credit rights, licenses, operating certificates, permits, causes of action (excluding causes of action, claims, objections and defenses arising under or deriving from sections 506(d), 510, 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code, or any similar state or federal law and any commercial tort actions not part of the MPT Prepetition Collateral ("<u>Avoidance</u>

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

8

Actions") and the proceeds of Avoidance Actions), and all rents, products, substitutions, accessions, profits, replacements, and cash and non-cash proceeds of all of the foregoing, wherever located, including insurance proceeds, noncash proceeds or any other proceeds of the foregoing; provided, however, that, the DIP Collateral shall not include (i) any Avoidance Actions (but shall include the proceeds of Avoidance Actions, subject to the terms of clause (ii) hereof), (ii) the proceeds of any (a) successful Objection (as hereinafter defined) or any successful affirmative claim of the Debtors and/or their Estates against the MPT Prepetition Lender or the CNH Prepetition Lender or (b) rights or claims for surcharge under section 506(c) of the Bankruptcy Code with respect to the DIP Collateral, the MPT Prepetition Collateral, or collateral of the CNH Prepetition Lender, (iii) any agreements, permits, licenses, or the like solely in the event and to the extent that a grant of a DIP Lien on such license, contract, or agreement results in a termination of any such license, contract, or agreement or would render such license, contract, or agreement non-assumable or non-assignable under the Bankruptcy Code (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9-406, 9-407, or 9-408 of the Uniform Commercial Code (or any successor provision or provisions)) and, in any event, immediately upon the ineffectiveness, lapse or termination of any such terms or default under such license, contract or agreement, the DIP Collateral shall include, and the applicable Debtor shall be deemed to have granted a security interest in, all such licenses, contracts, or agreements as if such terms had never been in effect, and (iv) any other Excluded Property (as defined in the DIP Note); provided, however, that the DIP Collateral shall include any and all proceeds of any of such property and assets described in the foregoing clauses (iii) and (iv) (except to the extent such proceeds themselves constitute Excluded Property); provided, further, that, any agreement, permit, license, or the like not constituting DIP Collateral under the foregoing clauses (i) through (iv) (except to the extent such proceeds themselves constitute Excluded Property) shall constitute DIP Collateral from and after such time as the lessor, licensor, grantor or other party to such agreement, permit, license, or the like consents to the grant of a DIP Lien in favor of the DIP Lender in such agreement, permit, license, or the like or the prohibition against granting a Lien therein in favor of the DIP Lender shall cease to be effective; provided, further, that the DIP Lender and the MPT Prepetition Lender shall not apply the proceeds of Avoidance Actions or rights or claims for surcharge under section 506(c) of the

9

Bankruptcy Code to the DIP Obligations or the MPT Prepetition Obligations, respectively, until the DIP Lender and the MPT Prepetition Lender, as applicable, have first used commercially reasonable efforts to exhaust their recoveries from all DIP Collateral other than the proceeds of Avoidance Actions.

2.1.3    Lien Priority.  The DIP Liens shall be first and senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with section 363, 364 or any other section of the Bankruptcy Code or other applicable law; provided, however, that the DIP Liens shall be subject to (A) the Carve-Out Expenses to the extent provided for in Section 2.3 of this Final Order and (B) the valid, enforceable, properly perfected, non-avoidable security interests in existence as of the Petition Date that are senior to the MPT Prepetition Liens (the "Permitted Priority Liens").  For the avoidance of doubt, the Intercreditor Agreement governed the priority of the liens granted to the CNH Prepetition Lender as described in the CNH Prepetition Loan Documents (as defined below), relative to the MPT Prepetition Liens and the DIP Liens (as if they were MPT Prepetition Liens) in the Loan Collateral (as defined in the Intercreditor Agreement and referred to herein as the "CNH Priority Collateral" prior to payment in full of the CNH Prepetition Obligations, which occurred following entry of the Interim Order.  Except as otherwise set forth in this Final Order, the DIP Liens and the Superpriority Claim (as defined below) (a) shall not be subject to sections 510, 542, 549, 550, or 551 of the Bankruptcy Code, the "equities of the case" exception of section 552 of the Bankruptcy Code, or section 506(c) of the Bankruptcy Code, (b) shall be senior in priority and right of payment to (x) the MPT Prepetition Obligations, (y) any lien that is avoided and preserved for the benefit of the Debtors and their Estates under section 551 of the Bankruptcy Code or otherwise and (z) any intercompany or affiliate liens or claims of the Debtors, and (c) shall be valid and enforceable against any trustee or any other estate representative appointed or elected in the Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code, or in any other proceedings related to any of the foregoing (each, a "Successor Case"), and/or upon the dismissal of any of the Cases or any Successor Case.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

2.1.4    Enforceable Obligations.    The DIP Loan Documents shall constitute and evidence the valid and binding DIP Obligations of the Debtors, which DIP Obligations shall be enforceable against the Debtors, their Estates, and any successors thereto (including, without limitation, any trustee or other estate representative in any Successor Case), and their creditors, in accordance with their terms.  Except as otherwise set forth in this order, no obligation, payment, transfer, or grant of security under the DIP Note, the other DIP Loan Documents, the Interim Order, or this Final Order shall be stayed, restrained, voidable, avoidable, disallowable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) or based on any Avoidance Actions), or subject to any avoidance, disallowance, impairment, reduction, setoff, offset, recoupment, recharacterization, disgorgement, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, surcharge, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

2.1.5    Post-Petition Lien Perfection.  This Final Order shall be sufficient and conclusive evidence of the priority, perfection, and validity of the DIP Liens, effective as of the Petition Date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording or possession of the DIP Collateral, or other act to validate or perfect such security interest or lien (each, a "Perfection Act"). Notwithstanding the foregoing, if the DIP Lender shall, in its sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, the DIP Lender is authorized to perform such act, and the Debtors are authorized and directed to perform such act to the extent necessary or reasonably required by the DIP Lender, which act or acts shall be deemed to have been accomplished as of the Petition Date, notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file, and/or record any document in regard to such act in accordance with applicable law.  The DIP Lender may choose to file, record, or present a certified copy of the Interim Order or this Final Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, and/or record such certified copy of the Interim Order or this Final Order in accordance with applicable law.  Should the DIP Lender so choose and attempt to file, record, and/or

11

perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment, or perfection of the post-petition liens and security interests granted herein by virtue of the entry of this Final Order. For the avoidance of doubt, the Existing Control Agreement (as defined in the DIP Note) shall be considered a "DIP Loan Document" and a Perfection Act for all purposes hereunder and thereunder.

2.2    <u>Superpriority Administrative Expense</u>. For all DIP Obligations now existing or hereafter arising pursuant to the Interim Order, this Final Order, the DIP Loan Documents, or otherwise, the DIP Lender is granted an allowed superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities, and indebtedness of the Debtors, whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia*, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 364(c)(1), 546, 726 or 1114 or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment (the "<u>Superpriority Claim</u>"); <u>provided</u>, <u>however</u>, that the Superpriority Claim shall be subject only to the payment of the Carve-Out Expenses. The Superpriority Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered an administrative expense allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including the proceeds of Avoidance Actions (but not including the proceeds of any (a) successful Objection or any successful affirmative claim of the Debtors and/or their Estates against the MPT Prepetition Lender or the CNH Prepetition Lender or (b) rights or claims for surcharge under section 506(c) of the Bankruptcy Code with respect to the DIP Collateral, the MPT Prepetition Collateral, or collateral of the CNH Prepetition Lender), subject only to the Carve-Out Expenses. Other than as expressly provided in the DIP Note, the Interim Order, and this Final Order with respect to the Carve-Out Expenses, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 326, 328, 330, or 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these Cases, or in any Successor

12

Case: 21-51477    Doc# 207-1    Filed: 01/17/22    Entered: 01/17/22 14:38:00    Page 14 of 77

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case, and no priority claims are, or will be, senior to, prior to, or on a parity with the Superpriority Claim or the DIP Obligations, or with any other claims of the DIP Lender arising hereunder.

2.3     <u>Carve-Out Expenses</u>.  Notwithstanding anything in this Final Order, the Interim Order, the DIP Loan Documents, the MPT Prepetition Transaction Documents, the CNH Prepetition Loan Documents, or any other document to the contrary, (i) the DIP Lender's liens, claims, and security interests in the DIP Collateral and its Superpriority Claim, and (ii) all liens, claims, and security interests of the MPT Prepetition Lender in any property of the Debtors or their Estates, including the MPT Prepetition Lender's Adequate Protection Replacement Liens (defined below) and Adequate Protection Claim (defined below), shall, in each instance, be subject to the right of payment of the following expenses (without any duplication of fees and expenses of any professionals in connection with any services rendered to more than one Debtor) (the "<u>Carve-Out Expenses</u>"):

a.     all incurred or accrued professional fees and expenses of professionals for the Debtors and professionals for the Committee to the extent (i) allowed at any time by the Bankruptcy Court (if required), whether prior to or after the Carve-Out Trigger Date (defined below) and regardless of whether allowed by interim order, procedural order, or otherwise, (ii) incurred or accrued through the Carve-Out Trigger Date; and (iii) up to and as limited by the respective aggregate amounts for each professional for the Debtors and each professional for the Committee or category of professionals for the Debtors and category of professionals for the Committee set forth in the Budget, without variance, through the Carve-Out Trigger Date, less the amount of any prepetition retainers received by such professionals and not applied to prepetition fees and expenses (for clarity, all requirements in the foregoing clauses (i) through (iii) must be satisfied for the inclusion of the fees and expenses described by this clause (a) in the Carve-Out Expenses);

b.     all accrued and unpaid fees, disbursements, costs, and expenses incurred by the professionals for the Debtors from and after the date (the "<u>Carve-Out Trigger Date</u>") that the DIP Lender delivers to the Debtors' lead counsel, the U.S. Trustee, and lead counsel to the Committee a written notice identifying an Event of Default (a "<u>Carve-Out Trigger Notice</u>"), to the extent allowed at any time, in an aggregate amount not to exceed

13

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

$200,000, without variance, less (i) the remaining amount of prepetition retainers received by such professionals not previously applied to the fees, disbursements, costs, and expenses set forth in clause (a) above, and (ii) the amounts remaining in the Professional Fee Trust Account for the professionals of the Debtors not previously applied or to be applied to the fees, disbursements, costs, and expenses set forth in clause (a) above ((i) and (ii) collectively, the "Debtor Excess Retainer and Trust Fees"), which Debtor Excess Retainer and Trust Fees shall be applied to the fees, disbursements, costs and expenses that would otherwise be payable under this clause (b);

c. all accrued and unpaid fees, disbursements, costs, and expenses incurred by the professionals for the Committee from and after the Carve-Out Trigger Date, to the extent allowed at any time, in an aggregate amount not to exceed $50,000, without variance, less the amount remaining in the Professional Fee Trust Account for the professionals of the Committee not previously applied or to be applied to the fees, disbursements, costs, and expenses set forth in clause (a) above (the "Committee Excess Trust Fees"), which Committee Excess Trust Fees shall be applied to the fees, disbursements, costs and expenses that would otherwise be payable under this clause (c);

d. (i) fees payable to the Office of the U.S. Trustee pursuant to 28 USC §1930(a)(6), as determined by agreement of the U.S. Trustee or by final order of the Bankruptcy Court, (ii) fees required to be paid to the Clerk of the Bankruptcy Court pursuant to 28 U.S.C. § 156(c), and (iii) allowed fees and expenses up to $25,000 incurred by any trustee appointed in these cases under chapter 7 of the Bankruptcy Code; and

e. all postpetition expenses of the Debtors and their Estates incurred in the ordinary course of the Debtors' operations to the extent such amounts were (i) due and payable prior to the Carve-Out Trigger Date under the Budget and (ii) not paid during the applicable Budget period(s), and up to and as limited by the amounts set forth in the Budget, subject to the permitted variance as set forth in the DIP Loan Documents, through the Carve-Out Trigger Date.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

14

Prior to the Carve-Out Trigger Date: (A) an amount sufficient to pay the Carve-Out Expenses set forth in clause (a) above may be funded by the Debtors on a weekly basis into a trust account held by Debtors' counsel (the "Professional Fee Trust Account") in accordance with the approved Budget, (B) the Debtors shall be permitted to borrow under the DIP Note to fund the Professional Fee Trust Account in the amounts contemplated under clause (a) above, and (C) the Debtors shall be permitted to pay, and all amounts contemplated under clause (a) shall be paid, from the Professional Fee Trust Account, as and when the same may become due and payable, the allowed professional fees of each Debtor and Committee professional. Following the Carve-Out Trigger Date, the Debtors shall be permitted to borrow under the DIP Note to fund the Professional Fee Trust Account for all Carve-Out Expenses set forth in clause (a) above to the extent not previously funded and paid, including by deposit in the Professional Fee Trust Account. Any excess amounts remaining in the Professional Fee Trust Account after payment of the Carve-Out Expenses shall be released to the DIP Lender. Notwithstanding the foregoing, none of the Carve-Out Expenses, proceeds from the DIP Facility or Cash Collateral may be used (i) to investigate (other than by the Committee and its professionals, subject to a cap of $50,000, and further subject to the limitations contained in Section 9.1, below) or challenge in any respect the validity, perfection, priority, extent, or enforceability of any of the MPT Prepetition Transaction Documents or the liens or security interests securing the obligations arising under the MPT Prepetition Transaction Documents; (ii) to delay, challenge, or impede any rights of the DIP Lender under any of the DIP Loan Documents, the Interim Order, or this Final Order or to object to or oppose any action authorized under the DIP Loan Documents, the Interim Order, or this Final Order; or (iii) to pursue any claims or causes of action of any kind against the DIP Lender, the MPT Prepetition Lender or MPT of Watsonville, LLC in their respective capacities under the DIP Loan Documents or MPT Prepetition Transaction Documents, as the case may be. For the avoidance of doubt, the Professional Fee Trust Account shall be held at an authorized depository compliant with Bankruptcy Code section 345.

        2.4      Use of Cash Collateral; Adequate Protection.

        2.4.1      Authorization to Use Cash Collateral.   Subject to the terms and conditions of this Final Order, the DIP Note and the other DIP Loan Documents, the Debtors shall be

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

15

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

and are hereby authorized to use, in accordance with the Budget, Cash Collateral subject to the MPT Prepetition Liens to, (a) upon entry of this Final Order, immediately repay the outstanding MPT Prepetition Obligations up to the sum of $9,250,000, (b) pay fees and expenses related to the DIP Note and the other DIP Loan Documents, and (c) fund working capital in the ordinary course of the business of the Debtors and other general corporate purposes, in each case, to the extent set forth in the Budget and permitted under DIP Loan Documents. In addition, pursuant to the Interim Order, the Debtors were authorized to use Cash Collateral to repay, and following entry of the Interim Order did repay, from ongoing receipts (aside from Applicable Managed Care QAF Payments (as defined in the DIP Note)) the outstanding principal balance, together with all accrued and unpaid interest thereon and all other sums due under that certain Credit and Security Agreement, dated as of June 22, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition CNH Credit Agreement" and, together with any additional agreements, documents, instruments and certificates executed, and any orders in connection therewith, or otherwise delivered in connection therewith or evidencing or securing any of the obligations thereunder, the "CNH Prepetition Loan Documents"), by and between WHC and the CNH Prepetition Lender (such obligations, the "CNH Prepetition Obligations"). Nothing in this Final Order shall authorize the disposition of any assets of the Debtors or their Estates outside the ordinary course of business, or any Debtor's use of Cash Collateral or other proceeds resulting therefrom, except as permitted in the Interim Order, this Final Order, the DIP Note, the other DIP Loan Documents, or the Budget. In accordance with the provisions of the DIP Note (and without limiting the Debtors' obligations thereunder), the Debtors shall timely deliver to the DIP Lender updated cash flow forecasts and Variance Reports (as defined in the DIP Note) and comply with all other reporting covenants and obligations described in the DIP Note; provided, however that, for purposes of calculating the Permitted Variance (as defined in the DIP Note) (i) the testing period set forth in Section 2(c) of the DIP Note is hereby increased from the most recently ended two (2) week period to the most recently ended four (4) week period, (ii) any cash flow positive variance shall be a Permitted Variance, (iii) the permitted fifteen percent (15%) aggregate adverse Permitted Variance described in Section 2(c)(2) of the DIP Note shall be measured by comparing aggregate collections and aggregate disbursements for the applicable testing period, and

16

(iv) any cash flow positive variance for any testing period may be carried forward to the subsequent testing period. The Debtors shall provide the Committee the same reports and/or information as the Debtors provide to the DIP Lender in satisfaction of the Debtors' reporting covenants and obligations under the DIP Note, and provide such reports and/or information to the Committee at the same time as the Debtor provides them to the DIP Lender.

