# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| In re<br><br>WATSONVILLE HOSPITAL CORPORATION, *et al.*,<br><br>Debtors.[1] | Case No. 21-51477<br><br>Chapter 11<br><br>**SUPPLEMENTAL CERTIFICATE OF SERVICE** |

I, Sabrina G. Tu, depose and say that I am employed by Stretto, the claims and noticing agent for the Debtors in the above-captioned cases.

On January 27, 2022, at my direction and under my supervision, employees of Stretto caused the following document to be served via first-class mail on Pension Assurance, LLP. at 5126 Clareton Dr, Ste 110, Agoura Hills, CA 91301-4400, pursuant to USPS forwarding instructions:

- **Order Authorizing the Debtors to Employ Professionals Used in the Ordinary Course of Business** (Docket No. 172)

Furthermore, on or before January 31, 2022, at my direction and under my supervision, employees of Stretto caused the following documents to be served via first-class mail on CNH Finance Fund I, L.P., c/o CNH Finance, L.P., Attn: Timothy Peters at PMB 1285, 24 East Ave, New Canaan, CT 06840-5529, pursuant to USPS forwarding instructions:

- **Debtors' Motion for Order (A) Approving Bidding Procedures for the Sale of Substantially All Assets; (B) Approving Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases (C) Approving Related Notice Procedures; (D) Authorizing Debtors to Enter into Stalking Horse Agreement and Approving Bid Protections; (E) Scheduling a Sale Hearing; and (F) Granting Certain Related Relief** (Docket No. 93)

- **Declaration of Lorie R. Beers in Support of Debtors' Motion for Order (A) Approving Bidding Procedures for the Sale of Substantially All Assets; (B) Approving Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases (C) Approving Related Notice Procedures; (D) Authorizing Debtors to Enter into Stalking Horse Agreement and Approving Bid Protections; (E) Scheduling a Sale Hearing; and (F) Granting Certain Related Relief** (Docket No. 94)

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Watsonville Hospital Corporation (4113); Watsonville Healthcare Management, LLC (4168); Watsonville Hospital Holdings, Inc. (1118); and Halsen Healthcare, LLC. The Debtors' business address is 75 Nielson Street, Watsonville, CA 95076.

- **Declaration of Jeremy Rosenthal in Support of Debtors' Motion for Order (A) Approving Bidding Procedures for the Sale of Substantially All Assets; (B) Approving Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases (C) Approving Related Notice Procedures; (D) Authorizing Debtors to Enter into Stalking Horse Agreement and Approving Bid Protections; (E) Scheduling a Sale Hearing; and (F) Granting Certain Related Relief** (Docket No. 95)

- **Notice of Hearing on Debtors' Motion for Order (A) Approving Bidding Procedures for the Sale of Substantially All Assets; (B) Approving Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases (C) Approving Related Notice Procedures; (D) Authorizing Debtors to Enter into Stalking Horse Agreement and Approving Bid Protections; (E) Scheduling a Sale Hearing; and (F) Granting Certain Related Relief** (Docket No. 96)

- **Notice of Continued Hearing on Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Liens and Superpriority Administrative Expense Claims; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief** (Docket No. 114)

Furthermore, on January 31, 2022, at my direction and under my supervision, employees of Stretto caused the following documents to be served via first-class mail on MCN Healthcare at 501 S Cherry St, Ste 1100, Denver, CO 80246-1323, pursuant to USPS forwarding instructions:

- **Notice of Bar Dates for Filing Proofs of Claim** (attached hereto as **Exhibit A**)

- **Proof of Claim Form** (Official Form 410)

- **Instructions for Proof of Claim** (attached hereto as **Exhibit B**)

- **Notice of Sale, Bidding Procedures, Auction, and Sale Hearing in Connection with a Sale of Substantially All of the Debtors' Assets** (attached hereto as **Exhibit C**)

- **Notice of Filing of Exhibit B to Asset Purchase Agreement – Form of MPT Lease Amendment** (Docket No. 191)

Furthermore, on January 31, 2022, at my direction and under my supervision, employees of Stretto caused the following documents to be served via first-class mail on Angel Gibson at 420 64th Ave, Ste 201, St Pete Beach, FL 33706-2166, and on one (1) confidential party not included herein, pursuant to USPS forwarding instructions:

- **Notice of Bar Dates for Filing Proofs of Claim** (attached hereto as **Exhibit A**)

- **Proof of Claim Form** (Official Form 410)

- **Instructions for Proof of Claim Form** (attached hereto as **Exhibit B**)

Furthermore, on January 31, 2022, at my direction and under my supervision, employees of Stretto caused the following document to be served via first-class mail on the service list attached hereto as **Exhibit D**, and on one (1) confidential party not included herein, pursuant to USPS forwarding instructions:

- **Notice of Sale, Bidding Procedures, Auction, and Sale Hearing in Connection with a Sale of Substantially All of the Debtors' Assets** (attached hereto as **Exhibit C**)

Furthermore, on or before February 1, 2022, at my direction and under my supervision, employees of Stretto caused the following document to be served via first-class mail on the service list attached hereto as **Exhibit E**, and one (1) confidential party not included herein, pursuant to USPS forwarding instructions:

- **Notice of Filing of Exhibit B to Asset Purchase Agreement – Form of MPT Lease Amendment** (Docket No. 191)

Furthermore, on or before February 1, 2022, at my direction and under my supervision, employees of Stretto caused the following documents to be served via first-class mail on five hundred sixty-three (563) confidential parties not listed herein, pursuant to USPS forwarding instructions:

- **Notice of Bar Dates for Filing Proofs of Claim** (attached hereto as **Exhibit F**)

- **Proof of Claim Form** (Official Form 410)

- **Instructions for Proof of Claim Form** (attached hereto as **Exhibit B**)

Furthermore, on or before February 2, 2022, at my direction and under my supervision, employees of Stretto caused the following document to be served via first-class mail on the service list attached hereto as **Exhibit G**, pursuant to USPS forwarding instructions:

- **Notice of Potential Assumption and Assignment and Cure Amount with Respect to the Executory Contracts and Unexpired Leases of the Debtors in Connection with a Sale of Substantially All of the Debtors' Assets** (Docket No. 200)

Dated: February 4, 2022

/s/ *Sabrina G. Tu*
STRETTO
Sabrina G. Tu
410 Exchange, Suite 100
Irvine, CA 92602
800.634.7734
Sabrina.Tu@stretto.com

# **Exhibit A**

1  Debra I. Grassgreen (CA Bar No. 169978)
   Maxim B. Litvak (CA Bar No. 215852)
2  Steven W. Golden (admitted *pro hac vice*)
   PACHULSKI STANG ZIEHL & JONES LLP
3  One Market Plaza, Spear Tower, 40th Floor
   San Francisco, CA 94105-1020
4  Telephone:    415.263.7000
   Facsimile:    415.263.7010
5  E-mail:       dgrassgreen@pszjlaw.com
                 mlitvak@pszjlaw.com
6                sgolden@pszjlaw.com

7  Attorneys for Debtors and Debtors in Possession

8                **UNITED STATES BANKRUPTCY COURT**

9                **NORTHERN DISTRICT OF CALIFORNIA**

10                      **SAN JOSE DIVISION**

11 | In re: | Case No. 21-51477 |
| --- | --- |
12 | WATSONVILLE HOSPITAL CORPORATION, *et al.*, | Chapter 11 (Jointly Administered) |
13 | Debtors.[1] | **NOTICE OF BAR DATES FOR FILING PROOFS OF CLAIM** |
14 | | |

15 **PLEASE TAKE NOTICE THAT:**

16 On December 5, 2021 (the "Petition Date"), Watsonville Hospital Corporation and certain of its affiliates, the debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), filed
17 voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Northern District of California, San Jose Division (the
18 "Bankruptcy Court").

19 On January 6, 2022, the Bankruptcy Court entered an order [Docket No. 171] (the "Bar Date Order")[2] establishing certain deadlines for filing proofs of claim ("Proofs of Claim") against the Debtors (the "Bar
20 Dates"), including a General Bar Date, Governmental Bar Date, Amended Schedules Bar Date, and Rejection Bar Date (each as defined in the Bar Date Order).

21
22 The Bar Dates and the procedures set forth below for the filing of Proofs of Claim against the Debtors apply to all claims against the Debtors that arose (or are deemed to have arisen) on or prior to the Petition Date,
23 including any claims arising under section 503(b)(9) of the Bankruptcy Code, except for the types of claims listed in Section 2 below.

24 You may obtain a copy of the Bar Date Order and other case pleadings, including the Schedules, once filed
25 (as defined below), at the Debtors' case website (https://cases.stretto.com/WatsonvilleHospital) or the

26 ───────────────
[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:
27 Watsonville Hospital Corporation (4113); Watsonville Healthcare Management, LLC (4168); Watsonville Hospital Holdings, Inc. (1118); and Halsen Healthcare, LLC. The Debtors' business address is 75 Nielson Street, Watsonville, CA
28 95076.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bar Date Order.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Bankruptcy Court's website (www.canb.uscourts.gov) (for a fee). Copies of case pleadings also may be examined between the hours of 9:00 a.m. and 3:00 p.m., Monday through Friday, excluding federal holidays, at the Office of the Clerk of the Bankruptcy Court (the "Clerk"), 280 South First Street, Room 3035, San Jose, CA 95113-3099. Finally, copies of case pleadings also may be obtained by written request to Stretto, Inc. ("Stretto"), the Debtors' court-appointed claims and noticing agent.

## 1.     WHO MUST FILE A PROOF OF CLAIM

You **must** file a Proof of Claim (a "Proof of Claim Form") to share in distributions from the Debtors' bankruptcy estates if you hold a claim[3] against the Debtors (including any claims arising under section 503(b)(9) of the Bankruptcy Code) that arose (or is deemed to have arisen) on or before the Petition Date, and it is not one of the kinds of claims set forth in Section 2 below. You must file a Proof of Claim Form by the applicable Bar Date even if your claim is not now fixed, liquidated, or certain or did not mature or become fixed, liquidated or certain before the Petition Date.

Specifically, and without limiting the generality of Bankruptcy Rule 3003(c)(2), you **must** file a Proof of Claim Form on or before the applicable Bar Date if:

   a.     your claim (i) is not listed in the Debtors' Schedules filed with the Bankruptcy Court, or in any supplements or amendments to the Schedules, or (ii) is listed in the Debtors' Schedules filed with the Bankruptcy Court, or in any supplements or amendments to the Schedules, as "contingent," "unliquidated," or "disputed;"

   b.     your claim is listed in the Debtors' Schedules filed with the Bankruptcy Court, or in any supplements or amendments to the Schedules, and you disagree with the amount, nature, classification, or characterization of the claim as set forth in the Schedules; or

   c.     you assert an administrative priority claim under section 503(b)(9) of the Bankruptcy Code.[4]

## 2.     EXCLUDED CLAIMS

You do **not** need to file a Proof of Claim Form if:

   a)     you have already properly filed a proof of claim with Stretto or the Clerk of the Court for the United States Bankruptcy Court for the Northern District of California in a form substantially similar to Official Form 410;

   b)     your claim is listed in the Debtors' Schedules and (i) the claim is not described as "disputed," "contingent," or "unliquidated," and (ii) you agree with the amount, nature, and priority of the claim set forth in the Schedules;

   c)     your claim has been allowed by Court order on or before the applicable Bar Date;

---

[3] Under section 101(5) of the Bankruptcy Code and as used herein, the word "claim" means (i) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (ii) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

[4] Section 503(b)(9) of the Bankruptcy Code provides that "the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business" is entitled to administrative priority.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

d) your claim has been satisfied in full by the Debtors or any other party prior to the applicable Bar Date;

e) your claim is one for which the Court has already fixed a specific deadline to file a proof of claim;

f) you are the MPT Prepetition Lender, the CNH Prepetition Lender, the DIP Lender, or any successors thereto, with respect to claims arising from or concerning the loan agreements referenced in the DIP Financing Motion (including the MPT Prepetition Obligations);

g) you are an employee of a Debtor and an order of the Court authorized such Debtor to honor your claim in the ordinary course of business, and the Debtor actually paid such claim, *provided, however*, that an employee must submit a Proof of Claim Form by the applicable Bar Date for all other claims, including claims for deferred compensation, accrued paid leave, wrongful termination, harassment, hostile work environment, retaliation, claims under one of the Debtors' collective bargaining agreements, claims covered by the Debtors' workers' compensation insurance, or any other litigation or pre-litigation claim;

h) you are a current director and/or manager, officer, or employee of the Debtors, with respect to a claim for indemnification, contribution, or reimbursement;

i) you are a Debtor having a claim against another Debtor; and

j) you are a holder of an equity interest in a Debtor; *provided, however*, that any holder of an equity interest who wishes to assert a claim against a Debtor, including any claim relating to such equity interest or the purchase or sale of such interest, must file a Proof of Claim Form asserting such claim on or prior to the applicable Bar Date pursuant to the procedures set forth herein.

**You should not file a Proof of Claim Form if you do not have a claim against the Debtors. The fact that you received this notice does not mean that you have a claim against the Debtors.**

**Additional copies of Proof of Claim Forms can be obtained at the Debtors' case website, https://cases.stretto.com/WatsonvilleHospital or by emailing your request to TeamWatsonvilleHospital@Stretto.com.**

**3.      THE BAR DATES**

The Bar Date Order establishes the following Bar Dates for filing proofs of claim in these cases:

**General Bar Date**. Except as otherwise provided herein, each person or entity (including, without limitation, each individual, partnership, joint venture, corporation, limited liability company, estate, or trust) holding or asserting a claim against the Debtors that arose (or is deemed to have arisen) on or prior to the Petition Date (including any claims arising under section 503(b)(9) of the Bankruptcy Code) must file a Proof of Claim Form, so that it is **actually received** by Stretto **on or before April 4, 2022 at 4:00 p.m. (Pacific Time)** (the "General Bar Date").

**Governmental Bar Date**. Each governmental unit holding or asserting a claim against the Debtors that arose (or is deemed to have arisen) on or prior to the Petition Date must file a Proof of Claim Form so that it is **actually received** by Stretto **on or before June 3, 2022 at 4:00 p.m. (Pacific Time)**.

**Amended Schedules Bar Date**. If, on or after the date the Debtors serve this Notice, the Debtors amend their Schedules to change the amount, nature, classification or characterization of a claim, or to schedule a new

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

claim, the affected claimant may dispute the amount, nature, classification or characterization of the scheduled claim by filing a Proof of Claim Form with respect to the scheduled claim, so that the Proof of Claim Form is <u>actually received</u> by Stretto **on or before the later of (i) the General Bar Date or (ii) thirty (30) days from the date notice is served alerting the affected creditor of the applicable amendment to the Schedules.**

<u>Rejection Bar Date</u>. Each person or entity (including, without limitation, each individual, partnership, joint venture, corporation, limited liability company, estate, and trust) holding or asserting a claim for any rejection damages arising from the rejection of any unexpired lease or executory contract of a Debtor (an "<u>Agreement</u>") during the Bankruptcy Cases must file a Proof of Claim Form so that it is *actually received* by Stretto **on or before the later of (i) 30 days after the entry of an order authorizing rejection of such Agreement or pursuant to a notice under procedures approved by the Bankruptcy Court, (ii) any date set by another order of the Bankruptcy Court, or (iii) the General Bar Date or the Governmental Bar Date, whichever is applicable.**

## 4. WHAT FORMS AND DOCUMENTS TO FILE

Any Proof of Claim Form previously and properly filed with either Stretto or the Clerk prior to the mailing of this Notice shall be deemed to be, and shall be treated as, a timely-filed claim subject to the rights of the Debtors or any party-in-interest to object to the allowance thereof. No additional Proof of Claim Form is required to be asserted with respect to such a previously-filed claim.

**If you have not filed your proof of claim yet**, a Proof of Claim Form should be submitted on the Proof of Claim Form enclosed with this notice. Additional copies of the Proof of Claim Form and general information related to these cases can be obtained at: https://cases.stretto.com/WatsonvilleHospital or by emailing your request to Team.WatsonvilleHospital@Stretto.com.

<u>Proof of Claim Form</u>. If your claim is scheduled by the Debtors, the enclosed Proof of Claim Form sets forth (i) the amount of the scheduled claim, if any; (ii) whether the claim is listed as disputed, contingent or unliquidated; (iii) whether the claim is listed as a secured, unsecured priority or unsecured nonpriority claim; and (iv) the identity of the Debtor against which the person or entity's claim is scheduled. To the extent you disagree with the information on the Proof of Claim Form, you should make the necessary changes to the information on the Proof of Claim Form.

<u>503(b)(9) Claim</u>. If you assert a claim pursuant to section 503(b)(9) of the Bankruptcy Code you must complete the appropriate box in the Proof of Claim Form and (i) identify the amount of such claim believed to be entitled to administrative expense priority treatment under section 503(b)(9) of the Bankruptcy Code and (ii) attach documentation supporting such claim. If you fail to identify the existence and amount of your 503(b)(9) Claim on the Proof of Claim Form, the claim will not be regarded as a 503(b)(9) Claim, and the claim will not be entitled to priority treatment under section 503(b)(9) of the Bankruptcy Code.

All Proof of Claim Forms must be filed with **original signatures** and be denominated in lawful currency of the United States. If possible, you should file your Proof of Claim Form in English. You should attach to your completed Proof of Claim Form copies of any documents on which the claim is based or an explanation as to why such documents are not available.[5]

Except as otherwise provided by the Bar Date Order, each Proof of Claim Form must state a claim against only one Debtor and clearly indicate the Debtor against which the claim is asserted. To the extent more than one Debtor is listed on the proof of claim, such claim will be treated as if filed only against Watsonville

---

[5] To the extent the supporting documentation concerns or contains individually identifiable health information, as such term is defined at 45 C.F.R. § 164.502, you may file such documentation under seal without further order of the Court.

Hospital Corporation. If a holder of a claim asserts a claim against more than one Debtor, a separate proof of claim must be filed against each such Debtor.

**5.      WHERE TO FILE**

Persons or entities filing Proof of Claim Forms must deliver such forms to Stretto at one of the following addresses in the manner indicated below:

<u>If by First-Class Mail</u>:

**Watsonville Hospital Corporation, et al. Claims Processing Center**
**c/o Stretto**
**410 Exchange, Suite 100**
**Irvine, CA 92602**

Alternatively, claimants may submit a Proof of Claim electronically by completing the Proof of Claim Form that can be accessed at Stretto's website: **https://cases.stretto.com/WatsonvilleHospital/file-a-claim/**. Proof of Claim Forms will be deemed timely and properly filed only if such forms are **_actually received_** by Stretto on or before the applicable Bar Date. Do not file your Proof of Claim Form with the Clerk.

**Proof of Claim Forms shall not be submitted by facsimile, telecopy, e-mail or other electronic means (except for the Electronic Proof of Claim), and Proof of Claim Forms submitted by such means shall not be deemed timely filed.**

Time-stamped copies of Proof of Claim Forms will not be returned unless you provide the Claims Agent with a copy of your Proof of Claim Form and a self-addressed, postage pre-paid, envelope.

**<u>CONSEQUENCES OF FAILURE TO TIMELY FILE PROOF OF CLAIM FORMS</u>. ANY PERSON OR ENTITY THAT IS REQUIRED TO FILE A PROOF OF CLAIM FORM IN THE FORM AND MANNER SPECIFIED IN THE BAR DATE ORDER AND THAT FAILS TO DO SO ON OR BEFORE THE APPLICABLE BAR DATE: (I) SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH CLAIM AGAINST THE DEBTORS, THEIR ESTATES OR THE PROPERTY OF THE ESTATES, OR THEREAFTER FILING A PROOF OF CLAIM FORM WITH RESPECT THERETO IN THE CHAPTER 11 CASES; (II) SHALL NOT, WITH RESPECT TO SUCH CLAIM, BE TREATED AS A CREDITOR OF THE DEBTORS FOR THE PURPOSE OF VOTING UPON ANY PLAN IN THESE PROCEEDINGS; AND (III) SHALL NOT RECEIVE OR BE ENTITLED TO RECEIVE ANY PAYMENT OR DISTRIBUTION OF PROPERTY FROM THE DEBTORS OR THEIR SUCCESSORS OR ASSIGNS WITH RESPECT TO SUCH CLAIM.**

**A HOLDER OF A POSSIBLE CLAIM AGAINST THE DEBTORS SHOULD CONSULT AN ATTORNEY REGARDING ANY MATTERS NOT COVERED BY THIS NOTICE AND ANY RELATED MATTERS, SUCH AS WHETHER THE HOLDER SHOULD FILE A PROOF OF CLAIM FORM.**

This notice is only a summary of the Bar Date Order, the terms of which control in the event of any conflict with the information set forth in this notice. All creditors and other parties-in-interest are referred to the text of the Bar Date Order itself and to the Bankruptcy Code, the Bankruptcy Rules and the Local Rules for additional information regarding the filing and treatment of proofs of claim.

**If you have any questions relating to this Notice, contact Questions concerning this Notice should be directed to Stretto at 855.524.4733, or <u>Team WatsonvilleHospital@Stretto.com</u>.**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**NEITHER THE ATTORNEYS FOR THE DEBTORS NOR STRETTO ARE AUTHORIZED TO PROVIDE YOU WITH LEGAL ADVICE.**

Dated: January 7, 2022                    PACHULSKI STANG ZIEHL & JONES LLP


                                          By: */s/ Debra I. Grassgreen*
                                          _____
                                             Debra I. Grassgreen
                                             Maxim B. Litvak
                                             Steven W. Golden

                                          Attorneys for Debtors and Debtors in Possession

# **Exhibit B**

# Instructions for Proof of Claim

United States Bankruptcy Court                                                                                              12/15

**These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.**

> **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**
> 18 U.S.C. §§ 152, 157 and 3571.

## How to fill out this form

- **Fill in all of the information about the claim as of the date the case was filed.**

- **Fill in the caption at the top of the form.**

- **If the claim has been acquired from someone else, then state the identity of the last party** who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- **Attach any supporting documents to this form.**
  Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)

  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure  (called "Bankruptcy Rule") 3001(c) and (d).

- **Do not attach original documents because attachments may be destroyed after scanning.**

- **If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.**

- **A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth.** See Bankruptcy Rule 9037.

- **For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian.** For example, write *A.B., a minor child* (*John Doe, parent, 123 Main St., City, State*). See Bankruptcy Rule 9037.

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, either enclose a stamped self-addressed envelope and a copy of this form or go to https://cases.stretto.com/WatsonvilleHospital/claims/

## Understand the terms used in this form

**Administrative expense:** Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate.
11 U.S.C. § 503.

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

Case: 21-51477     Doc# 277     Filed: 02/04/22     Entered: 02/04/22 17:23:59     Page 12 of
118

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. §101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. §507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. §506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Uniform claim identifier:** An optional 24-character identifier that some creditors use to facilitate electronic payment.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

**Do not file these instructions with your form.**

# **Exhibit C**

Debra I. Grassgreen (CA Bar No. 169978)
Maxim B. Litvak (CA Bar No. 215852)
Steven W. Golden (admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
One Market Plaza, Spear Tower, 40th Floor
San Francisco, CA  94105-1020
Telephone:     415.263.7000
Facsimile:     415.263.7010
E-mail:     dgrassgreen@pszjlaw.com
            mlitvak@pszjlaw.com
            sgolden@pszjlaw.com

Proposed Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| In re: | Case No. 21-51477 |
| WATSONVILLE HOSPITAL CORPORATION, *et al.*, | Chapter 11 (Jointly Administered) |
| Debtors.[1] | **NOTICE OF SALE, BIDDING PROCEDURES, AUCTION, AND SALE HEARING IN CONNECTION WITH A SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS** |
| | Judge:  Hon. M. Elaine Hammond |

**TO THE UNITED STATES BANKRUPTCY COURT, THE OFFICE OF THE UNITED STATES TRUSTEE, THE DEBTORS' CREDITORS, AND OTHER PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that on December 5, 2021 (the "Petition Date"), Watsonville Hospital Corporation and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Bankruptcy Cases"), each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Northern District of California (San Jose Division) (the "Court").

**PLEASE TAKE FURTHER NOTICE** that, on December 27, 2021, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 103] (the "Sale Motion"). Pursuant to the Sale Motion, the Debtors will seek the Court's approval of the Sale of substantially all

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Watsonville Hospital Corporation (4113); Watsonville Healthcare Management, LLC (4168); Watsonville Hospital Holdings, Inc. (1118); and Halsen Healthcare, LLC.  The Debtors' business address is 75 Nielson Street, Watsonville, CA 95076.

of their assets (the "Purchased Assets") to the Stalking Horse Bidder (or other Successful Bidder), as set forth in further detail therein.

PLEASE TAKE FURTHER NOTICE that, on January 10, 2022, the Court entered that certain order approving, among other things, the implementation of the Bidding Procedures, in connection with the sale of all or substantially all of the Debtors' assets [Docket No. 188], a copy of which is attached hereto as **Exhibit 1** (the "Bidding Procedures Order").[2]

PLEASE TAKE FURTHER NOTICE that, to ensure that the Sale process provides the opportunity to maximize value for the benefit of the Debtors' estates, the following key dates and deadlines have been established by the Debtors and approved by the Court pursuant to the Bidding Procedures Order:

(a) Sale Objection Deadline: **February 7, 2022, at 4:00 p.m.** (prevailing Pacific Time) is the deadline by which all objections to the Sale Motion (except with respect to the Supplemental Objection Matters[3]) must be filed and served in accordance with the Bidding Procedures Order.

(b) Bid Deadline: **February 14, 2022, at 4:00 p.m.** (prevailing Pacific Time) is the deadline by which Bids for the Purchased Assets (as well as the deposit and all other documentation required under the Bidding Procedures for Qualified Bidders) must be submitted.

(c) Auction: **February 17, 2022, at 10:00 a.m.** (prevailing Pacific Time) is the date and time that the Auction, if any, will be held (or such later date and time as provided for under the Bidding Procedures).

(d) Supplemental Sale Objection Deadline: **February 21, 2022, at 4:00 p.m.** (prevailing Pacific Time) is the deadline by which all objections to the Sale Motion, solely with respect to the Supplemental Objection Matters, must be filed and served in accordance with the Bidding Procedures Order

(e) Sale Hearing: The hearing approving the Sale to the Successful Bidder shall take place before the Court on **February 23, 2022 at 10:00 a.m.** (prevailing Pacific Time) **by telephonic/video appearance only**.

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Sale Motion must (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Rules, and any order governing the administration of these Bankruptcy Cases; (iii) state with specificity the nature of the objection; and (iv) be filed with the Court and served on the Master Service List[4] in accordance with the Bidding Procedures Order by the Sale Objection Deadline or Supplemental Sale Objection Deadline, as applicable.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order.

[3] The "Supplemental Objection Matters" are: (a) an objection to the Sale of the Purchased Assets to the extent the Winning Bidder is a party other than the Stalking Horse Bidder; (b) an objection to the Sale of the Purchased Assets to the Backup Bidder; or (c) an objection to the extent the Stalking Horse APA has been modified.

[4] The Master Service List is available on https://cases.stretto.com/WatsonvilleHospital under "Notice Lists" or by emailing TeamWatsonvilleHospital@stretto.com.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

**PLEASE TAKE FURTHER NOTICE** that if you do not file an objection by the Sale Objection Deadline or Supplemental Sale Objection Deadline, as applicable, or in accordance with the Bidding Procedures Order, the Court may grant the relief requested in the Sale Motion without holding a hearing.

**PLEASE TAKE FURTHER NOTICE** that your rights may be affected by the Sale Motion. You should read the Sale Motion carefully and you may want to discuss with your attorney. Copies of the Bidding Procedures Motion, Sale Motion, and all other pleadings filed in the Bankruptcy Cases can be viewed or obtained by: (i) accessing the Court's website at http://www.canb.uscourts.gov; (ii) contacting the Office of the Clerk of the Court at 280 South First Street, Room 3035, San Jose, CA 95113; or (iii) from the Debtors' claims and noticing agent, Stretto, at https://cases.stretto.com/WatsonvilleHospital, by calling 1-877-476-4390 (toll free) or by email at: TeamWatsonvilleHospital@stretto.com. Note that a PACER password is needed to access documents on the Court's website.

**PLEASE TAKE FURTHER NOTICE** that all interested parties should consult the Court's website at www.canb.uscourts.gov for information about Court operations during the COVID-19 pandemic. The Court's website provides information regarding how to arrange a telephonic or video appearance. If you have any questions regarding how to appear at a court hearing, you may contact the Court by calling 888-821-7606 or by using the Live Chat feature on the Court's website.