### 2.4.2 MPT Prepetition Adequate Protection.

a. *Adequate Protection Replacement Liens.* As adequate protection for any diminution in value of its interests in the MPT Prepetition Collateral (including Cash Collateral) on account of the Debtors' use of such MPT Prepetition Collateral (including Cash Collateral), the imposition of the automatic stay, the incurrence of the DIP Obligations, and the subordination to the Carve-Out Expenses, the MPT Prepetition Lender in respect of the MPT Prepetition Obligations, is hereby granted, solely to the extent of any such diminution in value and pursuant to sections 361 and 363 of the Bankruptcy Code, valid, binding, enforceable and perfected replacement liens upon and security interests in all DIP Collateral (the "Adequate Protection Replacement Liens"); provided, however, that to the extent that any lease prohibits the granting of a lien thereon, or otherwise prohibits hypothecation of the leasehold interest, then in such event the MPT Prepetition Lender shall be granted an Adequate Protection Replacement Lien only on the economic value of, proceeds of sale or other disposition of, and any other proceeds and products of such leasehold interests. The Adequate Protection Replacement Liens shall be junior and subordinate only to (i) the DIP Liens, (ii) the Permitted Priority Liens, (iii) the Carve-Out Expenses, and (iv) any other liens permitted to be senior to the DIP Liens by the DIP Loan Documents. The Adequate Protection Replacement Liens and the Adequate Protection Claim (as defined below) (A) shall not be subject to sections 510, 542, 549, 550, or 551 of the Bankruptcy Code, the "equities of the case" exception of section 552 of the Bankruptcy Code or section 506(c) of the Bankruptcy Code, (B) shall be senior in priority and right of payment to (x) any lien that is avoided and preserved for the benefit of the Debtors and their Estates under section 551 of the Bankruptcy Code or otherwise or (y) any intercompany or affiliate liens or claims of the Debtors, and (C)

17

shall be continuing, binding, valid, perfected, unavoidable, and enforceable against any trustee or any other estate representative appointed or elected in the Cases or any Successor Case, and/or upon the dismissal of any of the Cases or any Successor Case. For the avoidance of doubt, the Adequate Protection Replacement Liens shall not attach to the proceeds of any (a) successful Objection or any successful affirmative claim of the Debtors and/or their Estates against the MPT Prepetition Lender or the CNH Prepetition Lender or (b) rights or claims for surcharge under section 506(c) of the Bankruptcy Code with respect to the DIP Collateral, the MPT Prepetition Collateral, or collateral of the CNH Prepetition Lender.

      b.     *Prepetition Section 507(b) Priority Claim.* To the extent that the Adequate Protection Replacement Liens are insufficient protection against the diminution in value of their interests in the MPT Prepetition Collateral (including Cash Collateral) on account of the Debtors' use of such MPT Prepetition Collateral (including Cash Collateral), the incurrence of the DIP Obligations, the imposition of the automatic stay, and the subordination to the Carve-Out Expenses, the MPT Prepetition Lender, in respect of the MPT Prepetition Obligations, is hereby granted, solely to the extent of any such diminution of value and pursuant to section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases with priority over all administrative expense claims and unsecured claims against the Debtors or their Estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 364(c)(1), 546, 726 or 1114 and any other provision of the Bankruptcy Code (the "Adequate Protection Claim"); provided, however, that the Adequate Protection Claim shall be junior and subordinate only to (i) the right of payment of the DIP Obligations owing to the DIP Lender, (ii) the Superpriority Claim granted in favor of the DIP Lender pursuant to this Final Order, and (iii) the Carve-Out Expenses. The Adequate Protection Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered an administrative expense allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and

have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including the proceeds of Avoidance Actions (but not including the proceeds of any (a) successful Objection or any successful affirmative claim of the Debtors and/or their Estates against the MPT Prepetition Lender or the CNH Prepetition Lender or (b) rights or claims for surcharge under section 506(c) of the Bankruptcy Code with respect to the DIP Collateral, the MPT Prepetition Collateral, or collateral of the CNH Prepetition Lender), subject only to (i) the right of payment of the DIP Obligations owing to the DIP Lender, (ii) the Superpriority Claim granted in favor of the DIP Lender, pursuant to this Final Order, and (iii) the Carve-Out Expenses.

c. *Accrual of Fees, Costs and Expenses*: The Debtors shall accrue as part of the DIP Obligations and the DIP Lender may choose to pay and add to the DIP Obligations, at least ten (10) business days following receipt by the Debtors of any invoice (which may be provided in summary fashion or redacted to protect privilege) therefore, with a copy to the Committee and U.S. Trustee: the reasonable and documented fees and out-of-pocket expenses for the professionals advising the DIP Lender, including KTBS Law LLP and Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, and any other advisors to the DIP Lender and the MPT Prepetition Lender; provided, however, that such fees and expenses shall not be added to the DIP Obligations or paid by the DIP Lender if an objection is made by the Debtors, the Committee, or the U.S. Trustee within such ten (10) business day period (except to the extent such fees and expenses are not subject to the objection) unless consensually resolved by the affected professional and objecting party or approved by the Court. The fees and expenses accrued or paid hereunder shall not otherwise be subject to separate approval by the Court or to the United States Trustee Guidelines.

d. *Payment of Post-Petition Interest*. To the extent it is later determined by an order of the Court that the MPT Prepetition Obligations were oversecured, interest shall accrue on all of the outstanding MPT Prepetition Obligations at the default rate from and after the Petition Date.

e. *Reservation of Rights*. Notwithstanding any other provision

19

Case: 21-51477    Doc# 207-1    Filed: 01/17/22    Entered: 01/17/22 14:38:00    Page 21 of 77

hereof, the grant of adequate protection pursuant to the terms of this Final Order is without prejudice to the right of the MPT Prepetition Lender to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection, and without prejudice to the right of the Debtors, the Committee, or any other party in interest to contest any such modification.

Section 3.    Authorization to Accrue Professional Fees of DIP Lender.

3.1    Any and all reasonable and documented fees paid or required to be paid in connection with the DIP Loan Documents (including, but not limited to, the fees and expenses of the DIP Lender) are hereby authorized and shall be accrued as set forth in the DIP Note and Section 2.4.2.c, above. Notwithstanding anything to the contrary in this Final Order, the Interim Order, or the DIP Loan Documents, the Debtors are not authorized to pay, or accrue as part of the DIP Obligations, any fees or expenses, including legal fees and expenses, related to the DIP Lender or MPT Prepetition Lender's unsuccessful defense of (i) any Objection, (ii) affirmative claim of the Debtors and/or their Estates, or (iii) rights or claims for surcharge under section 506(c) of the Bankruptcy Code with respect to the DIP Collateral, the MPT Prepetition Collateral, or collateral of the CNH Prepetition Lender.

Section 4.    Sale Process.

4.1    Sale Process.  The Debtors have indicated that they intend to conduct a process to sell (the "Sale") substantially all of their assets (the "Acquired Assets").  Subject to the provisions of this Final Order, including Section 10.9, the Debtors are authorized and directed to immediately and indefeasibly distribute directly (or cause any purchaser of the Acquired Assets to immediately and indefeasibly distribute directly) to the DIP Lender the proceeds from the Sale of the Acquired Assets, up to the amount of the DIP Obligations and, to the extent applicable in accordance with the Term Sheet (defined below), the MPT Prepetition Obligations outstanding as of the closing of the Sale, including, but not limited to, principal, accrued and unpaid interest, and all outstanding fees and expenses.

4.2    Chapter 11 Milestones.  As a condition to funding under the DIP Facility, the Debtors shall achieve the following timeline milestones (the "Chapter 11 Milestones"), in each case

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

20

in a manner satisfactory to the DIP Lender or such later dates as may be agreed in writing by the DIP Lender in its discretion:

> a. entry of an order of the Court, satisfactory to the DIP Lender approving the Sale (the "Sale Order") no later than one business day after the sale hearing; and

> b. consummation of the Sale as soon as practicable after entry of the Sale Order and in no event later than August 31, 2022.

4.3     Credit Bid Rights.  In connection with any sale of all or substantially all of the Acquired Assets (excluding the "stalking-horse" bid from Pajaro Valley Healthcare District Project once deemed to be a qualified bid), the DIP Lender shall have the right to credit bid any portion or all of the Debtors' outstanding obligations under the MPT Prepetition Note pursuant to Bankruptcy Code section 363(k), subject to the Committee's Objection rights, and any bid submitted by the DIP Lender shall be deemed a "qualified bid" under the bid procedures for a potential Sale.

Section 5.     Cash Management System; Control Over Debtors' Accounts.  The Debtors shall maintain their existing cash management system unless the DIP Lender, in its sole and absolute discretion, consents in writing to any proposed modification to such cash management system; provided, however, that the Debtors shall be authorized, at the direction of the DIP Lender to enter into amendments to their existing cash management agreements and any such amendments shall be subject to any order of this Court authorizing the Debtors' maintenance of its cash management system.  From and after the date of the entry of the Interim Order, all collections and proceeds of any DIP Collateral and all Cash Collateral which shall at any time come into the possession, custody, or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be promptly deposited in a bank account in accordance with the DIP Note.  In addition, the DIP Lender shall be deemed without any further action of any kind, to have "control" over all of the Debtors' bank accounts within the meaning of Sections 8-106, 9-104, 9-105, 9-106, 9-107 and 9-314 of the New York Commercial Code.

Section 6.     Proof of Claim.  Any order entered, or to be entered, by the Court concerning the establishment of a bar date in any of the Cases or in any Successor Cases shall not apply to the DIP Lender.

Case: 21-51477   Doc# 207-1   Filed: 01/17/22   Entered: 01/17/22 14:38:00   Page 23 of 77

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

6.1     <u>MPT Prepetition Obligations</u>.  The MPT Prepetition Lender was, pursuant to the Interim Order, deemed to have filed a timely proof of claim in the Cases in an amount equal to no less than $40,132,813, inclusive of principal and all accrued and unpaid interest, exclusive of costs, expenses, and fees owed to the MPT Prepetition Lender on account of the MPT Prepetition Obligations.  The MPT Prepetition Lender shall not be required to file any other proof of claim in the Cases on behalf of itself setting forth the MPT Prepetition Obligations, or any portion thereof.  Notwithstanding any provision to the contrary in any order to be entered by the Court concerning the establishment of a bar date in any of the Cases or in any Successor Cases, the MPT Prepetition Lender is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it deems appropriate) one or more proofs of claim in each of the Cases or in any Successor Cases for any claim allowed herein.  Subject to Sections 9.1 and 9.1.1 hereof, any and all payments made to and accepted by the MPT Prepetition Lender, whether prepetition or postpetition, in connection with the MPT Prepetition Obligations, the Interim Order, or this Final Order are final and not subject to avoidance or recovery by the Debtor or any other entity under chapter 5 of the Bankruptcy Code or otherwise.

Section 7.     <u>Default; Rights and Remedies; Relief from Stay</u>.

7.1     <u>Events of Default</u>.  The occurrence and continuation of any of the following events, unless waived by the DIP Lender in its sole discretion, shall constitute an "<u>Event of Default</u>" under this Final Order and the DIP Loan Documents, and the DIP Lender shall provide notice of any such Event of Default to the Debtors, the U.S. Trustee, and lead counsel to the Committee (if a Committee has been appointed):

a.     the Debtors' failure to timely achieve any of the Chapter 11 Milestones;

b.     a plan of reorganization or liquidation is proposed which does not provide for termination of the commitment under the DIP Facility and payment in full of the DIP Obligations;

c.     any other superpriority administrative expense claim or lien senior to or *pari passu* with the DIP Obligations, the DIP Liens, the Adequate Protection Claim

or the Adequate Protection Replacement Liens shall be granted, approved, imposed, or otherwise created;

        d.      subject to Sections 9.1 and 9.1.1 below, any of the Debtors seeks to obtain additional financing under section 364(c) or 364(d) of the Bankruptcy Code or to grant any lien other than liens permitted under the DIP Note without the prior written consent of the DIP Lender;

        e.      subject to sections 9.1 and 9.1.1 below, any Debtor files, or any representative of any Debtors' Estate files, any action challenging the validity, perfection, priority, extent, or enforceability of the DIP Loan Documents or the DIP Liens and claims granted thereunder;

        f.      any Debtor commences any action against the MPT Prepetition Lender or MPT of Watsonville, LLC with respect to the MPT Prepetition Obligations or the Lease including, without limitation, any action to avoid, modify, dispute, challenge, or subordinate any of the MPT Prepetition Obligations or any MPT Prepetition Liens, or entry of an order in any action by any other party granting such relief;

        g.      the entry of an order dismissing any of the Cases that does not provide for the termination of the commitment under the DIP Facility and payment in full of the DIP Obligations;

        h.      any DIP Collateral becoming subject to an order of surcharge or marshaling;

        i.      the entry of an order of the Court granting relief from the automatic stay with respect to any DIP Collateral or assets of any Debtor that have an aggregate value equal to or exceeding $250,000;

        j.      any material contract of the Debtors is rejected or otherwise terminated (other than in accordance with its terms or any material property of the Debtors is sold outside the ordinary course of business (other than pursuant to the Sale), in each instance,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

other than as expressly permitted under the terms of the DIP Note, without the express written consent of the DIP Lender;

k.    the Debtors terminate the Chief Restructuring Officer of the Debtors or amend or otherwise modify the services or duties thereof unless such termination (and any replacement Chief Restructuring Officer) or modifications is acceptable to the DIP Lender;

l.    any Debtor's failure to perform, in any respect, any of the terms, conditions or covenants or their obligations under this Final Order; or

m.    any other "Event of Default" as defined in and under the DIP Note or any of the other DIP Loan Documents.

7.2    <u>Rights and Remedies Upon Event of Default</u>.  Upon the occurrence and during the continuance of an Event of Default, (i) the Debtors shall be bound by all restrictions, prohibitions, and other terms as provided in this Final Order, the DIP Note, and the other DIP Loan Documents, (ii) the DIP Lender shall be entitled to take any act or exercise any right or remedy (subject to Section 7.4 below) as provided in this Final Order or the DIP Loan Documents, including, without limitation, immediately suspending or immediately terminating the DIP Facility pending further order of the Court and (iii) the Debtors' right to use Cash Collateral shall thereupon immediately and without further action of any kind terminate pending further order of the Court; <u>provided</u>, <u>however</u>, that none of the foregoing shall restrict the payment of the Carve-Out Expenses or postpetition accrued and unpaid payroll expenses to the extent set forth in the Budget as of the date of such Event of Default. The DIP Lender shall have no obligation to lend or advance any additional funds to or on behalf of the Debtors, or provide any other financial accommodations to the Debtors, immediately upon or after the occurrence of an Event of Default or upon the occurrence of any act, event, or condition that, with the giving of notice or the passage of time, or both, would constitute an Event of Default, except to fund the Carve-Out Expenses and postpetition accrued and unpaid payroll expenses to the extent set forth in the Budget as of the date of the Event of Default.

7.3    <u>Expiration of Commitment</u>.  Upon the earlier of (i) expiration of the Debtors' authority to borrow and obtain other credit accommodations from the DIP Lender pursuant to the terms

24

of this Final Order and the DIP Loan Documents (except if such authority shall be extended with the prior written consent of the DIP Lender in its sole and absolute discretion, which consent shall not be implied or construed from any action, inaction, or acquiescence by the DIP Lender) and (ii) the occurrence and continuance of an Event of Default which results in the delivery by the DIP Lender of an Enforcement Notice (as defined below), all of the DIP Obligations shall automatically become due and payable, and the DIP Lender, in its sole discretion, may suspend additional advances under the DIP Facility (except to fund the Carve-Out Expenses) and seek relief from stay to take any and all actions and remedies provided to it in this Final Order, the DIP Loan Documents or applicable law which the DIP Lender may deem appropriate and to proceed against and realize upon the DIP Collateral or any other property of the Debtors' Estates following five (5) Business Days (as defined in the DIP Note) after delivery of an Enforcement Notice by the DIP Lender. All rights, objections, and defenses of the Debtors, the Estates, and the Committee are reserved and preserved with respect to any application for relief from the automatic stay under this Section 7.3.

7.4     <u>Relief from Automatic Stay</u>. Subject to the terms hereof, the automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified and vacated without further notice, application or order of the Court to the extent necessary to permit the DIP Lender to perform any act authorized or permitted under or by virtue of this Final Order or the DIP Loan Documents, including, without limitation, (a) to implement the postpetition financing arrangements authorized by this Final Order and pursuant to the terms of the DIP Loan Documents, and (b) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the DIP Collateral. In addition, and without limiting the foregoing, upon the occurrence and continuance of an Event of Default and after providing five (5) Business Days prior written notice to counsel for the Debtors, counsel for the Committee, and the U.S. Trustee (the "<u>Enforcement Notice</u>"), the DIP Lender shall be entitled to seek relief from stay to take any action and exercise all rights and remedies provided to it by this Final Order, the DIP Loan Documents, or applicable law as the DIP Lender may deem appropriate in its sole discretion to, among other things, proceed against and realize upon the DIP Collateral or any other assets or properties of Debtors' Estates upon which the DIP Lender has been or may hereafter be

granted liens or security interests to obtain the full and indefeasible repayment of all DIP Obligations. All rights, objections, and defenses of the Debtors, the Estates, and the Committee are reserved and preserved with respect to any application for relief from the automatic stay under this Section 7.4; provided, however, that the Debtors shall not object to the DIP Lender seeking a hearing before this Court on shortened notice during the five (5) Business Day period after an Enforcement Notice is delivered. For the avoidance of doubt, during the five (5) Business Day period referenced above, the DIP Lender shall have no obligation to make any additional advances under the DIP Loan Documents, except to fund the Carve-Out Expenses and postpetition accrued and unpaid payroll expenses to the extent set forth in the Budget as of the date of the Event of Default.

Section 8.     Good Faith.  The terms of this Final Order were negotiated in good faith and at arm's length by and among the Debtors and the DIP Lender.  The DIP Lender shall be entitled to the full protections of section 364(e) of the Bankruptcy Code with respect to the new money advances under the DIP Facility.

Section 9.     Representations; Covenants; and Waivers.