Dated: January 10, 2022

PACHULSKI STANG ZIEHL & JONES LLP

By: */s/ Debra I. Grassgreen*
Debra I. Grassgreen
Maxim B. Litvak
Steven W. Golden

Attorneys for Debtors and Debtors in Possession

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Exhibit 1**
(Bidding Procedures Order)

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA



1 | Debra I. Grassgreen (CA Bar No. 169978)
2 | Maxim B. Litvak (CA Bar No. 215852)
Steven W. Golden (admitted *pro hac vice*)
The following constitutes the order of the Court.
Signed: January 10, 2022
3 | PACHULSKI STANG ZIEHL & JONES LLP
One Market Plaza, Spear Tower, 40th Floor
San Francisco, CA 94105-1020
4 | Telephone: 415.263.7000
Facsimile: 415.263.7010

*M. Elaine Hammond*

5 | E-mail: dgrassgreen@pszjlaw.com
mlitvak@pszjlaw.com
_____
6 | sgolden@pszjlaw.com
**M. Elaine Hammond**
**U.S. Bankruptcy Judge**

7 | Attorneys for Debtors and
Debtors in Possession

8 | **UNITED STATES BANKRUPTCY COURT**

9 | **NORTHERN DISTRICT OF CALIFORNIA**

10 | **SAN JOSE DIVISION**

11 | In re: | Case No. 21-51477 (MEH)

12 | WATSONVILLE HOSPITAL | Chapter 11
CORPORATION, *et al.*, | (Jointly Administered)

13 |

Debtors.

14 | **ORDER (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL ASSETS; (B) APPROVING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (C) APPROVING RELATED NOTICE PROCEDURES; (D) SCHEDULING A SALE HEARING; AND (E) GRANTING CERTAIN RELATED RELIEF**

23 | Upon the motion (the "Motion")[1] of the above-captioned debtors and debtors in possession

24 | (the "Debtors") for entry of (a) an order (this "Order"): (i) authorizing and approving the proposed

25 | bidding procedures (the "Bidding Procedures") attached hereto as **Exhibit 1**, in connection with a sale

26 | (a "Sale") of all or substantially all of the Debtors' assets (collectively, the "Purchased Assets") free

27 | and clear of all claims, liens, and encumbrances; (ii) scheduling the bid deadline and scheduling an

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

auction in connection with the Sale (the "Auction"), a hearing date for the approval of the Sale (the "Sale Hearing") to the Winning Bidder pursuant to the Sale Motion, and the objection deadlines with respect to the Sale Motion; (iii) approving procedures (the "Assumption and Assignment Procedures") for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (collectively, the "Assignable Contracts"), and approving the form and manner of the Assumption and Assignment Notice; (iv) approving the form and manner of notice of the Bidding Procedures, Auction, Sale Motion, and Sale, substantially in the form attached hereto as **Exhibit 3** (the "Sale Notice"); and (v) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration, Rosenthal Declaration, and the Beers Declaration; and the Court having jurisdiction over this matter; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted as provided herein.

2.      Any objections filed in response to the Motion and the relief granted herein, to the extent not resolved as set forth herein, by stipulation filed with the Court, or as set forth on the record at the hearing, are hereby overruled.

**A.      The Bidding Procedures**

3.      The Bidding Procedures, substantially in the form attached hereto as **Exhibit 1**, are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all Bids relating to the proposed Sale of the Purchased Assets.  Any party desiring to bid on the Purchased Assets shall comply with the Bidding Procedures and this Order.  The Debtors, in consultation with the Consultation Parties, are authorized to take any and all actions necessary to implement the Bidding Procedures.

4.      All Bids must be submitted in accordance with the Bidding Procedures so that they are actually received no later than **February 14, 2022 at 4:00 p.m. (prevailing Pacific Time)** (the "Bid

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Deadline"). The Bid Deadline may be extended by the Debtors, in consultation with the Consultation Parties, in accordance with paragraph 24 hereof.

**B.    The Stalking Horse Bidder**

5.    The Debtors are authorized to enter into the Stalking Horse APA attached hereto as **Exhibit 5** for purposes of the Motion and the Auction.

6.    If the Debtors, after consultation with the Consultation Parties, determine that the Stalking Horse Bidder is a Qualified Bidder as provided in the Bidding Procedures on or prior to February 14, 2022, the Stalking Horse Bidder shall be entitled to the Expense Reimbursement, which, in such event, shall be earned by and payable to the Stalking Horse Bidder, without need for further order of the Court, upon the Closing and from the proceeds of a Sale with a Winning Bidder other than the Stalking Horse Bidder. For the avoidance of doubt, if the Stalking Horse Bidder is the Winning Bidder but fails to close, the Stalking Horse Bidder shall not be entitled to the Expense Reimbursement.

**C.    The Sale Motion and Sale Hearing**

7.    The hearing to approve the Sale to the Winning Bidder (the "Sale Hearing") pursuant to the *Debtors' Motion for Entry of an Order (I) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 103] (the "Sale Motion") shall take place before the Court on **February 23, 2022 at 10:00 a.m.** (prevailing Pacific Time). The Sale Hearing may be continued, from time to time, in accordance with the Bidding Procedures, without further notice to creditors or other parties in interest other than by announcement of said continuance before the Court on the date scheduled for such hearing or in the agenda for such hearing.

8.    Any objections to the Sale Motion (except with respect to the Supplemental Objection Matters[2]) must state in writing, with specificity, the legal and factual bases thereof and be filed with the Court and served on the Master Service List so as to be actually received on or before **February**

---

[2] The "Supplemental Objection Matters" are: (a) an objection to the Sale of the Purchased Assets to the extent the Winning Bidder is a party other than the Stalking Horse Bidder; (b) an objection to the Sale of the Purchased Assets to the Backup Bidder; or (c) an objection to the extent the Stalking Horse APA has been modified.

**7, 2022 at 4:00 p.m. (prevailing Pacific Time)** (the "<u>Sale Objection Deadline</u>"), unless extended by the Debtors, in consultation with the Consultation Parties, in accordance with paragraph 24 hereof.

9. Any objections to the Sale Motion, solely with respect to the Supplemental Objection Matters, must state in writing, with specificity, the legal and factual bases thereof and be filed with the Court and served on the Master Service List so as to actually be received on or before **February 21, 2022 at 4:00 p.m. (prevailing Pacific Time)** (the "<u>Supplemental Sale Objection Deadline</u>").

10. A party's failure to timely file or object in accordance with this Order shall forever bar the assertion of any objection to the Sale Motion, entry of the Sale Order, and/or consummation of the Sale with the Winning Bidder pursuant to the applicable Purchase Agreement, and shall be deemed to constitute such party's consent to entry of the Sale Order and consummation of the Sale and all transactions related thereto.

**D.    The Auction**

11. The Auction, if any, shall take place on **February 17, 2022 at 10:00 a.m.** (prevailing Pacific Time) via videoconference, subject to modification in accordance with the Bidding Procedures. The Debtors are authorized to hold and conduct the Auction in accordance with the Bidding Procedures.  As soon as reasonably practicable after the conclusion of the Auction, but in no event later than one day after the close of the Auction, the Debtors shall file with the Bankruptcy Court and serve on the Master Service List and all Qualified Bidders a notice identifying the Winning Bidder and the Backup Bidder, if any (the "<u>Notice of Winning Bidder</u>"), and post such notice on the Debtors' bankruptcy website (http://cases.stretto.com/WatsonvilleHospital).  As set forth more fully in the Bidding Procedures, only Qualified Bidders shall be permitted to participate in the Auction, however any party-in-interest may be permitted to attend the Auction, subject to the notice requirements set forth in the Bidding Procedures.

12. If the Debtors do not receive any Bids that the Debtors, in consultation with the Consultation Parties, deem to be Qualified Bids on or prior to the Bid Deadline other than the Stalking Horse APA, the Debtors, in consultation with the Consultation Parties, may designate the Stalking Horse Bidder as the Winning Bidder without holding an Auction, in which case the Debtors shall file a notice of cancellation of the Auction, which notice shall state that the Stalking Horse Bidder is the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Winning Bidder and, if applicable, seek authority at the Sale Hearing to consummate the Stalking Horse APA.

**E. Notice Procedures**

13. The Notice Procedures, as set forth immediately below, are approved:

    a. The Debtors (or their agent) shall, on or prior to January 17, 2022, file and serve the Auction and Sale Notice, by first-class mail, postage prepaid, upon the Sale Notice List. The Debtors are not required to serve the Auction and Sale Notice on the Patient List.

    b. The Debtors (or their agent) shall serve all Lienholders with a copy of the Sale Motion and accompanying papers in the same mailing as the Auction and Sale Notice.

    c. The Debtors (or their agent) shall, on or prior to January 17, 2022, file and serve the Assumption and Assignment Notice, by first class mail, postage prepaid, on the Contract Counterparties.

    d. As soon as practicable after entry of this Order, the Debtors shall cause the Publication Notice to be published once in each of *The Pajaronian* and the *Santa Cruz Sentinel*.

14. Notice of the Motion, together with the Debtors' implementation of the Notice Procedures, constitutes good and adequate notice of the Bidding Procedures, Assumption and Assignment Procedures, Auction, Sale Motion, and the proceedings and deadlines with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002 and Local Bankruptcy Rules 6004-1 and 6006-1. No other or further notice shall be required.

**F. The Assumption and Assignment Procedures**

15. The Assumption and Assignment Procedures attached hereto as **Exhibit 2** are approved in their entirety, including all procedures and deadlines set forth therein.

16. The notice to be provided under the Assumption and Assignment Procedures, including the Assumption and Assignment Notice, shall constitute adequate and sufficient notice thereof and no additional notice need be provided.

17. On or prior to January 17, 2022, the Debtors shall file with the Court, and serve on the Contract Counterparties, the Assumption and Assignment Notice, substantially in the form attached hereto as **Exhibit 4**, including the Cure Schedule. Service of the Assumption and Assignment Notice does not constitute an agreement or admission of the Debtors that any Assignable Contract is an

executory contract or unexpired lease or that such Assignable Contract will be assumed and/or assigned by the Debtors.

18. All Contract Objections must be filed with the Court and served on the Objection Notice Parties (as such term is defined in the Assumption and Assignment Procedures), on or before **February 7, 2022 at 4:00 p.m. (prevailing Pacific Time)** (the "Contract Objection Deadline"); *provided, however*, that MPT Lessor shall be deemed to object, without the need to file a Contract Objection on or before the Contract Objection Deadline, to any proposed assumption or assignment of the Lease that is on terms less favorable to MPT Lessor than the treatment of the Lease under the Bidding Procedures. The Debtors may, without further of the Court, extend the Contract Objection Deadline with respect to certain parties through the Sale Objection Deadline, if necessary. Contract Objections must comport with the requirements set forth in the Assumption and Assignment Procedures.

19. Any Contract Objection that is not resolved as of the Sale Hearing shall be resolved (i) at the Sale Hearing or (ii) on such other date subsequent to the Sale Hearing but before the Closing Date, as the Court may designate prior to, during, or after the Sale Hearing (the "Cure/Assignment Hearing") to consider the objection. If a Contract Objection is not satisfactorily resolved, the Winning Bidder may determine that such Assignable Contract should not be a Transferred Contract, in which instance the Assignable Contract shall not become a Transferred Contract and the Winning Bidder shall not be responsible for the payment of any Cure Costs.

20. If a Contract Counterparty does not file an objection, and absent a subsequent order of the Court establishing an alternative Cure Cost: (a) the Cure Amount and adequate assurance, if any, set forth in the Assumption and Assignment Notice shall be controlling, notwithstanding anything to the contrary in any Assignable Contract or any other document; and (b) the Contract Counterparty will be deemed to have consented to the assumption and assignment of the Assignable Contract and the Cure Amounts and adequate assurance, if any, and will be forever barred from objecting to the assumption and assignment of such Assignable Contract and rights thereunder, including the Cure Amounts and adequate assurance, if any, and from asserting any other claims related to such Assignable Contract against the Debtors or the Winning Bidder.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

21.     The Debtors may disclose Adequate Assurance Information to Contract Counterparties if such Contract Counterparty makes a written request for such information to the Debtors' counsel and confirms in writing their agreement to keep such information strictly confidential and to use it solely for the purpose of evaluating whether the Qualified Bidder has provided adequate assurance of future performance under the applicable Assignable Contract; *provided, however*, that a Qualified Bidder may require such Contract Counterparty execute a confidentiality agreement before the provision of any of their confidential, non-public information.

22.     The inclusion of an Assignable Contract on any Assumption and Assignment Notice will not (a) obligate the Debtors to assume any Assignable Contract listed thereon or obligate the Winning Bidder to take assignment of such Assignable Contract or (b) constitute any admission or agreement of the Debtors that such Assignable Contract is an executory contract or unexpired lease. Only those Assignable Contracts that are included on a schedule of assumed and assigned contracts attached to the definitive sale agreement with the Winning Bidder (including amendments or modifications to such schedules in accordance with such agreement) will be assumed and assigned to the Winning Bidder.

**G.     Miscellaneous**

23.     Notwithstanding anything to the contrary contained in this Order, the Bidding Procedures, or otherwise, the rights of the DIP Lender or the MPT Prepetition Lender under the MPT Prepetition Transaction Documents or DIP Loan Documents, respectively, to consent or object to the sale of any portion of its respective collateral on terms and conditions acceptable to the DIP Lender or the MPT Prepetition Lender, as applicable, are expressly reserved and not modified, waived, or impaired in any way by this Order. Nothing in this Order shall amend, modify, or impair any provision of the Final DIP Order or the rights of the Debtors or the DIP Lender thereunder.

24.     The Debtors shall have the right, in the exercise of their reasonable business judgment and after consultation with the Consultation Parties, to: (a) determine which Bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal, subject to the DIP Lender's consent right, which may be withheld at the DIP Lender's sole discretion, if the Purchase

Price of such Qualified Bid contains less Cash Consideration payable to the DIP Lender and the MPT Prepetition Lender than is provided to such parties in the Term Sheet; (d) reject any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the Bidding Procedures or the requirements of the Bankruptcy Code, or (iii) contrary to the best interests of the Debtors and their estates; (e) impose additional terms and conditions with respect to all Potential Bidders; (f) impose additional terms and conditions with respect to the Auction; (g) extend the deadlines set forth herein; (h) continue or cancel the Auction and/or Sale Hearing in open court without further notice; and (j) otherwise modify the Bidding Procedures in a manner reasonably necessary to properly exercise their fiduciary duties to the estates.

25. All persons and entities that participate in the bidding process or the Auction shall be deemed to have knowingly and voluntarily submitted to the jurisdiction of this Court with respect to all matters related to the terms and conditions of the transfer of the Debtors' assets, the Auction, and any transaction contemplated in this Order.

26. The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

27. The failure to include or reference a particular provision of the Bidding Procedures specifically in this Order shall not diminish or impair the effectiveness or enforceability of such provision.

28. In the event of any inconsistency between this Order, on the one hand, and the Motion or the Bidding Procedures, on the other hand, this Order shall govern in all respects.

29. Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained in the Motion or this Order shall constitute, nor is it intended to constitute, an admission as to the validity or priority of any claim or lien against the Debtors, a waiver of the Debtors' rights to subsequently dispute such claim or lien, or the assumption or adoption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.

30. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

31.    The requirements of Bankruptcy Rules 6004(h) and 6006(d) are hereby waived.

32.    The Court retains exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order

Approved as to Form:

The Official Committee of Unsecured Creditors

*/s/ Boris Mankovetskiy*
By:  Boris Mankovetskiy
Sills Cummis & Gross, P.C.
Counsel for the Committee

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**Exhibit 1 to Order**

**Bidding Procedures**

1  Debra I. Grassgreen (CA Bar No. 169978)
   Maxim B. Litvak (CA Bar No. 215852)
2  Steven W. Golden (admitted *pro hac vice*)
   PACHULSKI STANG ZIEHL & JONES LLP
3  One Market Plaza, Spear Tower, 40th Floor
   San Francisco, CA  94105-1020
4  Telephone:   415.263.7000
   Facsimile:    415.263.7010
5  E-mail:        dgrassgreen@pszjlaw.com
                 mlitvak@pszjlaw.com
6                 sgolden@pszjlaw.com

7  Proposed Attorneys for Debtors and
   Debtors in Possession

8

# UNITED STATES BANKRUPTCY COURT

9

## NORTHERN DISTRICT OF CALIFORNIA

10

### SAN JOSE DIVISION

11

| | |
|---|---|
| In re: | Case No. 21-51477 |
| WATSONVILLE HOSPITAL CORPORATION, *et al.*, | Chapter 11 (Jointly Administered) |
| Debtors.[1] | **BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS** |
| | Judge:  Hon. M. Elaine Hammond |

17        On December 5, 2021 (the "Petition Date"), the above-captioned debtors and debtors in possession (the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On December 6, 2021, the United States Bankruptcy Court for the Northern District of California, San Jose Division (the "Court") entered an order authorizing the joint administration of the chapter 11 cases (the "Bankruptcy Cases") pursuant to Bankruptcy Rule 1015(b).[2]

22        On January [12], 2022, the Court entered an order (the "Bidding Procedures Order") authorizing the Debtors to, among other things, solicit offers for the sale (a "Sale") of substantially all of their assets (the "Purchased Assets")[3] under the procedures set forth below (the "Bidding Procedures").  The Debtors have entered into that certain Asset Purchase Agreement with the Pajaro

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Watsonville Hospital Corporation (4113); Watsonville Healthcare Management, LLC (4168); Watsonville Hospital Holdings, Inc. (1118); and Halsen Healthcare, LLC.  The Debtors' business address is 75 Nielson Street, Watsonville, CA 95076.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order.

[3] The real estate underlying the Hospital (the "Real Estate") is owned by MPT of Watsonville, LLC ("MPT Lessor") and subject to a lease (the "Lease") that may be assumed and assigned by the Debtors or, alternatively, Bidders may choose to make an offer to purchase the Real Estate.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Valley Healthcare District Project (the "Stalking Horse Bidder"), dated as of December 27, 2021, (together with the schedules and related documents thereto, the "Stalking Horse APA"). The Bidding Procedures set forth the process by which the Debtors are authorized to conduct an auction (the "Auction"), if any, for the Sale of Watsonville Community Hospital and related assets (collectively, the "Hospital").

The Debtors are soliciting Qualified Bids for the Purchased Assets for the purposes of participating in:

1. An Auction to be selected as the Winning Bidder against the Stalking Horse Bidder ("Auction 1");

2. An Auction to be selected as the Backup Bidder to the Stalking Horse Bidder ("Auction 2"); or

3. An Auction to be selected as either the Winning Bidder or the Backup Bidder if the Stalking Horse Bidder is determined not to be a Qualified Bidder ("Auction 3").

Except to the extent special procedures may be applicable to, or implemented for, each of the foregoing possible Auctions, these Bidding Procedures will apply to each of the foregoing possible Auctions.

A. **The Sale Motion**

The Sale of the Purchased Assets to the Winning Bidder (as defined below) pursuant to sections 105, 363, and 365 of the Bankruptcy Code, will be presented to the Court pursuant to the *Debtors' Motion for Entry of an Order (I) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 103] (the "Sale Motion") at the Sale Hearing (as defined below).

Any objections to the Sale Motion (except with respect to the Supplemental Objection Matters[4]) must be filed and served in accordance with the Bidding Procedures Order on or before **February 7, 2022 at 4:00 p.m. (prevailing Pacific Time)** (the "Sale Objection Deadline"), unless extended by the Debtors, in consultation with the Consultation Parties,[5] in accordance with the Bidding Procedures Order.

Any objections to the Sale Motion, solely with respect to the Supplemental Objection Matters, must be filed and served in accordance with the Bidding Procedures Order on or before **February 21, 2022 at 4:00 p.m. (prevailing Pacific Time)** (the "Supplemental Sale Objection Deadline").

---

[4] The "Supplemental Objection Matters" are: (a) an objection to the Sale of the Purchased Assets to the extent the Winning Bidder is a party other than the Stalking Horse Bidder on the terms of the Stalking Horse APA; or (b) an objection to the Sale of the Purchased Assets to the Backup Bidder.

[5] The "Consultation Parties" are the DIP Lender and the official committee of unsecured creditors (the "Committee") appointed in these Bankruptcy Cases.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

### B. Stalking Horse Bid

The Stalking Horse APA sets forth the terms for the Sale of the Purchased Assets to the Stalking Horse Bidder, subject to higher or better Bids (as defined below) through a competitive process. The transaction contemplated by the Stalking Horse APA is subject to approval by the Court through the Sale Motion.

The Stalking Horse APA will be considered a Qualified Bid (as defined below), and the Stalking Horse Bidder will be considered a Qualified Bidder (as defined below), if, on or prior to February 14, 2022, the Stalking Horse Bidder shall have:

(a) established to the Debtors' satisfaction, in consultation with the Consultation Parties, that the person or persons that executed the Stalking Horse APA are duly authorized to bind the Stalking Horse Bidder;

(b) established to the Debtors' satisfaction, in consultation with the Consultation Parties, that legislation authorizing the formation (the "Formation Legislation") of the Pajaro Valley Healthcare District ("District") met the following legislative milestones:

  i. the Formation Legislation was amended into a California Senate Bill by January 7, 2022, (the "District Bill"),

  ii. the District Bill received a hearing in the relevant policy committee by January 21, 2022,

  iii. the District Bill was moved from the relevant fiscal committee by January 31, 2022, and

  iv. the District Bill was heard on the Assembly Floor and passed by a supermajority of the Assembly by February 13, 2022;

(c) established to the Debtors' satisfaction, in consultation with the Consultation Parties, that legislation authorizing an appropriation to the District or the County of Santa Cruz under an amendment to the Fiscal Year 2021-2022 budget and/or the Fiscal Year 2022-2023 budget for the State of California (the "Appropriation Legislation") is probable based on facts and circumstances known on February 13, 2022;

(d) provided a Good Faith Deposit in the amount of $4.4 million; and

(e) established to the Debtors' satisfaction, in consultation with the Consultation Parties, that the Stalking Horse Bidder has sufficient committed funds (excluding any additional funds that may be appropriated to the District through the Appropriation Legislation) to fund hospital operations and the administrative costs of the Debtors' estates, including estate professional fees, for the period between April 1 and May 31, 2022, pursuant to a budget formulated by the Debtors and consented to by the Stalking Horse Bidder and the DIP Lender (as such term is defined in the First Day Declaration) in an amount estimated to be approximately $5 million.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

## C. Potential Bidders

To participate in the bidding process and receive due diligence information, including full access to the Debtors' electronic data room (the "Data Room") and additional non-public information regarding the Debtors (the "Diligence Materials"), parties interested in receiving due diligence information to participate in the bidding process (each, an "Interested Party") must deliver or have previously delivered to the Debtors, if determined to be necessary by the Debtors in their sole discretion, the Preliminary Bid Documents (as defined below) to the following parties (the "Recipient Parties"):

(i) Jeremy Rosenthal, in his capacity as Chief Restructuring Officer of the Debtors, c/o Force Ten Partners LLC, 5271 California, Suite 270, Irvine CA 92617, email: jrosenthal@force10partners.com;

(ii) counsel to the Debtors: Pachulski Stang Ziehl & Jones LLP, One Market Plaza, Spear Tower, 40th Floor, San Francisco, CA 94105, Attn: Debra Grassgreen (dgrassgreen@pszjlaw.com); Maxim Litvak (mlitvak@pszjlaw.com); and Steven Golden (sgolden@pszjlaw.com); and

(iii) investment banker to the Debtors: Cowen & Company LLC: 599 Lexington Avenue, New York, NY 10022 Attn: Lorie R. Beers (lorie.beers@cowen.com); Kenneth Garnett (Kenneth.garnett@cowen.com); Justin Magner (Justin.Magner@cowen.com); Charles Tudor (Charles.Tudor@Cowen.com); and ProjectWarsaw@cowen.com.

The "Preliminary Bid Documents" that must be submitted to the Recipient Parties include: (a) an executed confidentiality agreement using the Debtors' form, as may be amended, on terms reasonably acceptable to the Debtors (a "Confidentiality Agreement"); and (b) a statement and other factual support demonstrating to the Debtors' satisfaction in the exercise of their reasonable business judgment that the Interested Party has a *bona fide* interest in purchasing the Hospital. Any Interested Party who, in the Debtors' determination, qualifies for access to the Diligence Materials shall be deemed a "Potential Bidder."

Each Potential Bidder and Qualified Bidder (as defined below) (each, a "Bidder") shall comply with all requests for additional information from the Debtors or their advisors regarding such party and its contemplated Sale transaction, including with respect to its financial capacity to close an acquisition of the Purchased Assets. Failure by a Potential Bidder to comply with requests for additional information may result in suspension of such Bidder's access to the Debtors' due diligence information and may be a basis for the Debtors, in consultation with the Consultation Parties, to determine that the Potential Bidder is not a Qualified Bidder. Failure by a Qualified Bidder to comply with requests for additional information may result in suspension of such Bidder's access to the Debtors' due diligence information and may be a basis for the Debtors to determine, in consultation with the Consultation Parties, that a Bid made by a Qualified Bidder is not a Qualified Bid.

## D. Auction Qualification Process

### 1. Bid Deadline

The Bid Deadline is **February 14, 2022 at 4:00 p.m. (prevailing Pacific Time)**. On or before the Bid Deadline, a Potential Bidder that desires to make a proposal, solicitation, or offer for a Sale

transaction (each, a "Bid") shall deliver an electronic set of the documents comprising its Bid to the Recipient Parties. A Bid received after the Bid Deadline shall not constitute a Qualified Bid unless the Debtors, in their discretion and after consultation with the Consultation Parties, determine otherwise. The Debtors may, after consultation with the Consultation Parties, extend the Bid Deadline without seeking further relief from the Court; *provided, however*, that the Debtors shall file a notice of any such extension on the Court's docket.

If the Debtors do not receive any Qualified Bids on or prior to the Bid Deadline, as such deadline may be extended consistent with these Bidding Procedures, the Debtors may, in consultation with the Consultation Parties, seek to implement procedures to close the Hospital.