9.1     Objections to MPT Prepetition Obligations.  Any action, claim or defense (hereinafter, an "Objection") that seeks to object to, challenge, contest, or otherwise invalidate or reduce, whether by setoff, recoupment, affirmative claim, counterclaim, deduction, subordination, disgorgement, cure, reinstatement, or claim of any kind: (a) the existence, validity, nonavoidability, priority, or amount of the MPT Prepetition Obligations, or (b) the extent, legality, validity, priority, perfection, nonavoidability, or enforceability of the MPT Prepetition Liens, shall be filed with the Court by the Committee, which shall have standing to file, pursue, prosecute, negotiate, and/or settle any such Objection, and by no other party, by no later than the earlier to occur of (x) the date that is one (1) day before the date of the "Sale Hearing" as defined in this Court's *Order (A) Approving Bidding Procedures for the Sale of Substantially All Assets; (B) Approving Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases; (C) Approving Related Notice Procedures; (D) Scheduling a Sale Hearing; and (E) Granting Certain Related Relief* [Docket No. 91] (the "Committee Objection Deadline") and (y) March 9, 2022; provided, however, that the foregoing deadline may be extended, in writing, by the DIP Lender, or as ordered by the Court for

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

cause shown. If any such Objection is timely filed, nothing in this Final Order shall prevent the Court from granting appropriate relief with respect to the MPT Prepetition Obligations or the MPT Prepetition Liens in the MPT Prepetition Collateral. If no Objection is timely filed, or if an Objection is timely filed but denied, (a) the MPT Prepetition Obligations shall be deemed allowed in full, shall not be subject to any setoff, recoupment, counterclaim, avoidance, subordination, deduction, cure, reinstatement, or claim of any kind, and shall not be subject to any further objection or challenge by any party at any time, and the MPT Prepetition Liens in favor of the DIP Lender in the MPT Prepetition Collateral shall be deemed legal, valid, perfected, enforceable, and non-avoidable, for all purposes and of first and senior priority, subject to only the Carve-Out Expenses, the Permitted Priority Liens, and the DIP Liens, and (b) the MPT Prepetition Lender and MPT of Watsonville, LLC and each of their respective agents, officers, directors, employees, attorneys, professionals, successors, and assigns, solely in their capacities as such, shall be deemed released and discharged from any and all claims and causes of action related to or arising out of the MPT Prepetition Transaction Documents and shall not be subject to any further objection or challenge by any party at any time.

9.1.1    The Committee is granted standing to file, pursue, prosecute, negotiate, and/or settle any and all of the Estates' claims and causes of action (including any Objection) against the MPT Prepetition Lender, the CNH Prepetition Lender, and their respective affiliates.

9.1.2    The MPT Prepetition Lender shall reasonably cooperate (the "MPT Cooperation Obligation") (including with respect to any reasonable formal or informal requests for nonprivileged documents and information) with the Committee's investigation of (i) the existence, validity, extent, amount, perfection, priority, or enforceability of the MPT Prepetition Obligations and the CNH Prepetition Obligations and (ii) any and all affirmative claims of the Debtors and/or their Estates against the MPT Prepetition Lender and the CNH Prepetition Lender.

9.1.3    Nothing in this Final Order, the Interim Order, the DIP Loan Documents, the MPT Prepetition Transaction Documents, the CNH Prepetition Loan Documents, the Intercreditor Agreement, or any other document or order shall constitute an admission or acknowledgment by the Committee regarding any prepetition liens, claims, or causes of action against the MPT Prepetition Lender or the CNH Prepetition Lender.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

27

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

9.2     Debtors' Waivers.  It shall be an immediate event of default under the DIP Facility if, at any time during the Cases, the Debtors seek authority to use Cash Collateral of the DIP Lender under section 363 of the Bankruptcy Code without the written consent of the DIP Lender in its sole and absolute discretion; provided, however, that no such consent shall be implied from any action, inaction, or acquiescence by the DIP Lender; provided, further, upon entry of the Final Order, the Debtors waive any right to use Cash Collateral of the DIP Lender or the MPT Prepetition Lender under section 363 of the Bankruptcy Code without the written consent of the DIP Lender or the MPT Prepetition Lender, as applicable, in their respective sole and absolute discretion.  At all times during the Cases, and whether or not an Event of Default has occurred, the Debtors irrevocably waive any right that they may have to (a) obtain postpetition loans or other financial accommodations pursuant to section 364 of the Bankruptcy Code, other than from the DIP Lender or as may be otherwise expressly permitted pursuant to the DIP Loan Documents, (b) challenge the application of any payments authorized by the Financing Orders, (c) propose, support or file a plan of reorganization or liquidation that does not provide for the indefeasible payment in cash in full and satisfaction of all DIP Obligations on the effective date of such plan in accordance with the terms and conditions set forth in the DIP Note, or (d) seek relief under the Bankruptcy Code, including without limitation, under section 105 of the Bankruptcy Code, to the extent any such relief would directly restrict or impair the rights and remedies of the DIP Lender under the Financing Orders and the DIP Loan Documents or the DIP Lender's exercise of such rights or remedies; provided, however, that the DIP Lender, in its sole and absolute discretion, may otherwise consent in writing, but no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender.

9.3     Section 506(c) Claims.  Except to the extent of the Carve-Out Expenses, during the periods for which the use of Cash Collateral is authorized, no costs or expenses of administration which have or may be incurred in the Cases shall be charged against the DIP Lender or its claims or interests, the DIP Collateral and/or MPT Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of the DIP Lender in its sole and absolute discretion, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender.  For the avoidance of doubt, any waiver of or limitation on the

Case: 21-51477     Doc# 207-1     Filed: 01/17/22     Entered: 01/17/22 14:38:00     Page 30 of 77

Debtors' or Estates' rights under section 506(c) shall not be applicable to any expenses incurred in any period following the expiration or termination of the Debtors' and Estates' authority to use Cash Collateral.

9.4     Collateral Rights.  Until all of the DIP Obligations shall have been indefeasibly paid and satisfied in full:

9.4.1    no other party shall foreclose or otherwise seek to enforce any junior lien or claim in any DIP Collateral; and

9.4.2    upon and after the occurrence of an Event of Default, and subject to the DIP Lender providing five (5) Business Days prior written notice as set forth in Section 7.4, above, the DIP Lender (or any of its employees, agents, consultants, contractors, or other professionals) shall have the right, subject to applicable state and federal law, to: (a) enter upon, occupy and use any real or personal property, fixtures, equipment, leasehold interests, or warehouse arrangements owned or leased by Debtors, and (b) use any and all trademarks, tradenames, copyrights, licenses, patents or any other similar assets of Debtors, which are owned by or subject to a lien of any third party and which are or were used by any of the Debtors.  All rights, objections, and defenses of the Committee with respect to any such action are reserved and preserved.

9.5     QAF Payments.  The Debtors shall timely pay all outstanding amounts with respect to the California Department of Health Care Service's Hospital Quality Assurance Fee Program IV and V (or any successor thereto) (or any similar or equivalent program pursuant to which any Debtor is entitled to receive supplemental payments from the State of California for providing inpatient or outpatient health care services).  The DIP Lender may, but shall have no obligation to, pay any such amounts not paid by the Debtors and charge such payments to the DIP Facility as DIP Obligations under the DIP Loan Documents.

Section 10.     Other Rights and Obligations.

10.1    No Modification or Stay of This Final Order.  Notwithstanding (a) any stay, modification, amendment, supplement, vacating, revocation, or reversal of this Final Order, any of the DIP Loan Documents or any term hereunder or thereunder or (b) the dismissal or conversion of one or more of the Cases (each, a "Subject Event"), (i) the acts taken by the DIP Lender in accordance

29

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

with this Final Order, and (ii) the DIP Obligations incurred or arising prior to the DIP Lender's actual receipt of written notice from Debtors expressly describing the occurrence of such Subject Event shall, in each instance, be governed in all respects by the original provisions of this Final Order, and the acts taken by the DIP Lender in accordance with this Final Order, and the liens granted to the DIP Lender in the DIP Collateral, and all other rights, remedies, privileges, and benefits in favor of the DIP Lender pursuant to this Final Order and the DIP Loan Documents shall remain valid and in full force and effect pursuant to section 364(e) of the Bankruptcy Code with respect to the new money advances under the DIP Facility.

10.2    <u>Power to Waive Rights; Duties to Third Parties</u>.  The DIP Lender, in its sole and absolute discretion, shall have the right to waive any of the terms, rights and remedies provided or acknowledged in this Final Order in respect of the DIP Lender (the "<u>DIP Lender Rights</u>"), with any such waiver to be made in writing by the DIP Lender, and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any DIP Lender Rights.  Any waiver by the DIP Lender of any DIP Lender Rights shall not be or constitute a continuing waiver.  Any delay in or failure to exercise or enforce any DIP Lender Right shall neither constitute a waiver of such DIP Lender Right, subject the DIP Lender to any liability to any other party, nor cause or enable any other party to rely upon or in any way seek to assert a defense to any obligation owed by the Debtors to the DIP Lender.

10.3    <u>Setoff and Return of Goods</u>.  The Debtors shall not, without the consent of the DIP Lender in its sole and absolute discretion, (a) enter into any agreement to return any goods to any of their creditors for application against any prepetition indebtedness under any applicable provision of section 546 of the Bankruptcy Code, or (b) consent to any creditor taking any setoff against any of its prepetition indebtedness based upon any such return of goods (pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise).

10.4    <u>Reservation of Rights</u>.  The terms, conditions, and provisions of this Final Order are in addition to and without prejudice to the rights of the DIP Lender to pursue any and all rights and remedies under the Bankruptcy Code, the Interim Order, the DIP Loan Documents, or any other applicable agreement or law, including, without limitation, to seek relief from the automatic stay, to

30

seek an injunction, to oppose any request for use of cash collateral or granting of any interest in the DIP Collateral or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of professionals or other parties seeking compensation or reimbursement from the Debtors' Estates.

10.5    Binding Effect of Final Order.

10.5.1   Immediately upon entry by this Court, this Final Order shall be valid and binding upon and inure to the benefit of the DIP Lender, the Debtors, and the property of the Debtors' Estates, all other creditors of any of the Debtors, the Committee, and all other parties in interest and their respective successors and assigns (including any chapter 11 or chapter 7 trustee or any other fiduciary hereafter appointed as a legal representative of the Debtors), in any of the Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.

10.5.2   Any order dismissing one or more of the Cases or any Successor Case under section 1112 or otherwise shall, subject to the rights of the Committee under Sections 9.1 through 9.1.3 above and to the extent consistent with applicable law, be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (a) the Superpriority Claim, the DIP Liens, the MPT Prepetition Liens, the Adequate Protection Replacement Liens, and the Adequate Protection Claim shall continue in full force and effect notwithstanding such dismissal until the DIP Obligations and MPT Prepetition Obligations are indefeasibly paid and satisfied in full, and (b) this Court shall retain jurisdiction to the greatest extent permitted by applicable law, notwithstanding such dismissal, for the purposes of enforcing the Superpriority Claim, the DIP Liens, the MPT Prepetition Liens, the Adequate Protection Replacement Liens, and the Adequate Protection Claim.

10.6    Restrictions on Cash Collateral Use, Additional Financing, Plan Treatment.  All postpetition advances and other financial accommodations under the DIP Note and the other DIP Loan Documents are made in reliance on the Financing Orders and there shall not at any time be entered in the Cases, or in any Successor Case, any order which (a) authorizes the use of Cash Collateral of the Debtors in which the DIP Lender has an interest, or the sale, lease, or other disposition of property of any Debtor's Estate subject to a lien or security interest granted to the DIP Lender, except as expressly permitted hereunder or in the DIP Loan Documents, or (b) authorizes under section 364 of the

31

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
San Francisco, California

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Bankruptcy Code the obtaining of credit or the incurring of indebtedness secured by a lien or security interest which is equal or senior to a lien or security interest in property in which the DIP Lender holds a lien or security interest, or which is entitled to priority administrative claim status which is equal or superior to that granted to the DIP Lender, herein unless, in each instance (i) the DIP Lender shall have given its express prior written consent with respect thereto (such consent to be in the DIP Lender's absolute and sole discretion and no such consent being implied from any other action, inaction, or acquiescence by the DIP Lender), or (ii) such other order requires that all DIP Obligations shall first be indefeasibly paid and satisfied in full in accordance with the terms of the DIP Note and the other DIP Loan Documents, including, without limitation, all debts and obligations of the Debtors to the DIP Lender which arise or result from the obligations, loans, security interests, and liens authorized herein, on terms and conditions acceptable to the DIP Lender. The security interests and liens granted to or for the benefit of the DIP Lender hereunder and the rights of the DIP Lender pursuant to this Final Order shall not be altered, modified, extended, impaired, or affected by any plan of reorganization or liquidation of the Debtors without the express prior written consent of the DIP Lender (such consent to be in the DIP Lender's absolute and sole discretion).

       10.7    <u>No Owner/Operator Liability</u>. In determining to make any loan under the DIP Note or any Financing Order, or in exercising any rights or remedies as and when permitted pursuant to the DIP Note or any Financing Order, the DIP Lender shall not be deemed to be in control of the operations of any of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of any of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, or any similar or other federal or state statute).

       10.8    <u>Marshalling/552(b)</u>. The MPT Prepetition Lender and the DIP Lender shall not be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the DIP Collateral or the MPT Prepetition Collateral. The DIP Lender and the MPT Prepetition Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender

32

or the MPT Prepetition Lender with respect to proceeds, products, offspring, or profits of any of the DIP Collateral and/or MPT Prepetition Collateral.

        10.9   <u>Committee Term Sheet</u>. The Committee and the DIP Lender consent to the entry of this Final Order subject to the terms of the Term Sheet attached as **<u>Exhibit C</u>** hereto, the terms of which are hereby approved.

        10.10   <u>Objections Overruled</u>. All objections to the entry of this Final Order are, to the extent not withdrawn or resolved, hereby overruled.

Section 11.   <u>Findings and Conclusions.</u> This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable, as of the Petition Date, immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Final Order.

Section 12.   <u>Final Order Governs.</u> In the event that any provision of this Final Order conflicts with any term of the Interim Order, the DIP Loan Documents, the MPT Prepetition Transaction Documents, the CNH Prepetition Loan Documents, the Intercreditor Agreement, or any other document or order, this Final Order shall govern.

Section 13.   <u>No Prejudice.</u> This Final Order shall not prejudice, impair, or adversely affect any of the MPT Prepetition Lender's rights in connection with any of the MPT Prepetition Transaction Documents, except as specifically set forth herein.

Section 14.   <u>Retention of Jurisdiction.</u> The Court has and will retain jurisdiction to interpret and enforce the provisions of this Final Order.

***END OF ORDER***

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**EXHIBIT A**

**DIP Note**

**SENIOR SECURED SUPERPRIORITY
DEBTOR IN POSSESSION PROMISSORY NOTE**

$30,750,000                                                      December 5, 2021

FOR VALUE RECEIVED, Halsen Healthcare, LLC, a California limited liability company, Watsonville Hospital Holdings, Inc., a California corporation ("Watsonville Holdings"), Watsonville Healthcare Management, LLC, a Delaware limited liability company, and Watsonville Hospital Corporation, a Delaware corporation ("WHC"), each a debtor and debtor-in-possession (collectively, jointly and severally, the "Debtors"), having an address at 75 Nielsen Street, Watsonville, California 95076, hereby absolutely and unconditionally, promise to pay to the order of MPT of Watsonville Lender, LLC, a Delaware limited liability company (the "DIP Lender"), having an address at c/o MPT Operating Partnership, L.P., 1000 Urban Center Drive, Suite 501, Birmingham, Alabama 35242, or at such other address as the holder of this Senior Secured Superpriority Debtor in Possession Promissory Note (this "DIP Note") may from time to time designate in writing, the aggregate unpaid principal amount of all advances from time to time outstanding hereunder, together with interest thereon and other amounts payable as provided herein (the "DIP Loan").

**R E C I T A L S:**

**WHEREAS**, on December 5, 2021 (the "Petition Date"), each Debtor filed a voluntary bankruptcy petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Northern District of California, San Jose Division (the "Bankruptcy Court") commencing cases thereunder (collectively, the "Chapter 11 Cases"), and the Debtors continue to operate their business and manage their properties as debtors and debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, the Debtors have requested the DIP Lender provide a multi-draw term loan credit facility to the Debtors consisting of post-petition senior secured and superpriority loans in an aggregate principal amount not to exceed $30,750,000 (the "Maximum Commitment") at any time outstanding on the terms and conditions provided herein, inclusive of up to $16,000,000 on an interim basis. The proceeds of such loans shall be used, subject to the terms and conditions of this DIP Note and the DIP Orders (as defined below), to (a) repay up to $9,250,000 of the outstanding principal balance, together with all accrued and unpaid interest thereon, under that certain Amended and Restated Promissory Note, dated September 30, 2019 (as amended, restated, supplemented or otherwise modified form time to time, the "MPT Prepetition Note" and, the portion of the Maximum Commitment allocated for the repayment of such obligations under the MPT Prepetition Note, the "Roll-Up Commitment"), made by WHC in favor of the DIP Lender, (b) pay fees and expenses related to this DIP Note and the Chapter 11 Cases and (c) fund working capital in the ordinary course of the business of the Debtors and for other general corporate purposes, in each case, to the extent set forth in the Budget (as defined below) (collectively, the "Permitted Purposes");

**WHEREAS**, the DIP Lender is willing to extend such credit to the Debtors subject to the terms and conditions set forth herein; and

**WHEREAS**, the Debtors have agreed to secure all of the DIP Obligations (as defined below) by granting to the DIP Lender security interests in, and liens upon, all or substantially of their respective existing and after-acquired personal and real property as more fully provided for herein.

**NOW, THEREFORE,** in consideration of the premises, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do agree as follows:

1. **Definitions**. As used in this Agreement, the following terms shall have the respective meanings indicated below.

"<u>Asset Purchase Agreement</u>" means the Stalking Horse APA in form and substance satisfactory to the DIP Lender (or other asset purchase agreement with respect to a qualified overbid pursuant to the Bid Procedures and consented to by the DIP Lender) in respect of a Sale, as the same may be amended or otherwise modified from time to time with the consent of the DIP Lender.

"<u>Avoidance Actions</u>" has the meaning given thereto in the Interim DIP Order and the Final DIP Order, as applicable.

"<u>Bid Procedures</u>" means the bid procedures for a potential Sale in form and substance satisfactory to the DIP Lender.

"<u>Business Day</u>" means each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which money centers in the City of New York, New York or Birmingham, Alabama are authorized or obligated by law or executive order to close.

"<u>Carve-Out Expenses</u>" has the meaning given thereto in the Interim DIP Order and the Final DIP Order, as applicable.

"<u>Cash Collateral</u>" has the meaning given thereto in the Interim DIP Order and the Final DIP Order, as applicable.

"<u>Committee</u>" means, collectively, any official committee of unsecured creditors and any other official committee appointed in any of the Chapter 11 Cases under Section 1102 of the Bankruptcy Code.