**2. Bid Requirements**

To be eligible to participate in an Auction and to be eligible for consideration as a Qualified Bidder, a Potential Bidder must deliver a Bid, so as to be received by the Recipient Parties on or before the Bid Deadline, that meets the following requirements (collectively, the "Bid Requirements"):

    i.    Purpose and Identity of Assets to be Purchased. Each Bidder must state that the Bid includes an offer by the Bidder to effectuate a Sale transaction and identify the assets that are included in the Bid. To the extent a Bidder seeks to acquire any of the following types of claims or causes of action, to the extent any such claims or causes of action exist, the Bidder shall specify the amount of the Purchase Price (as defined below) that is allocated to the purchase of such claims or causes of action: (a) any and all causes of action and the proceeds thereof arising under chapter 5 of the Bankruptcy Code or applicable state law equivalents (including, but not limited to, rights under section 506(c) of the Bankruptcy Code), (b) any pre-petition and post-petition commercial tort claims and the proceeds thereof (including, but not limited to, insurance proceeds), including, without limitation, any and all causes of action against current and former directors and officers of the Debtors and/or any of their affiliates, (c) any claims or causes of action (and the proceeds thereof) against the MPT Prepetition Lender and/or any of its affiliates, and (d) any claims or causes of action (and the proceeds thereof) against any and all managers of the Debtors, including, without limitation, Halsen Healthcare, LLC, Alta Hospitals System, LLC, and/or their respective affiliates.

    ii.    Good Faith Deposit. Each Bid must be accompanied by a cash deposit (the "Good Faith Deposit") in the form of a wire transfer, certified check, or cash payable to the order of proposed counsel for the Debtors, Pachulski Stang Ziehl & Jones LLP Attn: Maxim Litvak, equal to 10% of the Bidder's proposed Purchase Price (as defined below), which will be held in an escrow or trust account. Wire transfer instructions will be provided upon request.

    iii.    Purchase Price. Each Bid must clearly set forth the cash purchase price (the "Cash Consideration") and identify any non-cash consideration included in such Bid (together with the Cash Consideration, the "Purchase Price") including, without limitation, which executory contracts and unexpired leases the Bidder expects the Debtors to assume and assign to the Bidder (the "Transferred Contracts") and which liabilities, if any, of the Debtors the Bidder is agreeing to assume (the "Assumed Liabilities"). The Purchase Price associated with each Bid may include only cash and/or other consideration acceptable to the Debtors, after consultation with the Consultation Parties.

iv.    <u>Treatment of Real Estate</u>. Each Bid must clearly set forth the Bidder's intentions with respect to the Real Estate, which shall be either: (i) the Debtors' assumption and assignment of the Lease as a Transferred Contract on definitive, agreed terms between such Bidder and MPT Lessor in MPT Lessor's sole discretion; (ii) the Debtors' assumption and assignment of the Lease as a Transferred Contract without any agreed modification to the Lease, provided that the Bidder irrevocably agrees to take assumption of the Lease as-is and pay any Cure Amount[6] associated therewith and provide Adequate Assurance Information to MPT Lessor; (iii) the Bidder's purchase of the Real Estate from MPT Lessor on definitive, agreed terms; or (iv) such other treatment of the Lease and/or Real Estate that the Debtors and MPT Lessor agree.

v.    <u>Treatment of CBAs and Retiree Benefits</u>. To the extent a Bid includes, as a condition to the closing of the Sale contemplated therein, the rejection or modification of any collective bargaining agreement or the modification of any retiree benefits (as such term is defined in section 1114(a) of the Bankruptcy Code), each Bid must clearly set forth such conditions, including the corresponding proposal that would be made pursuant to section 1113(b)(1) or 1114(f)(1), as applicable.

vi.    <u>Binding and Irrevocable</u>. Each Bid must be signed and state that it is binding and irrevocable until the selection of the Winning Bidder, provided that if such Bidder is selected as the Winning Bidder or the Backup Bidder, its offer shall remain irrevocable until the closing of the Sale with the Winning Bidder or, as applicable, the Backup Bidder (the "<u>Closing</u>").

vii.    <u>Contemplated Transaction Documents</u>. Each Bid must include an executed asset purchase agreement (a "<u>Purchase Agreement</u>") marked against the Stalking Horse APA pursuant to which the Qualified Bidder proposes to effectuate the contemplated Sale including: (i) a redlined copy of the Purchase Agreement marked to show all changes requested by the Qualified Bidder against the Stalking Horse APA; (ii) specification of the proposed Purchase Price; and (iii) any changes to any exhibits or schedules to the Purchase Agreement (collectively, the "<u>Contemplated Transaction Documents</u>"). The terms and conditions of the Contemplated Transaction Documents must be, in the aggregate, not materially more burdensome to the Debtors than the provisions contained in the Stalking Horse APA. A Bid must identify with particularity each and every condition to Closing and all Transferred Contracts pursuant to the Contemplated Transaction Documents. All Bids must provide that all Cure Amounts (as defined herein) will be paid by such Bidder. *The Contemplated Transaction Documents must include a commitment to close by no later than March 31, 2022, unless the Bidder provides additional funding to the Debtors to sustain the operations of the Hospital and satisfy the administrative expenses of the Debtors' Bankruptcy Cases through the Extended Closing Date (as defined below).* A Bid shall contain a detailed description of how the Potential Bidder intends to treat current employees of the Debtors, including any intended treatment of the Debtors' collective bargaining agreements.

---

[6] MPT asserts that, as of the Petition Date, the Cure Amount under the Lease is equal to the $40,132,813 of MPT Prepetition Obligations.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

viii. <u>Contingencies</u>.  A Bid may not be conditioned on obtaining financing or any internal approval or on the outcome or completion of due diligence, but may be subject to the accuracy in all material respects at Closing of representations and warranties at or before Closing or the satisfaction in all material respects of customary representations and warranties for transactions of similar size and nature at or before Closing or the satisfaction in all material respects of customary conditions for transactions of similar size and nature at or before Closing.

ix. <u>Government Approvals</u>.  Each Bid must include a description of all governmental, licensing, regulatory, or other approvals or consents that are required to consummate the proposed Sale, together with evidence satisfactory to the Debtors of the ability to obtain such consents or approvals in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, obtaining any such consents or approvals.  Each Bid must set forth an estimated timeframe for obtaining any required governmental, licensing, regulatory, or other approvals or consents for consummating any proposed Sale.

x. <u>No Collusion</u>.  Each Bid must include a representation that the Bidder has not engaged in any collusion with respect to its Bid submission and that the Bidder will not engage in any collusion with respect to any Bids, the Auction, or the Sale Process.

xi. <u>Authorization to Bid and Identity of Bidder</u>.  Each Bid must include evidence of authorization and approval from such Potential Bidder's board of directors (or comparable governing body, or a statement as to why such approval is unnecessary) with respect to the submission, execution, delivery, and closing of the Contemplated Transaction Documents.  A Bid must also fully disclose the identity of the entity that is submitting the Bid, including the identity of the ultimate beneficial owners of the Bidder and the identity of any person or entity providing debt or equity financing for the Bid.

xii. <u>Financing Sources</u>.  Each Bid must include written evidence that demonstrates the Potential Bidder has the necessary financial ability to (a) close the contemplated Sale transaction; (b) provide adequate assurance of future performance under all Transferred Contracts; and (c) fund the administrative costs of the Debtors' estates for the period from April 1, 2022 through the Closing Date (which shall be no later than August 31, 2022) contemplated by such Bid (the "<u>Extended Closing Date</u>"), including interest payments on or repayment of the DIP Loan.  Such information may include, *inter alia*, the following:

a. the Potential Bidder's current financial statements (audited, if they exist);

b. contact names, telephone numbers, and e-mail addresses for verification of financing sources;

c. evidence of the Potential Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the contemplated Sale (including confirmation that the funding of such commitments is not subject to any contingency); and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

    d.    any other form of financial disclosure of credit-quality support information acceptable to the Debtors, in consultation with the Consultation Parties, demonstrating that such Potential Bidder has the ability to close the contemplated Sale.

    xiii.    <u>Adequate Assurance of Future Performance</u>.  Each Bid must provide Adequate Assurance Information that, in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, the Potential Bidder can provide adequate assurance of future performance to the applicable counterparty under all Transferred Contracts as required by section 365 of the Bankruptcy Code.

    xiv.    <u>No Fees Payable to Qualified Bidder</u>.  Other than the Stalking Horse Bidder, a Bidder may not request any break-up fee, termination fee, expense reimbursement, or any similar type of payment.  Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code relating in any way to the submission of its Bid, compliance with the Bidding Procedures, or participation in the Sale Process.

    xv.    <u>Non-Reliance</u>.  A Bid must include an acknowledgement and representation of the Potential Bidder that it has had an opportunity to conduct any and all due diligence regarding the Hospital, the assets, and any assumed liabilities prior to making its Bid, that it has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Hospital in making its Bid, and that it did not rely upon any written or oral statements, representations, warranties, or guaranties, express, implied, statutory or otherwise, regarding the Hospital, the financial performance of the Hospital or the physical condition of the Hospital, the assumed liabilities, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Contemplated Transaction Documents.

    xvi.    <u>Bidding Procedures</u>.  Each Bid must affirmatively state the Potential Bidder's agreement, and by submitting its Bid, each Potential Bidder is so agreeing, to abide by and honor the terms of these Bidding Procedures (including if such Bid is declared the Winning Bidder or Backup Bidder (as defined below)) and to refrain from submitting a Bid or seeking to reopen the Auction after conclusion of the Auction.  The submission of a Bid shall constitute a binding and irrevocable offer to acquire the assets reflected in such Bid.

    xvii.    <u>As Is, Where Is</u>.  A Bid must include an acknowledgement and representation of the Potential Bidder that it understands that any Sale shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or their estates except to the extent set forth in the Purchase Agreement of the Winning Bidder.

### 3. Designation of Qualified Bidders

A Bid will be considered a "<u>Qualified Bid</u>," and each Potential Bidder that submits a Qualified Bid will be considered a "<u>Qualified Bidder</u>," if the Debtors, after consultation with the Consultation Parties, determine in their reasonable business judgment that such Bid: (a) satisfies the Bid Requirements and (b) is reasonably likely (based on availability of financing, regulatory issues,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

experience, and other considerations) to be consummated, if selected as a Winning Bid, within a time frame reasonably acceptable to the Debtors, after consultation with the Consultation Parties. In making the determination as to whether a Bid will be considered a Qualified Bid and a Potential Bidder will be considered a Qualified Bidder, the Debtors may request that such Potential Bidder provide further supporting documentation or other information sufficient to demonstrate, in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, such Bidder's financial capacity and ability to close the proposed transaction.

As soon as practicable after the Bid Deadline, but not later than February 16, 2022 (unless extended by the Debtors, in consultation with the Consultation Parties), the Debtors will notify each Potential Bidder that submitted a Bid whether such party is a Qualified Bidder. Between the date that the Debtors notify a Potential Bidder that it is a Qualified Bidder and the Auction, (a) the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder, in consultation with the Consultation Parties, and (b) a Qualified Bidder may not, without the prior written consent of the Debtors, in consultation with the Consultation Parties, modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase their Purchase Price, or otherwise improve the terms of, the Qualified Bid; *provided* that any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures, including that such improved Qualified Bid shall constitute a binding and irrevocable offer to acquire the assets reflected in such Qualified Bid.

Notwithstanding anything herein to the contrary, the Debtors, in consultation with the Consultation Parties, reserve the right to work with (a) Potential Bidders and Qualified Bidders to aggregate two or more Bids into a single consolidated Bid prior to the Bid Deadline, (b) Qualified Bidders to aggregate two or more Qualified Bids into a single Qualified Bid prior to the conclusion of the Auction, and (c) any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid. The Debtors, in consultation with the Consultation Parties, may accept a single Qualified Bid or multiple Bids for non-overlapping material portions of the assets such that, if taken in the aggregate, the Bids would otherwise meet the standards for a single Qualified Bid (in which event those multiple bidders shall be treated as a single Qualified Bidder for purposes of the Auction).

**4. Bid Selection and Criteria**

The determination of which Qualified Bids constitute the Winning Bid and Backup Bid shall take into account any factors the Debtors, after consultation with the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things: (a) the type and amount of assets sought to be purchased; (b) the amount and nature of the Purchase Price, including, among other factors, the source, readiness, and availability of financing for such Purchase Price and the timing to close; (c) the other terms of the Qualified Bid; (d) the Qualified Bidder's ability to consummate a Sale and the timing thereof, including the effect of any governmental or regulatory approvals or disputes; (e) the net economic effect of any changes to the value to be received by the Debtors' estates as compared to any other Qualified Bid; (f) the effect on the Debtors' ability to wind down their estates in accordance with applicable law, including their ability to timely confirm a liquidating plan and have such plan become effective; (g) the Qualified Bid's treatment of the Debtors' employees and former employees, including any proposed modifications to, treatment of, or assumption of: the collective bargaining agreements applicable to the Hospital, employee benefits (including contingent or unliquidated obligations), and retiree benefits; (h) the tax consequences of

such Qualified Bid; and (j) any other factors that the Debtors reasonably choose to consider in the exercise of their fiduciary duties to the estates.

**E. Auction Procedure**

**1. Time and Place of Auction**

If the Debtors receive two or more Qualified Bids with respect to the Hospital, the Debtors will conduct the Auction to determine a Winning Bidder and a Backup Bidder (each as defined below) with respect to such assets. Based on the Qualified Bids, the Debtors may hold Auction 1, Auction 2, and/or Auction 3 in any sequence or manner they deem advisable, after consultation with the Consultation Parties. The Auction shall take place at 10:00 a.m. (prevailing Pacific Time) on February 17, 2022, either in person (at a place to be designated in advance of the Auction) or via videoconference (with instructions for participating in such videoconference to be provided by the Debtors in advance of the Auction), or such other date, time, and location, as selected by the Debtors, in consultation with the Consultation Parties (and provided that the DIP Lender's rights under the final order granting the DIP Financing Motion (the "Final DIP Order") shall remain unaffected). If the Debtors determine to hold the Auction in person, the Debtors reserve the right, in light of the ongoing COVID-19 pandemic, to require any attendee, at a minimum, to comply with rules that are consistent with CDC guidance and local regulations, however the Debtors may, in their reasonable discretion, implement other rules for the promotion of safety. The Debtors will consider requests for Qualified Bidders or personnel associated with a Qualified Bidder to attend the Auction via audio or video conference.

**2. Conducting the Auction**

The Debtors and their advisors shall direct and preside over the Auction. At the start of the applicable Auction (which may be Auction 1, Auction 2 or Auction 3), the Debtors shall describe the terms of the Qualified Bid that the Debtors determine in their business judgment, after consultation with the Consultation Parties, is the highest or best Qualified Bid, which shall serve as the baseline Bid (the "Baseline Bid") for such Auction.

Any Bids made at an Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid must comply with the conditions set forth below and shall be made and received on an open basis, with all material terms of each Bid fully disclosed to all other Qualified Bidders, and, if compliant with the foregoing, as determined by the Debtors in consultation with the Consultation Parties, shall be deemed an "Overbid."

As used in these Bidding Procedures, (a) the "Minimum Increment" means $250,000, *provided, however*, the Debtors may, following consultation with the Consultation Parties, raise or lower the Minimum Increment between rounds of bidding; (b) the "Incremental Success Fee" means the amount equal to the difference between (i) the greater of (x) $1,000,000 and (y) 3.0% of the Aggregate Consideration (as defined in the Cowen Engagement Letter) of such Bid; and (ii) $750,000; and (c) the "Expense Reimbursement" means the reimbursement of the Stalking Horse Bidder's actual and reasonable expenses incurred in connection with the Bankruptcy Cases, up to $500,000 in the aggregate. Any change to the Minimum Increment will be communicated to Qualified Bidders prior to the then-applicable round of bidding. After each Overbid, the Debtors shall announce the material terms of the Overbid, including value attributed to the Overbid.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

a. For Auction 1, the Debtors will announce the terms of the Baseline Bid and shall open the Auction starting with the Baseline Bid (which may be the Stalking Horse Bid). Any initial Overbid made at Auction 1 by a Qualified Bidder shall be not less than the sum of (i) the Baseline Bid, (ii) the Minimum Increment, (iii) the Incremental Success Fee, and (iv) the Expense Reimbursement. Any subsequent Bids shall be made in increments not less than the Minimum Increment.

b. For Auctions 2 and 3, the Debtors will announce the terms of the Baseline Bid and shall open the Auction starting with the Baseline Bid. Any initial Overbid made at Auction 2 by a Qualified Bidder shall be not less than the sum of (i) the Baseline Bid, and (ii) the Minimum Increment. Any subsequent Bids shall be made in increments not less than the Minimum Increment.

The Debtors shall conduct the applicable Auction in rounds and shall invite Bids or Overbids, as applicable, from all Qualified Bidders for that Auction. If there are more than two Qualified Bidders for any Auction, the Debtors may determine and set the order of bidding by Qualified Bidders after consultation with the Consultation Parties. The Debtors shall maintain a written transcript (and may elect to maintain a video and audio recording) of all Bids made and announced at the Auction, including the Winning Bid and the Backup Bid. The Debtors may (a) select, in their reasonable business judgment, pursuant to these Bidding Procedures, the highest or otherwise best Bid and the Winning Bidder or Backup Bidder, after consultation with the Consultation Parties, and (b) reject any Bid (regardless of whether such Bid is a Qualified Bid) that, in the Debtors' reasonable business judgment and after consultation with the Consultation Parties, (i) is (x) inadequate, insufficient, or not the highest or best Bid, (y) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, or these Bidding Procedures, or (z) contrary to, or otherwise not in the best interests of the Debtors' estates, affected stakeholders, or other parties in interest; or (ii) the acceptance of such Bid as the Winning Bid or the Backup Bid would constitute a breach of the Debtors' fiduciary duties.

### 3. Eligibility to Participate and Rules of the Auction

Only Qualified Bidders that have submitted Qualified Bids by the Bid Deadline are eligible to participate in the Auction (unless the Debtors, in consultation with the Consultation Parties, determine otherwise). The Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment, after consultation with the Consultation Parties, in a manner consistent with their fiduciary duties and applicable law, without further order from the Court, in any manner that will best promote the goals of these Bidding Procedures, or impose, at or prior to the Auction, additional customary terms and conditions on a Sale, including, without limitation: (a) extending or modifying any of the dates and deadlines set forth in these Bidding Procedures; (b) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (c) adjusting the applicable minimum Overbid increment, including by requesting that Qualified Bidders submit last or final Bids on a "blind" basis; (d) adjourning or cancelling the Auction; (e) rejecting any or all Bids or Qualified Bids; and (f) otherwise modifying the Bidding Procedures in a manner reasonably necessary for the Debtors to exercise their fiduciary duties to the estates.

### 4. Attendance at Auction

Qualified Bidders participating in the Auction must appear at the Auction, or through a duly authorized representative. Other parties wishing to attend the Auction must notify counsel to the Debtors, Steven W. Golden (sgolden@pszjlaw.com) at least 48 hours in advance thereof and the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Debtors, in their discretion, in consultation with the Consultation Parties, may (but are not required to) permit such party to attend the Auction; *provided* that the following parties (and their authorized representatives and professional advisors) shall be permitted to attend the Auction: Qualified Bidders, the Debtors' secured lenders (including the DIP Lender), the Committee, senior representatives of the Debtors' unions, any patient care ombudsperson, and the Office of the United States Trustee.

### 5. Adjourning and Closing the Auction(s)

Notwithstanding anything else herein to the contrary, the Debtors reserve the right, in their reasonable business judgment and after consultation with the Consultation Parties (provided that the DIP Lender's rights under the Final DIP Order shall remain unaffected), to adjourn the Auction (or any of Auction 1, Auction 2 or Auction 3) one or more times to, among other things, (a) facilitate discussions between the Debtors and Qualified Bidders; (b) allow Qualified Bidders to consider how they wish to proceed; (c) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient noncontingent debt and/or equity funding commitments to consummate the proposed Sale at the prevailing Overbid amount; and/or (d) commence or continue any other Auction.

Each Auction shall continue until the Debtors, after consultation with the Consultation Parties, select, in their reasonable business judgment, pursuant to these Bidding Procedures, the highest or otherwise best Qualified Bid for the Hospital in that Auction. If Auction 1 or Auction 3 are conducted, such highest or otherwise best Qualified Bid shall be declared the "Winning Bid," and such Qualified Bidder shall be declared the "Winning Bidder," and upon the declaration of the Winning Bid and the Winning Bidder such Auction will be closed; *provided, however,* that no Qualified Bidder shall be declared the Winning Bidder without the consent of the DIP Lender, which may be withheld at the DIP Lender's sole discretion, if the Purchase Price of such Qualified Bid contains less Cash Consideration payable to the DIP Lender and the MPT Prepetition Lender than is provided to such parties in the Term Sheet. The Debtors may also select, in their reasonable business judgment and after consultation with the Consultation Parties, pursuant to these Bidding Procedures, the next-highest or otherwise second-best Qualified Bid for the Assets to be the "Backup Bidder." The Backup Bidder shall be required to keep its final Qualified Bid open and irrevocable until such time as the Sale is consummated and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors, in consultation with the Consultation Parties.

If Auction 2 is conducted (and, for the avoidance of doubt, Auction 1 is not conducted because the Stalking Horse Bidder is selected as the Winning Bidder), the highest or otherwise best Qualified Bid for the Hospital in Auction 2 shall be selected the Backup Bidder; *provided, however,* that no Qualified Bidder shall be declared the Backup Bidder without the consent of the DIP Lender, which may be withheld at the DIP Lender's sole discretion, if the Purchase Price of such Qualified Bid contains less Cash Consideration payable to the DIP Lender and the MPT Prepetition Lender than is provided to such parties in the Term Sheet. The Backup Bidder shall be required to keep its final Qualified Bid open and irrevocable until such time as the Sale to the Stalking Horse Bidder is consummated and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors, in consultation with the Consultation Parties,

As soon as reasonably practicable after closing the Auction, the Debtors shall finalize definitive documentation to implement the terms of the Winning Bid and/or the Backup Bid, and, as applicable, cause such definitive documentation to be filed with the Court. The Debtors, in their

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

discretion, in consultation with the Consultation Parties, may elect not to close the Auction until the presumptively Winning Bid or Backup Bid is accurately reflected in definitive documentation. The acceptance by the Debtors of the Winning Bid is conditioned upon approval by the Court of the Winning Bid.

### 6. No Collusion; *Bona Fide* Offer

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction and, if requested by the Debtors, at each round of the Auction, that (a) it has not engaged in any collusion with respect to the bidding, and (b) its Qualified Bid is a good-faith *bona fide* offer and it intends to consummate the proposed Sale if selected as the Winning Bidder or the Backup Bidder.

### F. Miscellaneous

### 1. Sale Hearing

The hearing at which the Debtors will seek the Court's approval of the Sale pursuant to the Sale Motion (the "Sale Hearing") will occur on **February 23, 2022 at 10:00 a.m. (prevailing Pacific Time)** before the Hon. M. Elaine Hammond by telephonic/video appearance only.

At the Sale Hearing, the Debtors will seek entry of an order (the "Sale Order") authorizing and approving the Sale to the Winning Bidder. The Sale Hearing may be adjourned or rescheduled without notice or with limited and shortened notice, after consultation with the Consultation Parties (provided that the DIP Lender's rights under the Final DIP Order shall remain unaffected), including by (i) an announcement of such adjournment at the Sale Hearing or at the Auction or (ii) the filing of a notice of adjournment with the Court prior to the commencement of the Sale Hearing.

### 2. Return of Deposit

Unless previously forfeited for non-compliance with these Court-approved Bidding Procedures, the Good Faith Deposit of any Winning Bidder (or any Backup Bidder that becomes a Winning Bidder) shall be applied to the Purchase Price of such Sale at Closing. Counsel to the Debtors will hold the Good Faith Deposits of the Winning Bidder and the Backup Bidder in a segregated account until the Closing of the Sale with the Winning Bidder. Good Faith Deposits of all other Qualified Bidders also shall be held in such segregated account, and thereafter returned to the respective Bidders within three (3) business days following the conclusion of the Auction, or as soon as is reasonably practicable thereafter. If a Winning Bidder (including any Backup Bidder that has become the Winning Bidder) fails to consummate an approved Sale transaction because of a breach or failure to perform on the part of such Winning Bidder, the Debtors shall be entitled to retain such Winning Bidder's Good Faith Deposit as part of the Debtors' damages resulting from such Winning Bidder's breach or failure to perform, without prejudice to the Debtors' rights to seek additional damages from the Court as appropriate. If a Winning Bidder consummates a proposed transaction or fails to consummate a proposed transaction but the Debtors elect to not consummate the proposed transaction with the Backup Bidder, then the Backup Bidder's Deposit shall be returned within three (3) business days thereof, or as soon as is reasonably practicable thereafter.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

### 3. Free and Clear of All Interests

Except as otherwise provided in the Purchase Agreement of the Winning Bidder and subject to the approval of the Court, all of the Debtors' rights, title, and interest in and to the Debtors' assets subject thereto shall be sold free and clear of any liens, claims, encumbrances, and other interests to the maximum extent permitted by section 363 of the Bankruptcy Code, with such liens, claims, encumbrances, and other interests to attach to the proceeds of the Sale of such assets with the same validity and priority as such liens, claims, encumbrances, and other interests were held against the applicable assets prior to the Sale.

### 4. Fiduciary Out

Notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures or the Bidding Procedures Order shall require the Debtors or the board of directors of the Debtors to take any action or to refrain from taking any action to the extent taking or failing to take such action would be inconsistent with applicable law or its fiduciary obligations under applicable law.

### 5. Consent to Jurisdiction

All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and to have waived any right to a jury trial in connection with any disputes relating to the Sale process, the Auction, the Bidding Procedures, and the construction and enforcement of each Qualified Bidder's Contemplated Transaction Documents, as applicable.

**<u>Exhibit 2 to Order</u>**

**Assumption and Assignment Procedures**

Debra I. Grassgreen (CA Bar No. 169978)
Maxim B. Litvak (CA Bar No. 215852)
Steven W. Golden (admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
One Market Plaza, Spear Tower, 40th Floor
San Francisco, CA  94105-1020
Telephone:    415.263.7000
Facsimile:    415.263.7010
E-mail:    dgrassgreen@pszjlaw.com
        mlitvak@pszjlaw.com
        sgolden@pszjlaw.com

Proposed Attorneys for Debtors and
Debtors in Possession

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| In re: | Case No. 21-51477 |
| WATSONVILLE HOSPITAL CORPORATION, *et al.*, | Chapter 11 (Jointly Administered) |
| Debtors.[1] | **PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN OF THE DEBTORS' EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH A SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS** |
| | Judge:  Hon. M. Elaine Hammond |

On December 5, 2021 (the "<u>Petition Date</u>"), the above-captioned debtors and debtors in possession (the "<u>Debtors</u>") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On December 6, 2021, the United States Bankruptcy Court for the Northern District of California, San Jose Division (the "<u>Court</u>") entered an order authorizing the joint administration of the chapter 11 cases (the "<u>Bankruptcy Cases</u>") pursuant to Bankruptcy Rule 1015(b).

On January [12], 2022, the Court entered an order (the "<u>Bidding Procedures Order</u>")[2] authorizing the Debtors to, among other things, solicit offers for the sale of substantially all of their assets (a "<u>Sale</u>").  As part of a Sale, the Debtors may assume and assign certain of their executory

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Watsonville Hospital Corporation (4113); Watsonville Healthcare Management, LLC (4168); Watsonville Hospital Holdings, Inc. (1118); and Halsen Healthcare, LLC.  The Debtors' business address is 75 Nielson Street, Watsonville, CA 95076.

[2]  Capitalized terms not otherwise defined herein shall have the definitions ascribed to them in the Bidding Procedures Order.

contracts and unexpired leases (the "Assignable Contracts") to the Stalking Horse Bidder or other Winning Bidder (the "Transferred Contracts"). The following procedures govern the assumption and assignment of the Transferred Contracts in connection with a Sale to the Stalking Horse Bidder or other Winning Bidder.

## I.      ASSUMPTION AND ASSIGNMENT NOTICE

On or before January 17, 2022, the Debtors will file and serve a notice of Assignable Contracts (the "Assumption and Assignment Notice"). The Assumption and Assignment Notice will include a schedule (the "Cure Schedule") identifying (i) the Assignable Contracts that may be assumed and assigned to the Stalking Horse Bidder or other Winning Bidder pursuant to a Sale (*i.e.*, may become Transferred Contracts) and (ii) the amount, if any, the Debtors believe is necessary to cure all monetary defaults under such Assignable Contracts pursuant to section 365 of the Bankruptcy Code (the "Cure Amount").

The Assumption and Assignment Notice will be served on each of the non-Debtor counterparties to the Assignable Contracts (the "Contract Counterparties") listed on the Cure Schedule by first class mail. The Assumption and Assignment Notice will state that the Debtors are or may be seeking the assumption and assignment of the Assignable Contracts in connection with a Sale, but that the Debtors reserve all rights to add or remove any Assignable Contract from the Cure Schedule at any time prior to Closing.

Service of the Assumption and Assignment Notice shall not constitute an admission that any Assignable Contract is an executory contract or unexpired lease under section 365 of the Bankruptcy Code and shall not require the Debtors to assume and assign such Assignable Contract.

## II.      CONTRACT OBJECTIONS

Any Contract Counterparty may object to inclusion of its Assignable Contract(s) on the Cure Schedule and the Cure Amounts listed thereon. ***Objections to (i) the potential assumption and assignment of an Assignable Contract on the Cure Schedule; (ii) the Cure Amount; or (iii) the provision of adequate assurance of future performance (a "Contract Objection") must be filed with the Court and served on the Objection Notice Parties (as defined below) so as to be received no later than February 7, 2022 at 4:00 p.m. (prevailing Pacific Time) (the "Contract Objection Deadline"), unless extended by the Debtors in accordance with the Bidding Procedures Order***. Any Contract Objection must state with specificity the grounds for such objection, including, without limitation, the fully-liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Contract Counterparty believes is to be paid under section 365 of the Bankruptcy Code for the Assignable Contract (should such Assignable Contract be designated a Transferred Contract), along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.

Upon receipt of a Contract Objection, the Debtors will contact the Contract Counterparty or its counsel to attempt to resolve such objection. If a Contract Objection is timely filed by the Contract Objection Deadline and cannot be resolved, a hearing will be held (i) at the Sale Hearing or (ii) on such other date subsequent to the Sale Hearing but before the Closing Date, as the Court may designate prior to, during, or after the Sale Hearing (the "Cure/Assignment Hearing") to consider the objection.