"<u>DIP Loan Documents</u>" means this DIP Note, the Interim DIP Order, the Final DIP Order, the Existing Control Agreement, and any additional agreements, documents, instruments and certificates executed, and any orders in connection therewith, or otherwise delivered in connection therewith or evidencing or securing any of the DIP Obligations.

"<u>DIP Obligations</u>" means all present and future indebtedness, obligations and liabilities of each Debtor to the DIP Lender under the DIP Loan Documents and, whether or not the right of payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, unsecured, and whether or not such claim is discharged, stayed or otherwise affected by the Chapter 11 Cases. Without limiting the generality of the foregoing, the DIP Obligations of each Debtor under the DIP Loan Documents include (a) the obligation to pay principal, interest, charges, fees, expenses, indemnities and other amounts payable by such Person under the DIP Loan Documents, and (b) the obligation of such Person pursuant to the DIP Loan Documents to reimburse any amount in respect of any of the foregoing that the DIP Lender may elect to pay or advance on behalf of such Person.

2

"DIP Orders" means, collectively, the Interim DIP Order and the Final DIP Order.

"Excluded Loans" means any Loans the proceeds of which were used to repay any MPT Prepetition Obligations other than the Emergency Loan (as defined the Eighth Amendment of the DIP Note).

"Excluded Property" means:

(i)     any intent-to-use (or similar) trademark application prior to the filing and acceptance of a "Statement of Use", "Amendment to Allege Use" or similar filing with respect thereto, to the extent, if any, that, and solely during the period, if any, in which the grant of a security interest therein may impair the validity or enforceability of such intent-to-use trademark application under applicable law;

(ii)    any Avoidance Actions; provided that, subject to entry of the Final DIP Order, the proceeds of Avoidance Actions shall no longer be considered Excluded Property; and

(iii)   any agreements, permits, licenses, or the like solely in the event and to the extent that a grant of a lien on such license, contract, or agreement results in a termination of any such license, contract, or agreement or would render such license, contract or agreement non-assumable or non-assignable under the Bankruptcy Code (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9-406, 9-407, or 9-408 of the UCC (or any successor provision or provisions)) and, in any event, immediately upon the ineffectiveness, lapse or termination of any such terms or default under such license, contract or agreement, the DIP Collateral (as defined below) shall include, and the applicable Debtor shall be deemed to have granted a security interest in, all such licenses, contracts, or agreements as if such terms had never been in effect.

"Existing CNH Control Agreements" means, with respect to any deposit account, securities account, commodity account, securities entitlement or commodity contract, an agreement existing as of the Petition Date among CNH Finance Fund I, L.P., any of the Debtors and the financial institution or other Person at which such account is maintained or with which such entitlement or contract is carried, that grants (or purports to grant) "control" (as defined in the UCC) over such account to CNH Finance Fund I, L.P.

"Existing Control Agreement" means that certain Deposit Account Control Agreement, dated as of November 5, 2021 and in effect as of the Petition Date, by and among Watsonville Holdings, the DIP Lender, the MPT Lessor and Farmers and Merchants Bank of Long Beach. For the avoidance of doubt, the Existing Control Agreement is deemed to apply for the benefit of the DIP Lender under this DIP Note, the Interim DIP Order and the Final DIP Order, as applicable.

"Final DIP Order" means an order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be satisfactory in form and substance to the DIP Lender, which, among other matters but not by way of limitation, authorizes the Debtors to enter into and perform under this DIP Note and any other DIP Loan Documents, incur the DIP Obligations, and grant liens and security interests under this DIP Note and the other DIP Loan Documents, as the case may be, and provides for the superpriority claims as further set forth herein and therein.

3

"Interim DIP Order" means an order of the Bankruptcy Court in the Chapter 11 Cases authorizing the Debtors to enter into and perform under this DIP Note and any other DIP Loan Documents, to incur the DIP Obligations, and grant security interests and liens under this DIP Note and the other DIP Loan Documents, as the case may be, and provides for the superpriority claims, as set forth herein, for an interim period, under, inter alia, Sections 364(c) of the Bankruptcy Code and entered at or after an interim hearing, substantially in the form attached hereto as Exhibit B or otherwise in form and substance satisfactory to the DIP Lender, together with all extensions, modifications, and amendments thereto approved by the DIP Lender.

"Lease" means that certain Lease Agreement, dated September 30, 2019, by and between the MPT Lessor and WHC, as amended, restated, supplemented or otherwise modified from time to time.

"Minimum MPT Payment Amount" has the meaning given thereto in the definition of Sale.

"MPT Lessor" means MPT of Watsonville, LLC, a Delaware limited liability company.

"Permitted Priority Liens" has the meaning given thereto in the Interim DIP Order and Final DIP Order, as applicable.

"Person" means an individual, corporation, limited liability company, partnership, association, joint-stock company, trust, unincorporated organization, joint venture or other enterprise or entity or governmental authority.

"Project" means the Pajaro Valley Healthcare District Project.

"Project Term Sheet" means that certain Summary of Principal Terms for Potential Restructuring, dated as of December 3, 2021, by and among the Debtors, the Project, the DIP Lender and the MPT Lessor.

"Sale" means a sale of substantially all of the assets of the Debtors under Section 363 of the Bankruptcy Code pursuant to an Asset Purchase Agreement that, among other things, provides for, (A) in the case of the Stalking Horse APA, the indefeasible payment and satisfaction in cash of no less than (i) the principal amount of the DIP Obligations then outstanding (excluding the Excluded Loans) up to $25,000,000, and (ii) $9,000,000 to be applied to the MPT Prepetition Obligations (as defined in the Interim DIP Order) (the aggregate minimum amount described in the foregoing clauses (i) and (ii), the "Minimum MPT Payment Amount"), (B) in the case of an Asset Purchase Agreement other than the Stalking Horse APA, cash payment in respect of the DIP Obligations and the MPT Prepetition Obligations that are no less than as contemplated by the Stalking Horse APA and otherwise on such terms as are satisfactory to the DIP Lender, and (C) the assumption of the Lease by the Debtors and the assignment thereof without modification (except as the MPT Lessor may agree in its sole discretion, including, in the case of the Stalking Horse APA, the modifications to the Lease contemplated by the Project Term Sheet) to the buyer under the applicable Asset Purchase Agreement.

"Stalking Horse APA" means the Asset Purchase Agreement between the Debtors and the Project.

"UCC" means the Uniform Commercial Code in effect on the date hereof in the State of Delaware.

2.     **Advances; Increase in Principal Amount; Draw Conditions**.

(a)     The cash-flow forecast for the orderly Sale by the Debtors of the Watsonville Community Hospital (the "Hospital") attached hereto as Exhibit A (as may be modified from time to time by the Debtors with the consent of the DIP Lender in its sole discretion, the "Budget") setting forth the cash receipts and disbursements of the Debtors is hereby approved.

(b)     Subject to the terms and conditions set forth in this DIP Note, the DIP Lender shall make advances to the Debtors as follows (each individually a "Loan" and collectively, the "Loans"):

(i)     on the first Business Day after entry of the Interim DIP Order, an amount equal to $6,000,000 (the "Initial Loan"); and

(ii)     on the subsequent dates set forth in the Budget through March 31, 2022 (each, a "Funding Date"), an amount equal to the estimated "DIP Financing" line item for the periods set forth in the Budget; provided, further, that (1) the Debtors will be allowed the Permitted Variance (as defined below); (2) amounts that were budgeted for any disbursement line item for a prior period but not spent in such period shall be carried over and available to the Debtors in the subsequent period to fund such line item of the Budget; provided, however, that any amounts that are carried over shall reduce the Loan for such subsequent period on a dollar-for-dollar basis; and (3) the proceeds of the Roll-Up Commitment shall be used solely for the repayment of obligations under the MPT Prepetition Note and if all or any portion of such repayment is not approved in the Final DIP Order the Roll-Up Commitment will be reduced on dollar-for-dollar basis. Notwithstanding anything herein to the contrary, the DIP Lender shall have no obligation to advance "new money" hereunder in excess of $21,500,000.

Each Loan, including the Initial Loan, shall be funded to the deposit account subject to the Existing Control Agreement.

(c)     Except with respect to the Initial Loan, which shall be funded by the DIP Lender in accordance with Section 2(b)(i), subject to satisfaction of the Draw Conditions (as defined below), on the first Business Day after entry of the Interim DIP Order, by noon prevailing Eastern Time on two Business Days immediately prior to a Funding Date, the Debtors shall give the DIP Lender written notice of its request for a draw and shall specify the Funding Date and the amount of the requested draw (which amount shall not exceed the amount of the "DIP Financing" line item set forth in the Budget for the applicable Funding Date) (a "Borrowing Notice"). Every Friday, the Debtors shall deliver to the DIP Lender a variance report that reflects a comparison of actual disbursements and receipts for the prior one-week period to the projected disbursements and receipts in the Budget and a calculation of any variance from the Budget (a "Variance Report"). The Debtors may propose a revised Budget at any time, which shall be subject to the DIP Lender's approval in its discretion. The obligation of the DIP Lender to fund is subject to compliance with the terms and conditions of this DIP Note, the Interim DIP Order and, subject to its entry, the Final DIP Order.

Each Variance Report shall indicate whether there are any adverse variances with respect to disbursements or receipts that exceed the allowed variances, which means, in each case measured on a cumulative basis for the most recently ended two-week period, excluding any line items under the category of "Professional Fees," up to (1) 20% of the amount for any line item in the Budget for such period or (2) 15% in the aggregate in the Budget for such period (each, a "Permitted Variance").

5

(d)     Except for a draw to fund the Carve-Out Expenses in accordance with the Interim DIP Order or the Final DIP Order, as applicable, the DIP Lender shall not be obligated to make any Loan (including the Initial Loan hereunder), or to take, fulfill or perform any other action hereunder or under the DIP Orders unless each of the following conditions (each, a "<u>Draw Condition</u>") are met as of the date of each draw and the Debtors certify in a writing signed by the Chief Restructuring Officer of each of the Debtors as to the same:

(i)     All of the representations and warranties contained in the DIP Loan Documents are true and correct as of that date.

(ii)     The DIP Loan Documents shall have been executed or entered, as applicable, and delivered, if applicable, to the DIP Lender in form and substance satisfactory to the DIP Lender, and shall be in full force and effect.

(iii)     The consummation of the transactions contemplated hereby or entered into in contemplation hereof shall not contravene, violate or conflict with, nor involve the DIP Lender in, a violation of applicable law or regulation.

(iv)     All consents, authorizations and filings, if any, required in connection with the execution, delivery and performance by the Debtors, and the validity and enforceability against the Debtors, of the DIP Loan Documents, shall have been obtained or made, and such consents, authorizations and filings shall be in full force and effect.

(v)     The DIP Lender shall have received a copy of the applicable DIP Order, and such DIP Order shall have been entered by the Bankruptcy Court in form and substance satisfactory to the DIP Lender and shall be in full force and effect and shall not have been vacated, stayed, reversed, modified, or amended.

(vi)     No event shall have occurred and be continuing, or would result from the Loan requested thereby, that with the giving of notice or the passage of time or both, would constitute an Event of Default (as defined below) and no Event of Default shall be continuing.

(vii)     Except with respect to the Initial Loan, the Debtors shall have timely delivered a Borrowing Notice related to such Loan in form and substance satisfactory to the DIP Lender and consistent with the Budget.  For the avoidance of doubt, the Debtors may not draw amounts under this DIP Note in excess of the Budget, and the amounts requested by the Debtors shall be used for an authorized purpose and strictly in accordance with the Budget on a line item basis, subject to a Permitted Variance and Section 2(b)(ii)(2).

(viii)     The aggregate principal and amount of all DIP Loans extended shall not exceed the Maximum Commitment.

(ix)     The Debtor (and any successors thereto or any representatives thereof, including any trustees appointed in the Chapter 11 Cases or any successor case) shall be deemed to have waived any rights, benefits or causes of action under section 506(c) of the Bankruptcy Code as they may relate to or be asserted against the DIP Lender, the DIP Liens (as defined in the Interim DIP Order), or the DIP Collateral.

(x)     All information, approvals, documents or other instruments as the DIP Lender may reasonably request, and which are customary for postpetition lenders to request, shall have been received by the DIP Lender.

Notwithstanding anything herein to the contrary, the DIP Lender shall fund the Carve-Out Expenses to the extent set forth in, and in accordance with, the Interim DIP Order and the Final DIP Order, as applicable, without any obligation of the Debtor to meet the Draw Conditions.

3.      **Interest**.  Interest (the "Interest") shall be payable in kind, except as set forth in Section 4(a) below, pending the occurrence of the Maturity Date on so much principal as is from time to time outstanding and unpaid hereunder at a per annum rate equal to 10%, computed on the basis of a 360-day year of twelve 30-day months and for the actual number of days elapsed for any partial calendar month in which Interest is being calculated.  In computing the number of days during which Interest accrues, the day on which funds are initially advanced shall be included (regardless of the time of day such advance is made), and the day on which funds are repaid shall be excluded (subject to Section 4(c) below).

4.      **Payments and Maturity**.

(a)     From and after April 1, 2022, on the first day of each calendar month until the Maturity Date (as defined below), the Debtors shall pay to the DIP Lender all Interest accrued on the outstanding principal balance of the Loans (excluding the principal balance of any Excluded Loans) in the prior calendar month.  Except as otherwise set forth herein or in the DIP Orders, the DIP Obligations, including accrued Interest, shall be due and payable upon the earliest to occur of the following (the "Maturity Date"): (i) the date that is 30 days following the date of entry of the Interim DIP Order if the Final DIP Order has not been entered by the Bankruptcy Court on or prior to such date, (ii) August 31, 2022, (iii) upon the acceleration of this DIP Note pursuant to the terms hereof, and (iv) a Termination Date.  On the Maturity Date, the DIP Lender's obligation to provide Loans shall terminate.

(b)     Any payment made hereunder shall be applied (i) first, to the payment of any expenses, charges, late fees and other amounts payable hereunder, (ii) second, to the payment of the accrued Interest, and (iii) third, to the payment of principal remaining under this DIP Note.  Any principal amount of the DIP Loans which is repaid or prepaid may not be reborrowed.

(c)     All payments to be made by the Debtors under this DIP Note shall be made in lawful money of the United States of America by wire transfer of immediately available and freely transferable funds, and any such payments received by the DIP Lender prior to 2:00 p.m. local time on a Business Day in Birmingham, Alabama shall be credited prior to close of business, while other payments may, at the option of the DIP Lender, not be credited until immediately available to the DIP Lender prior to 2:00 p.m. local time at said place of payment on a day on which the DIP Lender is open for business.

5.      **Prepayment**.

(a)     Voluntary Prepayment.  The Debtors may voluntarily prepay this DIP Note in whole or in part at any time prior to the Maturity Date, without any prepayment penalty or premium.

(b) **Mandatory Prepayment**.  The Debtors must prepay the DIP Obligations with all net proceeds from any (A) sale or refinancing of the real property or other assets of the Debtors, (B) offering of equity or debt securities by the Debtors or other comprehensive recapitalization of the Debtors, or (C) cash received by the Debtors not in the ordinary of business (excluding any Applicable Managed Care QAF Payment (as defined below)).

6. **Late Charges; Interest on Overdue Installments; Collection Costs**.

(a) In the event that any amount of the principal hereof or accrued Interest on this DIP Note is not paid in full when due (whether at stated maturity, by acceleration or otherwise), the Debtors shall pay to the DIP Lender on demand interest on such unpaid amount (to the extent permissible under applicable law) for the period from the date such amount became due until such amount shall have been paid in full at an interest rate per annum equal to the Interest rate then in effect hereunder plus 2% (the "Overdue Rate").  If any amount remains unpaid past the Maturity Date, interest shall continue to accrue on such unpaid amount at the Overdue Rate until paid in full. Collection or acceptance by the DIP Lender of such additional interests and late charges shall not constitute a waiver of any other rights or remedies of the DIP Lender provided herein.

(b) Each Debtor acknowledges that it would be extremely difficult or impracticable to determine the DIP Lender's actual damages resulting from any late payment or Event of Default, and the late charges payable pursuant to Section 6(a) hereof are reasonable estimates of those damages and do not constitute a penalty.

7. **Covenants**.  Unless otherwise agreed to by the DIP Lender in writing, the Debtors shall:

(a) Use the proceeds of the Loans solely for the Permitted Purposes, in the amounts and otherwise in strict accordance (on a line item basis) with and for the purposes provided for in the Budget (subject to Section 2(b)(ii)(2)).  Notwithstanding the then applicable Budget, the Debtor may exceed the budgeted amount during any bi-weekly budget period up to the Permitted Variance; provided, further, that the total amount of the DIP Loans do not exceed the Maximum Commitment. None of the proceeds of the DIP Loans, any portion of the Carve-Out Expenses, Cash Collateral or other DIP Collateral proceeds may be used for any purpose prohibited by the Interim DIP Order or the Final DIP Order.  No part of the proceeds of the DIP Loans will be used, whether directly or indirectly, for any purpose that entails a violation of any of the regulations of the Board of Governors, including Regulations T, U and X.

(b) Keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and property and all legal requirements; and, upon the reasonable request of the DIP Lender, provide copies of, or access to, its books and records, and to discuss the business, operations, assets, and financial and other condition of the Debtors with officers and employees thereof and with their independent certified public accountants (but excluding privileged information) as is reasonably related to the DIP Loans.

(c) Promptly give written notice to the DIP Lender: (i) of the occurrence of any default hereunder or Event of Default; (ii) of any (A) default or event of default under any instrument or other material agreement, guarantee or document of any Debtor or (B) litigation, investigation or proceeding that may exist at any time between any Debtor and any governmental authority after the

Case: 21-51477   Doc# 207-1   Filed: 01/17/22   Entered: 01/17/22 14:38:00   Page 44 of 77

date hereof; and (iii) of the commencement of any litigation or proceeding against any Debtor for acts occurring after the Petition Date.

(d)     At all times, cause all of the DIP Collateral to be subject to a first priority perfected security interest in favor of the DIP Lender in accordance with the DIP Orders, subject and subordinate only to the Carve-Out Expenses and the Permitted Priority Liens.