If no Contract Objection is timely filed or received with respect to an Assignable Contract identified on the Cure Schedule, then the Cure Amount set forth in the Cure Schedule for such Assignable Contract will be binding upon the Contract Counterparty to such Assignable Contract for all purposes and will constitute a final determination of the Cure Amount required to be paid in connection with the assumption and assignment of such Assignable Contract.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

In addition, any Contract Counterparty to an Assignable Contract who fails to file a Contract Objection before the Contract Objection Deadline, will be (i) forever barred from objecting to the Cure Amount with respect to such Assignable Contract, and the Debtors and the applicable Bidder(s) at the Auction will be entitled to rely solely upon the Cure Amount set forth in the Cure Schedule; (ii) deemed to have consented to the assumption and assignment of such Assignable Contract to the Stalking Horse Bidder or other Winning Bidder; and (iii) forever barred and estopped from asserting or claiming against the applicable Debtor(s) or the Stalking Horse Bidder or other Winning Bidder that any additional amounts are due or other defaults exist under such Assignable Contract, that any conditions to assignment must be satisfied, or that there is any other objection or defense to the assumption or assignment of the applicable Assignable Contract.

## III.    AMENDMENTS TO ASSUMPTION AND ASSIGNMENT NOTICE

In the event that the Debtors file and serve an amendment to the Assumption and Assignment Notice on or after January 31, 2022, the Contract Counterparty to any Assignable Contract affected by (*i.e.*, added to, removed from, or with an amended Cure Amount on) an amended Cure Schedule must file and serve a Contract Objection in accordance with the procedures described above within seven (7) days after the filing of such amendment.  In the event that the Debtors amend the Assumption and Assignment Notice solely to change the Cure Amount of an Assignable Contract previously included, any such Contract Objection shall be limited to the Cure Amount only.

The Purchase Agreement of the Winning Bidder may set forth additional deadlines and procedures concerning the Winning Bidder's evaluation of the Assignable Contracts and/or designation or de-designation of Transferred Contracts.  The final list of Transferred Contracts shall be attached to the notice of the Closing filed with the Court.

## IV.    OBJECTION NOTICE PARTIES

The "Objection Notice Parties" are as follows: (i) the Debtors, c/o Jeremy Rosenthal, 5271 California, Suite 270, Irvine CA 92617 (jrosenthal@force10partners.com); and proposed counsel to the Debtors: Pachulski Stang Ziehl & Jones LLP, One Market Plaza, Spear Tower, 40th Floor, San Francisco, CA 94105, Attn: Debra Grassgreen (dgrassgreen@pszjlaw.com); Maxim Litvak (mlitvak@pszjlaw.com); and Steven Golden (sgolden@pszjlaw.com); (ii) co-counsel to the official committee of unsecured creditors, Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey 07102, Attn: Andrew Sherman, Esq. (asherman@sillscummis.com) and Boris Mankovetskiy, Esq. (bmankovetskiy@sillscummis.com); (iii) co-counsel to the official committee of unsecured creditors, Perkins Coie, LLP, 505 Howard Street, Suite 1000, San Francisco, CA 94105-3204, Attn: Paul Jasper, Esq. (pjasper@perkinscoie.com) and Eric E. Walker, Esq. (ewalker@perkinscoie.com); (iv) counsel to the DIP Lender: KTBS Law LLP, 1801 Century Park East, Los Angeles, CA 90067, Attn: Thomas Patterson (tpatterson@ktbslaw.com); Robert Smith (rsmith@ktbslaw.com); and Sasha Gurvitz (sgurvitz@ktbslaw.com); and (v) counsel to the Stalking Horse Bidder, Pillsbury Winthrop Shaw Pittman LLP, Four Embarcadero Center, 22nd Floor, San Francisco, CA 94111, Attn: Gerry Hinkley (gerry.hinkley@pillsburylaw.com); Jonathan Doolittle (jonathan.doolittle@pillsburylaw.com); and Claire Wu (claire.wu@pillsburylaw.com).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**Exhibit 3 to Order**

**Sale Notice**

DOCS_DE:336978.9 92381/001

1    Debra I. Grassgreen (CA Bar No. 169978)
    Maxim B. Litvak (CA Bar No. 215852)
2    Steven W. Golden (admitted *pro hac vice*)
    PACHULSKI STANG ZIEHL & JONES LLP
3    One Market Plaza, Spear Tower, 40th Floor
    San Francisco, CA 94105-1020
4    Telephone:    415.263.7000
    Facsimile:     415.263.7010
5    E-mail:       dgrassgreen@pszjlaw.com
              mlitvak@pszjlaw.com
6                sgolden@pszjlaw.com

7    Proposed Attorneys for Debtors and
    Debtors in Possession

8

**UNITED STATES BANKRUPTCY COURT**

9

**NORTHERN DISTRICT OF CALIFORNIA**

10

**SAN JOSE DIVISION**

11

| | |
|---|---|
| In re: | Case No. 21-51477 |
| 12   WATSONVILLE HOSPITAL CORPORATION, *et al.*, | Chapter 11 (Jointly Administered) |
| Debtors.[1] | **NOTICE OF SALE, BIDDING PROCEDURES, AUCTION, AND SALE HEARING IN CONNECTION WITH A SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS** |
| | Judge: Hon. M. Elaine Hammond |

17

**TO THE UNITED STATES BANKRUPTCY COURT, THE OFFICE OF THE UNITED**
18 **STATES TRUSTEE, THE DEBTORS' CREDITORS, AND OTHER PARTIES IN INTEREST:**

19      **PLEASE TAKE NOTICE** that on December 5, 2021 (the "Petition Date"), Watsonville
20 Hospital Corporation and its debtor affiliates, as debtors and debtors in possession (collectively, the
"Debtors") in the above-captioned chapter 11 cases (the "Bankruptcy Cases"), each filed a voluntary
21 petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with
the United States Bankruptcy Court for the Northern District of California (San Jose Division) (the
22 "Court").

23      **PLEASE TAKE FURTHER NOTICE** that, on December 27, 2021, the Debtors filed the
24 *Debtors' Motion for Entry of an Order (I) Approving the Sale of Substantially All of the Debtors'*
*Assets Free and Clear of Liens, (II) Approving the Assumption and Assignment of Executory Contracts*
25 *and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 103] (the "Sale Motion").
Pursuant to the Sale Motion, the Debtors will seek the Court's approval of the Sale of substantially all

26

---

27 [1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:
Watsonville Hospital Corporation (4113); Watsonville Healthcare Management, LLC (4168); Watsonville Hospital
28 Holdings, Inc. (1118); and Halsen Healthcare, LLC. The Debtors' business address is 75 Nielson Street, Watsonville, CA
95076.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

of their assets (the "<u>Purchased Assets</u>") to the Stalking Horse Bidder (or other Successful Bidder), as set forth in further detail therein.

**PLEASE TAKE FURTHER NOTICE** that, on January [12], 2022, the Court entered that certain order approving, among other things, the implementation of the Bidding Procedures, in connection with the sale of all or substantially all of the Debtors' assets [Docket No. [●]], a copy of which is attached hereto as **<u>Exhibit 1</u>** (the "<u>Bidding Procedures Order</u>").[2]

**PLEASE TAKE FURTHER NOTICE** that, to ensure that the Sale process provides the opportunity to maximize value for the benefit of the Debtors' estates, the following key dates and deadlines have been established by the Debtors and approved by the Court pursuant to the Bidding Procedures Order:

(a) <u>Sale Objection Deadline</u>: **February 7, 2022, at 4:00 p.m.** (prevailing Pacific Time) is the deadline by which all objections to the Sale Motion (except with respect to the Supplemental Objection Matters[3]) must be filed and served in accordance with the Bidding Procedures Order.

(b) <u>Bid Deadline</u>: **February 14, 2022, at 4:00 p.m.** (prevailing Pacific Time) is the deadline by which Bids for the Purchased Assets (as well as the deposit and all other documentation required under the Bidding Procedures for Qualified Bidders) must be submitted.

(c) <u>Auction</u>: **February 17, 2022, at 10:00 a.m.** (prevailing Pacific Time) is the date and time that the Auction, if any, will be held (or such later date and time as provided for under the Bidding Procedures).

(d) <u>Supplemental Sale Objection Deadline</u>: **February 21, 2022, at 4:00 p.m.** (prevailing Pacific Time) is the deadline by which all objections to the Sale Motion, solely with respect to the Supplemental Objection Matters, must be filed and served in accordance with the Bidding Procedures Order

(e) <u>Sale Hearing</u>: The hearing approving the Sale to the Successful Bidder shall take place before the Court on **February 23, 2022 at 10:00 a.m.** (prevailing Pacific Time) **by telephonic/video appearance only**.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Sale Motion must (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Rules, and any order governing the administration of these Bankruptcy Cases; (iii) state with specificity the nature of the objection; and (iv) be filed with the Court and served on the Master Service List[4] in accordance with the Bidding Procedures Order by the Sale Objection Deadline or Supplemental Sale Objection Deadline, as applicable.

**PLEASE TAKE FURTHER NOTICE** that if you do not file an objection by the Sale Objection Deadline or Supplemental Sale Objection Deadline, as applicable, or in accordance with the

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order.

[3] The "<u>Supplemental Objection Matters</u>" are: (a) an objection to the Sale of the Purchased Assets to the extent the Winning Bidder is a party other than the Stalking Horse Bidder; (b) an objection to the Sale of the Purchased Assets to the Backup Bidder; or (c) an objection to the extent the Stalking Horse APA has been modified.

[4] The Master Service List is available on https://cases.stretto.com/WatsonvilleHospital under "Notice Lists" or by emailing TeamWatsonvilleHospital@stretto.com.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

Bidding Procedures Order, the Court may grant the relief requested in the Sale Motion without holding a hearing.

**PLEASE TAKE FURTHER NOTICE** that your rights may be affected by the Sale Motion. You should read the Sale Motion carefully and you may want to discuss with your attorney. Copies of the Bidding Procedures Motion, Sale Motion, and all other pleadings filed in the Bankruptcy Cases can be viewed or obtained by: (i) accessing the Court's website at http://www.canb.uscourts.gov; (ii) contacting the Office of the Clerk of the Court at 280 South First Street, Room 3035, San Jose, CA 95113; or (iii) from the Debtors' claims and noticing agent, Stretto, at https://cases.stretto.com/WatsonvilleHospital, by calling 1-877-476-4390 (toll free) or by email at: TeamWatsonvilleHospital@stretto.com. Note that a PACER password is needed to access documents on the Court's website.

**PLEASE TAKE FURTHER NOTICE** that all interested parties should consult the Court's website at www.canb.uscourts.gov for information about Court operations during the COVID-19 pandemic. The Court's website provides information regarding how to arrange a telephonic or video appearance. If you have any questions regarding how to appear at a court hearing, you may contact the Court by calling 888-821-7606 or by using the Live Chat feature on the Court's website.

Dated:    January [●], 2022                         PACHULSKI STANG ZIEHL & JONES LLP


By: _/s/_ _____
        Debra I. Grassgreen
        Maxim B. Litvak
        Steven W. Golden

        Proposed Attorneys for Debtors and Debtors in
        Possession

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

**Exhibit 1**
(Bidding Procedures Order)

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

**Exhibit 4 to Order**

**Assumption and Assignment Notice**

Debra I. Grassgreen (CA Bar No. 169978)
Maxim B. Litvak (CA Bar No. 215852)
Steven W. Golden (admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
One Market Plaza, Spear Tower, 40th Floor
San Francisco, CA 94105-1020
Telephone: 415.263.7000
Facsimile: 415.263.7010
E-mail: dgrassgreen@pszjlaw.com
          mlitvak@pszjlaw.com
          sgolden@pszjlaw.com

Proposed Attorneys for Debtors and
Debtors in Possession

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| In re:<br><br>WATSONVILLE HOSPITAL<br>CORPORATION, *et al.*,<br><br>Debtors.[1] | Case No. 21-51477<br><br>Chapter 11<br>(Jointly Administered)<br><br>**NOTICE OF POTENTIAL ASSUMPTION AND ASSIGNMENT AND CURE AMOUNT WITH RESPECT TO THE EXECUTORY CONTRACTS AND UNEXPIRED LEASES OF THE DEBTORS IN CONNECTION WITH A SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS**<br><br>Judge: Hon. M. Elaine Hammond |

**PLEASE TAKE NOTICE** that on December 5, 2021 (the "Petition Date"), the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") filed voluntary petitions with the United States Bankruptcy Court for the Northern District of California, San Jose Division (the "Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

**PLEASE TAKE FURTHER NOTICE** that the Debtors may seek to assume and assign certain of their executory contracts and unexpired leases in connection with a potential sale (the "Sale") of all or substantially all of their assets, consisting of Watsonville Community Hospital and

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Watsonville Hospital Corporation (4113); Watsonville Healthcare Management, LLC (4168); Watsonville Hospital Holdings, Inc. (1118); and Halsen Healthcare, LLC. The Debtors' business address is 75 Nielson Street, Watsonville, CA 95076.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

DOCS_DE:236974.5 92381/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

related assets (collectively, the "Hospital"), or some subset thereof, pursuant to the Court-approved procedures (the "Assumption and Assignment Procedures") set forth on Exhibit 2 to the Bidding Procedures Order (as defined below).

**PLEASE TAKE FURTHER NOTICE** that by order dated January [12], 2022 [Docket No. ●] (the "Bidding Procedures Order"),[2] the Court approved certain procedures (the "Bidding Procedures") that will govern the Auction (as defined below), which are set forth in Exhibit 1 to the Bidding Procedures Order. Copies of the Bidding Procedures Order, Bidding Procedures, and Assumption and Assignment Procedures are available on the Court's website at https://ecf.canb.uscourts.gov for a fee, and on the Debtors' restructuring website at https://cases.stretto.com/WatsonvilleHospital/ free of charge.

**PLEASE TAKE FURTHER NOTICE THAT YOU ARE RECEIVING THIS NOTICE BECAUSE YOU MAY BE A PARTY TO AN EXECUTORY CONTRACT OR AN UNEXPIRED LEASE THAT MAY BE ASSUMED AND ASSIGNED (COLLECTIVELY, THE "ASSIGNABLE CONTRACTS"), IN CONNECTION WITH SUCH SALE. A LIST OF THE ASSIGNABLE CONTRACTS IS ATTACHED HERETO AS APPENDIX A. FOR THE AVOIDANCE OF DOUBT, THE DEBTORS RESERVE ALL RIGHTS TO ADD OR REMOVE ANY ASSIGNABLE CONTRACTS, OR AMEND ANY INFORMATION RELATED THERETO, FROM THE CURE SCHEDULE PRIOR TO CLOSING IN ACCORDANCE WITH THE ASSUMPTION AND ASSIGNMENT PROCEDURES.**

**PLEASE TAKE FURTHER NOTICE** that the presence of an Assignable Contract on this Assumption and Assignment Notice does not constitute an admission that such Assignable Contract is an executory contract or unexpired lease, nor does it constitute an agreement to actually assume and/or assume and assign such Assignable Contract, and the Debtors reserve all rights, claims, defenses, and causes of action with respect to all Assignable Contracts listed herein.

**PLEASE TAKE FURTHER NOTICE** that the Debtors have determined the current amounts owing (the "Cure Amounts") under each Assignable Contract and have listed the applicable Cure

---

[2] Capitalized terms not otherwise defined herein shall have the definitions ascribed to them in the Bidding Procedures Order.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

Amounts on **Appendix A** attached hereto.  The Cure Amounts are the only amounts proposed to be paid upon any assumption and assignment of the Assignable Contracts, in full satisfaction of all amounts outstanding under such Assignable Contracts.

**PLEASE TAKE FURTHER NOTICE** that one or more auctions (an "Auction") for the Debtors' assets, including the Assignable Contracts, will be conducted on **February 17, 2022 at 10:00 a.m. (prevailing Pacific Time)**, and may be held in person or via teleconference and/or videoconference as determined by the Debtors. As soon as reasonably practicable after the Auction, the Debtors will file and serve a notice that identifies the Winning Bidder for the Purchased Assets.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Stalking Horse APA that the Debtors may enter into with the Stalking Horse Bidder (or such other Purchase Agreement as the Debtors may enter into with another Winning Bidder), the Debtors may seek to assume and assign one or more of the Assignable Contracts to the Winning Bidder subject to the Court's approval at the hearing (the "Sale Hearing") to be held on **February 23, 2022 at 10:00 a.m. (prevailing Pacific Time) by telephonic/virtual appearance only**.

**PLEASE TAKE FURTHER NOTICE** that any objection to (i) the proposed assumption, assignment, or potential designation of such party's Assignable Contract; (ii) the applicable Cure Amount; or (iii) the provision of adequate assurance of future performance (a "Contract Objection") must: (i) be in writing; (ii) comply with the Bankruptcy Rules and Local Bankruptcy Rules; (iii) be filed with the Clerk of the Court, together with proof of service, **on or before 4:00 p.m. (prevailing Pacific Time) on February 7, 2022** (as may be extended in accordance with the Assumption and Assignment Procedures, the "Contract Objection Deadline"); (iv) be served, so as to be actually received on or before the Contract Objection Deadline, upon the Objection Notice Parties (as defined herein); and (v) state with specificity the grounds for such objection, including, without limitation, the fully-liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Contract Counterparty believes is to be paid under section 365 of the Bankruptcy Code for the Assignable Contract (should such Assignable Contract be designated a Transferred Contract), along with the specific nature an dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.  The "Objection Notice Parties" are as follows: (i)

the Debtors, c/o Jeremy Rosenthal, 5271 California, Suite 270, Irvine CA 92617 (jrosenthal@force10partners.com); and proposed counsel to the Debtors: Pachulski Stang Ziehl & Jones LLP, One Market Plaza, Spear Tower, 40th Floor, San Francisco, CA 94105, Attn: Debra Grassgreen (dgrassgreen@pszjlaw.com); Maxim Litvak (mlitvak@pszjlaw.com); and Steven Golden (sgolden@pszjlaw.com); (iii) proposed co-counsel to the Committee, (a) Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey 07102, Attn: Andrew Sherman, Esq. (asherman@sillscummis.com) and Boris Mankovetskiy, Esq. (bmankovetskiy@sillscummis.com), and (b) Perkins Coie, LLP, 505 Howard Street, Suite 1000, San Francisco, CA 94105-3204, Attn: Paul Jasper, Esq. (pjasper@perkinscoie.com) and Eric E. Walker, Esq. (ewalker@perkinscoie.com); (iv) counsel to the DIP Lender: KTBS Law LLP, 1801 Century Park East, Los Angeles, CA 90067, Attn: Thomas Patterson (tpatterson@ktbslaw.com); Robert Smith (rsmith@ktbslaw.com); and Sasha Gurvitz (sgurvitz@ktbslaw.com); and (v) counsel to the Stalking Horse Bidder, Pillsbury Winthrop Shaw Pittman LLP, Four Embarcadero Center, 22nd Floor, San Francisco, CA 94111, Attn: Gerry Hinkley (gerry.hinkley@pillsburylaw.com); Jonathan Doolittle (jonathan.doolittle@pillsburylaw.com); and Claire Wu (claire.wu@pillsburylaw.com).

**PLEASE TAKE FURTHER NOTICE** that if the Debtors file and serve an amendment to the Assumption and Assignment Notice on or after January 31, 2022, the Contract Counterparty to any Assignable Contract affected by (*i.e.*, added to, removed from, or with an amended Cure Amount on) an amended Cure Schedule must file and serve a Contract Objection in accordance with the procedures described above within seven (7) days after the filing of such amendment. In the event that the Debtors amend the Assumption and Assignment Notice solely to change the Cure Amount of an Assignable Contract previously included, any such Contract Objection shall be limited to the Cure Amount only.

**PLEASE TAKE FURTHER NOTICE** that the Purchase Agreement of the Winning Bidder may set forth additional deadlines and procedures concerning the Winning Bidder's evaluation of the Assignable Contracts and/or designation or de-designation of Transferred Contracts. The final list of Transferred Contracts shall be attached to the notice of the Closing filed with the Court.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

**PLEASE TAKE FURTHER NOTICE THAT, IF NO OBJECTION IS TIMELY RECEIVED WITH RESPECT TO THE NOTICED CURE AMOUNT, (I) ANY NON-DEBTOR PARTY TO AN ASSIGNABLE CONTRACT SHALL BE FOREVER BARRED FROM OBJECTING TO THE CURE AMOUNT AND FROM ASSERTING ANY ADDITIONAL CURE OR OTHER AMOUNTS WITH RESPECT TO SUCH ASSIGNABLE CONTRACT; (II) THE CURE AMOUNT SET FORTH ON <u>APPENDIX A</u> ATTACHED HERETO SHALL BE CONTROLLING, NOTWITHSTANDING ANYTHING TO THE CONTRARY IN ANY ASSIGNABLE CONTRACT, OR ANY OTHER DOCUMENT, AND THE NON-DEBTOR PARTY TO AN ASSIGNABLE CONTRACT SHALL BE DEEMED TO HAVE CONSENTED TO THE CURE AMOUNT; AND (III) THE NON-DEBTOR PARTY TO AN ASSIGNABLE CONTRACT SHALL BE FOREVER BARRED AND ESTOPPED FROM ASSERTING ANY OTHER CLAIMS RELATED TO SUCH CONTRACT AGAINST THE DEBTORS OR THE APPLICABLE TRANSFEREE, OR THE PROPERTY OF ANY OF THEM.**

**PLEASE TAKE FURTHER NOTICE THAT IF NO TIMELY OBJECTION IS RECEIVED WITH RESPECT TO THE ASSUMPTION AND ASSIGNMENT OF AN ASSIGNABLE CONTRACT TO THE PURCHASER, INCLUDING WITH RESPECT TO THE PROVISION OF ADEQUATE ASSURANCE OF FUTURE PERFORMANCE, ANY NON-DEBTOR PARTY TO SUCH ASSIGNABLE CONTRACT SHALL BE DEEMED TO HAVE CONSENTED TO THE ASSUMPTION, ASSIGNMENT, AND/OR TRANSFER OF THE APPLICABLE ASSIGNABLE CONTRACT TO THE PURCHASER, AND SHALL BE FOREVER BARRED FROM OBJECTING TO THE ASSUMPTION AND ASSIGNMENT OF SUCH ASSIGNABLE CONTRACT ON ANY BASIS.\**

Dated: January [●], 2022                    PACHULSKI STANG ZIEHL & JONES LLP

By: */s/*
  _____
  Debra I. Grassgreen
  Maxim B. Litvak
  Steven W. Golden

  Proposed Attorneys for Debtors and Debtors in Possession

# APPENDIX A

Cure Schedule

**Exhibit 5 to Order**

**Stalking Horse APA**

# ASSET PURCHASE AGREEMENT


## BY AND AMONG


## HALSEN HEALTHCARE, LLC, WATSONVILLE HOSPITAL HOLDINGS, INC., WATSONVILLE HEALTHCARE MANAGEMENT, LLC, AND WATSONVILLE HOSPITAL CORPORATION, AS SELLER

## AND


## PAJARO VALLEY HEALTHCARE DISTRICT PROJECT, AS BUYER


**Dated as of December 27, 2021**

# TABLE OF CONTENTS

**Page**

ARTICLE I ASSETS AND LIABILITIES ................................................................. 3

    1.1.   Acquired Assets ................................................................. 3
    1.2.   Excluded Assets ................................................................. 3
    1.3.   Assumed Liabilities ................................................................. 4
    1.4.   Excluded Liabilities ................................................................. 5
    1.5.   Instruments of Transfer ................................................................. 6
    1.6.   Payment of Sales Taxes ................................................................. 6
    1.7.   As Is, Where Is ................................................................. 6

ARTICLE II PURCHASE PRICE ................................................................. 6

    2.1.   Consideration / Purchase Price ................................................................. 6
    2.2.   Deposit ................................................................. 7
    2.3.   Pro-Rations ................................................................. 7
    2.4.   Allocation of Purchase Price ................................................................. 8
    2.5.   Negotiated Value ................................................................. 8

ARTICLE III CLOSING ................................................................. 8

    3.1.   Closing ................................................................. 8

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER ................................................................. 9

    4.1.   Organization, Good Standing and Qualification ................................................................. 9
    4.2.   Authorization; Binding Obligation ................................................................. 9
    4.3.   Consents and Approvals ................................................................. 10
    4.4.   No Violation ................................................................. 10
    4.5.   Licenses and Permits ................................................................. 10
    4.6.   Acquired Assets ................................................................. 10
    4.7.   Leases of Personal Property ................................................................. 11
    4.8.   Absence of Certain Events ................................................................. 11
    4.9.   Legal Proceedings ................................................................. 11
    4.10.   Payment Programs ................................................................. 11
    4.11.   Compliance with Laws ................................................................. 12
    4.12.   Employees ................................................................. 12
    4.13.   Benefit Plan ................................................................. 12
    4.14.   No Brokers ................................................................. 12
    4.15.   Taxes ................................................................. 12
    4.16.   Contracts ................................................................. 13
    4.17.   Leased Real Property ................................................................. 13
    4.18.   Financing Statements ................................................................. 14
    4.19.   Insurance ................................................................. 14
    4.20.   Intellectual Property ................................................................. 14
    4.21.   NO OTHER REPRESENTATIONS OR WARRANTIES ................................................................. 14

ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER ................................................................. 14

    5.1.   Organization, Good Standing and Qualification ................................................................. 15

5.2. Authorization; Binding Agreement ........................................................ 15
5.3. Legal Proceedings .......................................................................... 15
5.4. No Brokers ................................................................................... 15
5.5. No Violation ................................................................................. 15

ARTICLE VI COVENANTS ........................................................................ 15

6.1. Conduct of the Business Pending Closing ........................................... 15
6.2. Notice by Seller of Certain Events .................................................... 17
6.3. Efforts and Further Assurances ........................................................ 17
6.4. Preservation of and Access to Information and Records ......................... 18
6.5. Access to Information ..................................................................... 18
6.6. Regulatory Agreements ................................................................... 19
6.7. Employment Matters ...................................................................... 19
6.8. Discovered Contracts ..................................................................... 20
6.9. Management of the Hospital ............................................................ 20

ARTICLE VII CONFIDENTIALITY .............................................................. 20

7.1. Confidentiality .............................................................................. 20

ARTICLE VIII CONDITIONS PRECEDENT TO BUYER'S PERFORMANCE AND
TO SELLER'S PERFORMANCE .......................................... 22

8.1. Conditions to Buyer's Obligations .................................................... 22
8.2. Conditions to Seller's Obligations .................................................... 23
8.3. No Injunction or Action .................................................................. 24

ARTICLE IX MISCELLANEOUS .................................................................. 24

9.1. Termination .................................................................................. 24
9.2. Notice of Termination; Effect of Termination ..................................... 25
9.3. Expense Reimbursement ................................................................. 25
9.4. Survival of Representations and Warranties; Survival of Post-Closing
Covenants .................................................................................... 25
9.5. Expenses ...................................................................................... 25
9.6. Entire Agreement; Amendment ........................................................ 25
9.7. Assignment .................................................................................. 26
9.8. Counterparts ................................................................................. 26
9.9. Law Governing Agreement; Bankruptcy Court Jurisdiction ................... 26
9.10. Schedules and Exhibits ................................................................... 26
9.11. Severability .................................................................................. 27
9.12. Notices ........................................................................................ 27
9.13. Representation by Counsel ............................................................... 28
9.14. Construction ................................................................................. 28
9.15. Certain References ......................................................................... 28
9.16. Waivers ....................................................................................... 28
9.17. Bulk Sales Laws ............................................................................ 28

9.18.  Third Parties .......................................................................................... 28
9.19.  Specific Performance .............................................................................. 28
ARTICLE X BANKRUPTCY MATTERS AND CONDUCT OF AUCTION ........................ 29
10.1.  Seller's Motions in Bankruptcy Court ................................................... 29
10.2.  Defense of Orders .................................................................................. 30

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (the "**Agreement**") is made and entered into as of the 27th day of December, 2021 (the "**Effective Date**"), by and among **HALSEN HEALTHCARE, LLC, WATSONVILLE HOSPITAL HOLDINGS, INC., WATSONVILLE HEALTHCARE MANAGEMENT, LLC, AND WATSONVILLE HOSPITAL CORPORATION** (the foregoing are herein jointly and severally referred to as "**Seller**"), and **PAJARO VALLEY HEALTHCARE DISTRICT PROJECT** ("**Buyer**").