(e)     Promptly deliver (i) to the DIP Lender copies of all written reports given by any Debtor to any official or unofficial Committee, (ii) copies of all letters of intent, commitment letters, written offers and purchase agreements (in each case, with such redactions as deemed reasonably necessary by the Debtors) received by any Debtor or any of their advisors with respect to, in connection with, or in response to, a proposed Sale or pleadings seeking approval of the same (unless the DIP Lender submits, or has notified the Debtors that it intends to submit, a bid of its own) and (iii) such other information regarding the operations, business affairs, and financial condition of the Debtors as the DIP Lender may request from time to time.

(f)     To the extent practicable, at least two Business Days prior to the date when the Debtors intend to file any pleading, motion, or other document (and, if not reasonably practicable, as soon as reasonably practicable), provide copies of all material pleadings, motions, applications, judicial information, financial information, and other documents to be filed by any Debtor in the Chapter 11 Case.

(g)     Promptly execute and deliver such documents, instruments and agreements, and take or cause to be taken such acts and actions, as the DIP Lender may reasonably request from time to time to carry out the intent of this DIP Note, the other DIP Loan Documents and the DIP Orders.

(h)     Not create, incur, assume, or suffer to exist any indebtedness other than (i) indebtedness outstanding on the date hereof; (ii) indebtedness in connection with the Loans; (iii) indebtedness in respect of fees and expenses owed to professionals retained by the Debtors, any Committee, or U.S. Trustee (as defined in the Interim DIP Order) fees up to the amounts set forth in the Budget; and (iv) subject in all respects to the Budget, any ordinary course unsecured indebtedness of the Debtor of the type ordinarily incurred in the Debtors' business or in connection with a chapter 11 bankruptcy case.

(i)     Not create, incur, assume, or suffer to exist any lien upon any of its assets, whether now owned or hereafter acquired, except for liens that are permitted by the DIP Orders.

(j)     Other than a Sale, not enter into any merger or consolidation or amalgamation or other change of control transaction or engage in any type of business other than of the same general type now conducted by it.

(k)     Other than a Sale, not convey, sell, lease, assign, transfer or otherwise dispose of (including through a transaction of merger or consolidation) any assets or property (including, without limitation, tax benefits), other than the sale of inventory or the licensing of intellectual property in the ordinary course of the Debtors' business.

(l)     Not make any advance, investment, acquisition, loan, extension of credit, or capital contribution to, in, or for the benefit of any Person.

9

(m)     Other than a Sale and subject in all respects to the Budget, not enter into any transaction, including, without limitation, any purchase, sale, lease, or exchange of property or the rendering of any service, with any affiliate.

(n)     Not incur or apply to the Bankruptcy Court for authority to incur, or suffer to exist, any indebtedness having the priority afforded by section 364(c) or (d) of the Bankruptcy Code (including any superpriority claims) other than the financing provided for under this DIP Note, unless the DIP Obligations hereunder are to be irrevocably paid in full, in cash with the proceeds thereof.

(o)     Not limit, affect, or modify, or apply to the Bankruptcy Court to limit, affect, or modify, any of the rights of the DIP Lender with respect to the DIP Obligations, including rights with respect to the DIP Collateral and the priority thereof.

(p)     Except with respect to the Carve-Out Expenses and the Permitted Priority Liens, not incur, create, assume, suffer, or permit any claim to exist or apply to the Bankruptcy Court for the authority to incur, create, assume, suffer or permit any claim to exist against the Debtors' estates or any of their respective assets which is to be pari passu with, or senior to, the DIP Obligations, unless the DIP Obligations are being irrevocably repaid in full, in cash with the proceeds thereof.

(q)     The Debtors shall use commercially reasonable efforts to, within 15 days of the Petition Date, amend each of the Existing CNH Control Agreements to join the DIP Lender as a second secured party thereto with all the customary rights of secured party thereunder upon the payment in full of the CNH Prepetition Obligations (as defined in the Interim DIP Order).

(r)     The Debtors shall cause (i) any managed care payments to be received by the Debtors pursuant to the QAF Program (as defined below) from and after January 1, 2020 (each an "Applicable Managed Care QAF Payment") and, (ii) after the payment in full of the CNH Prepetition Obligations, all other "Collections" (as specified in the Budget) which shall at any time come into the possession, custody, or control of any Debtor, or to which any Debtor is now or shall become entitled to at any time, in each case, to be deposited in the bank account subject to the Existing Control Agreement or, if directed in writing by the DIP Lender, a Cash Collateral account held for the benefit of the DIP Lender; provided, that if such funds are to be deposited in any such Cash Collateral account, so long as no default or Event of Default has occurred and is continuing hereunder or under any of the other DIP Loan Documents, such amounts shall be released to the Debtors to fund expenses in an amount sufficient to pay expenses in accordance with the Budget (together with any Loans as necessary and permitted hereunder, in each case, looking first to such amounts to be released before any Loans). "QAF Program" shall mean the California Department of Health Care Service's Hospital Quality Assurance Fee Program IV or V (or any successor thereto) (or any similar or equivalent program pursuant to which any Debtor is entitled to receive supplemental payments from the State of California for providing inpatient or outpatient health care services).

8.     **Event of Default and Remedies**.

(a)     Each of the following shall constitute an "Event of Default":

(i)     the Debtors (A) fail to pay any payment (whether principal, interest, or otherwise) when such amount becomes due and payable under this DIP Note or (B) default in the due performance or observance of any other term, covenant, or agreement contained in this DIP Note (and, if such default is capable of being remedied, it has not been remedied within the cure period set

10

forth in this DIP Note or, if no such cure period is provided, it has not been remedied to the reasonable satisfaction of the DIP Lender within five Business Days following written notice to the Debtors of the occurrence of such default);

(ii)     any representation, warranty, or statement made by the Debtor herein or in this DIP Note or in any certificate delivered in connection with this DIP Note proves to be untrue in any material respect on the date on which made or deemed made;

(iii)     the security interest granted to the DIP Lender ceases to be in full force and effect, or ceases to create a perfected security interest in, and lien on, the DIP Collateral purported to be created thereby;

(iv)     this DIP Note or any other DIP Loan Document is or becomes invalid, ineffective, or unenforceable against the Debtors, in whole or in part, or the Debtors so assert or at any time denies the liability or the DIP Obligations under this DIP Note or any other DIP Loan Document;

(v)     the Bankruptcy Court enters an order dismissing the Chapter 11 Cases or converting them to a case under Chapter 7 or any other chapter of the Bankruptcy Code, or appointing a trustee or other responsible officer or an examiner with enlarged powers relating to the operation of the Debtors' business (beyond those set forth in sections 1106(a)(3) or (4) of the Bankruptcy Code) under section 1104 of the Bankruptcy Code, in each case, without the consent of the DIP Lender in its sole discretion;

(vi)     the Bankruptcy Court enters an order granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code and authorizing an action by a lienholder (other than the DIP Lender) with respect to assets of the Debtor on which the lienholder has a lien;

(vii)     the Debtors seek to, advocate, or otherwise support any other Person's motion to (A) disallow, in whole or in part, the DIP Obligations or to challenge the validity, priority, or enforceability of the DIP Liens and superpriority claims hereunder (for avoidance of doubt, complying with document requests shall not constitute a breach of the foregoing) or (B) disallow, in whole or in part, or challenge the validity or enforceability of the MPT Prepetition Transaction Documents (as defined in the Interim DIP Order) or any of the Debtors obligations thereunder (for avoidance of doubt, complying with document requests shall not constitute a breach of the foregoing);

(viii)     a debtor in possession financing order is entered in form and substance that is not acceptable to the DIP Lender or from and after the date of entry thereof, the Interim DIP Order or the Final DIP Order, as applicable, ceases to be in full force and effect or is vacated, stayed, reversed, modified, or amended (or the Debtors take any step to accomplish any of the foregoing) without the consent of the DIP Lender in its sole discretion;

(ix)     the Debtors make any payments on any indebtedness that arose before the Petition Date other than as provided in the Budget or otherwise consented to by the DIP Lender in its sole discretion;

(x)     either DIP Order is revoked, stayed, reversed, vacated, amended, extended or otherwise modified in any respect without the prior written consent of the DIP Lender in its sole discretion;

(xi)     the Debtors breach or fail to comply with the terms of the DIP Orders in any material respect or there occurs an "Event of Default" as defined therein;

(xii)    any of the milestones set forth on <u>Exhibit C</u> hereto (the "<u>Chapter 11 Milestones</u>") are not satisfied;

(xiii)   one or more judgments or decrees is entered against the Debtor or its estate involving in the aggregate a postpetition liability (not paid or fully covered by insurance or otherwise considered permitted indebtedness) of $250,000 or more, and all such judgments or decrees are not vacated, discharged, stayed, or bonded pending appeal;

(xiv)    this DIP Note or any other DIP Loan Document ceases, for any reason, to be in full force and effect or any Debtor shall so assert in writing, or the DIP Liens cease to be effective and perfected with respect to any material item of DIP Collateral described therein with the priority purported to be created by the DIP Loan Documents;

(xv)     any Debtor fails to provide all information, approvals, documents, or other instruments as the DIP Lender may reasonably request, and as are customary for postpetition lenders to request;

(xvi)    any Debtor files an application or motion for the approval of postpetition financing from any party other than the DIP Lender, including financing that provides for superpriority claims or priming liens on any of the DIP Collateral without the written consent of the DIP Lender in its sole discretion;

(xvii)   the Bankruptcy Court enters an order terminating the right of the Debtor to use the DIP Loans for any of the Permitted Purposes or otherwise;

(xviii)  the Debtors make any payments or incur any obligations except as set forth in the Budget or otherwise fail to strictly comply with the Budget on a line item basis (including, without limitation, with respect to projected receipts), subject to a Permitted Variance and Section 2(b)(ii)(2);

(xix)    immediately upon consummation of the Sale, the aggregate amount required by the Asset Purchase Agreement to be paid to the DIP Lender and the MPT Prepetition Lender is not paid in cash (which amount shall in no event be less than the Minimum MPT Payment Amount);

(xx)     if at any time the Sale has not been consummated and the Debtors do not have sufficient funding (or other direct payment commitment) from a source other than the DIP Lender or any of its affiliates to fund the ordinary course operations of the business of the Debtors (including maintaining a patient standard of care consistent with the standard of care provided prior to the Petition Date) after March 31, 2022;

(xxi)    an Asset Purchase Agreement is terminated for any reason other than the termination of the Stalking Horse APA in connection with the Debtors entering into an alternative Asset Purchase Agreement with a qualified overbidder pursuant to the Bid Procedures;

(xxii)   the management agreement for the Hospital with Alta Hospital System, LLC is terminated without, as of the time of termination, a replacement manager satisfactory to the DIP Lender having been engaged;

12

(xxiii) the Debtors assume or reject the Lease without the prior written consent of the DIP Lender; or

(xxiv) the Debtors terminate the Chief Restructuring Officer of the Debtors or amend or otherwise modify the services or duties thereof unless such termination (and any replacement Chief Restructuring Officer) or modification is acceptable to the DIP Lender.

(b) Subject to the terms of the DIP Orders, upon the occurrence of an Event of Default and after five Business Days' written notice by the DIP Lender to the Debtors (the "Default Notice Period"), the automatic stay shall terminate, and the DIP Lender shall be permitted to exercise any remedies permitted by law, including any of the following actions, without application or motion to, or further orders from, the Bankruptcy Court or any other court, and without interference from the Debtors or any other party in interest, unless the Bankruptcy Court determines during the Default Notice Period that an Event of Default has not occurred:

(i) declare all or any portion of the outstanding DIP Obligations due and payable, whereupon the same shall become forthwith due and payable without presentment, demand, protest or notice of any kind, all of which are hereby waived by the Debtors;

(ii) set off any amounts held as Cash Collateral (including, without limitation, in any Cash Collateral account held for the benefit of the DIP Lender);

(iii) enforce all liens and security interests in the DIP Collateral;

(iv) institute proceedings to enforce payment of such DIP Obligations;

(v) terminate the obligation of the DIP Lender to make Loans; and

(vi) exercise any other remedies and take any other actions available to it at law, in equity, under the DIP Loan Documents, the Bankruptcy Code, other applicable law or pursuant to the DIP Orders, including, without limitation, exercising any and all rights and remedies with respect to the DIP Collateral or any portion thereof.

(c) Subject to Section 9(b) above, if any Event of Default shall occur and be continuing, the DIP Lender may exercise in addition to all other rights and remedies granted to it in this DIP Note, the other DIP Loan Documents and the DIP Orders, all rights and remedies of a secured party under the UCC or other applicable law. Without limiting the generality of the foregoing, each Debtor, on behalf of its estate, expressly agrees that in any such event the DIP Lender, without demand of performance or other demand, advertisement, or notice of any kind (except the notice required by the DIP Orders or the notice specified below of time and place of public or private sale) to or upon such Debtor or any other Person (all and each of which demands, advertisements, and/or notices (except the notice required by the DIP Orders or the notice specified below of time and place of public or private sale) are hereby expressly waived to the maximum extent permitted by the UCC and other applicable law), may forthwith collect, receive, appropriate, and realize upon the DIP Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give an option or options to purchase, or sell or otherwise dispose of and deliver said DIP Collateral (or contract to do so), or any part thereof, in one or more parcels at public or private sale or sales, at any exchange or broker's board or at any of the DIP Lender's offices or elsewhere at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk. The DIP Lender shall have the right upon any

13

such public sale or sales to purchase for cash or by credit bidding all or a part of the DIP Obligations the whole or any part of said DIP Collateral so sold, free of any right or equity of redemption, which equity of redemption each Debtor hereby releases. Each Debtor, on behalf of its estate, further agrees, at the DIP Lender's request, to assemble the DIP Collateral constituting movable tangible personal property and make it available to the DIP Lender at places that the DIP Lender shall reasonably select. The DIP Lender shall apply the proceeds of any such collection, recovery, receipt, appropriation, realization or sale to the DIP Obligations in the order reasonably deemed appropriate by the DIP Lender, the Debtors' respective estates remaining jointly and severally liable for any deficiency remaining unpaid after such application, and only after so paying over such net proceeds and after the payment by the DIP Lender of any other amount required by any provision of law, including section 9-608(a)(1)(C) of the UCC, shall the DIP Lender account for and pay over the surplus, if any, to the Debtors. To the maximum extent permitted by applicable law, each Debtor waives all claims, damages, and demands against the DIP Lender arising out of the repossession, retention, or sale of the DIP Collateral except such as arise out of the gross negligence or willful misconduct of the DIP Lender. Each Debtor agrees that the DIP Lender need not give more than five Business Days' notice to the Debtors (which notification may run concurrently with any notice required under the DIP Orders and shall be deemed given when mailed, electronically delivered or delivered on an overnight basis, postage prepaid, addressed to the Debtors at the address set forth below) of the time and place of any public sale or of the time after which a private sale may take place and that such notice is reasonable notification of such matters. The Debtors respective estate shall remain jointly and severally liable for any deficiency if the proceeds of any sale or disposition of the DIP Collateral are insufficient to pay all amounts to which the DIP Lender is entitled.

(d)     Subject to Section 9(b) above, except as otherwise expressly provided herein and in the DIP Orders, each Debtor hereby waives presentment, demand, protest, or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this DIP Note or any DIP Collateral. The Debtors' respective estates shall also pay all of the DIP Lender's reasonable costs of collection if any DIP Obligations are not paid when due, including, without limitation, court costs, collection expenses, reasonable out-of-pocket attorneys' fees, and other expenses which the DIP Lender may incur or pay in the prosecution or defense of its rights hereunder, whether in judicial proceedings, including bankruptcy court and appellate proceedings, or whether out of the Bankruptcy Court.

(e)     Except with respect to the payment of the Carve-Out Expenses in accordance with the Interim DIP Order and the Final DIP Order, as applicable, the DIP Lender's agreement to provide the DIP Loans in accordance with the DIP Loan Documents and the Debtors' authorization to use Cash Collateral shall immediately and automatically terminate (except as the DIP Lender may otherwise agree in writing in its sole discretion), upon the earliest to occur of any of the following (each, a "Termination Date"):

(i)     the date of final indefeasible payment and satisfaction in full in cash of the DIP Obligations;

(ii)     the effective date or the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of any plan of reorganization or liquidation in the Chapter 11 Cases which is confirmed by an order of the Bankruptcy Court;

Case: 21-51477     Doc# 207-1     Filed: 01/17/22     Entered: 01/17/22 14:38:00     Page 50 of 77

        (iii)    the date on which a Sale is consummated or any other sale of all or substantially all of the Debtors' assets and/or equity interests is consummated under Section 363 and/or Section 1129 of the Bankruptcy Code;

        (iv)    the entry of an order by the Bankruptcy Court granting a motion by the Debtors to obtain additional financing from a party other than the DIP Lender under section 363 or 364 of the Bankruptcy Code unless the proceeds from such financing are used to immediately repay in cash the DIP Obligations or unless such financing is subordinate to the DIP Obligations and consented to in writing by the DIP Lender (which consent may be withheld in its sole discretion); and

        (v)    the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or appointing a trustee or other responsible officer or an examiner with enlarged powers relating to the operation of the Debtors' business (beyond those set forth in sections 1106(a)(3) or (4) of the Bankruptcy Code) under section 1104 of the Bankruptcy Code.

9.    **Security**.