## R E C I T A L S

A.   Seller is engaged in the business of providing healthcare services at the Watsonville Community Hospital in Watsonville, California, which offers a 24-hour emergency department, outpatient and inpatient surgical services, obstetrics, neonatal intensive care (NICU), hyperbaric therapies, diagnostic, therapeutic, and rehabilitative services, and community education at the approximately 106 bed acute care hospital at the location described on <u>Schedule 1.0</u> hereto (collectively, the "**Business**");

B.   On December 5, 2021 ("**Petition Date**"), Seller filed voluntary petitions for relief under title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court, Northern District of California, San Jose Division (the "**Bankruptcy Court**"), commencing cases under chapter 11 of the Bankruptcy Code that are proceeding on an administratively consolidated basis under Docket No. 21-51477 (collectively, the "**Bankruptcy Case**");

C.   To satisfy a Closing condition and facilitate Buyer's purchase of the Business, MPT of Watsonville, LLC ("**MPT Lessor**"), as lessor, agreed to certain rent concessions under that certain Lease Agreement, dated as of September 30, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "**MPT Lease**"), by and between MPT Lessor and Watsonville Hospital Corporation, and MPT of Watsonville Lender, LLC ("**MPT Prepetition Lender**" and, together with MPT Lessor, "**MPT**") as lender agreed to provide post-petition debtor-in-possession financing to Seller in connection with the Bankruptcy Case, subject to Bankruptcy Court approval.  Such financing is set forth in that certain Senior Secured Superpriority Debtor in Possession Promissory Note, dated as of December 5, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "**DIP Note**"), by and among MPT Prepetition Lender and Seller, which DIP Note provides for a multi-draw term loan credit facility in the amount of up to $21,500,000 in new money to fund the working capital requirements of Seller and for other permitted purposes during the pendency of the Bankruptcy Case pursuant to a budget approved in accordance with the DIP Note, with MPT seeking to roll-up prepetition advances made to Seller of $9,250,000 into the post-petition credit facility, which is secured by first priority security interests in substantially all of the Seller's assets as further described in and subject to the terms and conditions set out in the DIP Note and the other DIP Loan Documents (as defined in the DIP Note);

D.   Seller has filed a Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Liens and Superpriority Administrative Expense Claims; (IV) Granting Adequate Protection; (V) Modifying the Automatic

- 1 -

Stay; Scheduling a Final Hearing; and (VI) Granting Related Relief, Dkt. No. 10 (the "**DIP Financing Motion**");

E.   On December 7, 2021, the Bankruptcy Court heard the DIP Financing Motion and on an interim basis entered an order dated December 8, 2021, Dkt. No. 54 (the "**Interim DIP Order**") authorizing Seller to borrow up to $16,000,000 in new money under the DIP Note pending a final hearing on the DIP Financing Motion scheduled on January 7, 2022;

F.   It is a condition of Closing that the Bankruptcy Court approve the DIP Loan Documents to fund Seller's projected post-petition expenses through the earlier of (i) March 31, 2022, and (ii) the Closing, in each case on the terms and subject to the conditions set forth in the DIP Loan Documents;

G.   Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, all of the assets, properties and rights of Seller relating to the Business (except for the Excluded Assets) free and clear of all Encumbrances pursuant to section 363(f) of the Bankruptcy Code as provided in a final order of the Bankruptcy Court approving such sale under section 363 of the Bankruptcy Code to be entered in the Bankruptcy Case, and to assume only certain specified liabilities of Seller related thereto, all on the terms and subject to the conditions set forth in this Agreement and in accordance with sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code;

H.   Buyer intends to seek legislative approval to authorize the formation of the Pajaro Valley Healthcare District, a political subdivision of the State of California (the "**District**"), Buyer may designate the District to purchase the Business pursuant to this Agreement, and references to "Buyer" under this Agreement after the District is formed and this Agreement is assigned to the District in accordance with Section 9.7 shall mean the "District;"

I.   As additional consideration, and as a material inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, Seller desires to make certain representations, warranties, indemnities, covenants and agreements relating to the sale of the Business; and

J.   Capitalized terms used herein not defined elsewhere have the meanings set forth in the Table of Definitions attached hereto as <u>Annex I</u>.

**AGREEMENT**

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

DOCS_SF:106516.11 92381/001

Case: 21-51477    Doc# 287    Filed: 02/00/22    Entered: 02/00/22 12:25:50    Page 65 of 118

# ARTICLE I
## ASSETS AND LIABILITIES

1.1.  Acquired Assets.

(a)  Subject to the terms and the conditions set forth in this Agreement and on the basis of the representations and warranties herein, Seller shall sell, convey, transfer, assign and deliver to Buyer, and Buyer shall purchase, receive and accept from Seller, all rights, title and interest in and to the assets and properties of every kind, character and description (other than the Excluded Assets) owned or leased by Seller and used in the operation and management of the Business, or otherwise for the benefit of the Business, whether tangible, intangible, real, personal or mixed, movable or fixed, and wherever located (as specified in greater detail in Section 1.1(b), collectively referred to hereinafter as the "**Acquired Assets**").

(b)  With the exception of the Excluded Assets, the Acquired Assets include all of Seller's tangible and intangible property, including all property listed on Schedule 1.1 hereto, all cash except Excluded Cash, deferred tax assets, employee advances, prepaid insurance, including prepaid professional liability insurance, accounts (including all accounts receivable), machinery, equipment, inventories, tenant improvements (regardless of whether they are accounted for as an asset on the books of Seller), goodwill of the Business, software and computer programs, hardware, Intellectual Property (including the names "Watsonville Community Hospital" and all other trade names and acronyms under which Seller conducts the Business or by which Seller or the Business is commonly known), prepaid expenses and deposits, Assigned Contracts, Assigned Personal Property Leases, books and records (including all patient charts and records, patient lists and appointment books relating to patients treated by the Business to the extent transferable under applicable law), any Seller policies and procedures relating to the Business, telephone and facsimile numbers, uniform resource locators, email addresses, social media identifiers, all Licenses (for clarity, the Medicare, Medicaid or Medi-Cal provider numbers set forth on Schedule 1.1 hereto are Licenses included as Acquired Assets) and permits (including drug and nuclear licenses) to the extent transferable to Buyer, in each case to the extent transferable or otherwise capable of being assumed, sold and assigned, all benefits, proceeds and other amounts payable under any Seller policy of insurance relating to the Business, and proceeds of all of the foregoing assets.

1.2.  Excluded Assets.  Notwithstanding anything contained in **Section 1.1** above, Buyer is not purchasing (i) Seller's contracts and leases that are not Assigned Contracts or Assigned Personal Property Leases and including the proceeds thereof, (ii) the Purchase Price and all rights of the Seller and MPT, respectively, under this Agreement, (iii) any rights, claims or causes of action of any Seller under the Bankruptcy Code, including under chapter 5 of the Bankruptcy Code (or any state analogs) and including all proceeds thereof, (iv) any rights, claims or causes of action of any Seller unrelated to the Business, the Assigned Contracts or the Assigned Personal Property Leases and including the proceeds thereof, (v) all personnel records and other books, records, and files that the Seller is required by law to retain in its possession or that are protected by attorney client privilege, (vi) any patient records with respect to which the applicable patient(s) has objected to a transfer of such patient records to the Buyer, (vii) any Seller's deposit accounts, (viii) any Seller's cash as of the Closing Date that consists of the following: (A) any amounts budgeted to pay, but that have not been paid to applicable parties or funded to the trust account of Seller's

- 3 -

bankruptcy counsel, under the "*Professional Fees*" category of the Budget (as defined in the DIP Note) (for the avoidance of doubt, any amounts that have been funded to the trust account of Seller's bankruptcy counsel also shall be treated as Excluded Assets), plus (B) the sum of $500,000 to fund a wind-down of Seller's estates (subsections (A) and (B) are together the "**Excluded Cash**"), (ix) any tax refunds, benefits, or proceeds relating to periods prior to the Closing Date, (x) any other prepaid assets or properties expressly set forth on Schedule 1.2 hereto, (xi) Seller's federal, state, and local tax obligations, (xi) any rights, claims or causes of action of any Seller against its current or former directors, officers, managers or equity holders, including claims made under any insurance policy covering same and the proceeds thereof, (xii) those items listed on Schedule 1.2 hereto, (xiii) any right and interest, if any, in and to any Letter of Credit or Cash Deposit (each as defined in the MPT Lease) held by MPT prior to the Closing, and (xiv) any books and records relating to any of the foregoing (such assets being referred to collectively as the "**Excluded Assets**").

      1.3.   Assumed Liabilities.

      a.   As of the Closing Date, subject to **Section 2.3**, Seller shall assign to Buyer and Buyer shall assume only Seller's obligations arising from events occurring on or after the Closing Date under those agreements and contracts designated specifically on Schedule 4.7 attached hereto as "**Assigned Personal Property Leases**," and on Schedule 4.16 attached hereto as "**Assigned Contracts**," and "**Assumed Employee Amounts**," as such term is defined in Section 6.7(b) of this Agreement. (The Assigned Personal Property Leases, Assigned Contracts, Assumed Employee Amounts, and obligations set forth in **Section 2.3** are together referred to as the "**Assumed Liabilities**"). For clarity and avoidance of doubt, the Assigned Contracts include the MPT Lease as modified by the MPT Lease Amendment. At or after the Sale Hearing, Seller shall seek authorization to assume and assign to Buyer the Assigned Contracts, the Assigned Personal Property Leases, and the MPT Lease as modified by the MPT Lease Amendment. The amounts, if any, required to cure all defaults under the Assigned Contracts and the Assigned Personal Property Leases, as required under the Bankruptcy Code or determined by the Bankruptcy Court pursuant to a final order (the "**Cure Costs**"), shall be paid on the Closing Date (except as otherwise agreed to by the applicable counterparty to any Assigned Contract or Assigned Personal Property Lease) by the Buyer directly to the applicable counterparty to each Assigned Contract and Assigned Personal Property Lease. Attached hereto as Schedule 1.3 is a listing of Seller's good faith estimate of the Cure Costs as of the Effective Date of this Agreement, which Schedule 1.3 may be updated by Seller and delivered to Buyer, on notice to each applicable counterparty, consistent with the procedures for the assumption and assignment of executory contracts and unexpired leases approved by the Bankruptcy Court in the Bankruptcy Case. Buyer may remove any Assigned Contract (other than the MPT Lease and the MPT Lease will in all events be listed or deemed listed on Schedule 4.16 for purposes of this Agreement) or any Assigned Personal Property Lease set forth on Schedule 4.16 and Schedule 4.18 at any time up to, and including, the Closing Date.

      b.   Collective Bargaining Agreements and Employee Benefit Plans. Subject to **Section 6.7(a)**, no later than January 14, 2022, Buyer will notify Seller if Buyer intends to assume any CBAs and/or which provisions Buyer will assume or request to modify. Seller will initiate negotiations under sections 1113 and/or 1114 of the Bankruptcy Code with the Unions to modify or reject the existing CBAs if Buyer so requests. Achievement of modified CBAs shall not be a

condition of Closing, though Seller agrees to seek modification of any CBA in good faith if Buyer so requests. Seller has the right independently of Buyer to seek modification and/or rejection of any CBA under sections 1113 and/or 1114 of the Bankruptcy Code and nothing in this Agreement waives such right. Buyer understands that it may have to set initial terms and conditions of employment and will not rely on Seller or its labor counsel with respect to post-Closing liabilities to the Unions. With respect to any Seller Employee Benefit Plan, on or before January 14, 2022, Buyer shall inform Seller whether Buyer intends to include any such Employee Benefit Plan as an Assigned Contract. Liabilities arising from any Employee Benefit Plans not designated as an Assigned Contract shall be considered Excluded Liabilities. For clarity and avoidance of doubt, Buyer will on or before January 14, 2022, inform Seller which Seller employee liabilities, if any, will be Excluded Liabilities, including, without limitation, liabilities relating to any pension plans, 401(k) plans, health and welfare plans, post-retirement medical reimbursement plans, and COBRA, and will coordinate transition between plans with the planned Closing.

1.4.    Excluded Liabilities. Except as expressly set forth in this Agreement, specifically including the obligations assumed by Buyer under the last sentence of **Section 2.1**, **Section 2.3**, and **Section 3.1(b)**, Buyer does not assume and will not be liable for any of the direct or indirect debts, Claims, Interests, Encumbrances, obligations or liabilities of Seller, any Affiliate of Seller, or the Business whenever arising and of whatever type or nature. In particular, but without limiting the foregoing, subject to the obligations assumed by Buyer under the last sentence of **Section 2.1**, **Section 2.3**, and **Section 3.1(b)**, Buyer will not assume, and will not be deemed by anything contained in this Agreement (other than to the extent expressly provided in **Section 1.3** above) to have assumed and will not be liable for any debts, obligations or liabilities of Seller, any Affiliate of Seller or the Business whether known or unknown, contingent, absolute or otherwise and whether or not they would be included or disclosed in financial statements prepared in accordance with GAAP (the "**Excluded Liabilities**"). Without limitation of the foregoing, subject to the obligations assumed by Buyer under the last sentence of **Section 2.1**, **Section 2.3**, and **Section 3.1(b)**, the Excluded Liabilities include debts, Claims, Interests, Encumbrances, liabilities and obligations: (a) under any real estate lease or any contract or agreement to which Seller is a party or by which Seller or the Business is bound that is not, as of the Closing Date, listed as an Assigned Contract on Schedule 4.1816 or any Personal Property Lease by which Seller or the Business is bound that has not been listed as an Assigned Personal Property Lease on Schedule 4.7; (b) with respect to any Assigned Contract or Assigned Personal Property Lease, arising from the period prior to the Closing Date (except for the Cure Costs); (c), arising out of any arrangements, agreements, understandings or commitments (including any CBAs, except for any such agreements designated as Assigned Contracts) with or on behalf of any employees or independent contractors providing professional medical or nursing services to the Business to which Seller is a party or by which Seller is bound from the period prior to the Closing Date; (d) arising out of Seller's obligation under any of the CBAs or otherwise required under the National Labor Relations Act to engage in effects bargaining with the Unions (unless assumed in this Agreement); (e) for, or relating to, any Employee Benefit Plan (unless designated as an Assigned Contract); (f) for any obligation for Taxes from the period prior to the Closing Date; (g) for any liability for local or state sales, use or transfer tax and taxes that may be imposed upon the sale or assignment of the Acquired Assets pursuant to this Agreement and the Assignment and Assumption and Bill of Sale from the period prior to the Closing Date; (h) for any damages or injuries to persons or property or for any malpractice, tort or strict liability arising from events, actions or inactions in the Business or the operation of the Business prior to the Closing Date; (i) arising out of any litigation arising

- 5 -

with respect to the period prior to the Closing Date, whether or not threatened or pending on or before the Closing Date; (j) incurred by Seller or the Business for borrowed money from the period prior to the Closing Date or that otherwise constitute indebtedness (including the Prepetition Loan Facility); (k) for any accounts payable of Seller or any Affiliate of Seller from the period prior to the Closing Date; and (l) for amounts due or that may become due to Medicare, Medicaid, Medi-Cal or any other health care reimbursement or payment intermediary, or other third-party payor on account of any payment adjustments attributable to any period prior to the Closing Date, or any other form of Medicare or other health care reimbursement recapture, adjustment or overpayment whatsoever, or any violation of any Law by Seller relating to Medicare, Medicaid, Medi-Cal or any other payor program, including fines and penalties, with respect to any period prior to the Closing Date (unless payable as a Cure Cost). The intent and objective of Buyer and Seller is that, except for liabilities explicitly assumed by Buyer hereunder, Buyer does not assume, and no transferee liability will attach to Buyer pertaining to, any of the Excluded Liabilities.

1.5.  <u>Instruments of Transfer</u>.  The sale of the Acquired Assets and the assumption of the Assumed Liabilities as herein provided shall be effected at Closing by the "**Assignment and Assumption and Bill of Sale**" in the form attached hereto as **Exhibit A**.

1.6.  <u>Payment of Sales Taxes</u>.  Buyer shall pay any and all sales, use or other transfer taxes payable by reason of the transfer and conveyance of the Acquired Assets hereunder unless no such taxes are due and payable pursuant to the Sale Order.  Seller will prepare, deliver and if necessary file at or before Closing all transfer tax returns and other filings necessary to vest in Buyer full right, title and interest in the Acquired Assets.

1.7.  <u>As Is, Where Is</u>.  Buyer is acquiring the Acquired Assets at the Closing "as is, where is" and, except as otherwise expressly provided in this Agreement, Buyer understands that Seller is making no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Acquired Assets or the Business.  Buyer acknowledges that it has conducted an independent inspection and investigation of the physical condition of all Acquired Assets and all such other matters relating to or affecting the Acquired Assets as Buyer deems necessary or appropriate and that in proceeding with its acquisition of the Acquired Assets, except for any representations and warranties expressly provided in this Agreement, Buyer is doing so based solely upon such independent inspections and investigations. Without limiting the foregoing, Seller hereby disclaims any warranty, express or implied, of merchantability or fitness for any particular purpose as to any portion of the Acquired Assets. Notwithstanding the foregoing, subject to and assuming entry of the Sale Order, Buyer is acquiring the Acquired Assets free and clear of all Encumbrances, to the maximum extent permitted under section 363(f) of the Bankruptcy Code and as set forth in the Sale Order.

**ARTICLE II**
**PURCHASE PRICE**

2.1.  <u>Consideration / Purchase Price</u>.  In reliance on Seller's representations, warranties and covenants, the purchase price to be paid by Buyer to Seller for the Acquired Assets and the other rights set forth herein (the "**Purchase Price**") shall consist of: (i) the amounts then due under the DIP Loan Documents (including the obligations under the DIP Loan Documents constituting the roll-up of $3,500,000 of the obligations under the Prepetition Loan Facility advanced

- 6 -

thereunder on November 30, 2021, but excluding any other amounts under the Prepetition Loan Facility rolled up as obligations under the DIP Loan Documents) to MPT up to $25,000,000, such amounts to be paid directly to MPT at the Closing by wire transfer of immediately available funds, plus (ii) the payment by Buyer of all Cure Costs to counterparties to the Assigned Contracts and Assigned Personal Property Leases, plus (iii) the Assumed Liabilities, (iv) the Assumed Employee Amounts, plus (v) $9,000,000 to be paid directly to MPT at the Closing by wire transfer of immediately available funds on account of its secured claim against the Seller's personal property assets and MPT's release of its security interests in the Acquired Assets. As additional consideration, if prior to termination of the Agreement a Sale Order is entered approving Buyer as the winning bidder for the Business, pending the Closing, Buyer shall fund Business operations and other administrative obligations of the Business and the Bankruptcy Case, including estate professional fees and any interest accrued and payable in cash under and pursuant to the DIP Loan Documents from and after April 1, 2022, (without recourse to the Seller or MPT) irrespective of whether the Closing is ultimately consummated, pursuant to a budget to be agreed upon by Seller and Buyer, and sufficient to the reasonable satisfaction of Seller and MPT to maintain a patient standard of care and operations of Seller consistent with its current levels (the "**Extended Budget**").

2.2. <u>Deposit</u>. On or before February 14, 2022, Buyer shall pay to Seller or its designee the sum of $4,400,000 in immediately available funds (the "**Deposit**") to be held in accordance with the terms of this Agreement. If the Closing occurs, the Deposit shall be released to Seller or MPT, as applicable, and applied to the Purchase Price. If this Agreement terminates pursuant to **Section 9.1(a), Section 9.1(b), Section 9.1(c)** (solely in the event of Seller's breach of this Agreement), **Section 9.1(d)** (except that the failure of Buyer to have received all Third-Party Consents, Governmental Approvals, and Regulatory Agreements required under **Section 8.1(f)** shall not entitle Buyer to a refund of the Deposit), **Section 9.1(e)**, or **Section 9.1(h)**, the Deposit shall be returned to Buyer. If this Agreement is terminated on any other basis pursuant to Section 9.1 (except **Section 9.1(i)**), the Deposit will be forfeited by Buyer and retained by Seller. Seller shall have no legal or equitable remedies against Buyer for any breaches of this Agreement by Buyer other than retaining the Deposit under this **Section 2.2**.

2.3. <u>No Pro-Rations</u>. Seller shall pay, consistent with its rights, duties and obligations under the DIP Note, all Operating Expenses incurred by Seller in the ordinary course with respect to the Business, as they come due through the earlier of the Closing Date or March 31, 2022. Buyer shall be responsible for funding all obligations under the Extended Budget, including previously incurred Operating Expenses that may be accrued but unpaid as of April 1, 2022, as they come due or are otherwise payable from and after April 1, 2022, as set forth in the last sentence of **Section 2.1** and **Section 3.1(b)**. For purposes of this section, "Operating Expenses" means all budgeted postpetition business expenses under the "*Operations Spend*" category of the Budget (as defined in the DIP Note) for the period from the Petition Date through March 31, 2022. For the avoidance of doubt, from and after the Closing Date, excluding any obligations of Seller to be paid from the Excluded Cash, Buyer shall be responsible for satisfying all accrued, but unpaid, Operating Expenses and any other postpetition accounts payable of Seller from the period prior to the Closing Date, whenever such amounts may come due. Nothing in this section shall alter or affect Buyer's responsibility for those expenses of the Business and the Acquired Assets that are incurred following the Closing Date.

2.4. <u>Allocation of Purchase Price</u>. The Purchase Price and any liability or other amount that is properly included in the amount realized by Seller or the cost basis to Buyer with respect to the purchase and sale of the Acquired Assets will be allocated to the Acquired Assets in accordance with Treasury Regulations § 1.1060-1(c) as set forth in an allocation schedule that is provided by the Buyer to the Seller within ninety (90) days after the Closing Date (the "**Allocation**"). Buyer and Seller shall report the transactions contemplated by this Agreement for federal and state income tax purposes in accordance with the Allocation and shall not (and shall cause their respective Affiliates not to) take any position inconsistent with the Allocation. The parties shall execute all forms required to be filed for tax purposes with any taxing authority in a manner consistent with the Allocation.

2.5. <u>Negotiated Value</u>. The Purchase Price, and the Allocation determined pursuant to **Section 2.4**, shall reflect the fair value of the Business and the fair values of the Acquired Assets, respectively, agreed to by the parties hereto as a result of arms' length negotiations. No consideration is or will be paid for the value of any patient referrals (direct or indirect) to or from Buyer, Seller, or any of their respective Affiliates.

**ARTICLE III**
**CLOSING**

3.1. <u>Closing</u>.

a. Subject to **Section 8.1(f)**, the closing of the sale and purchase of the Acquired Assets (the "**Closing**") will take place no later than the fifth (5th) business day following the date on which all of the conditions to closing set forth in **Article VIII** below are fully satisfied (other than the conditions that by their nature are to be satisfied at the Closing), or on such other date as the parties may mutually agree (the "**Closing Date**") at the offices of Buyer's counsel located in Los Angeles, California, or by electronic or facsimile transmission and United States or overnight mail. Buyer and Seller shall proceed to the Closing as promptly as possible after entry of the Sale Order. Closing will be deemed to have occurred at 12:01 a.m. Pacific time on the day immediately following the Closing Date.

b. <u>Closing Extensions and Associated Funding</u>. Buyer and Seller acknowledge that the Closing Date may occur at any time prior to August 31, 2022, provided the conditions to closing set forth in **Article VIII** have been fully satisfied. In the event, however, that Buyer is unable to close by March 31, 2022, and seeks additional time to effectuate a Closing, Buyer has agreed to fund Seller's Business operations and the administrative expenses of the Bankruptcy Case, including estate professional fees and interest accrued and payable in cash under the DIP Loan Documents, for any such extension requested by Buyer pursuant to the Extended Budget. For purposes of this section, "Monthly Funding" means funding in the amount of $2,500,000 per month that is needed by Seller for each month during the period covered by the Extended Budget. Buyer shall be entitled to extend the Closing Date through August 31, 2022, if Buyer notifies Seller in writing no less than thirty-five (35) days prior to each of April 1, 2022, May 1, 2022, June 1, 2022, July 1, 2022, and August 1, 2022, that Buyer intends to make the Monthly Funding for each applicable month consistent with the Extended Budget (for example, Buyer will notify Seller that Buyer seeks an extension of the Closing Date to April 30, 2022, no later than February 25, 2022). Assuming that the foregoing monthly notice is timely delivered

- 8 -

by Buyer to Seller, then Buyer shall be required to pay the Monthly Funding so that it is received by Seller by no later than five (5) business days before each of April 1, 2022, May 1, 2022, June 1, 2022, July 1, 2022, and August 1, 2022. If, at any time, Buyer fails to timely provide the applicable Monthly Funding, Seller shall be entitled to terminate this Agreement and retain the Deposit. If the Closing Date occurs before the Monthly Funding applicable to any period has been used for any pre-Closing expenses or reserved for other obligations incurred or accrued through such date under the Extended Budget, the excess amount shall be included in the Acquired Assets, but shall not reduce the Purchase Price.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

Each Seller hereby represents and warrants to Buyer, as of the Effective Date and as of the Closing Date (except for those representations and warranties that are made as of the Closing Date only, which are true and correct as of the Closing Date), and only with respect to itself, as follows:

4.1. <u>Organization, Good Standing and Qualification</u>. Except as set forth on <u>Schedule 4.1</u>, (i) Watsonville Hospital Corporation is a Delaware corporation duly incorporated, validly existing and in good standing under the provisions of the laws of the State of Delaware, and is qualified and licensed to do business in every other jurisdiction in which it conducts business or in which the nature of its business and operations would require qualification as a foreign corporation; (ii) Watsonville Healthcare Management, LLC is a Delaware limited liability company duly organized, validly existing and in good standing under the provisions of the laws of the State of Delaware, and is qualified and licensed to do business in every other jurisdiction in which it conducts business or in which the nature of its business and operations would require qualification as a foreign limited liability company; (iii) Halsen Healthcare, LLC is a California limited liability company duly organized, validly existing and in good standing under the provisions of the laws of the State of California, and is qualified and licensed to do business in every other jurisdiction in which it conducts business or in which the nature of its business and operations would require qualification as a foreign limited liability company; and (iv) Watsonville Hospital Holdings, Inc. is a California corporation duly incorporated, validly existing and in good standing under the provisions of the laws of the State of California, and is qualified and licensed to do business in every other jurisdiction in which it conducts business or in which the nature of its business and operations would require qualification as a foreign corporation. Except as set forth on <u>Schedule 4.1</u>, Seller has all requisite corporate power and authority to own, operate, and to carry on the Business as now conducted. Except as set forth on <u>Schedule 4.1</u>, Seller has all corporate power and authority to enter into all of the Acquisition Agreements to which Seller is a party and to carry out and perform its obligations under the Acquisition Agreements.

4.2. <u>Authorization; Binding Obligation</u>. Subject to Bankruptcy Court approval, Seller has full legal corporate right, power and authority to execute and deliver the Acquisition Agreements to which Seller is a party, and to carry out the transactions contemplated thereby. Subject to Bankruptcy Court approval, the execution and delivery by Seller of the Acquisition Agreements and all of the documents and instruments required thereby and the consummation of the transactions contemplated thereby have been duly authorized by all requisite action on the part of Seller. The Acquisition Agreements to which Seller is a party and each of the other documents and instruments required thereby or delivered in connection therewith have been duly executed

- 9 -

DOCS_SF:106516.11 92381/001

Case: 21-51477    Doc# 287    Filed: 02/00/22    Entered: 02/00/22 12:25:50    Page 52 of
Doc# 277          Filed: 02/04/22    Entered: 02/04/22 12:23:59    Page 72 of
                  191    118

and delivered by Seller, and constitute the legal, valid and binding obligations of Seller, enforceable against them in accordance with their respective terms, subject to Bankruptcy Court approval.

4.3.    Consents and Approvals.

(a)    Governmental Consents and Approvals.    Except for the Regulatory Agreements and Licenses and subject to Bankruptcy Court approval, and except as set forth on Schedule 4.3(a) attached hereto, no notice, registration or filing with, or consent or approval of, or other action by, any federal, state or other governmental agency or instrumentality is or will be necessary for the valid execution, delivery and performance of this Agreement by Seller and the transfer of the Acquired Assets to Buyer (each, a "**Governmental Approval**").

(b)    Third-Party Consents.    Except for Regulatory Agreements and Licenses and subject to Bankruptcy Court approval, and except as set forth on Schedule 4.3(b) attached hereto, no notice to, consent, approval or authorization of, any non-governmental third party is required to consummate the transactions or perform the related covenants and agreements contemplated hereby or to vest full right, title and interest in the Acquired Assets free and clear of any Encumbrances upon Buyer, all without any change in the Acquired Assets and all rights therein after Closing (each, a "**Third-Party Consent**").