    (a)    As security for the full and timely payment and performance of all of the DIP Obligations, upon entry of the Interim DIP Order but retroactive to the Petition Date, each Debtor hereby assigns, pledges and grants (or causes the assignment, pledge and grant in respect of any indirectly owned assets) to the DIP Lender, pursuant to Section 364(c)(2), Section 364(c)(3) and Section 364(d) of the Bankruptcy Code, under this DIP Note, the other DIP Loan Documents and the Interim DIP Order and the Final DIP Order, as applicable, a fully perfected first priority security interest and liens, superior to all other liens, security interests or claims that any creditor of the Debtors' and their estates may have, in all of the existing and after acquired real and personal, tangible and intangible, property and assets of the Debtors, including, but not limited to, all cash, cash equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, fixtures, real property interests, franchise rights, patents, tradenames, trademarks, copyrights, intellectual property, general intangibles, payment intangibles, rights under Section 506(c) of the Bankruptcy Code (subject to entry of Final DIP Order), and all other property or "property of the estate" (as defined in Section 541 of the Bankruptcy Code) of any kind or nature, investment property, supporting obligations, letter of credit rights, licenses, operating certificates, permits, causes of action (excluding Avoidance Actions but including the proceeds of Avoidance Actions subject to entry of the Final DIP Order other than with respect to Avoidance Actions arising under Section 549 of the Bankruptcy Code which shall be included in the DIP Collateral upon entry of the Interim DIP Order) and all rents, products, substitutions, accessions, profits, replacements and cash and non-cash proceeds of the foregoing, wherever located, including insurance proceeds, noncash proceeds or any other proceeds of the foregoing (collectively, the "DIP Collateral"); provided that the DIP Collateral shall not include any Excluded Property but the DIP Collateral shall include any and all proceeds thereof; provided, further, that, any agreement, permit, license, or the like constituting Excluded Property shall constitute DIP Collateral from and after such time as the lessor, licensor, grantor or other party to such agreement, permit, license, or the like consents to the grant of a lien in favor of the DIP Lender in such agreement, permit, license, or the like or the prohibition against granting a lien therein in favor of the DIP Lender shall cease to be effective.

(b)     The granting clause herein is intended to supplement (not supersede) that which is provided for in the DIP Orders and the DIP Loans and any other indebtedness or obligations, contingent or absolute (including, without limitation, the principal thereof, interest thereon, and costs and expenses owing in connection therewith) which may now or from time to time hereafter be owing by the Debtors to the DIP Lender under this DIP Note or any other DIP Loan Document shall be secured as set forth herein and in the DIP Orders.

(c)     The DIP Orders provide for the perfection, maintenance, protection, and enforcement of the DIP Lender's security interest in the DIP Collateral.  Upon the request of the DIP Lender, the Debtor shall deliver to the DIP Lender those DIP Loan Documents necessary or desirable to perfect the DIP Lender's lien, including in letters of credit on which any Debtor is named as beneficiary and all acceptances issued in connection therewith.  The Debtors shall take such other reasonable steps as are deemed necessary or desirable to maintain the DIP Lender's security interest in the DIP Collateral.

(d)     The Debtors hereby authorize the DIP Lender to execute and file financing statements or continuation statements, and amendments thereto, on the Debtors' behalf covering the DIP Collateral.  The DIP Lender may file one or more financing statements disclosing the DIP Lender's security interest under this DIP Note without the signature of the applicable Debtor appearing thereon.  The Debtors agree that a carbon, photographic, photostatic, or other reproduction of this DIP Note or of a financing statement is sufficient as a financing statement.

(e)     Except as otherwise provided for in this DIP Note, the other DIP Loan Documents or in any DIP Order, until all DIP Obligations have been fully satisfied in cash and the DIP Lender shall have no further obligation to make any Loans hereunder, the DIP Lender's security interest in the DIP Collateral, and all proceeds and products thereof, shall continue in full force and effect.

(f)     Notwithstanding the preceding paragraphs, or any failure on the part of the Debtors to take any of the actions set forth therein, the liens and security interests granted herein shall be deemed valid, enforceable and perfected by entry of the Final DIP Order.  No financing statement, notice of lien, mortgage, deed of trust or similar instrument in any jurisdiction or filing office need be filed or any other action taken in order to validate and perfect the liens and security interests granted by or pursuant to this DIP Note, the other DIP Loan Documents and the DIP Orders.

(g)     The priority of the DIP Lender's liens on the DIP Collateral shall be senior to all liens existing as of the Petition Date except for the Permitted Priority Liens and for so long as any DIP Obligations shall be outstanding, the Debtors hereby irrevocably waive any right, pursuant to sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any lien of equal or greater priority than the liens securing the DIP Obligations other than the Permitted Priority Liens, or to approve a claim of equal or greater priority than the DIP Obligations, unless otherwise permitted or provided for in the DIP Orders or effective upon the granting of any such lien or priority, the DIP Obligations shall be irrevocably paid in full in cash and the obligation to make Loans hereunder terminated.  Notwithstanding anything herein to the contrary, all proceeds received by the DIP Lender from the DIP Collateral shall be subject to prior payment of the Carve-Out Expenses; provided, that no Person entitled to such Carve-Out Expenses shall be entitled to sell or otherwise dispose, or seek or object to the sale or other disposition, of any DIP Collateral.

(h)     Upon entry of, subject to and in accordance with the DIP Orders, the DIP Obligations shall at all times constitute allowed superpriority claims pursuant to section 364(c)(1) of the

16

Bankruptcy Code, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final DIP Order), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code, subject only to the prior payment of Carve-Out Expenses.

(i)    It is expressly agreed by the Debtors that, anything herein to the contrary notwithstanding, the Debtors shall remain liable under their postpetition contractual obligations to observe and perform all the conditions and obligations to be observed and performed by them thereunder, and the DIP Lender shall not have any obligation or liability under any contractual obligations by reason of or arising out of this DIP Note or any other DIP Loan Document unless otherwise agreed to in writing by the DIP Lender, and the DIP Lender shall not be required or obligated in any manner to perform or fulfill any of the obligations of the Debtors' estates under or pursuant to any contractual obligations, or to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by it or the sufficiency of any performance by any party under any contractual obligations, or to present or file any claim, or to take any action to collect or enforce any performance or the payment of any amounts that may have been assigned to it or to which it may be entitled at any time or times.

(j)    Each Debtor hereby appoints the DIP Lender, or any other Person who the DIP Lender may designate, as such Debtor's attorney-in-fact (such appointment being coupled with an interest and being irrevocable until the DIP Lender's liens and claims shall have been satisfied), at any time after (i) the occurrence of an Event of Default specified above, (ii) the expiration of the Default Notice Period, or (iii) termination of the automatic stay (x) to do any act which such Debtor is obligated to do hereunder, or (y) to exercise any of the rights and remedies available under the UCC or other applicable law to a secured party with a lien having the same priority as the DIP Lender's lien on the DIP Collateral (and all acts of such attorney in fact or designee taken pursuant to this section are hereby ratified and approved by the Debtor and said attorney or designee shall not be liable for any acts or omissions nor for any error of judgment or mistake of fact or law, except for gross negligence or willful misconduct).

(k)    Except for the Carve-Out Expenses, no costs or expenses of administration shall be imposed against the DIP Lender or any of the DIP Collateral under Sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, and the Debtors hereby waive for themselves and on behalf of each of their estates in bankruptcy, any and all rights under Sections 105, 506(c) (subject to entry of the Final DIP Order) or 552, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against the DIP Lender or any of the DIP Collateral.

(l)    The liens, lien priority, administrative priorities and other rights and remedies granted to the DIP Lender pursuant to this DIP Note, the Interim DIP Order and the Final DIP Order, as applicable, and the other DIP Loan Documents (specifically including the existence, perfection and priority of the liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by any Debtor (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Chapter 11 Cases, or any successor bankruptcy case, or by any other act or omission whatsoever.

17

10.     **Usury**.  In no event shall the amount of Interest due or payable hereunder exceed the maximum rate of interest allowed by applicable law, and in the event any such payment is inadvertently paid by the Debtors or inadvertently received by the DIP Lender, then the DIP Lender may elect, in its sole discretion, to do one or more of the following with all or any portion of such excess: (a) apply such excess to other sums due, if any, under this DIP Note (b) credit such excess as a prepayment of principal, or (c) refund such excess to the Debtors, which refund the Debtors shall forthwith accept.  It is the express intent hereof that the Debtors not pay and the DIP Lender not receive, directly or indirectly, Interest in excess of that which may be legally paid by the Debtors under applicable law.

11.     **Relationship of Parties**.  The Debtors and the DIP Lender agree that the relationship between them shall be solely that of debtor and creditor.  Nothing contained in this DIP Note shall be deemed to create a partnership, tenancy-in-common, joint tenancy, joint venture or co-ownership by or among the Debtors and the DIP Lender.

12.     **Notices**.  All notices, demands, consents, approvals, requests, and other communications required or permitted to be provided under this DIP Note shall be in writing (except where specifically stated otherwise) and shall be either (a) delivered in person, (b) sent by certified mail, return receipt requested, (c) delivered by a recognized delivery service, or (d) sent by facsimile transmission, and addressed as follows:

| | |
|---|---|
| If to Debtors: | Halsen Healthcare, LLC and its subsidiaries<br>c/o Force 10<br>5271 California Ave, Suite 270<br>Irvine, California 92617<br>Attn:   Jeremy Rosenthal |
| With a copy to: | Pachulski Stang Ziehl & Jones LLP<br>One Market Plaza, Spear Tower<br>40th Floor<br>San Francisco, CA  94105-102<br>Attn:   Debra Grassgreen<br>Fax:    415-263-7010 |
| If to DIP Lender: | c/o MPT Operating Partnership, L.P.<br>1000 Urban Center Drive, Suite 501<br>Birmingham, AL  35242<br>Attn:   Legal Department<br>Fax:    (205) 969-3756 |
| With a copy to: | Baker, Donelson, Bearman, Caldwell & Berkowitz, PC<br>420 20th Street North<br>1400 Wells Fargo Tower<br>Birmingham, Alabama  35203<br>Attn:   Thomas O. Kolb, Esq.<br>Fax:    (205) 322-8007 |

or to such other address as either party may hereafter designate in writing, and shall be effective upon receipt. A notice, demand, consent, approval, request, and other communication shall be deemed to be duly received if delivered in person or by a recognized delivery service, when left at the address of the recipient and if sent by facsimile, upon receipt by the sender of an acknowledgment or transmission report generated by the machine from which the facsimile was sent indicating that the facsimile was sent in its entirety to the recipient's facsimile number; provided that if a notice, demand, consent, approval, request, or other communication is served by hand or is received by facsimile on a day which is not a Business Day, or after 5:00 p.m. (based upon Birmingham, Alabama time) on any Business Day, such notice or communication shall be deemed to be duly received by the recipient at 9:00 a.m. (based upon Birmingham, Alabama time) on the first Business Day thereafter. Nothing in this DIP Note or in any other DIP Loan Document shall be construed to limit or affect the obligation of the Debtors or any other Person to serve upon the DIP Lender in the manner prescribed by the Bankruptcy Code any pleading or notice required to be given to the DIP Lender pursuant to the Bankruptcy Code.

13.  **Governing Law; Jurisdiction and Venue; Waiver of Jury Trial**.

(a)  THIS DIP NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE (EXCEPT AS GOVERNED BY THE BANKRUPTCY CODE) APPLICABLE TO CONTRACTS EXECUTED AND PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO CONFLICTS OF LAW PRINCIPLES.

(b)  EACH DEBTOR AND THE DIP LENDER SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA OR (IF THE BANKRUPTCY COURT LACKS OR DECLINES JURISDICTION) IN THE STATE OF DELAWARE; PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY DIP COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT THE DIP LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE THE DIP LENDER ELECTS TO BRING SUCH ACTION OR WHERE SUCH DIP COLLATERAL OR OTHER PROPERTY MAY BE FOUND. EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT. EACH DEBTOR AND THE DIP LENDER EXPRESSLY ACKNOWLEDGE THAT THE BANKRUPTCY COURT (OR DELAWARE, IF APPLICABLE) IS A FAIR, JUST AND REASONABLE FORUM AND AGREE NOT TO SEEK REMOVAL OR TRANSFER OF ANY ACTION FILED BY THE OTHER PARTY IN SAID COURTS. FURTHER, EACH DEBTOR AND THE DIP LENDER IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY CLAIM THAT SUCH SUIT, ACTION OR PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. SERVICE OF ANY PROCESS, SUMMONS, NOTICE OR DOCUMENT BY CERTIFIED MAIL ADDRESSED TO A PARTY AT THE ADDRESS DESIGNATED PURSUANT TO SECTION 12 SHALL BE EFFECTIVE SERVICE OF PROCESS

AGAINST SUCH PARTY FOR ANY ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT.  A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT MAY BE ENFORCED IN ANY OTHER COURT TO WHOSE JURISDICTION ANY OF THE PARTIES IS OR MAY BE SUBJECT.

(c)     TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS DIP NOTE, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OF ANY PARTY OR ANY EXERCISE OF ANY PARTY OF THEIR RESPECTIVE RIGHTS HEREUNDER OR IN ANY WAY RELATING TO THIS DIP NOTE (INCLUDING ANY CLAIM OR DEFENSE ASSERTING THAT THIS DIP NOTE WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE).  THIS WAIVER IS A MATERIAL INDUCEMENT FOR THE DIP LENDER TO ENTER INTO THIS DIP NOTE.

14.     **Representations and Warranties of the Debtors**.  The Debtors jointly and severally represent and warrant to the DIP Lender that (a) the execution and delivery of this DIP Note and the obligations created hereby have been duly authorized by all necessary proceedings on each Debtor's part, and will not conflict with or result in the breach or violation of any of the terms or conditions of, or constitute (or with notice or lapse of time or both would constitute) a default under the governing documents of such Debtor, any instrument, contract, or other agreement to which such Debtor is a party or by or to which such Debtor or any of its assets or properties are bound or subject; or, subject to the entry and terms of the Interim DIP Order and the Final DIP Order, as applicable, any statute or any regulation, order, judgment, or decree of any court or governmental or regulatory body; (b) each Debtor, subject to the entry and terms of the Interim DIP Order and the Final DIP Order, as applicable, has full legal right, power, and authority to enter into this DIP Note and to incur the obligations provided for herein, and to execute and deliver the same to the DIP Lender; (c) subject to entry of the Interim DIP Order or the Final DIP Order, this DIP Note constitutes the valid and legally binding obligation of each Debtor, enforceable against it in accordance with its terms, subject to bankruptcy, insolvency, reorganization, and similar laws affecting the enforcement of creditor's rights or contractual obligations generally and, as to enforcement, to general principles of equity, regardless of whether applied in a proceeding at law or in equity; (d) except for entry of the Interim DIP Order or the Final DIP Order, as applicable, no approval or consent of any foreign, federal, state, county, local, or other governmental or regulatory body, and no approval or consent of any other Person, is required in connection with each Debtor's execution and delivery of this DIP Note or its consummation and performance of the transactions contemplated hereby, except such approvals or consents as shall have been obtained on or prior to the date of this DIP Note; and (e) the Budget was prepared in good faith on the basis of the assumptions stated therein, which assumptions the Debtors reasonably believe, in their good faith business judgment, were fair in light of the conditions existing at the time of delivery, of the Debtors' forecasts of future financial performance.

15.     **Expenses; Indemnification**.  The Debtors' shall pay (i) all reasonable out-of-pocket expenses of the DIP Lender in connection with the preparation, delivery and review of this DIP Note, any waiver or consent hereunder or any amendment hereof or any Event of Default or alleged Event of Default hereunder, or any agreements, pleadings, documents and reports related to, and the administration of, the Chapter 11 Cases and any subsequent cases under Chapter 7 of the Bankruptcy Code, as well as attendance at meetings, court hearings or conferences related to the Chapter 11 Cases

20

and any subsequent cases under Chapter 7 of the Bankruptcy Code, and general monitoring of the Chapter 11 Cases and any subsequent cases under Chapter 7 of the Bankruptcy Code, in each case, including (without duplication) the reasonable fees and disbursements of outside counsel in connection therewith, and (ii) if an Event of Default occurs, all reasonable out-of-pocket expenses incurred by the DIP Lender, including (without duplication) the reasonable fees and disbursements of outside counsel in connection with such Event of Default and collection, bankruptcy, insolvency and other enforcement proceedings resulting therefrom. Without limitation of the foregoing, the Debtors agree to jointly and severally indemnify the DIP Lender, its affiliates and the respective shareholders, partners, members, directors, managers, officers, agents, and employees of the foregoing (each, an "Indemnitee"), and hold each Indemnitee harmless from and against, any and all liabilities, losses, damages, costs and expenses of any kind, including, without limitation, the reasonable fees and disbursements of counsel and settlement costs, which may be incurred by such Indemnitee in connection with any investigative, administrative or judicial proceeding (whether or not such Indemnitee shall be designated a party thereto) brought or threatened relating to or arising out of this DIP Note, the other DIP Loan Documents or the DIP Orders.

16. **Miscellaneous**.

(a)     With respect to the amounts due under this DIP Note, the Debtors waive the following to the fullest extent permitted by law:

(i)     All rights of exemption of property from levy or sale under execution or other process for the collection of debts under the laws of the United States of America or any state thereof;

(ii)     Subject to Section 9(b) above and except for notices required by applicable law that cannot be waived, demand, presentment, protest, notice of protest, notice of dishonor, notice of non-payment, diligence in collection, and all other requirements necessary to charge or hold the Debtors liable for the DIP Obligations; and

(iii)     Any further receipt for or acknowledgment of any collateral now or hereafter deposited as security for the DIP Obligations.

(b)     Each Debtor hereby acknowledges that the DIP Lender shall not by any act, delay, omission, or otherwise be deemed to have waived any of its rights or remedies under this DIP Note and no waiver of any kind shall be valid unless in writing and signed by the DIP Lender. All rights and remedies of the DIP Lender under the terms of this DIP Note and applicable statutes or rules of law shall be cumulative and may be exercised separately, successively or concurrently.

(c)     Each Debtor agrees that, irrespective of claims such Debtor may hereafter have against the DIP Lender, all payments due under this DIP Note, shall be payable hereunder without setoff or counterclaim.

(d)     Neither this DIP Note nor any of the rights, interests or obligations hereunder may be assigned or delegated by any Debtor without the prior written consent of the DIP Lender. The DIP Lender may at any time and without the consent of the Debtors assign all of its rights and obligations hereunder to any other Person.