4.4.    No Violation.    The execution, delivery, compliance with and performance by Seller of the Acquisition Agreements and each of the other documents and instruments delivered in connection therewith do not and will not (a) violate or contravene the organizational certificates, documents and agreements, as amended to date, of Seller, (b) subject to and assuming entry of the Sale Order, violate or contravene any law, statute, rule, regulation, order, judgment or decree to which Seller is subject, (c) subject to and assuming entry of the Sale Order and except as set forth on Schedule 4.3(b), conflict with or result in a breach of or constitute a default by any party under any contract, agreement, instrument or other document to which Seller is a party or by which Seller or any of its assets or properties are bound or subject or to which any entity in which Seller has an interest, is a party, or by which any such entity is bound, or (d) result in the creation of any Lien upon the Acquired Assets or the Business therein; other than, as to clauses (b) and (c), such violations, conflicts, breach, default, fees, payments, increases, charges, modifications, terminations, cancellations, accelerations or losses that would not have, individually or in the aggregate, a Seller Material Adverse Effect.

4.5.    Licenses and Permits.    Schedule 4.5 attached hereto contains a true, correct and complete list and summary description of all Licenses that have been issued to Seller in connection with the Acquired Assets or the Business (the "**Seller Licenses**").    Schedule 4.5 specifies the holder of each Seller License.

4.6.    Acquired Assets.    Seller is the sole and exclusive legal and equitable owner of all right, title and interest in, and has good, clear, indefeasible, insurable and marketable title to, all of the Acquired Assets free of all Liens, except for those capital leases and other indebtedness set forth on Schedule 4.6 attached hereto.    The Acquired Assets together with the Excluded Assets include all assets, properties and rights used or found useful by Seller in connection with the Business.

4.7.    Leases of Personal Property.  For purposes of this Agreement, "**Personal Property Leases**" means any lease, conditional or installment sale contract, Lien or similar arrangement to which any tangible personal property used by Seller in connection with the operation of the Business is subject.  Except as set forth on Schedule 4.7 attached hereto, none of the tangible personal property used by Seller in connection with the operation of the Business is subject to a Personal Property Lease.  Seller has delivered to Buyer a complete and correct copy of each Personal Property Lease listed on Schedule 4.7.  Buyer may agree to assume at the Closing any Personal Property Lease separately designated on Schedule 4.7 (each, an "**Assigned Personal Property Lease**").

4.8.    Absence of Certain Events.  Except as noted on Schedule 4.8 attached hereto, since January 1, 2021, with respect to the Business, to Seller's Knowledge there has not been:

(a)    any material damage or destruction of any of the assets utilized in the Business by fire or other casualty, whether or not covered by insurance;

(b)    any change in any of the accounting principles adopted by Seller, or any change in Seller's policies, procedures, or methods with respect to applying such principles; or

(c)    any action that if taken after the Effective Date would constitute a breach of any of the covenants in **Section 6.1** below.

4.9.    Legal Proceedings.  Other than the Bankruptcy Case or as listed on Schedule 4.9, there is no action, suit, litigation, proceeding or investigation pending or, to Seller's Knowledge, threatened by or against Seller, relating directly or, to Seller's Knowledge, indirectly to the Business or the Acquired Assets that could result in a Seller Material Adverse Effect, and Seller has not received any written or oral claim, complaint, incident, report, threat or notice of any such proceeding or claim and there is no basis therefore, except for payment defaults and demands for payment.  There are no outstanding orders, writs, judgments, injunctions or decrees of any court, governmental agency or arbitration tribunal against, involving or affecting Seller, the Business or the Acquired Assets that could result in a Seller Material Adverse Effect.  To Seller's Knowledge, neither Seller nor the Business is in default with respect to any order, writ, injunction or decree known to or served upon it from any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that could result in a Seller Material Adverse Effect.

4.10.    Payment Programs.

(a)    All Payment Programs in which Seller has participated at any time during the last three (3) years are listed on Schedule 4.10 attached hereto (the "**Seller Payment Programs**").  Buyer acknowledges that Payment Programs may also be identified on Schedule 4.16.

(b)    Neither Seller, nor, to Seller's Knowledge, any of its respective officers, managers, directors or employees has been or is currently suspended, excluded or debarred from contracting with any governmental authority or from participating in any Payment Program or has been or is subject to any fine, penalty, or sanction by any governmental authority or pending or

- 11 -

threatened investigation, audit or proceeding by any governmental authority that could result in such suspension, exclusion, or debarment.

4.11. <u>Compliance with Laws</u>.

(a) <u>Schedule 4.11</u> attached hereto lists all written claims and statements (including all correspondence or communications with governmental agencies, contractors, intermediaries or carriers) concerning or relating to any federal or state government funded health care program that involves, relates to or alleges (i) any material violation of any applicable rule, regulation, policy or requirement of any such program or any irregularity with respect to any activity, practice or policy of Seller or the Business; or (ii) any material violation of any applicable rule, regulation, policy or requirement of any such program or any irregularity with respect to any claim for payment or reimbursement made by Seller or the Business or any payment or reimbursement paid to Seller or the Business.

(b) Seller has not received any notice to the effect that, or otherwise been advised that, Seller or the Business is not in material compliance with any Laws, except as set forth on <u>Schedule 4.11</u> attached hereto.

4.12. <u>Employees</u>.

(a) Seller has provided to Buyer a true and accurate list of each Seller Employee as of the Effective Date, together with such person's position, date of hire, current salary, and accrued paid time off, and amount of any other accrued benefits to which such person may be entitled or for which such person has made either written or oral claim to Seller. Except as indicated on such list, no Seller Employee has an employment agreement with Seller.

(b) Except as set forth on <u>Schedule 4.12(b)</u>, Seller is not a party to any collective bargaining contracts or any other contracts, agreements or understandings with any labor unions or other representatives of the Seller Employees.

4.13. <u>Benefit Plan</u>. <u>Schedule 4.13</u> attached hereto sets forth a list of each Employee Benefit Plan.

4.14. <u>No Brokers</u>. Except for Cowen and Company, LLC, Seller has not directly or indirectly, or incurred any liability to, any broker, finder or other agent in connection with the transactions contemplated by this Agreement. Seller and its Affiliates shall indemnify and hold harmless Buyer from any claims brought by any broker, finder or other agent claiming to have acted on behalf of Seller or an Affiliate of Seller in connection with the purchase and sale of the Acquired Assets or the Business.

4.15. <u>Taxes</u>. Except as set forth on <u>Schedule 4.15</u> attached hereto, Seller has filed, or has caused to be filed, on a timely basis and subject to all permitted extensions, all Tax Returns with the appropriate governmental agencies in all jurisdictions in which such Tax Returns are required to be filed.

4.16. <u>Contracts</u>.

(a)     For purposes of this Agreement, "**Contracts**" means all agreements, contracts and commitments, written or oral, directly related to the Business, to which Seller is a party or by which Seller or the Acquired Assets or the Business is bound including (i) notes, loans, credit agreements, mortgages, indentures, security agreements, operating leases, capital leases and other agreements and instruments relating to the borrowing of money or extension of credit and any contract of suretyship or guaranty; (ii) all employment and consulting agreements and arrangements (including agreements for medical director services), and all bonus, compensation, pension, insurance, retirement, deferred compensation and other plans, agreements, trusts, funds and other arrangements for the benefit of employees; (iii) agreements with health care providers, including visiting nurses associations, health maintenance organizations, hospitals and long-term care facilities; (iv) agreements, orders or commitments for the purchase by Seller of inventories and supplies that involve annual purchases exceeding $10,000; (v) agreements, orders or commitments for the sale or lease to customers of goods or services that involve annual sales exceeding $10,000; (vi) licenses of patents, copyrights, trademarks and other intangible property rights; (vii) agreements or commitments for capital expenditures in excess of $10,000 for any single project; (viii) provider and supplier agreements with Payment Programs; (ix) any joint venture, partnership or other agreement involving a share of profits or losses; (x) any contract, agreement or arrangements with any Affiliate; (xi) any agreement restricting competition or the business activities of any person or entity; (xii) any agreement for the purchase or sale of any Acquired Asset; (xiii) [reserved]; and (xiv) any other agreements or obligations pursuant to which Seller receives any payment in excess of $10,000 per year (*e.g.*, any clinical study program). <u>Schedule 4.16</u> contains a complete and correct list of Contracts, including a complete description for any oral Contracts.  Each Contract listed on <u>Schedule 4.16</u> is a Contract that Seller has agreed to assign and that Buyer may agree to assume at the Closing (each, an "**Assigned Contract**").

(b)     Seller has made no prepayments or deposits under any Contract except as set forth on <u>Schedule 4.16</u>.

4.17. <u>Leased Real Property</u>.

(a)     <u>Schedule 4.17(a)</u> sets forth each parcel of real property leased by Seller and used in the conduct of the Business as currently conducted (together with all rights, title and interest of Seller in and to leasehold improvements relating thereto, including security deposits, reserves or prepaid rents paid in connection therewith, collectively, the "**Leased Real Property**"), and a true and complete list of all leases, subleases, licenses, concessions and other agreements (whether written or oral), including all amendments, extensions renewals, guaranties and other agreements with respect thereto, pursuant to which Seller holds any Leased Real Property (collectively, the "**Leases**").  Seller has delivered to Buyer a true and complete copy of each Lease. With respect to each Lease, except as set forth on <u>Schedule 4.17(a)</u>:

(i)     Seller has not subleased, assigned or otherwise granted to any Person the right to use or occupy such Leased Real Property or any portion thereof; and

(ii)    Seller has not pledged, mortgaged or otherwise granted an Encumbrance on its leasehold interest in any Leased Real Property.

- 13 -

(b)     Except as set forth on <u>Schedule 4.17(b)</u>, since January 1, 2021, Seller has not received any written notice of (i) material violations of building codes and/or zoning ordinances or other governmental or regulatory Laws affecting the Real Property, (ii) existing, pending or threatened condemnation proceedings affecting the Real Property, or (iii) existing, pending or threatened zoning, building code or other moratorium proceedings, or similar matters which could reasonably be expected to adversely affect the ability to operate the Real Property as currently operated.  Neither the whole nor any material portion of any Real Property has been damaged or destroyed by fire or other casualty.

4.18.    <u>Financing Statements</u>.  To Seller's Knowledge, there are no financing statements under the Uniform Commercial Code that name Seller as debtor or lessee filed in any state, except as set forth on <u>Schedule 4.18</u> attached hereto.  Except for those no longer in effect, Seller has not signed any financing statement or any security agreement under which a secured party thereunder may file any such financing statement.

4.19.    <u>Insurance</u>.  Seller is, and will through the Closing Date be, insured with insurers (including general liability insurance coverage of the Acquired Assets and Premises and professional liability coverage) against risks normally insured against by similar businesses under similar circumstances.  <u>Schedule 4.19</u> attached hereto correctly describes, by type, carrier, policy number, limits, premium and expiration date, the insurance coverage carried by Seller, which insurance will remain in full force and effect in accordance with policy terms, with respect to all events occurring prior to the Closing Date.  <u>Schedule 4.19</u> also states whether each such policy is carried on a "*claims made*" or "*occurrence*" basis.  All such insurance policies are owned by and payable solely to Seller, unless other or additional beneficiaries are identified in the applicable policy.

4.20.    <u>Intellectual Property</u>.  <u>Schedule 4.20</u> attached hereto sets forth a list of Intellectual Property owned, controlled or used by Seller, together in each case with a brief description of the nature of such right.  Except as set forth on <u>Schedule 4.20</u>, Seller has not granted any person or entity any right or license to use any of the Intellectual Property for any purpose.

4.21.    <u>NO OTHER REPRESENTATIONS OR WARRANTIES</u>.  EXCEPT FOR THE REPRESENTATIONS NOR AND WARRANTIES CONTAINED IN THIS ARTICLE IV, NONE OF THE SELLERS NOR ANY OTHER PERSON ON BEHALF OF THE SELLERS MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO ANY OF THE SELLERS OR WITH RESPECT TO ANY OTHER INFORMATION PROVIDED TO BUYER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY, INCLUDING AS TO THE PROBABLE SUCCESS OR PROFITABILITY OF THE OWNERSHIP, USE OR OPERATION OF THE BUSINESS, OR THE ACQUIRED ASSETS FOLLOWING THE CLOSING.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer hereby represents, warrants and covenants to Seller, as of the Effective Date and as of the Closing Date, as follows:

5.1.    Organization, Good Standing and Qualification.  Buyer is a nonprofit public benefit corporation organized under the California Nonprofit Public Benefit Corporation Law for public purposes and is validly existing and in good standing under the laws of the State of California. Buyer has all requisite corporate power and authority to enter into this Agreement and to carry out and perform its obligations under the Acquisition Agreements to which Buyer is a party.

5.2.    Authorization; Binding Agreement.  Buyer has the corporate power and authority to execute and deliver this Agreement, and to carry out the transactions contemplated hereby.  The execution and delivery by Buyer of the Acquisition Agreements to which Buyer is a party and all of the documents and instruments required thereby and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite company action on the part of Buyer.  The Acquisition Agreements to which Buyer is a party and each of the other documents and instruments required hereby have been duly executed and delivered by Buyer and constitute the valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms.

5.3.    Legal Proceedings.  There are no actions, suits, litigation, or proceedings pending or, to Buyer's knowledge without inquiry, threatened against Buyer that could materially adversely affect Buyer's ability to perform its obligations under this Agreement or the consummation of the transactions contemplated by this Agreement.

5.4.    No Brokers.  Buyer has not employed, either directly or indirectly, or incurred any liability to, any broker, finder or other agent in connection with the transactions contemplated by this Agreement.  Buyer shall indemnify Seller for any claims brought by any broker, finder or other agent claiming to have acted on behalf of Buyer in connection with this sale.

5.5.    No Violation.  The execution, delivery, compliance with and performance by Buyer of the Acquisition Agreements to which Buyer is a party and each of the other documents and instruments delivered in connection therewith do not and will not (a) violate or contravene the articles of organization or operating agreement, as amended to date, of Buyer, (b) to Buyer's knowledge without inquiry, violate or contravene any law, statute, rule, regulation, order, judgment or decree to which Buyer is subject, or (c) conflict with or result in a breach of or constitute a default under any contract, agreement, instrument or other document or contract to which Buyer is a party or by which Buyer or any of its assets or properties are bound or to which Buyer or any of its assets or properties are subject.

## ARTICLE VI
## COVENANTS

6.1.    Conduct of the Business Pending Closing.  Between the Effective Date and the Closing Date, and subject to any limitations and restrictions created by the lack of available funds or the provisions of the Bankruptcy Code, unless Buyer consents in writing, (i) Seller shall conduct the Business only in, and Seller shall not take any action except in, the ordinary course of business consistent with past practice, (ii) Seller shall use commercially reasonable efforts to keep available the services of Seller Employees and to preserve the current relationships of the Business with such of the patients, suppliers, physicians and other persons with which Seller has significant business relations so to preserve substantially intact the Business, and (iii) Seller shall use

- 15 -

commercially reasonable efforts to preserve intact the Acquired Assets. By way of amplification and not limitation, between the Effective Date and the Closing Date, the Seller shall not, and shall neither cause nor permit any of Seller's Affiliates, officers, directors, managers, employees and agents to, directly or indirectly, do, or agree to do, any of the following with respect to the Business or the Acquired Assets, without the prior written consent of Buyer, except as permitted by an order of the Bankruptcy Court:

(a)     Sell, pledge, dispose of, grant, transfer, lease, license, guarantee, encumber, or authorize the sale, pledge, disposition, grant, transfer, lease, license, guarantee or encumbrance of the Business, or any membership interests of Seller, or any of the Acquired Assets except in the ordinary course of business and in a manner consistent with past practice; *provided that* the aggregate amount of any such sale or disposition (other than a sale or disposition of products or other inventory in the ordinary course of business consistent with past practice, as to which there will be no restriction on the aggregate amount), or pledge, grant, transfer, lease, license, guarantee or encumbrance of such property or assets will not exceed $10,000;

(b)     Acquire (including by merger, consolidation or acquisition of stock or assets) for or in connection with the Business any interest in any corporation, partnership, other business organization, person or any division thereof or any assets, other than (i) acquisitions of assets in the ordinary course of business consistent with past practice, or (ii) purchases of inventory for resale or consumption (whether for cash or pursuant to an exchange) in the ordinary course of business and consistent with past practice;

(c)     Enter into, amend, terminate, cancel or make any material change in any Contract or Personal Property Lease except in the ordinary course of business and in a manner consistent with past practice, but shall not assume or reject any such Contract or Personal Property Lease without Buyer's consent;

(d)     Make or authorize any dividends or distributions to holders of equity or membership interests in Seller;

(e)     Increase the compensation payable or to become payable to any Seller Employee, except in the ordinary course of business and in a manner consistent with past practice, but shall not assume or reject any Contract with an Employee without Buyer's consent, or grant any rights to severance or termination pay to, or enter into any employment or severance agreement with, any Seller Employee, or establish, adopt, enter into or amend any collective bargaining, bonus, profit sharing, thrift, compensation, pension, retirement, deferred compensation, employment, termination, severance or other plan, agreement, trust, fund, policy or arrangement for the benefit of any Seller Employee;

(f)     Modify any material accounting policies, procedures or methods;

(g)     Take any action that could result in the representations and warranties set forth in **Article IV** above becoming materially false or inaccurate;

(h)     Fail to maintain a patient standard of care and operate Seller during the Bankruptcy Case consistent with its current level of operations through the Closing Date; or

- 16 -

(i)    Take any action or fail to take any action that could result in a Seller Material Adverse Effect.

6.2.    <u>Notice by Seller of Certain Events</u>.  Between the Effective Date and the Closing Date, except as to any filings in the Bankruptcy Case, Seller shall give prompt written notice to Buyer of (a) any notice or other communication from any person alleging that the consent of such person is or may be required in connection with the consummation of the transactions contemplated by this Agreement; (b) any notice or other communication from any governmental entity in connection with the transactions contemplated by this Agreement; (c) any actions, suits, claims, investigations or proceedings commenced or, to Seller's Knowledge, threatened against, relating to or involving or otherwise affecting Seller, the Business or the Acquired Assets or the transactions contemplated by this Agreement; (d) the occurrence of a breach or default or event that, with notice or lapse of time or both, could become a breach or default under this Agreement or any Contract or Personal Property Lease; (e) any Seller Material Adverse Effect, event or circumstance that is likely to delay or impede the ability of Seller to consummate the transactions contemplated by this Agreement or to fulfill its obligations set forth herein; (f) any incurrence of indebtedness for borrowed money or any issuance of any guarantee for any debt; or (g) any waiver, release, settlement or compromise of any claims or litigation.  Buyer's receipt of information pursuant to this **Section 6.2** shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement and shall not be deemed to amend or supplement the Schedules hereto.

6.3.    <u>Efforts and Further Assurances</u>.

(a)    <u>Efforts</u>.  Buyer shall use best efforts to (x) obtain prior to the Closing Date all Third-Party Consents, Licenses, Governmental Approvals, and Regulatory Agreements and (y) timely satisfy the Legislative and Funding Milestones.  If a Third-Party Consent, License, Governmental Approval, or Regulatory Agreement is not obtained and delivered at Closing and Buyer waives in writing such requirement, (i) neither this Agreement nor any action taken hereunder will be deemed to constitute an assignment of any Acquired Asset or any Contract if such assignment or attempted assignment would constitute a breach, or cause a violation, of any Acquired Asset or Contract or result in the loss or diminution of any rights thereunder or acceleration of any obligations thereunder, and (ii) Seller shall cooperate with Buyer in any reasonable arrangement proposed by Buyer designed to provide Buyer with the benefits of the Acquired Asset and Contract as to which such Third-Party Consent relates, including enforcement by Seller (at Buyer's expense), for the account and benefit of Buyer, of any and all rights of Seller against any other person arising out of the breach or cancellation of any such Acquired Asset or Contract by such other person or otherwise; *provided that* if the Sale Order approves the assignment of an Acquired Asset or Contract without regards to any Third-Party Consent, any such Third-Party Consent need not be consensual.

(b)    <u>Further Assurances</u>.  Each of the parties hereto shall, from time to time after the Closing Date, upon the reasonable request of any other party hereto and at the expense of such requesting party, duly execute, acknowledge and deliver all such further instruments and documents reasonably required to further effectuate the interests and purposes of this Agreement.  The parties hereto agree to assist one another in good faith with respect to the transition of the Acquired Assets to Buyer.  From and after the Closing Date, Seller shall cooperate with Buyer and

- 17 -

promptly sign and deliver to Buyer any and such additional documents, instruments, endorsements and related information and take actions as Buyer may reasonably request, for the purpose of effecting the transfer of the Acquired Assets to Buyer and/or carrying out the provisions of this Agreement (including, *inter alia*, delivering post-Closing Date accounts receivable, refunds, and insurance payments to Buyer that constitute Acquired Assets).

6.4.     Preservation of and Access to Information and Records.

(a)     After the Closing, Buyer shall keep and preserve all medical records and other books and records relating to the Business and/or the Acquired Assets existing as of the Closing and that are delivered to Buyer by Seller; *provided that*, subject to the last two (2) sentences of this sub-section, Buyer may dispose of such records in accordance with applicable law or Buyer's records retention and disposition policies from time to time in effect. Upon reasonable notice, subject to patient confidentiality and during regular business hours and at mutually agreeable times, Buyer will afford the representatives of Seller, including its counsel and accountants, full and complete access to, and copies of (at the sole cost and expense of Seller), the patient medical records and other books and records transferred to Buyer at Closing. Notwithstanding the foregoing, should Buyer wish to destroy such records or any portion thereof, Buyer shall first notify Seller of its intent and Seller will have thirty (30) days following its receipt of such notice to notify Buyer of its intent to reclaim any such records in whole or in part. Seller shall take possession of such records no later than ten (10) days following Seller's delivery of such notice of intent.

(b)     After the Closing, Seller shall keep and preserve all medical records and other records of the Business as of Closing that are not delivered to Buyer by Seller and that are required to be kept and preserved by applicable Law or in connection with any claim or controversy pending at Closing involving the Business; *provided*, *that*, subject to the last two (2) sentences of this sub-section, Seller may dispose of such records in accordance with Seller's records retention and disposition policies from time to time in effect. From and after the Closing Date, for such period as is required by Law or in connection with any claim or controversy pending at Closing involving the Business, Buyer and Seller shall retain and make available to representatives of Seller or Buyer, respectively, including its counsel and accountants, upon reasonable notice, subject to patient confidentiality and during regular business hours and at mutually agreeable times, full and complete access to, and copies of (at the sole cost and expense of Buyer), any such records of the Business or relating to the Acquired Assets prior to the Closing Date and access to personnel as may be reasonably necessary to comply with applicable Law, prepare tax returns, or to resolve any such pending dispute. Notwithstanding the foregoing, should Seller wish to destroy such records or any portion thereof, Seller shall first notify Buyer of its intent and Buyer will have thirty (30) days following its receipt of such notice to notify Seller of its intent to reclaim any such records in whole or in part. Buyer shall take possession of such records no later than ten (10) days following Buyer's delivery of such notice of intent.

6.5.     Access to Information. From the date hereof until the Closing, Seller shall (a) afford Buyer and its representatives full and free access to and the right to inspect all of the real property, properties, assets, premises, non-privileged books and records (subject to any limitation imposed by Law), Contracts and other documents and data related to the Business; (b) furnish Buyer and its representatives with such financial, operating and other non-privileged data and

- 18 -

information related to the Business as Buyer or any of its representatives may reasonably request; and (c) instruct the representatives of Seller to cooperate with Buyer in its investigation of the Business. Any investigation pursuant to this **Section 6.5** shall be conducted in such manner as not to interfere unreasonably with the conduct of the Business or any other businesses of Seller. No investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement.

6.6. <u>Regulatory Agreements</u>. Prior to the Closing Date, Buyer shall negotiate the Regulatory Agreements on terms reasonably acceptable to Buyer, and Buyer shall obtain all Governmental Approvals, Licenses, and Third Party Consents necessary to consummate the transactions contemplated by this Agreement.

6.7. <u>Employment Matters</u>.

(a) Effective as of the Closing Date, the District or other designee of Buyer shall offer employment to (i) at least the minimum number of Seller Employees at the Business location as specified on <u>Schedule 6.7(a)</u> attached hereto and who are not represented by any of the Unions, and (ii) each of the Seller Employees who are represented by any of the Unions, and subject to the terms and conditions of those certain Collective Bargaining Agreements by and between Watsonville Hospital Corporation and the respective Unions (collectively, the "**CBAs**"), as such CBAs may be amended, replaced or superseded by agreements with Buyer and the respective Unions. Buyer shall offer employment to all employees who submit an application for employment by any reasonable deadlines set in accordance with the respective CBAs. Buyer shall provide a reasonable amount of time between making the employment offer and the deadline for acceptance of employment. Employment offers shall be mailed and also transmitted via email where available. Alternatively, Buyer may set up an employment portal to process applications and make offers of employment. Effective as of the Closing Date, Seller will terminate the employment of the Seller Employees. Buyer shall cooperate in placing any information in the employment application or offer letter necessary to effectuate the hire of Seller Employees. Those Seller Employees who accept Buyer's offer of employment as of the Closing Date shall be hereinafter referred to as "**Transferring Employees**."

(b) Except to the extent that such amounts have been paid by Seller prior to the Closing Date, Buyer or Buyer's designee shall assume liability for the following (collectively, the "**Assumed Employee Amounts**"): (i) any compensation, benefits, and corresponding Taxes (including any withholding obligations related thereto) payable to or on behalf of any Seller Employee on or after the Closing Date (whether or not such amounts accrued before, on, or after the Closing Date), and (ii) the obligations set forth in <u>Schedule 6.7(b)</u> attached hereto (the "**Assumed Non-Cash Employee Obligations**").

(c) All Transferring Employees, other than those represented by any of the Unions, shall be employees at will, subject to Buyer's or its Affiliate's employment policies and offered medical, dental, vision and retirement plan benefits. Nothing herein shall obligate Buyer or an Affiliate of Buyer to employ the Transferring Employees for any specific time period. Nothing in this **Section 6.7** shall be construed to grant any employee any rights as a third-party

- 19 -

beneficiary. Seller shall retain all liabilities with respect to any and all Seller Employees who are not Transferring Employees.

(d)     Buyer will not assume any liability or responsibility for any benefit or other obligations arising out of or under any Employee Benefit Plan (unless such plan is an Assigned Contract) to which any Transferring Employee, or any Seller Employee who is not a Transferring Employee, is or may be entitled to without regard to whether such obligation or responsibility arises under the terms of such Employee Benefit Plan or applicable Law. Seller shall retain all liability and responsibility for benefits, administration and compliance with the terms of any and all Employee Benefit Plans and applicable Laws with regard to any and all Employee Benefit Plans.

(e)     Buyer has been provided with the CBAs between the Unions and Seller. Buyer has read and understood its Buyer obligations under those CBAs. Buyer will comply with the terms of such CBAs with regard to offering employment to and hiring employees employed by the Seller on the date the transaction closes. By hiring those Union represented employees who accept offers of employment, which the parties expect will be greater than a majority of represented employees, Buyer recognizes the Unions as the collective bargaining agent for each unit of employees. Buyer has the right to set initial terms and conditions of employment, and to negotiate its own Memorandums of Understanding or CBAs consistent with obligations under the Meyers Milias Brown Act (if it is a District) or the National Labor Relations Act (if it is a private employer) with each Union following Closing.

6.8.    Discovered Contracts. At any time and from time to time on or before earliest to occur of (i) the ninetieth (90th) day after Closing, (ii) dismissal of the Bankruptcy Case, (iii) conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, and (iv) entry of an order confirming a chapter 11 plan in the Bankruptcy Case, Buyer may designate one or more Discovered Contracts as an Assigned Contract upon ten (10) days' notice to Seller. In such event and at Buyer's written request, Seller shall file the appropriate motion with the Bankruptcy Court for the assumption of such Discovered Contract on notice to any counterparty thereto, and Buyer shall reimburse Seller or its successor for any expense associated with such motion.

6.9.    Management of the Hospital. If Buyer is selected as the Successful Bidder, after the time such selection made, Buyer may direct the Seller to reject that certain Management Services Agreement, dated as of January 18, 2021, by and between Watsonville Hospital Corporation and Alta Hospitals System, LLC, on thirty (30) days prior written notice, subject to identification prior to rejection of a replacement interim manager acceptable to Buyer, Seller and MPT to manage the Business through the Closing on terms acceptable to Buyer, Seller and MPT.