(e)     This DIP Note and the obligations of the Debtors hereunder shall be binding upon and enforceable against the Debtors and their respective successors and assigns, and shall inure to the benefit of the DIP Lender and its successors and assigns, including any subsequent holder of this DIP Note; provided, however, that (i) this DIP Note shall not inure to the benefit of any assignee pursuant to an assignment which violates the terms of this DIP Note and (ii) neither this DIP Note nor any other document or agreement contemplated under this DIP Note shall be deemed to confer upon any Person not a party to this DIP Note any rights or remedies contained in this DIP Note.

(f)     Each Debtor hereby accepts joint and several liability hereunder and under the other DIP Loan Documents in consideration of the financial accommodations to be provided by the DIP Lender hereunder and the other DIP Loan Documents, for the mutual benefit, directly and indirectly, of each of the Debtors and in consideration of the undertakings of the other Debtors to accept joint and several liability for the DIP Obligations.

(g)     The DIP Lender may, at its option, release any collateral given to secure the indebtedness evidenced hereby, or release any guarantor from its obligations under any guaranty, and no such release shall impair the DIP Obligations under this DIP Note.

(h)     Section headings are inserted for convenience of reference only and shall be disregarded in the interpretation of this DIP Note.  The provisions of this DIP Note shall be construed without regard to the party responsible for the drafting and preparation hereof.

(i)     The parties and their respective counsel have participated in the drafting and redrafting of this DIP Note and the general rules of construction which would construe any provisions of this DIP Note in favor of or to the advantage of either the DIP Lender or the Debtors as opposed to the other as a result of one party drafting this DIP Note as opposed to the other or in resolving any conflict or ambiguity in favor of either the DIP Lender or the Debtors as opposed to the other on the basis of which party drafted this DIP Note are hereby expressly waived by the Debtors and the DIP Lender.

(j)     If any provision of this DIP Note is prohibited or unenforceable in any jurisdiction, then apart from such ineffectiveness as a result of such prohibition or unenforceability, the remaining provisions hereof shall remain in full force and effect.

(k)     Time is of the essence with respect to this DIP Note and the performance of each of the covenants and agreements contained herein.

(l)     This DIP Note and any signed agreement entered into in connection herewith or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or by .pdf, .tif, .gif, .jpeg or similar attachment to electronic mail, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such contract, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such contract shall raise the use of a facsimile machine or by .pdf, .tif, .gif, .jpeg or similar attachment to electronic mail to deliver a signature or the fact that any signature or contract was transmitted or communicated through the use of facsimile machine or by .pdf, .tif, .gif, .jpeg or similar attachment to electronic mail as a defense to the formation of a contract and each such party forever waives any such defense.

22

(m)     Subject to the Interim DIP Order and Final DIP Order, as applicable, this DIP Note, the other DIP Loan Documents, and all liens created hereby or pursuant hereto or to any other DIP Loan Document shall be binding upon each Debtor, the estate of each Debtor, and any trustee or other successor in interest of any Debtor in any Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code or any other bankruptcy or insolvency laws, and shall not be subject to Section 365 of the Bankruptcy Code.  Subject to the Interim DIP Order and Final DIP Order, as applicable, this DIP Note and the other DIP Loan Documents shall be binding upon, and inure to the benefit of, the successors of the DIP Lender and its assigns, transferees and endorsees.  Subject to the Interim DIP Order and the Final DIP Order, as applicable, the liens created by this DIP Note and the other DIP Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Case or any other bankruptcy case of any Debtor to a case under Chapter 7 of the Bankruptcy Code, or in the event of dismissal of any Chapter 11 Case or the release of any DIP Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the DIP Lender file financing statements or otherwise perfect their security interests or liens under applicable law.

[The remainder of this page intentionally left blank.]

**IN WITNESS WHEREOF**, the Debtors and the DIP Lender have caused this DIP Note to be duly executed and delivered as of the day and year first above written.

**DEBTORS**:

**HALSEN HEALTHCARE, LLC**,
a California limited liability company

By: _____
Name:    Jeremy Rosenthal
Title:      Chief Restructuring Officer

**WATSONVILLE HOSPITAL HOLDINGS, INC.**,
a California limited liability company

By: _____
Name:    Jeremy Rosenthal
Title:      Chief Restructuring Officer

**WATSONVILLE HEALTHCARE
MANAGEMENT, LLC**,
a California limited liability company

By: _____
Name:    Jeremy Rosenthal
Title:      Chief Restructuring Officer

**WATSONVILLE HOSPITAL CORPORATION**,
a California limited liability company

By: _____
Name:    Jeremy Rosenthal
Title:      Chief Restructuring Officer

Senior Secured Superpriority Debtor in Possession Promissory Note
Signature Page 1 of 2

**DIP LENDER**:

**MPT OF WATSONVILLE LENDER, LLC,**
a Delaware limited liability company

By:     MPT Development Services, Inc.
Its:     Sole Member

By:
Name:
Title:

R. Steven Hamner
Executive Vice President & CFO

Senior Secured Superpriority Debtor in Possession Promissory Note
Signature Page 2 of 2

**FIRST AMENDMENT
TO
SENIOR SECURED SUPERPRIORITY
DEBTOR IN POSSESSION PROMISSORY NOTE**

THIS **FIRST AMENDMENT TO SENIOR SECURED SUPERPRIORITY DEBTOR IN POSSESSION PROMISSORY NOTE** (this "Amendment") is dated as of December 21, 2021, by and among Halsen Healthcare, LLC, a California limited liability company, Watsonville Hospital Holdings, Inc., a California corporation, Watsonville Healthcare Management, LLC, a Delaware limited liability company, and Watsonville Hospital Corporation, a Delaware corporation, each a debtor and debtor-in-possession (collectively, jointly and severally, the "Debtors"), and MPT of Watsonville Lender, LLC, a Delaware limited liability company (the "DIP Lender").

**RECITALS:**

**WHEREAS**, Debtors executed that certain Senior Secured Superpriority Debtor in Possession Promissory Note, dated December 5, 2021 (the "Existing DIP Note" and, as amended by this Amendment, the "DIP Note"), in favor of and for the benefit of the DIP Lender, in the original principal amount of up to $30,750,000.00;

**WHEREAS**, at the request of the Debtors, the DIP Lender has agreed to make certain modifications to the Existing DIP Note and, to give effect to such modifications, waivers under that certain Interim DIP Order [Docket No. 54] on the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the premises, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

**1.** **Defined Terms**. Capitalized terms used in this Amendment and not expressly defined in this Amendment shall have the respective meanings ascribed to them in the Existing DIP Note.

**2.** **Amendments to Note**. Notwithstanding any terms or provisions of the Existing DIP Note to the contrary, effective upon the Effective Time (as defined below), the Existing DIP Note is hereby amended as follows:

(a) Exhibit C to the Existing DIP Note is deleted in its entirety and replaced with Exhibit C attached hereto as Annex I.

**3.** **Representations and Warranties**. The Debtors jointly and severally represent and warrant to the DIP Lender that (a) the execution and delivery of this Amendment and the obligations created hereby have been duly authorized by all necessary proceedings on each Debtor's part, and will not conflict with or result in the breach or violation of any of the terms or conditions of, or constitute (or with notice or lapse of time or both would constitute) a default under the governing documents of such Debtor, any instrument, contract, or other agreement to which such Debtor is a party or by or to which such Debtor or any of its assets or properties are bound or subject; or, subject to the entry and terms of the Interim DIP Order and the Final DIP Order, as applicable, any statute or any regulation, order, judgment, or decree of any court or governmental or regulatory body; (b) each Debtor, subject

183169.4

to the entry and terms of the Interim DIP Order and the Final DIP Order, as applicable, has full legal right, power, and authority to enter into this Amendment and to incur the obligations provided for herein, and to execute and deliver the same to the DIP Lender; (c) subject to entry of the Interim DIP Order or the Final DIP Order, this Amendment constitutes the valid and legally binding obligation of each Debtor, enforceable against it in accordance with its terms, subject to bankruptcy, insolvency, reorganization, and similar laws affecting the enforcement of creditor's rights or contractual obligations generally and, as to enforcement, to general principles of equity, regardless of whether applied in a proceeding at law or in equity; and (d) except for entry of the Interim DIP Order or the Final DIP Order, as applicable, no approval or consent of any foreign, federal, state, county, local, or other governmental or regulatory body, and no approval or consent of any other Person, is required in connection with each Debtor's execution and delivery of this Amendment or its consummation and performance of the transactions contemplated hereby, except such approvals or consents as shall have been obtained on or prior to the date of this Amendment.

**4.** **Conditions Precedent**. Section 2 of this Amendment shall become effective only upon, (the date upon which such condition shall have been satisfied being hereinafter referred to as the "**Effective Time**") the DIP Lender having received a copy of this Amendment duly executed by each of the parties hereto.

**5.** **Ratification**. The Existing DIP Note, as amended by this Amendment is hereby ratified and confirmed in all respect by the parties hereto.

**6.** **Miscellaneous**.

(a)     This Amendment and the obligations of the Debtors hereunder shall be binding upon and enforceable against the Debtors and their respective successors and assigns, and shall inure to the benefit of the DIP Lender and its successors and assigns, including any subsequent holder of this DIP Note; provided, however, that (i) this Amendment shall not inure to the benefit of any assignee pursuant to an assignment which violates the terms of this Amendment or the DIP Note and (ii) neither this Amendment, the DIP Note, nor any other document or agreement contemplated hereunder or thereunder shall be deemed to confer upon any Person not a party to this Amendment or the DIP Note any rights or remedies contained in this Amendment or the DIP Note.

(b)     Section headings are inserted for convenience of reference only and shall be disregarded in the interpretation of this DIP Note. The provisions of this DIP Note shall be construed without regard to the party responsible for the drafting and preparation hereof.

(c)     If any provision of this DIP Note is prohibited or unenforceable in any jurisdiction, then apart from such ineffectiveness as a result of such prohibition or unenforceability, the remaining provisions hereof shall remain in full force and effect.

(d)     This DIP Note and any signed agreement entered into in connection herewith or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or by .pdf, .tif, .gif, .jpeg or similar attachment to electronic mail, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. At the request of any party hereto or to any such contract, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such contract

Case: 21-51477   Doc# 207-1   Filed: 01/17/22   Entered: 01/17/22 14:38:00   Page 63 of 77

shall raise the use of a facsimile machine or by .pdf, .tif, .gif, .jpeg or similar attachment to electronic mail to deliver a signature or the fact that any signature or contract was transmitted or communicated through the use of facsimile machine or by .pdf, .tif, .gif, .jpeg or similar attachment to electronic mail as a defense to the formation of a contract and each such party forever waives any such defense.

(e)    <u>Reference to and Effect on the Existing DIP Note</u>.

(i)    Upon the effectiveness of this Amendment, on and after the date hereof, each reference in the Existing DIP Note to "the DIP Note," "this Agreement," "hereunder," "hereof," "herein" or words of like import shall mean and be a reference to the Existing DIP Note, as amended and modified hereby.

(ii)    Except as specifically amended above, the Existing DIP Note and all other documents, instruments and agreements executed and/or delivered in connection therewith (including, without limitation, all of the Loan Documents) shall remain in full force and effect and are hereby ratified and confirmed.

(iii)    Except as expressly set forth herein, the execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of the DIP Lender, nor constitute a waiver of any provision of the DIP Note or any other documents, instruments and agreements executed and/or delivered in connection therewith.

*[The remainder of this page is intentionally left blank.]*

**IN WITNESS WHEREOF**, the Debtors and the DIP Lender have caused this Amendment to be duly executed and delivered as of the day and year first above written.

<u>**DEBTORS:**</u>

**HALSEN HEALTHCARE, LLC,**
a California limited liability company

By:_____
Name: Jeremy Rosenthal
Title: Chief Restructuring Officer

**WATSONVILLE HOSPITAL HOLDINGS, INC.,**
a California corporation

By:_____
Name: Jeremy Rosenthal
Title: Chief Restructuring Officer

**WATSONVILLE HEALTHCARE MANAGEMENT, LLC,**
a California limited liability company

By:_____
Name: Jeremy Rosenthal
Title: Chief Restructuring Officer

**WATSONVILLE HOSPITAL CORPORATION**,
a Delaware corporation

By:_____
Name: Jeremy Rosenthal
Title: Chief Restructuring Officer

First Amendment to Senior Secured Superpriority Debtor in Possession Promissory Note
Signature Page 1 of 2

**DIP LENDER:**

**MPT OF WATSONVILLE LENDER, LLC,**
a Delaware limited liability company

By:    MPT Development Services, Inc.
Its:    Sole Member

By:_____
Name:    R. Steven Hamner
Title:    Executive Vice President & CFO

First Amendment to Senior Secured Superpriority Debtor in Possession Promissory Note
Signature Page 2 of 2

## ANNEX I

**Exhibit C to DIP Note**

(attached)

# EXHIBIT C

## Chapter 11 Milestones

The obligations of the DIP Lender to advance the DIP Loans shall be subject to the Debtors satisfying, or causing the satisfaction of, the Chapter 11 Milestones listed below by the specified deadline (after taking into account any applicable cure period, the "Specified Deadlines"). The non-satisfaction of any Chapter 11 Milestone by the applicable Specified Deadline (and the non-waiver of such non-satisfaction by the DIP Lender and Debtors in their sole and absolute discretion) shall be an Event of Default under the DIP Loan Documents.

| Chapter 11 Milestone | Specified Deadline |
|---|---|
| Petition Date | No later than December 5, 2021 |
| The Debtors shall filed a motion in form and substance satisfactory to the DIP Lender seeking the Bankruptcy Court approval of the DIP Loans | No later than December 5, 2021 |
| The Bankruptcy Court shall enter the Interim DIP Order | No later than December 8, 2021 |
| The Debtors shall have filed a motion in form and substance satisfactory to the DIP Lender seeking approval of the (a) Bid Procedures and (b) the form and manner of notice of the Sale and assumption and assignment of executory contracts and unexpired leases. | No later than December 22, 2021 |
| The Debtors shall have entered into the Stalking Horse APA in form and substance acceptable to the DIP Lender | No later than December 27, 2021 |
| The Bankruptcy Court shall have, each in form and substance satisfactory to the DIP Lender, approved the (a) Bid Procedures and (b) the form and manner of notice of the Sale and assumption and assignment of executory contracts and unexpired leases. | No later than January 12, 2022 |
| The Bankruptcy Court shall enter an order in form and substance satisfactory to the DIP Lender approving the Debtors' retention of an investment banking firm acceptable to the DIP Lender (it being understood that Cowen and Company, LLC is acceptable) | No later than January 7, 2022 |
| The hearing in the Chapter 11 Cases for the Bid Procedures | No later than January 12, 2022 |
| The Bankruptcy Court shall enter the Final DIP Order | No later than 30 days after entry of the Interim DIP Order |
| The final date for submitting a qualified bid, as set forth in the approved Bid Procedures, and | No later than February 16, 2022 |

| | |
|---|---|
| for the Debtors to designate the "stalking-horse" bid from Pajaro Valley Healthcare District Project as a qualified bid | |
| So long as more than one qualified overbid under the Bid Procedures has been received, the auction for a Sale | No later than February 23, 2022 |
| The sale hearing for a Sale | No later than three (3) Business Days after the auction of the Sale |
| The Bankruptcy Court shall have entered the Sale Order (as defined in the Interim DIP Order) in form and substance satisfactory to the DIP Lender | No later than one (1) Business Day after the sale hearing for the Sale |
| The consummation of a Sale | As soon as practicable after entry of the Sale Order, targeting March 31, 2022, but in no event later than August 31, 2022; Buyer will be required to fund estate expenses if sale does not close by March 31, 2022 |