### ARTICLE VII
### CONFIDENTIALITY

7.1.    Confidentiality.

(a)     All information not disclosed to the public by Seller regarding the Business and the medical information of any patient currently receiving treatment or having previously

received treatment at the Business that is compiled by, obtained by, or furnished to Buyer or any of its agents or employees in the course of its due diligence review of the Business is acknowledged to be confidential information, trade secrets and the exclusive property of Seller through the Closing Date, and of Buyer thereafter, and all information not disclosed to the public by Buyer regarding Buyer's business or operations is acknowledged to be confidential information, trade secrets and the exclusive property of Buyer (collectively, "**Confidential Information**").

(b)      Each of the parties shall not divulge, directly or indirectly, any Confidential Information of the other party in any manner contrary to the interests of such party, use or cause or suffer to be used any Confidential Information in competition with such party, or use Confidential Information in violation of the patients' confidentiality rights under HIPAA or any applicable state Law.  Each of the parties acknowledges that the breach or threatened breach of the provisions of this **Section 7.1** would cause irreparable injury to the other party that could not be adequately compensated by money damages.  Accordingly, a party may obtain a restraining order and/or injunction prohibiting a breach or threatened breach of the provisions of this **Section 7.1**, in addition to any other legal or equitable remedies that may be available.  If requested by legal process to disclose any Confidential Information of another party, the party in receipt of such request shall promptly give notice thereof to the other party so that such party may, at its own cost and expense, seek an appropriate protective order or, in the alternative, waive compliance to the extent necessary to comply with such request if a protective order is not obtained.  If a protective order or waiver is granted, the party subject to such legal process may disclose the Confidential Information to the extent required by such court order or as may be permitted by such waiver.  Notwithstanding any part of the foregoing, Buyer may disclose Confidential Information for the purpose of complying with government filing requirements and for the purpose of issuing a press release about the transaction following the Closing Date.

(c)      Seller shall provide employee contact information to Buyer for the purpose of soliciting job applications and making employee offers. Seller shall not release personnel files, medical history or disciplinary history. From and after the Closing, Buyer shall onboard newly hired employees with its own onboarding materials, and follow all required immigration laws without reliance on existing I-9's.

(d)      The term "*Confidential Information*" does not include information that (i) is at the time of disclosure or later becomes generally known to the public or within the industry or segment of the industry to which such information relates without violation by a party of any of its obligations hereunder and not through any action by any of its directors, managers, officers, employees or agents which, if committed by such party, would have constituted a violation by it of any of its obligations hereunder; (ii) at the time of disclosure to the other party was already known by such other party; or (iii) after the time of the disclosure to the other party, is received by such party from a third party which, to such party's best knowledge, is under no confidentiality obligation with respect thereto.

DOCS_SF:106516.11 92381/001

**ARTICLE VIII**
**CONDITIONS PRECEDENT TO BUYER'S**
**PERFORMANCE AND TO SELLER'S PERFORMANCE**

8.1.    <u>Conditions to Buyer's Obligations</u>.  The obligations of Buyer under this Agreement are subject to the satisfaction of the following conditions on or prior to the Closing Date, all or any of which may be waived in writing by Buyer:

(a)    All representations and warranties made by Seller in this Agreement and the Schedules attached to and incorporated into the Agreement shall be true and correct as of the Effective Date and as of the Closing Date as though made on such dates, except for any failures of such representations or warranties to be so true and correct that, taken together, do not result in or constitute (and are not reasonably likely to result in or constitute) a Seller Material Adverse Effect.

(b)    Seller shall have performed, satisfied and complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by them on or prior to the Closing Date.

(c)    On or before January 10, 2022, Seller shall have obtained from the Bankruptcy Court a final order approving the DIP Financing Motion and approving the DIP Loan Documents to fund Seller's operations through the earlier of (i) March 31, 2022, and (ii) the Closing, in each case, on the terms and subject to the conditions set forth in the DIP Loan Documents.

(d)    Seller shall have executed and delivered to Buyer the Assignment and Assumption and Bill of Sale in the form attached hereto as **Exhibit A**.

(e)    Seller shall have delivered to Buyer all other documents required to be delivered by them hereunder, and all such documents shall have been properly executed by each of them, if applicable.

(f)    Buyer shall have received all Third-Party Consents, listed on <u>Schedule 4.3(b)</u>, Governmental Approvals listed on <u>Schedule 4.3(a)</u>, and Regulatory Agreements in form and substance satisfactory to Buyer, effective as of the Closing Date.

(g)    Each of the Legislative and Funding Milestones shall have been timely satisfied.

(h)    Buyer shall have received a copy of an amendment to the MPT Lease in substantially the form set forth on **Exhibit B** hereto (the "**MPT Lease Amendment**") executed by MPT.

(i)    The Bankruptcy Court shall have entered an order authorizing the assumption and assignment of the MPT Lease as modified by the MPT Lease Amendment.

(j)    All Schedules and Exhibits attached to this Agreement are delivered to Buyer by Seller pursuant to this Agreement.

(k)    All of the Assigned Contracts and Assigned Personal Property Leases to the maximum extent permitted by applicable law, shall have been validly assumed and assigned under section 365 of the Bankruptcy Code to the District or Buyer's designee pursuant to the Sale Order or subsequent order of the Bankruptcy Court.

(l)    The Bankruptcy Court shall have entered the Bidding Procedures Order in accordance with **Article X** below.

(m)    The Bankruptcy Court shall have entered an order authorizing the sale of the Acquired Assets to Buyer free and clear of all Encumbrances (the "**Sale Order**") in accordance with **Article X** below substantially in the form attached hereto as **Exhibit C** or otherwise in form and substance satisfactory to Buyer and the Sale Order shall not have been stayed.

(n)    No event shall have occurred, that, individually or in the aggregate, could be reasonably expected to be a Seller Material Adverse Event.

8.2.    <u>Conditions to Seller's Obligations</u>.  The obligations of Seller under this Agreement are subject to the satisfaction of the following conditions, on or prior to the Closing Date, all or any of which may be waived in writing by Seller, with MPT's prior written consent:

(a)    All representations and warranties made by Buyer in this Agreement and in any written statements delivered to Seller under this Agreement shall be true and correct in all material respects as of the Effective Date and as of the Closing Date as though made on such date.

(b)    Each of the Legislative and Funding Milestones shall have been timely satisfied.

(c)    Buyer shall have performed, satisfied and complied in all material respects with all obligations and covenants of Buyer required by this Agreement to be performed or complied with by it on or prior to the Closing Date, specifically including Buyer's obligations to fund the Extended Budget.

(d)    Buyer shall have delivered to Seller all documents required to be delivered by Buyer hereunder, and all such documents shall have been properly executed by Buyer, if applicable.

(e)    Buyer shall have executed and delivered to Seller the Assignment and Assumption and Bill of Sale in the form attached hereto as **Exhibit A**.

(f)    The Bankruptcy Court shall have entered an order authorizing the assumption and assignment of the MPT Lease as modified by the MPT Lease Amendment in the form attached hereto as **Exhibit B**.

(g)    The Bankruptcy Court shall have entered the Bidding Procedures Order in accordance with **Article X** below.

DOCS_SF:106516.11 92381/001

(h)     The Bankruptcy Court shall have entered the Sale Order in accordance with **Article X** below substantially in the form attached hereto as **Exhibit C** or otherwise in form and substance satisfactory to MPT and the Sale Order shall not have been stayed.

8.3.     <u>No Injunction or Action</u>.  The obligations of both Buyer and Seller under this Agreement are conditioned upon there being, as of the Closing Date, no preliminary or permanent injunction or other order, decree or ruling issued by a court of competent jurisdiction or by a governmental agency concerning this Agreement that would make illegal or otherwise prevent consummation of this Agreement in accordance with its terms, and no proceeding or action brought by any governmental authority seeking the foregoing shall be pending.

## ARTICLE IX
## MISCELLANEOUS

9.1.     <u>Termination</u>.  This Agreement may be terminated and the transaction contemplated hereby may be abandoned at any time prior to the Closing Date as follows:

(a)     By mutual written consent of Buyer and Seller;

(b)     By Seller, upon or after the entry of a Sale Order approving a transaction with another party that has submitted a Competing Bid that has been accepted by Seller in accordance with **Section 10.1** hereof;

(c)     By either Buyer or Seller, if Closing has not occurred on or before August 31, 2022; *provided that* the right to terminate this Agreement under this **Section 9.1(c)** shall not entitle Buyer to a refund of the Deposit and will not be available to the party whose failure to fulfill any obligation under this Agreement has been the cause of, or resulted in, the failure of Closing to occur on or before such date;

(d)     By either Buyer or Seller, solely to the extent that such party has not breached this Agreement by causing the following to occur, if any order or other legal restraint or prohibition preventing the consummation of the transaction contemplated by this Agreement has been issued by any governmental authority or any Law has been enacted or adopted that enjoins, prohibits or makes illegal consummation of the transaction, *provided that* the failure of Buyer to have received all Third-Party Consents, Governmental Approvals, and Regulatory Agreements required under **Section 8.1(f)** shall not entitle Buyer to a refund of the Deposit;

(e)     By Buyer, upon a breach of, or failure to perform in any material respect (which breach or failure cannot be or has not been cured within thirty (30) days after the giving of notice of such breach or failure), any representation, warranty, covenant or agreement on the part of Seller set forth in this Agreement;

(f)     By Seller or Buyer, if any of the Legislative and Funding Milestones shall fail to be timely satisfied, *provided that* the failure of Buyer to satisfy the Legislative and Funding Milestones required under **Section 8.1(g)** shall not entitle Buyer to a refund of the Deposit; and

(g)     By Seller, (i) upon a breach of, or failure to perform in any material respect (which breach or failure cannot be or has not been cured within thirty (30) days after the giving of

- 24 -

notice of such breach or failure), any representation, warranty, covenant or agreement on the part of Buyer set forth in this Agreement; provided that Buyer shall only have two (2) business days to cure any failure to timely fund the Extended Budget or (ii) if all of the conditions to closing set forth in **Article VIII** above are fully satisfied (other than the conditions that by their nature are to be satisfied at the Closing) or waived and Buyer fails to consummate the Closing within two (2) business days following the date such conditions have been so satisfied or waived;

        (h)     By Buyer, if Buyer is not the Successful Bidder at any Auction due to a successful overbid or underbid by another party and such Competing Bid closes; or

        (i)     By either Buyer or Seller, if Buyer is not designated as a Qualified Bidder under the Bidding Procedures.

    9.2.   <u>Notice of Termination; Effect of Termination</u>.  If this Agreement is terminated by either Buyer or Seller pursuant to **Section 9.1(c)** or **Section 9.1(d)** above, the terminating party will give prompt written notice thereof to the non-terminating party.  Except as set forth in **Section 9.3** below and in respect to the Deposit, in the event of a termination pursuant to **Section 9.1**, this Agreement will be of no further effect, there will be no liability under this Agreement on the part of either Buyer or Seller and all rights and obligations of each party hereto will cease.

    9.3.   <u>Expense Reimbursement</u>.  Subject to the terms of the Bidding Procedures Order, if this Agreement is terminated pursuant to **Section  9.1(b)** or **Section 9.1(h)** above and a sale is closed with the Successful Bidder, then Seller shall pay to Buyer all documented fees and expenses actually and reasonably incurred by Buyer, its attorneys, accountants, other professionals and representatives in negotiating and documenting this Agreement and any related documents, and in preserving and protecting Buyer's rights and interests as Buyer in the Bankruptcy Case up to $500,000 in the aggregate payable from the proceeds from the closing of an acquisition by an alternative buyer (the "**Expense Reimbursement**").  The Expense Reimbursement shall constitute an administrative expense claim pursuant to section 503(b) of the Bankruptcy Code.

    9.4.   <u>Survival of Representations and Warranties; Survival of Post-Closing Covenants</u>. The parties hereto agree that the representations and warranties contained in this Agreement shall expire automatically and immediately upon the closing or earlier termination of this Agreement, and shall have no further force and effect after such time. The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive in accordance with the terms of the particular covenant or until fully performed.

    9.5.   <u>Expenses</u>.  Except as otherwise specified herein, each of the parties hereto shall pay its own fees, costs and expenses incurred in connection with the negotiation, preparation, execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

    9.6.   <u>Entire Agreement; Amendment</u>.  The Acquisition Agreements, together with their Schedules and Exhibits and all ancillary agreements and exhibits and schedules thereto to be delivered at Closing, contain the entire understanding of the parties with respect to the subject matter hereof and supersede all prior agreements, either oral or written.  This Agreement may not be amended, or any term or condition waived, unless signed by the party to be charged or making the waiver and MPT.  Each party to this Agreement acknowledges that no representations,

DOCS_SF:106516.11 92381/001

inducements, promises, or agreements, orally or otherwise, have been made by any other party, or by anyone acting on behalf of any other party, that are not embodied herein, and that no other agreement, statement or promise not contained in this Agreement will be valid or binding.

9.7.    Assignment.  No party hereto shall assign or otherwise transfer this Agreement or any of its rights hereunder, or delegate any of its obligations hereunder without the prior written consent of the other party and MPT; *provided that* Buyer will be permitted, without the consent of (but on notice to) each of Seller and MPT, to assign or otherwise transfer this Agreement or any of its rights hereunder to the District or any affiliate of Buyer with the demonstrated financial wherewithal to close the transactions contemplated hereby satisfactory to each of Seller and MPT; provided, further, that no such assignment or other transfer by Buyer will relieve Buyer of any of its obligations hereunder.  Subject to the foregoing, this Agreement and the rights and obligations set forth herein will inure to the benefit of, and be binding upon the parties hereto, and each of their respective successors, heirs and assigns, without novation.

9.8.    Counterparts.  This Agreement may be executed in counterparts, any one of which need not contain the signatures of all parties, but all of which counterparts when taken together will constitute one and the same agreement.  This Agreement and any signed agreement entered into in connection herewith or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or by .pdf, .tif, .gif, .jpeg or similar attachment to electronic mail, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. At the request of any party hereto or to any such contract, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such contract shall raise the use of a facsimile machine or by .pdf, .tif, .gif, .jpeg or similar attachment to electronic mail to deliver a signature or the fact that any signature or contract was transmitted or communicated through the use of facsimile machine or by .pdf, .tif, .gif, .jpeg or similar attachment to electronic mail as a defense to the formation of a contract and each such party forever waives any such defense.

9.9.    Law Governing Agreement; Bankruptcy Court Jurisdiction.  This Agreement shall be construed and interpreted according to the internal laws of California without regard to any conflicts of law provisions.  The parties agree that the Bankruptcy Court shall retain jurisdiction to enforce the provisions of this Agreement, the Bidding Procedures Order, and the Sale Order. With respect to the above jurisdiction, the parties expressly and irrevocably (a) consent and submit to the personal jurisdiction of such court in any such action or proceeding, (b) waive any claim or defense in any such action or proceeding based on any alleged lack of personal jurisdiction, improper venue, or *forum non conveniens* or any similar basis, and (c) waive all rights, if any, to trial by jury with respect to any such action or proceeding.

9.10.    Schedules and Exhibits.  The Schedules and Exhibits attached hereto are an integral part of this Agreement.  All Exhibits and Schedules attached to this Agreement are incorporated herein by this reference and all references herein to this "Agreement" mean this Asset Purchase Agreement together with all such Exhibits and Schedules, and all ancillary agreements and exhibits and schedules thereto to be delivered at Closing.

- 26 -

DOCS_SF:106516.11 92381/001

9.11. <u>Severability</u>. Any provision hereof that is held to be prohibited or unenforceable in any jurisdiction will, as to such jurisdiction, be adjusted rather than avoided, if possible, to achieve the intent of the parties to this Agreement to the extent possible without in any manner invalidating the remaining provisions hereof.

9.12. <u>Notices</u>. All notices or other communications required or permitted hereunder must be in writing and will be deemed properly given three (3) business days after being sent by registered or certified mail, postage prepaid, to the parties at the address listed below:

If to Seller:                  Halsen Healthcare, LLC and its subsidiaries
c/o Force 10
5271 California Ave, Suite 270
Irvine, California 92617
Attn: Jeremy Rosenthal

-with a copy (which shall not constitute notice) to-

Pachulski Stang Ziehl & Jones LLP
One Market Plaza, Spear Tower
40th Floor
San Francisco, CA 94105-102
Attn: Debra Grassgreen

If to Buyer:                Pajaro Valley Healthcare District Project
Attn: Dorie Rose Inda, Treasurer, CFO
Pajaro Valley Healthcare District Project
23 East Beach Street, No. 214
Watsonville, CA 95076

-with a copy (which shall not constitute notice) to-

Cecilia Montalvo
P.O. Box 1296
Cambria, CA 93428]

And

Pillsbury Winthrop Shaw Pittman LLP
725 South Figueroa Street, 36th Floor
Los Angeles, California 90017-5524
Attn: Gerry Hinkley

And

Pillsbury Winthrop Shaw Pittman LLP
Four Embarcadero Center, 22nd Floor
San Francisco, California 94111-5998

- 27 -

DOCS_SF:106516.11 92381/001

Attn: Jonathan Doolittle

9.13. <u>Representation by Counsel</u>. Each party hereto acknowledges that it has been advised by legal and any other counsel retained by such party in its sole discretion. Each party acknowledges that such party has had a full opportunity to review this Agreement and all related Exhibits, Schedules and ancillary agreements and to negotiate any and all such documents in its sole discretion, without any undue influence by any other party hereto or any third party.

9.14. <u>Construction</u>. The parties have participated jointly in the negotiations and drafting of this Agreement and if any ambiguity or question of intent or interpretation arises, no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

9.15. <u>Certain References</u>. As used in this Agreement, and unless the context requires otherwise: references to "*include*" or "*including*" mean including without limitation and are intended to be illustrative and not restrictive of the word or phrase to which they refer; references to "*partners*" mean general and limited partners of partnerships and members of limited liability companies; references to "*partnerships*" mean general and limited partnerships, joint ventures and limited liability companies; references to any document are references to that document as amended, consolidated, supplemented, novated or replaced by the parties thereto; references to laws generally or to any law specifically are references to that law as amended, supplemented or replaced, and all rules and regulations promulgated thereunder; the gender of all words includes the masculine, feminine and neuter, and the number of all words includes the singular and plural; references to articles or sections are references to articles or sections of this Agreement, unless otherwise expressly stated; and the table of contents, the division of this Agreement into articles and sections, and the use of captions and headings in connection therewith are solely for convenience and have no legal effect in construing this Agreement.

9.16. <u>Waivers</u>. No waiver by any party, whether express or implied, of its rights under any provision of this Agreement will constitute a waiver of the party's rights under such provisions at any other time or a waiver of the party's rights under any other provision of this Agreement. No failure by any party to take any action against any breach of this Agreement or default by another party will constitute a waiver of the former party's right to enforce any provision of this Agreement or to take action against such breach or default or any subsequent breach or default by the other party. To be effective any waiver must be in writing and signed by the waiving party.

9.17. <u>Bulk Sales Laws</u>. Buyer waives compliance by Seller and Seller waives compliance by Buyer, with the provisions of the "bulk sales", "bulk transfer" or similar laws of any state other than any Laws which would exempt any of the transactions contemplated by this Agreement from any Tax liability which would be imposed but for such compliance.<u>Third Parties</u>. Nothing herein, expressed or implied, is intended to or shall confer on any person other than the parties hereto any rights, remedies, obligations or liabilities under or by reason of this Agreement, except that MPT shall be a third-party beneficiary of this Agreement without any liability or obligations hereunder.

9.19. <u>Specific Performance</u>. The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that

- 28 -

Buyer, Seller and MPT, as applicable, shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

## ARTICLE X
## BANKRUPTCY MATTERS AND CONDUCT OF AUCTION

10.1.   <u>Seller's Motions in Bankruptcy Court</u>.

(a)     Seller has selected Buyer to serve, and Buyer has consented to its selection and service, as a "Stalking Horse Bidder," whereby this Agreement shall serve as a base by which other offers for a potential transaction may be measured and is subject to qualified competing offers (each a "**Competing Bid**") by way of the auction process (the "**Auction**") contemplated by and more fully set forth in the Bidding Procedures Order, which may include underbids. Buyer acknowledges that Seller filed and served a motion (the "**Bidding Procedures Motion**") requesting that the Bankruptcy Court enter an order approving the procedures proposed in the Bidding Procedures Motion (the "**Bidding Procedures**"), in form and substance satisfactory to Buyer and MPT, including the form and manner of notice of the sale and assumption and assignment of executory contracts and unexpired leases, and that Seller is required to secure an order approving the proposed Bidding Procedures and the form and manner of notice of the sale and assignment and assumption of executory contracts and unexpired leases no later than January 14, 2022 (the "**Bidding Procedures Order**").

(b)     In the Bidding Procedures Motion, Seller seeks (i) approval from the Bankruptcy Court of the Bidding Procedures and the Specified Deadlines (as defined in the DIP Financing Motion) to achieve the Chapter 11 milestones and complete the proposed sale process, (ii) the date of the subsequent hearing to consider the Sale Motion (the "**Sale Hearing**"), (iii) approval of the Expense Reimbursement, and (iv) entry of the Sale Order no later than February 25, 2022, as such deadline may be modified with the prior written consent of Buyer and MPT.

(c)     Seller will file and serve a motion seeking entry of the Sale Order (the "**Sale Motion**") and the Sale Hearing shall be held in accordance with the Specified Deadlines. Seller will seek entry of a Sale Order that authorizes the parties to close soon as practicable after entry of the Sale Order, but in no event later than August 31, 2022.  The Sale Motion will request that the sale of the Acquired Assets be free and clear of all Encumbrances to the fullest extent permitted under section 363(f) of the Bankruptcy Code.

(d)     Seller agrees not to withdraw, amend, or otherwise unwind the Bidding Procedures Motion, the Bidding Procedures, or the Sale Motion without the consent of Buyer.

(e)     Seller will provide Buyer with a reasonable opportunity to review and comment upon the Bidding Procedures Order, the Bidding Procedures, the Sale Order and any other pleading pertaining in any way to the transaction contemplated by this Agreement prepared by Seller (including forms of orders and notices to interested parties) prior to the filing thereof with the Bankruptcy Court, each of which shall be in a final form acceptable to Buyer in its reasonable discretion.

(f)     <u>Acceptance of Competing Bid</u>.  If the highest or best offer is submitted at the Auction by a party other than Buyer who presents an acceptable Competing Bid (the

- 29 -

"**Successful Bidder**"), then Seller shall be entitled to terminate this Agreement and close a sale pursuant to such other offer (or, if such other offer does not close, then pursuant to the next highest or best offer) or, alternatively, Seller may elect not to terminate this Agreement and Buyer shall remain bound to this Agreement as a Backup Bidder consistent with the terms of the Bidding Procedures. For the avoidance of doubt, with the consent of MPT, Seller shall be permitted to select a Backup Bidder with a lower bid than Buyer as the Successful Bidder.

10.2. <u>Defense of Orders</u>. If, following the Closing, the Bidding Procedures Order, the Sale Order, or any other order of the Bankruptcy Court relating to this Agreement shall be appealed (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), Seller, at Seller's expense (to the extent only of its financial resources available therefor), shall take all commercially reasonable steps as may be appropriate to defend against such appeal, petition or motion, and Buyer agrees to cooperate in such efforts, and each party hereto shall endeavor to obtain an expedited resolution of such appeal.

*[Signature Pages Follow]*

- 30 -

**IN WITNESS WHEREOF**, the parties hereto have executed, or caused this Agreement to be executed by their duly authorized representatives, as of the date first written above.

<u>**BUYER:**</u>

PAJARO VALLEY HEALTHCARE DISTRICT PROJECT

By: _____

Name:  Mimi Hall

Title:  Chair, Board of Directors

*[Signature Page to Asset Purchase Agreement]*

DOCS_SF:106516.11 92381/001

**SELLER:**

HALSEN HEALTHCARE, LLC, WATSONVILLE
COMMUNITY HOSPITAL HOLDINGS, INC.,
WATSONVILLE HEALTHCARE
MANAGEMENT, LLC, AND WATSONVILLE
HOSPITAL CORPORATION

By: _____
Name:    Jeremy Rosenthal
Title:    Chief Restructuring Officer

# TABLE OF EXHIBITS AND SCHEDULES

## [To Be Attached]

Exhibit A – Form of Assignment and Assumption and Bill of Sale
Exhibit B – Form of MPT Lease Amendment
Exhibit C – Form of Sale Order

Annex I – Table of Definitions

Schedule 1.0          - Business Site Locations Being Transferred to Buyer
Schedule 1.1          - Acquired Assets
Schedule 1.2          - Excluded Assets
Schedule 1.3          - Cure Costs
Schedule 4.1          - Corporate Governance
Schedule 4.3(a)       - Governmental Approvals
Schedule 4.3(b)       - Third Party Consents
Schedule 4.5          - Seller Licenses
Schedule 4.6          - Assets Not Presently Owned but to be Conveyed at Closing
Schedule 4.7          - Assigned Personal Property Leases
Schedule 4.8          - Absence of Certain Events
Schedule 4.9          - Legal Proceedings
Schedule 4.10         - Payment Programs
Schedule 4.11         - Compliance with Laws
Schedule 4.12(b)      - Collective Bargaining Agreements
Schedule 4.13         - Benefit Plans
Schedule 4.15         - Tax Returns
Schedule 4.16         - Assigned Contracts
Schedule 4.17(a)      - Leased Real Property
Schedule 4.17(b)      - Notices Regarding Leased Real Property
Schedule 4.18         - Financing Statements
Schedule 4.19         - Insurance
Schedule 4.20         - Intellectual Property
Schedule 6.7(a)       - Employment Matters
Schedule 6.7(b)       - Assumed Employee Amounts

**EXHIBIT A**

**ASSIGNMENT AND ASSUMPTION
AND BILL OF SALE**

This Assignment and Assumption and Bill of Sale (the "**Agreement**") is and entered into and made as of the [●] day of [●], 2022 (the "**Effective Date**"), by and among **Halsen Healthcare, LLC, Watsonville Hospital Holdings, Inc. Watsonville Healthcare Management, LLC, and Watsonville Hospital Corporation** (the foregoing are herein jointly and severally referred to as "**Seller**"), and **Pajaro Valley Healthcare District Project** ("**Buyer**").

**R E C I T A L S**

**WHEREAS,** Seller and Buyer are parties to an Asset Purchase Agreement dated as of December 27, 2021 (the "**Purchase Agreement**"), whereby (i) Seller has agreed to sell, convey, transfer, assign and deliver to Buyer the Acquired Assets (as defined in the Purchase Agreement) and (ii) Seller has agreed to assign and Buyer has agreed to assume, the Assumed Liabilities (as defined in the Purchase Agreement); and

**WHEREAS**, all capitalized terms not defined herein will have the meanings ascribed to such terms in the Purchase Agreement.

**NOW, THEREFORE,** pursuant to the Purchase Agreement, and in consideration of the mutual promises, covenants and agreements therein and hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  Bill of Sale.

    (a)      Except for Excluded Assets (as defined in the Purchase Agreement) and subject to the Sale Order, Seller hereby sells, conveys, transfers, assigns and delivers to Buyer, its successors and assigns, free and clear of any pledge, lien, option, security interest, mortgage or other Encumbrance, and Buyer does hereby acquire from Seller, all right, title and interest in, to and under the Acquired Assets.  The Acquired Assets will include all rights, privileges, hereditaments and appurtenances belonging, incident or appertaining to the Acquired Assets.

    (b)      Notwithstanding anything contained herein, Buyer is not purchasing from Seller any Excluded Assets.

    (c)      It is understood by both Seller and Buyer that, contemporaneously with the execution and delivery of this Agreement, Seller may be executing and delivering to Buyer certain further assignments and other instruments of transfer, including wire transfers of cash, as applicable, that in particular cover certain of the property and assets described herein or in the Purchase Agreement, the purpose of which is to supplement, facilitate and otherwise implement the transfer intended hereby.

    (d)      Seller does hereby irrevocably constitute and appoint Buyer, its successors and assigns, its true and lawful attorney, with full power of substitution, in its name or otherwise,

and on behalf of Seller, or for its own use, to claim, demand, collect and receive at any time and from time to time any and all Acquired Assets, properties, claims, accounts and other rights, tangible or intangible, hereby sold, transferred, conveyed, assigned and delivered, or intended so to be, and to prosecute the same at law or in equity and, upon discharge thereof, to complete, execute and deliver any and all necessary instruments of satisfaction and release.