# **EXHIBIT B**

## **Budget**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**Watsonville Hospital Corporation**
**Actual Cashflow & Revised Forecast**
Amended DIP Budget January 14, 2022

| | Week -1 | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Week 14 | Week 15 | Week 16 | Week 17 | Total Forecast | Total Budget | Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 12/03/21 | 12/10/21 | 12/17/21 | 12/24/21 | 12/31/21 | 01/07/22 | 01/14/22 | 01/21/22 | 01/28/22 | 02/04/22 | 02/11/22 | 02/18/22 | 02/25/22 | 03/04/22 | 03/11/22 | 03/18/22 | 03/25/22 | 04/01/22 | | | |
| **Collections** | | | | | | | | | | | | | | | | | | | | | |
| Collections | | 1,942,418 | 3,144,270 | 2,089,069 | 1,646,260 | 1,900,000 | 2,050,000 | 2,050,000 | 2,050,000 | 2,050,000 | 2,050,000 | 2,050,000 | 2,050,000 | 2,050,000 | 2,090,000 | 2,150,000 | 2,200,000 | 2,200,000 | 35,762,218 | 35,762,218 | 0 |
| Provision for Bad Debts | | 0 | 0 | 0 | 0 | | | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| QAF, DSH & Other Revenue | | 0 | 1,659,075 | 941,690 | 0 | 0 | 0 | 0 | 0 | 2,071,619 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,921,866 | 8,594,250 | 6,935,175 | 1,659,075 |
| **Total Net Collections** | 0 | 1,942,418 | 4,803,345 | 3,030,759 | 1,646,260 | 1,900,000 | 2,050,000 | 2,050,000 | 2,050,000 | 4,121,619 | 2,050,000 | 2,050,000 | 2,050,000 | 2,050,000 | 2,090,200 | 2,150,000 | 6,121,866 | 2,200,000 | 44,356,468 | 42,697,393 | 1,659,075 |
| | | | | | | | | | | | | | | | | | | | | | |
| **Operations Spend** | | | | | | | | | | | | | | | | | | | | | |
| Salaries & Wages | | 2,476,256 | 11,817 | 2,533,339 | 22,999 | 2,600,000 | 0 | 2,608,636 | 0 | 2,620,000 | 0 | 2,630,279 | 0 | 2,660,000 | 0 | 2,690,000 | 0 | 2,700,000 | 23,553,326 | 23,579,348 | 26,022 |
| Employee Benefits | | 96,452 | 433,916 | 283,130 | 347,755 | 200,000 | 463,700 | 200,000 | 736,847 | 200,000 | 463,700 | 200,000 | 736,847 | 200,000 | 463,700 | 200,000 | 570,308 | 200,000 | 5,996,356 | 5,998,650 | 2,294 |
| Registry | | 0 | 0 | 65,534 | 20,533 | 90,000 | 75,000 | 112,393 | 112,393 | 112,703 | 112,703 | 112,703 | 112,703 | 118,769 | 118,769 | 118,769 | 118,769 | 113,121 | 1,514,858 | 1,934,213 | 419,355 |
| Professional Fees Medical | | 0 | 273,927 | 30,546 | 237,945 | 85,000 | 200,000 | 200,000 | 162,618 | 80,000 | 161,917 | 200,000 | 200,000 | 200,000 | 80,000 | 250,000 | 145,000 | 145,099 | 2,652,052 | 2,649,537 | -2,515 |
| Supplies - Other | | 40,002 | 182,009 | 161,916 | 347,072 | 335,000 | 285,000 | 335,000 | 285,000 | 335,000 | 285,000 | 335,000 | 285,000 | 335,000 | 285,000 | 335,000 | 285,000 | 335,000 | 4,785,999 | 4,791,704 | 5,705 |
| Repairs & Maintenance | | 0 | 21,589 | 0 | 44,429 | 29,941 | 50,000 | 50,000 | 29,941 | 30,755 | 38,000 | 30,755 | 30,755 | 36,499 | 45,000 | 36,499 | 36,499 | 40,000 | 530,603 | 534,062 | 3,459 |
| Utilities | | 0 | 2,078 | 0 | 18,351 | 5,000 | 120,000 | 30,000 | 20,000 | 20,000 | 20,000 | 120,000 | 20,000 | 20,000 | 20,000 | 120,000 | 20,000 | 7,700 | 563,130 | 560,000 | -3,130 |
| Purchased Services | | 112,000 | 210,943 | 207,693 | 114,230 | 358,940 | 383,940 | 383,940 | 383,940 | 377,843 | 377,843 | 277,843 | 277,843 | 274,108 | 274,108 | 274,108 | 274,108 | 285,085 | 4,848,512 | 5,366,552 | 518,040 |
| Rents & Leases | | 0 | 10,234 | 0 | 106,382 | 40,000 | 0 | 0 | 169,252 | 0 | 0 | 0 | 149,831 | 0 | 0 | 0 | 151,325 | 0 | 627,023 | 610,244 | -16,779 |
| MPT Facility Lease | | 0 | 0 | 0 | 0 | 250,000 | 0 | 0 | 250,000 | 0 | 0 | 0 | 250,000 | 0 | 0 | 0 | 0 | 0 | 750,000 | 750,000 | 0 |
| Property Taxes & Other | | 0 | 6,297 | 100,346 | 11,264 | 0 | 3,000 | 119,141 | 0 | 0 | 0 | 119,141 | 0 | 0 | 0 | 119,141 | 0 | 0 | 478,329 | 479,563 | 1,234 |
| Other Expenses (Incl QAF Pymts) | | 0 | 49,661 | 0 | 599 | 36,111 | 1,035,094 | 36,111 | 36,111 | 1,020,401 | 39,971 | 39,971 | 920,237 | 50,000 | 31,311 | 50,000 | 31,311 | 33,945 | 3,410,835 | 3,413,119 | 2,285 |
| Utility Deposits | | 0 | 0 | 0 | 0 | 351,684 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 351,684 | 351,684 | 0 |
| Hospital Mgmt Fee | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 250,000 | 0 | 0 | 0 | 250,000 | 0 | 0 | 0 | 250,000 | 250,000 | 1,000,000 | 1,000,000 | 0 |
| Wind Down Operating Reserve | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,000,000 | 0 | 1,000,000 | 0 | -1,000,000 |
| US Trustee Fees | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 108,682 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 108,682 | 108,682 | 0 |
| **Total Operations Spend** | 0 | 2,724,710 | 1,202,470 | 3,382,503 | 1,271,560 | 4,381,675 | 2,595,674 | 4,075,220 | 2,544,784 | 4,796,702 | 1,499,134 | 4,065,692 | 3,233,216 | 3,894,375 | 1,317,888 | 4,193,516 | 1,882,320 | 5,109,949 | 52,171,389 | 52,127,356 | -44,032 |
| | | | | | | | | | | | | | | | | | | | | | |
| **Professional Fees** | | | | | | | | | | | | | | | | | | | | | |
| **Debtor's Professionals** | | | | | | | | | | | | | | | | | | | | | |
| Force 10 Partners | | 0 | 325,000 | 162,500 | 162,500 | 162,500 | 162,500 | 162,500 | 162,500 | 112,500 | 112,500 | 112,500 | 112,500 | 75,000 | 75,000 | 75,000 | 75,000 | 600,000 | 2,650,000 | 2,650,000 | 0 |
| Pachulski Stang Ziehl & Jones | | 0 | 325,000 | 162,500 | 162,500 | 162,500 | 162,500 | 162,500 | 162,500 | 112,500 | 112,500 | 112,500 | 112,500 | 75,000 | 75,000 | 75,000 | 75,000 | 600,000 | 2,650,000 | 2,650,000 | 0 |
| Investment Banker (Cowen) | | 0 | 0 | 0 | 0 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 750,000 | 975,000 | 975,000 | 0 |
| Healthcare Counsel (Hooper Lundy) | | 0 | 12,500 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 25,000 | 125,000 | 125,000 | 0 |
| Labor Counsel (Bartko Zankel) | | 0 | 37,500 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 375,000 | 375,000 | 0 |
| Noticing Agent (Stretto) | | 0 | 37,500 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 7,500 | 7,500 | 7,500 | 7,500 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 355,000 | 355,000 | 0 |
| **Patient Ombudsperson** | | | | | | | | | | | | | | | | | | | | | |
| Ombudsperson | | 0 | 0 | 0 | 0 | 40,000 | 0 | 0 | 0 | 20,000 | 0 | 0 | 0 | 20,000 | 0 | 0 | 0 | 20,000 | 100,000 | 120,000 | 20,000 |
| **Committee** | | | | | | | | | | | | | | | | | | | | | |
| Committee Professionals | | 0 | 0 | 0 | 0 | 100,000 | 0 | 0 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 1,000,000 | 500,000 | -500,000 |
| **Board of Directors** | | | | | | | | | | | | | | | | | | | | | |
| Board of Directors | | 0 | 0 | 0 | 0 | 50,000 | 0 | 0 | 0 | 50,000 | 0 | 0 | 0 | 50,000 | 0 | 0 | 0 | 50,000 | 250,000 | 300,000 | 50,000 |
| **Total Professionals Spend** | 0 | 0 | 737,500 | 368,750 | 368,750 | 577,500 | 387,500 | 387,500 | 477,500 | 436,250 | 366,250 | 366,250 | 366,250 | 372,500 | 302,500 | 302,500 | 302,500 | 2,360,000 | 8,480,000 | 8,050,000 | -430,000 |
| | | | | | | | | | | | | | | | | | | | | | |
| **Financing** | | | | | | | | | | | | | | | | | | | | | |
| Revolver Paydown | | -1,753,017 | -4,908,736 | -674,591 | 1,564,745 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | -5,771,599 | -5,709,638 | 61,961 |
| Emergency Advance | 3,500,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,500,000 | 3,500,000 | 0 |
| Prepetition MPT Note Rollup (FN 1) | | 0 | 0 | 0 | 0 | 0 | 0 | -9,250,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | -9,250,000 | -9,250,000 | 0 |
| Prepetition MPT Note Rollup Funding (FN | | 0 | 0 | 0 | 0 | 0 | 0 | 9,250,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9,250,000 | 9,250,000 | 0 |
| Projected DIP Draws | | 6,000,000 | 0 | 3,340,925 | 0 | 5,000,000 | 0 | 0 | 0 | 0 | 0 | 2,500,000 | 0 | 2,500,000 | 0 | 0 | 2,159,075 | 0 | 21,500,000 | 21,500,000 | 0 |
| | | | | | | | | | | | | | | | | | | | | | |
| Beginning Cash | | 1,100,457 | 4,565,148 | 2,519,787 | 4,465,627 | 6,036,322 | 7,977,147 | 7,043,973 | 4,631,253 | 3,658,969 | 2,547,636 | 2,732,252 | 2,850,310 | 1,300,844 | 1,583,969 | 2,053,781 | 1,866,840 | 5,803,886 | 1,100,457 | 1,821,470 | -721,013 |
| Ending Cash | 1,100,457 | 4,565,148 | 2,519,787 | 4,465,627 | 6,036,322 | 7,977,147 | 7,043,973 | 4,631,253 | 3,658,969 | 2,547,636 | 2,732,252 | 2,850,310 | 1,300,844 | 1,583,969 | 2,053,781 | 1,866,840 | 5,803,886 | 533,937 | 533,937 | 131,868 | 402,069 |

Case: 21-51477    Doc# 207-1    Filed: 01/17/22    Entered: 01/17/22 14:38:00    Page 71 of 77

## EXHIBIT C

**Committee Term Sheet**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**TERM SHEET RESOLVING COMMITTEE**
**OBJECTIONS TO DIP FINANCING ORDER**

This term sheet (the "Term Sheet") sets forth the terms of a resolution of objections by the Committee (as defined below) to the entry of a final order approving the DIP Facility[1]. The "Parties" to this Term Sheet are: (i) Watsonville Hospital Corporation, Watsonville Healthcare Management, LLC, Watsonville Hospital Holdings, Inc., and Halsen Healthcare, LLC (collectively, the "Debtors"); (ii) MPT of Watsonville Lender, LLC and its affiliates, including MPT of Watsonville, LLC (collectively, "MPT"); and (iii) the Official Committee of Unsecured Creditors (the "Committee"). The terms set forth in this Term Sheet are integrated and not divisible, and the Parties shall cooperate in good faith and use commercially reasonable efforts, including in connection with any Sale (as defined below), Alternative Transaction (as defined below), other sale or transaction, and the other transactions and matters contemplated hereby to enter into such definitive agreements or other documents as necessary to ensure that each Party receives its respective benefits set forth in this Term Sheet.

| | |
|---|---|
| DIP Financing Order | In consideration of the terms of the final order approving postpetition financing to which this Term Sheet is attached (the "DIP Financing Order") and the terms of this Term Sheet, the Parties consent to the entry of the DIP Financing Order. |
| Objection Condition | The "Objection Condition" shall be deemed to occur upon the passage of the Committee Objection Deadline without the Committee having filed an Objection. The Parties agree that, in the event of the occurrence of the Objection Condition, MPT and the Committee shall consent to the Sale (as defined in the *Debtors' Motion for Entry of an Order (I) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 103] (the "Sale Motion"), the "Sale") on the terms set forth in the Stalking Horse APA (as defined in the Sale Motion, and as same may be amended from time to time with MPT's consent or as otherwise agreed by the Parties, the "Stalking Horse APA") or, if applicable, any proposed Alternative Transaction (as defined below). |
| Closing | In the event that (i) the Objection Condition occurs and (ii) the Sale or any other transaction or series of transactions (collectively, an "Alternative Transaction") on economic terms no less beneficial to each of the Parties than those set forth in the Stalking Horse APA and this Term Sheet shall have closed |

---

[1] All terms used but not otherwise defined in this Term Sheet shall have the meanings ascribed to them in the DIP Financing Order.

(the "Closing") (unless otherwise agreed by the Parties) prior to August 31, 2022 (subject to extension by agreement of the Parties):

- At the Closing, to the extent that the DIP Facility has not already been fully funded, advanced, and made available to the Debtors, MPT shall fully fund, advance, and make available to the Debtors the entire $30,750,000 DIP Facility, consistent with the Debtors' operational needs and obligations hereunder;

- The net cash proceeds of the Sale or Alternative Transaction, up to the amount of $34,000,000, shall be paid to MPT (the "MPT Payment") at the Closing;

- Any net cash proceeds of the Sale or Alternative Transaction in excess of $34,000,000 (the "Excess Sale Proceeds") shall be shared between MPT and the Estates as follows: MPT shall be paid 80% of the Excess Sale Proceeds at the Closing (the "MPT Excess Sale Proceeds Payment") and the Estates shall be paid and retain 20% of the Excess Sale Proceeds ("Estate Excess Sale Proceeds Share");

- In the event that the Debtors' and Estates' cash on hand immediately following the Closing (excluding (i) any amounts in the Professional Fee Trust Account required for the payment of professional fees that are contemplated to be paid from the Professional Fee Trust Account as of the Closing and (ii) the Estate Excess Sale Proceeds Share) (the "Post-Closing Cash on Hand") exceeds $3,500,000, the Post-Closing Cash on Hand in excess of $3,500,000 (the "Post-Closing Excess Cash") shall be shared between MPT and the Estates as follows: MPT shall be paid 65% of the Post-Closing Excess Cash (the "MPT Post-Closing Excess Cash Payment") and the estates shall be paid and/or retain, as applicable, 35% of the Post-Closing Excess Cash;

- Upon payment of (i) the MPT Payment, (ii) the MPT Excess Sale Proceeds Payment (if any), and (iii) the MPT Post-Closing Excess Cash Payment (if any), the following terms shall apply:

| | |
|---|---|
| | ▪ All DIP Obligations and all claims of MPT, with respect to the DIP Facility and the DIP Loan Documents shall automatically be deemed satisfied in full;<br><br>▪ All liens and security interests of MPT and any other party in and/or on any property of the Debtors or their Estates under the DIP Facility and the DIP Loan Documents shall automatically be deemed satisfied and released; provided, however, MPT shall be entitled to retain and apply as it determines any cash security or other deposit held by MPT in respect of the MPT Prepetition Obligations;<br><br>▪ All claims of MPT in any capacity against the Debtors and their Estates shall automatically be deemed waived and released in their entirety for all purposes (including for the purposes of distribution under any chapter 11 plan for the Debtors) other than (i) voting to accept or reject a chapter 11 plan for the Debtors and (ii) receiving the MPT Trust Distribution Share (as defined below) under a chapter 11 plan for the Debtors; provided, however, MPT shall be entitled to retain and apply as it determines any cash security or other deposit held by MPT in respect of the MPT Prepetition Obligations; and<br><br>▪ All claims of the Debtors and their Estates against MPT (including, but not limited to, any causes of action vested in the Committee) shall be deemed waived and released; and<br><br>● MPT and the Committee (i) shall support and (ii) shall not object to or otherwise oppose, and MPT shall vote in favor of, a chapter 11 plan for the Debtors that (a) contains the following terms, (b) provides for the appointment of an individual reasonably acceptable to the Debtors, the Committee, and MPT as the trustee of the Liquidating Trust (defined below), and (c) is otherwise consistent with this Term Sheet (the "Plan"):<br><br>▪ A liquidating trust (the "Liquidating Trust") shall be established for the benefit of the Debtors' creditors, to be funded pursuant to the |

3

| | Plan with all available Debtor and Estate cash on hand (excluding any amounts in the Professional Fee Trust Account required for the payment of allowed professional fees); |
| --- | --- |
| | ▪ All Debtor and Estate cash on hand, including (i) all Excluded Cash (as defined in the Stalking Horse APA) earmarked under the Stalking Horse APA to fund a wind-down of the Debtors' Estates and (ii) all amounts in the Professional Fee Trust Account (which Professional Fee Trust Account, notwithstanding anything in the DIP Financing Order or other DIP Loan Documents to the contrary, shall be funded in accordance with and to the full extent of the Budget) other than amounts required for the payment of allowed (or pending) professional fees that are accrued but unpaid as of the date the Liquidating Trust is established, shall be treated as unencumbered Estate assets, and, to the extent then remaining, available for the funding of and use by the Liquidating Trust; |
| | ▪ All causes of action of the Debtors and the Estates (including all Avoidance Actions) and/or their proceeds, as applicable, shall be treated as unencumbered Estate assets available for the funding of and use by the Liquidating Trust; |
| | ▪ All other assets of the Debtors and their Estates and/or such assets' proceeds, as applicable, shall be treated as unencumbered Estate assets available for the funding of and use by the Liquidating Trust; |
| | ▪ In the event that the Liquidating Trust distributes to holders of allowed general unsecured claims against the Debtors and their Estates (after accounting for all other payments required under the Plan, including the payment of the Liquidating Trust's expenses) the greater of (i) $3,500,000 or (ii) an amount equal to 20% of the aggregate amount of allowed general unsecured claims (the "Minimum Distribution |

4

| | |
|---|---|
| | <u>Threshold</u>"), any further amounts distributed by the Liquidating Trust from any source shall be paid 50% to MPT(the "<u>MPT Trust Distribution Share</u>") and 50% to holders of allowed general unsecured claims against the Debtors and their Estates;<br><br>▪ The trustee of the Liquidating Trust (or debtor representative appointed for such purpose under the Plan, as applicable) shall have sole and absolute discretion to pursue, prosecute, negotiate, release, and/or settle all Debtor and Estate causes of action (including Avoidance Actions and commercial tort claims) subject to approval of a plan oversight committee (the "<u>POC</u>"), which POC will be established under the Plan and consist of (i) any members selected by the Committee and (ii) one member selected by MPT; and<br><br>▪ MPT shall not receive any distribution or retain any rights with respect to the Debtors or the Estates' assets under the Plan other than the MPT Trust Distribution Share. |
| Failure of Closing | Unless otherwise agreed by the Debtors, the Committee, and MPT, in the event that (i) the Objection Condition occurs but (ii) the Closing of the Sale or an Alternative Transaction does not occur prior to August 31, 2022:<br><br>▪ All Objection rights of the Committee shall be restored in full without regard to the Committee Objection Deadline or any lapse thereof; and<br><br>▪ The Debtors, the Committee, and MPT shall negotiate in good faith regarding modifications to this Term Sheet and/or an alternative agreement to facilitate confirmation of a chapter 11 plan for the Debtors and a distribution to the Debtors' unsecured creditors. |

5

Case: 21-51477   Doc# 207-1   Filed: 01/17/22   Entered: 01/17/22 14:38:00   Page 77 of 77