2.　　Assignment and Assumption of Assumed Liabilities.

(a)　　Seller hereby assigns to Buyer, its successors and assigns, and Buyer hereby assumes, in accordance with the terms and conditions of the Purchase Agreement, the Assumed Liabilities.  Notwithstanding anything in this Agreement to the contrary, except as specifically set forth in the Purchase Agreement, Buyer will not assume nor be deemed to have assumed any debt, claim, obligation or other liability of Seller or any Affiliate of Seller, whether known or unknown, accrued or unaccrued, fixed or contingent, natural or unnatural, whether arising out of occurrences, events or actions prior to, at or after the Closing Date.

(b)　　If Seller and/or Buyer determines after execution of this Agreement that one or more contracts or agreements between Seller and any third party necessary to operate the Acquired Assets was not designated as an Assigned Contract or an Assigned Personal Property Lease (each an "**Omitted Agreement**"), and the parties consent in writing to the assignment and assumption of such Omitted Agreement, which consent shall not be unreasonably withheld, then, subject to an appropriate order of the Bankruptcy Court, such Omitted Agreement will be deemed assigned by Seller to Buyer as of 12:01 a.m. on the Closing Date and such Omitted Agreement shall be deemed an Assigned Contract or Assigned Personal Property Lease, as applicable.

(c)　　Seller hereby authorizes and directs all obligors under any Assigned Contracts and Assigned Personal Property Leases included in the Assumed Liabilities, to deliver any warrants, checks, drafts or payments to be issued or paid to Seller pursuant to the Assigned Contracts or the Assigned Personal Property Leases to Buyer; and Seller further authorizes Buyer to receive such warrants, checks, drafts or payments from such obligors and to endorse Seller's name on them and to collect all funds due or to become due under the Assigned Contracts and the Assigned Personal Property Leases.

(d)　　Any payment that may be received by Seller to which Buyer is entitled by reason of this Agreement or the Purchase Agreement will be received by Seller as trustee for Buyer, and will be immediately delivered to Buyer without commingling with any other funds of Seller.

(e)　　Notice of the assignment under this Agreement may be given at the option of either party to all parties to the Assigned Contracts and the Assigned Personal Property Leases (other than Seller) or to such parties' duly authorized agents.

(f)　　The assumption by Buyer of any Assumed Liabilities will not enlarge the rights of any third party with respect to any Assumed Liabilities, nor will it prevent Buyer, with respect to any party other than Seller, from contesting or disputing any Assumed Liability.

(g)　　Seller hereby appoints Buyer, its successors and assigns, as the true and lawful attorney-in-fact of Seller, with full power of substitution, having full right and authority, in

the name of Seller, to collect or enforce for the account of Buyer, liabilities and obligations of third parties under the Assumed Liabilities; to institute and prosecute all proceedings they may deem proper to enforce any claim to obligations owed under the Assumed Liabilities, to defend and compromise any and all actions, suits or proceedings in respect of the Assumed Liabilities, and to do all such acts in relation to the Assumed Liabilities that Buyer may deem advisable. The above-stated powers are coupled with an interest and will be irrevocable by Seller.

3. <u>Consummation of Purchase Agreement</u>. This Agreement is intended to evidence the consummation of the assignment by Seller and assumption by Buyer of the Assumed Liabilities and the sale by Seller and the purchase by Buyer of the Acquired Assets contemplated by the Purchase Agreement. Except as set forth herein, Buyer and Seller by their execution of this Agreement each hereby acknowledges that neither the representations and warranties nor the rights and remedies of any party under the Purchase Agreement will be deemed to be enlarged, modified or altered in any way by this Agreement. Any inconsistencies or ambiguities between this Agreement and the Purchase Agreement will be resolved in favor of the Purchase Agreement.

4. <u>Binding Effect</u>. This Agreement will be binding upon and inure to the benefit of the parties and their respective successors and assigns.

5. <u>Further Assurances</u>. After the Closing Date, each party will from time to time, at the other party's request and without further cost to the party receiving the request, execute and deliver to the requesting party such other instruments and take such other action as the requesting party may reasonably request so as to enable it to exercise and enforce its rights under and fully enjoy the benefits and privileges with respect to this Agreement and to carry out the provisions and purposes hereof.

6. <u>Governing Law</u>. This Agreement is governed by and construed in accordance with the laws of the California applicable to agreements made and to be performed in that State without giving effect to conflicts of law principles.

7. <u>Counterparts</u>. This Agreement may be signed in any number of counterparts and all such counterparts will be read together and construed as one and the same document. Facsimile copies of signatures will be deemed originals for all purposes hereof and that a party may produce such copies, without the need to produce original signatures, to prove the existence of this Agreement in any proceeding brought hereunder. This Agreement, and any executed counterpart of a signature page to this Agreement, may be transmitted by fax or e-mail, and delivery of an executed counterpart of a signature page to this Agreement by fax or e-mail will be effective as delivery of a manually executed counterpart of this Agreement.

**IN WITNESS WHEREOF**, the parties hereto have executed, or caused this Agreement to be executed by their duly authorized representatives, as of the date first written above.

<u>**BUYER**</u>:

PAJARO VALLEY HEALTHCARE DISTRICT PROJECT

By: _____
Name:   Mimi Hall
Title:    Chair, Board of Directors

*[Signature Page to Assignment and Assumption and Bill of Sale]*

**SELLER:**

HALSEN HEALTHCARE, LLC, WATSONVILLE
COMMUNITY HOSPITAL HOLDINGS, INC.,
WATSONVILLE HEALTHCARE
MANAGEMENT, LLC, AND WATSONVILLE
HOSPITAL CORPORATION

By: _____
Name:   Jeremy Rosenthal
Title:   Chief Restructuring Officer

*[Signature Page to Assignment and Assumption and Bill of Sale]*

**Annex I**

**TABLE OF DEFINITIONS**

"**Acquired Assets**" has the meaning set forth in **Section 1.1** of this Agreement.

"**Acquisition Agreements**" means this Agreement, the Assignment and Assumption and Bill of Sale, and all other agreements executed in connection with this Agreement and in connection with Closing.

"**Affiliates**" means, as to the Person in question, any Person that directly or indirectly controls, is controlled by, or is under common control with, the Person in question and any successors and assigns of such Person; and the term "control" means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person whether through ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the first sentence of this Agreement.

"**Allocation**" has the meaning set forth in the **Section 2.4** of this Agreement.

"**Assigned Contract**" has the meaning set forth in **Section 4.16** of this Agreement.

"**Assigned Personal Property Leases**" has the meaning set forth in **Section 4.7** of this Agreement.

"**Assumed Employee Amounts**" has the meaning set forth in **Section 6.7(b)** of this Agreement.

"**Assumed Liabilities**" has the meaning set forth in **Section 1.3** of this Agreement.

"**Assumed Non-Cash Employee Obligations**" has the meaning set forth in **Section 6.7(b)** of this Agreement.

"**Auction**" has the meaning set forth in **Section 10.1(a)** of this Agreement.

"**Backup Bidder**" shall have the meaning set forth in the Bidding Procedures

"**Bankruptcy Case**" has the meaning set forth in the recitals of this Agreement.

"**Bankruptcy Code**" has the meaning set forth in the recitals of this Agreement.

"**Bankruptcy Court**" has the meaning set forth in the recitals of this Agreement.

"**Bidding Procedures**" has the meaning set forth in **Section 10.1(a)** of this Agreement.

"**Bidding Procedures Motion**" has the meaning set forth in **Section 10.1(a)** of this Agreement.

"**Bidding Procedures Order**" has the meaning set forth in **Section 10.1(a)** of this Agreement.

"**Business**" has the meaning set forth in the first recital to this Agreement.

DOCS_SF:106516.11 92381/001

"**Buyer**" has the meaning set forth in the preamble to this Agreement.

"**CBA**" has the meaning set forth in **Section 6.7(a)** of this Agreement.

"**Claim**" has the meaning given that term in Section 101(5) of the Bankruptcy Code and includes all rights, claims, causes of action, chose in action, Taxes, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and liabilities of any kind or nature under contract, at law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"**Closing**" has the meaning set forth in the first sentence of **Article III** of this Agreement.

"**Closing Date**" has the meaning set forth in **Article III** of this Agreement.

"**CMS**" means the Centers for Medicare and Medicaid Services.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Competing Bid**" has the meaning set forth in **Section 10.1** of this Agreement.

"**Confidential Information**" has the meaning set forth in **Section 7.1(a)** of this Agreement.

"**Contract**" has the meaning set forth in **Section 4.16** of this Agreement.

"**Cure Costs**" has the meaning set forth in **Section 1.3** of this Agreement.

"**Deposit**" has the meaning set forth in **Section 2.2** of this Agreement.

"**DIP Financing Motion**" has the meaning set forth in the recitals to this Agreement.

"**DIP Note**" has the meaning set forth in the recitals of this Agreement.

"**Discovered Contracts**" means any Contract of Seller identified following the Closing that was not previously disclosed to Buyer.

"**District**" has the meaning set forth in the recitals to this Agreement.

"**DOJ**" means the United States Department of Justice.

"**Effective Date**" has the meaning set forth in the preamble to this Agreement.

"**Employee Benefit Plans**" means any "employee benefit plan" as defined in Section 3(3) of ERISA (whether or not subject to ERISA) and all bonus, stock or other security option, stock or other security purchase, stock or other security appreciation rights, incentive, deferred compensation, pension, retirement or supplemental retirement, severance, golden parachute, vacation, cafeteria, dependent care, medical care, employee assistance program, education or tuition assistance programs, insurance and other similar fringe or employee benefit plans, programs or arrangements, and any current or former employment or executive compensation or severance agreements or any other plan or arrangement to provide compensation or benefits to an

2

DOCS_SF:106516.11 92381/001

individual, written or otherwise, that either: (i) has ever been sponsored or maintained, contributed to or entered into for the benefit of, or relating to, Seller or any ERISA Affiliate, and determined without regard to whether such individual is a Seller Employee or a Transferring Employee; or (ii) with respect to which Seller or any ERISA Affiliate has any liability or obligation, whether known or unknown, absolute, accrued, contingent or otherwise.

"**Encumbrance**" means any and all Liens (statutory or otherwise), conditions, equitable interests, security interests, community property interests, mortgages, pledges, options, warrants, purchase rights, easements, encroachments, rights of way, deed restrictions, defects or imperfections of title, covenants, restrictions, charges or claims of any kind, rights of first refusal, rights of set-off, or restrictions of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any entity (whether or not incorporated) that together with Seller is (or has been) a member of (i) a controlled group of corporations within the meaning of Section 414(b) of the Code; (ii) a group of trades or business under common control within the meaning of Section 414(c) of the Code; (iii) an affiliated service group within the meaning of Section 414(n) of the Code; or (iv) any other person or entity treated as an Affiliate of Seller under Section 4l4(o)of the Code.

"**Excluded Assets**" has the meaning set forth in **Section 1.2** of this Agreement.

"**Excluded Cash**" has the meaning set forth in **Section 1.2** of this Agreement.

"**Excluded Liabilities**" has the meaning set forth in **Section 1.4** of this Agreement.

"**Expense Reimbursement**" has the meaning set forth in **Section 9.3** of this Agreement.

"**Extended Budget**" has the meaning set forth in **Section 2.1** of this Agreement.

"**GAAP**" means accounting principles generally accepted in the United States of America, consistently applied.

"**Governmental Approval**" has the meaning set forth in **Section 4.3(a)** of this Agreement.

"**HIPAA**" means the Health Insurance Portability and Accountability Act of 1996, as amended.

"**Intellectual Property**" means all recipes, patents, inventions, show-how, designs, trade secrets, copyrights, trademarks, trade names, service marks, fictitious and assumed business names, Internet domain names, manufacturing processes, software, formulae, trade secrets, technology or the like, and all applications for any of the foregoing.

"**Interest**" has the meaning ascribed to such term under Section 363(f) of the Bankruptcy Code.

"**Interim DIP Order**" has the meaning set forth in the recitals to this Agreement.

DOCS_SF:106516.11 92381/001

"**IRS**" means the United States Internal Revenue Service.

"**Law**" or "**Laws**" means any and all federal, state, and local statutes, codes, licensing requirements, ordinances, laws, rules, regulations, decrees or orders of any foreign, federal, state or local government and any other governmental department or agency, and any judgment, decision, decree or order of any court or governmental agency, department or authority, if applicable to the parties and, in the case of Seller, that are material to the Business.

"**Leased Real Property**" has the meaning set forth in **Section 4.17(a)**.

"**Leases**" has the meaning set forth in **Section 4.17(a)**

"**Legislative and Funding Milestones**" means Buyer shall have obtained (i) legislative authorization for the formation of the District to participate as the buyer in this Agreement and thereafter provide for the operation of the Hospital, and (ii) State of California funding and tax-exempt debt to consummate the Closing.

"**Licenses**" means licenses, permits, consents, approvals, authorizations, registrations, qualifications and certifications of any governmental or administrative agency or authority (whether federal, state or local), including any Medicare, Medicaid, Medi-Cal and other provider numbers, certificates or determinations of need, Clinical Laboratory Improvement Amendments and Drug Enforcement Administration certifications, if applicable.

"**Liens**" means any lien, claim, security interest, mortgage, pledge, restriction, covenant, charge or encumbrance of any kind or character, direct or indirect, whether accrued, absolute, contingent or otherwise, including any lien or claim granted by the Bankruptcy Court pursuant to section 364 of the Bankruptcy Code or otherwise granted by the Bankruptcy Court to a lender to loan funds to Seller after the initiation of the Bankruptcy Case.

"**Medi-Cal**" means the Medicaid programs administered by the California Department of Health Care Services.

"**MPT**" has the meaning set forth in the recitals to this Agreement.

"**MPT Lease**" has the meaning set forth in the recitals to this Agreement.

"**MPT Lease Amendment**" has the meaning set forth in **Section 8.1(h)** of this Agreement.

"**MPT Lessor**" has the meaning set forth in the recitals to this Agreement.

"**MPT Prepetition Lender**" has the meaning set forth in the recitals to this Agreement.

"**Payment Programs**" means Medicare, Medicaid, Tricare, Medi-Cal, Worker's Compensation, Blue Cross/Blue Shield programs, and all other health maintenance organizations, preferred provider organizations, health benefit plans, health insurance plans, and other third-party reimbursement and payment programs.

4

"**Person**" means an individual, a corporation, a limited liability company, a partnership, an association, a trust or any other entity or organization, including a government or political subdivision or any agency or instrumentality thereof.

"**Personal Property Leases**" has the meaning set forth in **Section 4.7** of this Agreement.

"**Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**Premises**" means all real property used by Seller in connection with the Business, as described on Schedule 4.17 to this Agreement.

"**Prepetition Loan Facility**" means that certain Amended and Restated Promissory Note (TRS Acquisition Note) dated as of September 30, 2019, as amended, restated supplemented or otherwise modified from time to time, by and among Watsonville Hospital Corporation and MPT Prepetition Lender with respect to a loan in the original principal amount of $15,000,000, as increased from time to time in accordance with the terms thereof, secured by a continuing lien on Seller's assets and the proceeds thereof.

"**Purchase Price**" has the meaning set forth in **Section 2.1** of this Agreement.

"**Real Property**" means the Leased Real Property.

"**Real Property Leases**" means the real property leases set forth on Schedule 4.17(a) of this Agreement.

"**Regulatory Agreements**" means the approvals and agreements, in form and substance reasonably satisfactory to Buyer, with each of the CMS, Medi-Cal, the DOJ, and the IRS.

"**Sale Hearing**" has the meaning set forth in **Section 10.1(b)** of this Agreement.

"**Sale Motion**" has the meaning set forth in **Section 10.1(c)** of this Agreement.

"**Sale Order**" has the meaning set forth in **Section 8.1(l)** of this Agreement.

"**Seller**" has the meaning set forth in the preamble to this Agreement.

"**Seller Employees**" means the individuals employed by Seller primarily in connection with the operation of the Business immediately prior to the date hereof or the Closing, including in each case all such individuals on leave of absence, vacation, sick leave, short-term disability, military leave, jury duty or bereavement leave.

"**Seller Licenses**" has the meaning set forth in **Section 4.5** of this Agreement.

"**Seller Material Adverse Effect**" means any event, circumstance, change or effect that individually or in the aggregate with all other events, circumstances, changes or effects, is, or could reasonably expected to be, materially adverse to the condition (financial or otherwise), properties, assets, liabilities, businesses, or operations of the Business or the Acquired Assets or to Seller's ability to perform its obligations as contemplated in this Agreement. A Seller Material Adverse

5

DOCS_SF:106516.11 92381/001

Case: 21-51477    Doc# 1387    Filed: 02/04/22    Entered: 02/04/22 12:23:56    Page 806 of 118

Effect shall not include any event that is reasonably foreseeable as a result of the Seller's Bankruptcy Case or the circumstances surrounding the bankruptcy filing or Bankruptcy Case including the impact thereof on the relationship of the Seller with employees, customers, distributors, financing sources, service providers and other business partners. In no event shall any event, circumstance, change or effect ("**Change**") arising out of, relating to or resulting from any of the following, alone or in combination, be construed to constitute or be taken into account in determining whether there has been a Seller Material Adverse Effect: (a) Changes in any Law or GAAP, (b) Changes in the international or national, regional or local financial, credit, banking, commodities or securities markets or general economic, political or social conditions in such locations, including changes in interest or exchange rates, except to the extent of any disproportionate impact on the Seller's business as compared to similarly situated businesses, (c) Changes in financial, banking, or securities markets (including any disruption thereof and any decline in the price of any commodity, security or any market index), (d) Changes generally affecting the industries in which the Seller's business is operated, except to the extent of any disproportionate impact on Seller's business as compared to similarly situated businesses in such industry, (e) acts of war, sabotage, terrorism or escalations of hostilities, force majeure events, natural disasters or acts of God, including the ongoing COVID-19 pandemic or any other pandemic or epidemic; (f) the execution, announcement, pendency, performance or consummation of the transactions contemplated in this Agreement (including the announcement of this Agreement or the identities of the Buyer or its Affiliates and the impact thereof on the relationships of the Seller with employees, customers, distributors, financing sources, service providers and other business partners), (g) any unintentional failure by Seller to meet any internal or published budgets, projections, forecasts or predictions of financial performance for any period with respect to Seller's business (it being understood that the facts and circumstances giving rise or contributing to such failure may be taken into account in determining whether there has been a Seller Material Adverse Effect, unless otherwise excluded by any of clauses (a)–(g), (h) any action taken (or omitted to be taken) as required by this Agreement or at the written request or with the written consent of Buyer, (i) any adverse Change that is cured on or prior to the Closing Date, or (j) (1) the commencement of the chapter 11 cases or events that would typically result from the commencement of such chapter 11 cases, (2) any objections in the Bankruptcy Court to (I) this Agreement or any of the transactions contemplated hereby or thereby, (II) the Bidding Procedures Order or (III) the assumption or rejection of any Assigned Contract or Assigned Person Property Lease, or (3) any order of the Bankruptcy Court or any actions or omissions of the Seller in compliance therewith.

"**Seller Payment Programs**" has the meaning set forth in **Section 4.10(a)** of this Agreement.

"**Seller's Knowledge**" means the actual or constructive knowledge of Jeremy Rosenthal, Chief Restructuring Officer; Steven Salver, Chief Executive Officer; Matko Vjarnes, Chief Operating Officer; and Sumer Sharma, Chief Financial Officer.

"**Successful Bidder**" has the meaning set forth in **Section 10.1(f)** of this Agreement.

"**Tax Returns**" means any and all returns, declarations, reports, claims for refunds and information returns or statements relating to Taxes, required to be filed by Seller for itself and for the Employee Benefit Plans of Seller, including all schedules or attachments thereto and including any amendment thereof.

DOCS_SF:106516.11 92381/001

"**Taxes**" means all taxes of any type or nature whatsoever assessed by any federal, state, local, or other taxing authority, including income, gross receipts, excise, franchise, property, value added, import duties, employment, payroll, sales and use taxes and any additions to tax and any interest or penalties thereon.

"**Third-Party Consent**" has the meaning set forth in **Section 4.3(b)** of this Agreement.

"**Transferring Employee**" has the meaning set forth in **Section 6.7(a)** of this Agreement.

"**Union**" individually and "Unions" collectively, refers to those unions representing certain of Seller's employees, including the California Nurses Association California Technical Employees' Coalition, General Teamsters, Local 853 (formerly Local 912, and SEIU-United Healthcare Workers West.

**\*\*END OF ORDER\*\***

7

DOCS_SF:106516.11 92381/001

1    COURT SERVICE LIST
2    All ECF Parties.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# **Exhibit D**



| Name | Address 1 | Address 2 | City | State | Zip |
|------|-----------|-----------|------|-------|-----|
| Angel Gibson | 420 64th Ave | Apt 201 | St Pete Beach | FL | 33706-2166 |
| Sanchez Roxanne | 2000 Eberlein Ave | | Klamath Falls | OR | 97601 |

In re: Watsonville Hospital Corporation, et al.
Case No. 21-51477 (MEH)

Case: 21-51477    Doc# 277    Filed: 02/04/22    Entered: 02/04/22 17:23:59    Page 111 of 118

Page 1 of 1

# **Exhibit E**



| Name | Address 1 | Address 2 | City | State | Zip |
|------|-----------|-----------|------|-------|-----|
| Pension Assurance, LLP. | 5126 Clareton Dr | Ste 110 | Agoura Hills | CA | 91301-4400 |
| Taurino N. Avelar | 1003 Paradise View St | | Henderson | NV | 89052-3937 |
| Vigilance Risk Solutions | 704 J St | | San Diego | CA | 92101-7111 |

In re: Watsonville Hospital Corporation, et al.
Case No. 21-51477 (MEH)

Case: 21-51477    Doc# 277    Filed: 02/04/22    Entered: 02/04/22 17:23:59    Page 113 of 118

Page 1 of 1

# **Exhibit F**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA (SAN JOSE DIVISION)**

In re:

WATSONVILLE HOSPITAL
CORPORATION, *et al.*,

Debtors.[1]

Case No. 21-51477 (MEH)

Chapter 11

## NOTICE OF DEADLINE FOR FILING PROOFS OF CLAIM

**To Patients of Watsonville Community Hospital:**

As you may be aware, Watsonville Hospital Corporation d/b/a Watsonville Community Hospital and certain of its affiliates (together, the "Debtors") filed for chapter 11 protection on December 5, 2021. You are receiving this notice because the Debtors' records indicate that you received treatment at Watsonville Community Hospital between December 1, 2018 and December 5, 2021.

Receipt of this notice does not mean that you have a claim against the Debtors. However, if you believe that you have a claim against any of the Debtors that arose prior to December 5, 2021, a Proof of Claim Form is included with this notice. All Proofs of Claim must be submitted so as to be actually received on or before **April 4, 2022 at 4:00 p.m. (PT)** at the following address:

**Watsonville Hospital Corporation, et al. Claims Processing Center c/o Stretto,**
**410 Exchange, Suite 100**
**Irvine, CA 92602**

Proofs of claim can also be submitted electronically through Stretto's website at the following web address: https://cases.stretto.com/WatsonvilleHospital/file-a-claim/.

**If you have a claim against the Debtors but fail to file a Proof of Claim before April 4, 2022, you will lose your right to assert such claim against the Debtors and will not receive any distribution with respect to such claim.** Filing a claim does not necessarily entitle you to or guarantee you payment. If you have questions about your specific claim, you should consult with your own lawyer.

**ALL QUESTIONS OR INQUIRIES CONCERNING THIS NOTICE SHOULD BE DIRECTED TO THE DEBTORS' CLAIMS AGENT, STRETTO, AT 855-524-4733 OR TEAMWATSONVILLEHOSPITAL@STRETTO.COM.**

Very Truly Yours,

PACHULSKI STANG ZIEHL & JONES LLP
COUNSEL FOR DEBTORS AND DEBTORS-IN-POSSESSION

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Watsonville Hospital Corporation (4113); Watsonville Healthcare Management, LLC (4168); Watsonville Hospital Holdings, Inc. (1118); and Halsen Healthcare, LLC. The Debtors' business address is 75 Nielson Street, Watsonville, CA 95076.

**TRIBUNAL DE QUIEBRAS DE LOS ESTADOS UNIDOS**
**DISTRITO NORTE DE CALIFORNIA (DIVISIÓN DE SAN JOSÉ)**

| | |
|---|---|
| Asunto:<br><br>WATSONVILLE HOSPITAL<br>CORPORATION, *et al.*,<br><br>Deudores.[1] | Caso n.° 21-51477 (MEH)<br><br>Capítulo 11 |

## <u>AVISO DE FECHA LÍMITE PARA LA PRESENTACIÓN DE PRUEBAS DE RECLAMACIÓN</u>

**A los pacientes de Watsonville Community Hospital:**

Como ustedes saben, Watsonville Hospital Corporation, que opera bajo el nombre Watsonville Community Hospital, y algunos de sus afiliados (en conjunto, los "<u>Deudores</u>") se acogieron a la protección del capítulo 11 de el Código de Quiebra el 5 de diciembre de 2021. Usted ha recibido este aviso porque los registros de los Deudores indican que usted recibió tratamiento u otros servicios médicos en Watsonville Community Hospital durante el periodo comenzando el 1 de diciembre de 2018 hasta el 5 de diciembre de 2021.

La recepción de este aviso no implica que usted tenga una reclamación o demanda en contra de los Deudores. Sin embargo, si usted considera que tiene una reclamación o demanda en contra de cualquiera de los Deudores que haya surgido antes del 5 de diciembre de 2021, se incluye en este aviso un formulario de prueba de reclamación. Todas las pruebas de reclamación deben presentarse de manera que se reciban efectivamente el **4 de abril de 2022 a las 4:00 p. m. (hora del Pacífico)** o antes de esa fecha a la siguiente dirección:

**Watsonville Hospital Corporation, et al. Claims Processing Center c/o Stretto,**
**410 Exchange, Suite 100**
**Irvine, CA 92602**

Las pruebas de reclamación también pueden presentarse electrónicamente a través del sitio web de Stretto en la siguiente dirección web: https://cases.stretto.com/WatsonvilleHospital/file-a-claim/.

**Si usted tiene una reclamación o demanda en contra de los Deudores pero no presenta una prueba de reclamación antes del 4 de abril de 2022, perderá el derecho de alegar dicha reclamación o demanda en contra de los Deudores y no participará en ninguna distribución relacionada con dicha reclamación o demanda.** La presentación de una reclamación no necesariamente le otorga derecho a recibir un pago ni lo garantiza. Si tiene preguntas sobre su reclamación específica, debe consultar a su abogado personal.

**TODAS LAS PREGUNTAS O CONSULTAS RELACIONADAS CON ESTE AVISO DEBEN DIRIGIRSE AL AGENTE DE RECLAMACIONES DE LOS DEUDORES, STRETTO, LLAMANDO AL 855-524-4733 O ESCRIBIENDO A TEAMWATSONVILLEHOSPITAL@STRETTO.COM.**

Atentamente.

PACHULSKI STANG ZIEHL & JONES LLP
ABOGADOS DE LOS DEUDORES Y DEUDORES EN
POSESIÓN

---

[1] Los Deudores en estos casos, mencionados con los últimos cuatro dígitos del número de identificación para el impuesto federal correspondiente a cada uno, son los siguientes: Watsonville Hospital Corporation (4113); Watsonville Healthcare Management, LLC (4168); Watsonville Hospital Holdings, Inc. (1118); y Halsen Healthcare, LLC. La dirección comercial de los Deudores es 75 Nielson Street, Watsonville, CA 95076.

# **Exhibit G**



| Name | Address 1 | Address 2 | City | State | Zip |
|------|-----------|-----------|------|-------|-----|
| GE Hfs, LLC | PO Box 2320 | | Jacksonville | FL | 32203-2320 |
| MCN Healthcare | 501 S Cherry St | Ste 1100 | Denver | CO | 80246-1323 |
| Salem & Green A Prf Corp | 400 Capitol Mall | Fl 11 | Sacramento | CA | 95814-4434 |
| Spectrio LLC | 7624 Bald Cypress Pl | | Tampa | FL | 33614-2417 |

In re: Watsonville Hospital Corporation, et al.
Case No. 21-51477 (MEH)

Case: 21-51477   Doc# 277   Filed: 02/04/22   Entered: 02/04/22 17:23:59   Page 118 of 118

Page 1 of 1